**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AUSTIN SANCTUARY NETWORK,
FREE MIGRATION PROJECT,
GRASSROOTS LEADERSHIP; and
CENTER FOR CONSTITUTIONAL
RIGHTS,

                Plaintiffs,

      v.

                                  Case No. 20-cv-1686

UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES
DEPARTMENT OF TREASURY;
and UNITED STATES DEPARTMENT
OF JUSTICE EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,

                Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq*., seeking declaratory, injunctive, and other appropriate relief to compel the Defendants, the United States Department of Homeland Security Immigration and Customs Enforcement ("ICE"), the United States Department of Treasury ("Treasury"), and the United States Department of Justice Executive Office for Immigration Review ("EOIR") (collectively, "Defendants"), to produce agency records that have been improperly withheld from Plaintiffs, the Austin Sanctuary Network ("ASN"), Center for Constitutional Rights ("CCR"), Free Migration Project ("FMP"), and Grassroots Leadership ("GL") (collectively "Plaintiffs").

    2.    Plaintiffs bring this action to seek documents sought in a September 11, 2019 FOIA request related to a time-sensitive and urgent public policy matter: the recent and

unprecedented imposition of massive civil penalties by the federal government on individuals who have sought refuge from deportation in houses of worship (known as "living in sanctuary") out of fear of removal to countries where they face torture, persecution, and/or separation from their families in the United States. The imposition of these fines comes at a time when the historic "sanctuary movement" is once again bringing together interfaith communities committed to universal human dignity and rights. In keeping with these religious and moral principles, the sanctuary movement offers safe haven to immigrants at risk of deportation.

3.      In the summer of 2019, several asylum-seeking women living in sanctuary received letters stating that ICE was imposing fines of up to $500,000 under the Immigration and Nationality Act §274D. As leaders in the immigrant rights and sanctuary movements, these women engage in ongoing communication with the public and both local and federal government officials about their efforts to remain in the U.S. and the need for changes in immigration policy.

4.      The imposition of such high civil fines on immigrants who live in sanctuary for their own protection, depend on faith-based and immigrant rights communities for food and shelter, and who have spoken out about their plight, is punitive and raises serious First, Fifth, and Eighth Amendment concerns. These large fines will make it impossible for the recipients, even if they were to leave sanctuary, to meet their basic needs and access services critical to their ability to live a free and safe life, such as healthcare, subsistence amenities, and housing.

5.      After several of the women who received these letters responded to ICE and challenged the bases for the fines, ICE withdrew its letters for several of the sanctuary leaders without explanation in October 2019. In response to media inquiries, ICE stated that they had

issued nine fines in June 2019, eight of which they had rescinded.[1] Then in December 2019,

ICE announced that it would reissue these fines to the same group of sanctuary leaders it had

initially targeted. ICE made this announcement through an exclusive story to *The Washington*

*Times*, before the sanctuary leaders ever received the new letters.[2] The new letters commanded

the women to present themselves at ICE offices for check-in appointments later that same

month, listing removal, departure, and similar reasons for the appointment, and threatened them

with civil fines and criminal prosecution.[3]

      6.      Immigration policy, freedom of speech, and sanctuary spaces have been the

subjects of an impassioned national and political debate for decades. Nevertheless,

critical changes to the federal government's immigration policies and practices since January,

2017, have significantly increased public concern and interest in these matters, as demonstrated

by extensive reporting on the sanctuary fines by leading national news organizations.[4] The

---

[1] *ICE withdraws big fines for immigrants taking sanctuary in churches*, NATIONAL BROADCASTING COMPANY, Oct. 24, 2019, https://www.nbcnews.com/news/latino/ice-withdraws-big-fines-immigrants-taking-sanctuary-churches-n1071236.

[2] Steven Dinan, EXCLUSIVE: *ICE revives six-figure fines against illegal immigrants living in sanctuary*, WASHINGTON TIMES, Dec. 7, 2019, https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-fines-agains/.

[3] *See* Press Release, Free Migration Project, Ice Escalates Retaliation Against Communities of Faith (Dec. 11, 2019), https://freemigrationproject.org/ice-threatens-women-living-in-sanctuary-with-renewed-fines-criminal-prosecution/.

[4] *See, e.g.,* Elizabeth Dias, *Ordered Deported, Then Sent a $497,777 Fine From ICE*, N.Y. TIMES, July 4, 2019, https://www.nytimes.com/2019/07/04/us/migrants-deportation-fines.html; Stephanie Ebbs and Anne Flaherty, *ICE Issuing Fines to Immigrants Who Have Taken Sanctuary in Churches*, ABC NEWS, July 2, 2019, https://abcnews.go.com/Politics/ice-issuing-fines-immigrants-sanctuary-churches/story?id=64094018; Saja Hindi, *Colorado Immigrant Seeking Sanctuary Imposed Penalty for not Leaving the United States*, DENVER POST, July 3, 2019, https://www.denverpost.com/2019/07/03/colorado-immigrant-sanctuary-ingrid-encalada-latorre-ice/; Franco Ordoñez, *Trump Administration Hits Some Immigrants In U.S. Illegally With Fines Up To $500,000*, NATIONAL PUBLIC RADIO, July 2, 2019, https://www.npr.org/2019/07/02/738059913/trump-administration-sends-out-notices-of-500-000-fines-for-those-in-u-s-illegal; Christine Bolaños, *Mother and Son In Church Sanctuary For 3-Plus Years Prevail Amid Increasing Fines, Deportation Threats*, LATINO USA, July 31, 2019, https://www.latinousa.org/2019/07/31/motherandson/; Russ Bowen, *Immigrant taking sanctuary at Chapel Hill church among many nationwide facing hefty fines*, CBS 17, Aug. 26, 2019, https://www.cbs17.com/news/local-news/orange-county-news/immigrant-taking-sanctuary-at-chapel-hill-church-among-many-facing-hefty-fines/; Regina Garcia Cano, *Immigrants taking sanctuary in churches hit with huge fines,* THE ASSOCIATED PRESS, July 30, 2019, https://www.apnews.com/e8ff5f53c5ed4c24a2a533d56e910771; Yonat Shimron, *Sanctuary churches say fines against immigrants meant to sow fear*, RELIGION NEWS, July 3, 2019, https://religionnews.com/2019/07/03/sanctuary-churches-say-fines-against-immigrants-meant-to-sow-fear/; Teo

level of national attention on and interest in immigration issues demonstrates an urgent and compelling need for information on the government's immigration policies and practices, including the imposition of these fines.

7.       Large civil penalties of this nature, particularly when they are levied against sanctuary movement and immigrant rights leaders who criticize the government, raise constitutional concerns regarding retaliatory, excessive, and punitive fines. In addition, because the government issued these fines as part of its broader strategy of targeting the women in sanctuary and their families for deportation, the fines implicate the important liberty interests of millions of people in this country who seek to remain here with their families.[5] Information about these policies will allow the public to engage productively in an ongoing, critical, and pressing public dialogue about immigration in the U.S.

8.       Under the FOIA, the public has a statutory right to records relating to Defendants' actions toward immigrant rights leaders. Over five months ago, Plaintiffs submitted a FOIA request to Defendants seeking records related to the federal government's policies and practices of imposing fines and monetary penalties on individuals, particularly those who have taken sanctuary to protect themselves from the threat of deportation. Plaintiffs' request sought expedited processing, outlining the compelling need for the requested records given the threat that these fines and deportation pose to the safety and well-being of the individuals in sanctuary as well as the critical changes to, and increased public attention,

---

Armus, *She took refuge in a Chapel Hill church from ICE. Now, she could be fined $314,000*, CHARLOTTE OBSERVER, July 17, 2019, https://www.charlotteobserver.com/news/state/north-carolina/article232462202.html; .
[5] *See Bridges v. Wixon*, 326 U.S. 135, 147 (1945) ("[D]eportation may result in the loss of all that makes life worth living" (internal quotation marks omitted)); Ng Fung Ho v. White, 259 U.S. 276, 284 (1922) ("[Deportation] may result also in loss of both property and life; or of all that makes life worth living."); *see also Zadvydas v. Davis*, 533 U.S. 678, 693-694, 721 (2001); *St. John v. McElroy*, 917 F. Supp. 243, 250 (S.D.N.Y. 1996) (noting that in deportation proceedings an important liberty interest is at stake).

including by the media, to U.S. immigration policies and practices. Those sanctuary leaders still live under the threat of civil fines today. Yet to date, Defendant Treasury has provided only 20 pages, and Defendants ICE and EOIR have failed to produce any records sought in Plaintiff's request.

9.      To vindicate the public's right to information about immigration policies and imposition of penalties, Plaintiffs bring this action to compel Defendants to immediately process Plaintiffs' Request and release records that have been unlawfully withheld.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(2).

11.      Venue is proper under 5 U.S.C. § 552(a)(4)(B), 28 U.S.C. §§1391(e) and 1402(a) because Plaintiff CCR resides in this district.

12.      Because the Defendants have failed to comply with the time limits imposed by FOIA, including with regard to administrative appeals, Plaintiffs have exhausted their administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i). Plaintiffs are therefore entitled to appeal directly to this Court for relief. 5 U.S.C. § 552(a)(4)(B).

## PARTIES

14.      Plaintiff ASN is a coalition of faith communities, immigrants and other community members of civil society and organizations in and around Austin, Texas, that support immigrants fleeing violence or in danger of deportation. Among other activities, ASN educates the faith community and the community as a whole about the refugee crisis and mass

5

migration, partnering with other educators and multi-faith groups who approach the crisis from an ethical and theological perspective. ASN operates in Austin, Texas.

15.     Plaintiff FMP represents immigrant clients in their legal proceedings, provides legal support and training to organizers and advocates, engages in public education and outreach, litigates in the public interest, and advocates for fair and open immigration laws. FMP represents clients in public deportation defense campaigns and provides legal and strategic support to undocumented organizers fighting for immigrant rights. FMP works to educate and inform the public about the widespread benefits of open migration policies. FMP organizes public forums, workshops, and panel events to provide a platform for scholars, advocates, and activists to challenge status quo ideas about migration. FMP's office and principal place of business is located in Philadelphia, Pennsylvania.

16.     Plaintiff GL is a non-profit advocacy organization based in Austin, Texas that works for a more just society where prison profiteering, mass incarceration, deportation, and criminalization are things of the past. GL uses research, education, organizing, and direct action to deliver its message, including through its website, www.grassrootsleadership.org, its email list of more than 18,000 individuals, its blog, and its social media channels. GL regularly publishes and widely disseminates reports, newsletters, press releases, and other materials that provide impacted communities, national and local policy-makers, the press, and the public with information on the system of detention and deportation. GL is a member of many national networks and coalitions that educate and advocate for better treatment of immigrants and other people of color in the immigration and criminal legal systems. GL's office and principal place of business is located in Austin, Texas.

17.     Plaintiff CCR is a non-profit, public interest legal and advocacy organization that engages in the fields of civil and international human rights. CCR's diverse issue areas include litigation and advocacy around immigration, as well as racial and ethnic profiling. CCR is a member of several networks nationally and provides legal support to civil rights movements. One of CCR's primary activities is the publication of newsletters, know-your-rights handbooks, legal analysis of current immigration law issues, and other similar materials for public dissemination. These and other materials are available through CCR's Development, Communications, and Advocacy Departments. CCR operates a website, http://ccrjustice.org, which addresses the issues on which the Center works. CCR staff members often serve as sources for journalist and media outlets, including on issues related to racial justice and immigrant rights, government misconduct, police brutality, racial discrimination, and the right to dissent. In addition, CCR regularly issues press releases, has an active social media presence with thousands of followers, and also issues regular email updates sent to over 50,000 supporters about developments and news pertaining to CCR's work. The office and principal place of business of CCR is located in New York County, New York.

18.     Defendant ICE is a component of the Department of Homeland Security that enforces immigration and customs law and is responsible for the detention and removal of immigrants. It has offices in all 50 states.

19.     Defendant Treasury is an agency that manages national finances, including collecting taxes, issuing currency, funding the U.S. debt, and advising the president on financial and economic policy.

20.     Defendant EOIR is a component of the Department of Justice that oversees immigration courts and adjudicates all immigration cases in the United States.

7

21.     Defendants are "agencies" within the meaning of 5 U.S.C. § 551(1) and 5 U.S.C. 552(f)(1).

## STATEMENT OF FACTS

22.     All statements herein are made upon information and belief except where basis of knowledge is specified.

## I.  History of the Sanctuary Movement, its Contribution to the Immigrants' Rights Movement, and Subsequent Retaliation by the Federal Government

23.     During the early 1980s, hundreds of thousands of Central Americans arrived in the U.S. seeking asylum from brutal civil wars, severe political repression, and mass killings and other forms of extreme violence. Despite the enactment of the 1980 Refugee Act, which provided for humanitarian protection to individuals fleeing these types of conditions, ICE's predecessor, the Department of Justice Immigration and Naturalization Service (INS), specifically targeted Central American refugees for deportation. Viewing these actions as immoral, racist, and motivated by the U.S.' backing of military regimes in Central America, communities across the country responded in what would become a human rights movement deeply rooted in faith-based and spiritual traditions.[6]

24.     Calling themselves "sanctuaries," communities and houses of worship began building networks of support to assist the growing number of refugees. They opened their doors to provide physical shelter, as well as food, medical care, and employment; they hid individuals subject to deportation and vowed not to allow immigration authorities to enter their sacred

---

[6] *See, e.g.,* Gary MacEoin, *A Brief History of the Sanctuary Movement, in* SANCTUARY: A RESOURCE GUIDE FOR UNDERSTANDING AND PARTICIPATING IN THE CENTRAL AMERICAN REFUGEES' STRUGGLE 14 (G. MacEoin ed., 1985).

spaces to detain them; they helped transport individuals to safe spaces across the country; and they provided legal assistance in the form of bond and legal representation. By 1985, the sanctuary movement had grown to over 500 member-sites across the United States.[7]

25.    By the mid-1980s, the INS retaliated against sanctuary movement members in full force, hoping to "disband" what they viewed as a modern "underground railroad" by sending paid informants to infiltrate, record, and monitor them under "Operation Sojourner".[8] These undercover agents, posing as members and clergy, attended and taped worship services and other church gatherings, and documented license plate numbers, which culminated in a series of high-profile show trials in Texas and Arizona, also known as the "Sanctuary Trials."[9] Legal scholars at the time criticized this disturbing phenomenon as part and parcel of a "spotty American tradition of subjecting supposedly treasonous political and social movements to ordeals of harassment and prosecution."[10] While these prosecutions resulted in the felony convictions of eight sanctuary leaders, none of the eight ended up serving time in jail.[11]

26.    The Sanctuary Movement reignited in the 2000s through a network of over 800 houses of worship that opened their doors to immigrants at risk of deportation, amidst a steady rise in anti-immigrant rhetoric and the criminalization, detention, and deportation of immigrants.[12] Much like their 1980s predecessors, these communities pledged to protect and

---

[7] Puck Lo, *Inside the New Sanctuary Movement That's Protecting Immigrants From ICE,* THE NATION, May 6, 2015, https://www.thenation.com/article/archive/inside-new-sanctuary-movement-thats-protecting-immigrants-ice/.
[8] Kristina M. Cambell, *Operation Sojourner: The Government Infiltration of the Sanctuary Movement in the 1980's and its Legacy on the Modern Central American Refugee Crisis*, 13(3) UNIV. OF ST. THOMAS L. J. 474, 480 (2017).
[9]*Id.* at 480-482.
[10]*Id.* at 384; *see also* Peter Applebome, *Sanctuary Movement: New Hopes After Trial*, N.Y. TIMES, May 6, 1986, https://www.nytimes.com/1986/05/06/us/sanctuary-movement-new-hopes-after-trial.html.
[11] Barbara Bezdek, *Religious Outlaws: Narratives of Legality and the Politics of Citizen Interpretation*, 62 TENN. L. REV. 899, 906 n.21 (1994-1995).
[12]In 2005, the U.S. House of Representatives passed an anti-immigrant bill that would dramatically increase the criminalization of undocumented immigrants. *See,* Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005, H.R. 4437, 109 CONG. (2005). "This bill and rampant anti-immigrant sentiment clashed with the values and beliefs of members of many religious communities across the country, sparking the New Sanctuary

stand with immigrants by providing legal, emotional, and practical support, including physical

shelter, so that they may continue to fight for their right to live and remain in the U.S., as a

testament of faith in action.[13] Their advocacy and actions have spurred legislative changes at

the local and state levels, as localities have adopted "sanctuary" measures to welcome and

protect immigrant residents.[14]

## II. The Trump Administration's Targeting of the Sanctuary Movement and its Leaders as Part of a War on Immigrants

27.     As part of his broader campaign to limit immigration, the Trump administration

has used its authority to target sanctuary efforts. As one of his first official actions as President,

Trump signed Executive Order No. 13768 in 2017 explicitly targeting sanctuary cities and

spaces, claiming that "sanctuary jurisdictions across the United States… in an attempt to shield

aliens from removal from the United States… have caused immeasurable harm to the American

people and to the very fabric of our Republic."[15] The Executive Order significantly expanded

the categories of noncitizens that were considered "enforcement priorities," including those

who "are subject to a final order of removal, but who have not complied with their legal

obligation to depart the United States." The Executive Order also called on the Secretary of

Homeland Security to "ensure the assessment and collection of all fines and penalties . . . from

aliens unlawfully present in the United States and from those who facilitate their presence in

the United States."[16]

---

Movement." *Fighting Injustice: The New Sanctuary Movement*, LATIN AMERICA WORKING GROUP, https://www.lawg.org/fighting-injustice-the-new-sanctuary-movement/.

[13] Sharon Otterman, *Hindu Temple in Queens Joins Sanctuary Movement*, N.Y. TIMES, May 7, 2017, https://www.nytimes.com/2017/05/07/nyregion/a-lonely-stand-hindu-temple-in-queens-joins-sanctuary-movement.html.

[14] *See, e.g.*, Christopher N. Lasch et al., *Understanding "Sanctuary Cities*," 59 B.C.L. REV. 1703 (2018).

[15] Executive Order No. 13768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

[16] *Id.*

28.      These efforts have escalated since 2017. The administration has attempted to 'punish' these localities by withholding federal funding and access to federal programs.[17] Despite a standing 2011 memorandum issued by the Director of ICE instructing agents not to pursue enforcement actions at "sensitive locations" such as churches, schools, and courthouses, recent reports have documented numerous incidents of ICE entering such locations, including churches that are providing sanctuary to noncitizens.[18] In addition, immigrant rights advocates and leaders, including sanctuary movement members and clergy, have been targeted for deportation and surveillance, both within the U.S. and at the border.[19]

29.      President Donald J. Trump has often spoken disparagingly of today's sanctuary movement[20] portraying advocates, particularly noncitizens, who call for sanctuary as his administration's 'political enemies.'[21] He has verbally attacked localities that limit local

---

[17] Clyde Haberman, *Trump and the Battle Over Sanctuary in America*, N.Y. TIMES, Mar. 5, 2017, https://www.nytimes.com/2017/03/05/us/sanctuary-cities-movement-1980s-political-asylum.html.

[18] U.S. IMMIGRATION AND CUSTOM ENFORCEMENT, ENFORCEMENT ACTIONS AT OR FOCUSED ON SENSITIVE LOCATIONS 10029.2, Memorandum (Oct. 24, 2011); Liz Robbins, *In a 'Sanctuary city,' Immigrants are Still at Risk*, N.Y. TIMES, Feb. 27, 2018, https://www.nytimes.com/2018/02/27/nyregion/sanctuary-cities-immigrants-ice.html.

[19] *See, e.g.,* Adolfo Flores, *A Pastor Who Was Put On A Watch List After Working With Immigrants Is Suing The US*, BUZZFEED, https://www.buzzfeednews.com/article/adolfoflores/pastor-watchlist-immigrants-lawsuit; Nick Pinto, *No Sanctuary*, THE INTERCEPT, Jan. 19, 2018, https://theintercept.com/2018/01/19/ice-new-sanctuary-movement-ravi-ragbir-deportation/; Maria Sacchetti and Davie Weigel, *ICE has detained or deported prominent immigration activists*, WASH. POST, JAN. 19, 2018, https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html; Gaby del Valle, *ICE Keeps Arresting Prominent Immigration Activists. They Think They're Being Targeted.*, VICE, Aug. 24, 2019, https://www.vice.com/en_us/article/ywady5/ice-keeps-arresting-prominent-immigration-activists-they-think-theyre-being-targeted; Jimmy Tobias, *Exclusive: ICE Has Kept Tabs on 'Anti-Trump' Protesters in New York City*, THE NATION, Mar. 6, 2019, https://www.thenation.com/article/ice-immigration-protest-spreadsheet-tracking/.

[20] *See, e.g.,* The Associated Press, *Trump Administration Gets Court Victory in Sanctuary Cities Case*, N.Y. TIMES, July 12, 2019, https://www.nytimes.com/2019/07/12/us/sanctuary-cities-ruling.html; Erik Slobe, *DOJ blocked from restricting federal grants to 'sanctuary cities'*, JURIST, Oct. 8, 2018, https://www.jurist.org/news/2018/10/doj-blocked-from-restricting-federal-grants-to-sanctuary-cities/; Mike Pearl, *What Are 'Sanctuary Cities' and Why Does Trump Hate Them So Much?*, VICE, Sept. 2, 2016, https://www.vice.com/en_us/article/yvevqy/sanctuary-cities-donald-trump-immigration-plan.

[21] *See, e.g.,* Noah Bierman, *Trump kicks off a new campaign reprising his old themes,* L.A. TIMES, June 18, 2019, https://www.latimes.com/politics/la-na-pol-trump-reelection-kickoff-rally-arena-immigration-orlando-20190618-story.html; Philip Rucker, *'How do you stop these people?': Trump's anti-immigrant rhetoric looms over El Paso massacre,* WASH. POST, August 4, 2019, https://www.washingtonpost.com/politics/how-do-you-stop-these-people-

involvement with federal immigration enforcement on numerous occasions, including during

the 2020 State of Union Address, calling them "outrageous," "terrible," "catastrophic," and

"dangerous."[22] The administration recently blocked enrollment in Global Entry and other

trusted traveler programs for New York residents, citing a law that allows otherwise qualified

undocumented New Yorkers to obtain driver's licenses in the state.[23]

30.     The administration has even announced it will deploy Customs and Border

Protection's ("CBP") elite BORTAC unit to New York and other jurisdictions that limit their

involvement with federal immigration enforcement. This "SWAT team of the Border Patrol"[24]

has enhanced Special Forces training including sniper certification, and is equipped with

military-grade weaponry, such as grenades.[25] ICE officials have explicitly stated that the goal

of this operation is to significantly increase arrests in the "sanctuary jurisdictions."[26] This move

has drawn widespread criticism. Senators Ed Markey and Elizabeth Warren called the initiative

"unnecessary, unwelcome, dangerous, menacing, retaliatory and unlikely to achieve its stated

goal," in a letter to CBP, ICE and DHS.[27] Former CBP Commissioner Kerlikowske, in

---

trumps-anti-immigrant-rhetoric-looms-over-el-paso-massacre/2019/08/04/62d0435a-b6ce-11e9-a091-
6a96e67d9cce_story.html.

[22] Amber Phillips and Kristina Orrego, *President Trump's 2020 State of the Union address, annotated,* WASH. POST,
Feb. 4, 2020, https://www.washingtonpost.com/politics/2020/02/04/transcript-president-trumps-2020-state-union-
address/.

[23] Zolan Kanno-Youngs and Jesse McKinley, *Trump Administration Freezes Global Entry Enrollment in New York
Over Immigration Law,* https://www.nytimes.com/2020/02/06/us/politics/dhs-new-york-global-entry.html.

[24] Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities,*
N.Y. TIMES, Feb. 14, 2020, https://www.nytimes.com/2020/02/14/us/Border-Patrol-ICE-Sanctuary-Cities.html.

[25] Hari Sreenivasan and Caitlin Dickerson, *Elite 'BORTAC' unit to join sanctuary city crackdown,* PUBLIC
BROADCASTING SYSTEM, Feb. 15, 2020, https://www.pbs.org/newshour/show/elite-bortac-unit-to-join-sanctuary-
city-crackdown.

[26] Dickerson, *supra* note 24.

[27] Fausto Menard, *Warren and Markey Demand CBP Withdraw Plan To Deploy Heavily Armed Officers*, WBUR
NEWS, Feb. 17, 2020, https://www.wbur.org/news/2020/02/16/bortac-immigration-officers-boston.

response to the deployment, said that sending officers to conduct immigration enforcement within cities was a "significant mistake."[28]

## III. The Imposition of Massive Civil Fines Against Sanctuary Leaders

31.     In July 2019, Plaintiffs became aware of a spate of exorbitant civil fines levied against people who have been leaders in the sanctuary movement and living in sanctuary while pursuing legal remedies to remain in the U.S.

32.     Plaintiffs are aware of at least seven people in sanctuary who received letters specifying ICE's intent to fine them via form I-79B "Notice of Intention to Fine Under Section 274D of the Immigration and Nationality Act." The fines ranged from 300,000 to over 500,000 dollars. These forms alleged that recipients had "willfully failed or refused to depart the United States," "willfully failed or refused to present [themselves] for removal," and "connived, conspired, or took any other action" to thwart their deportations.[29]

33.     The women in sanctuary known to have received these fines are all prominent activists whose individual cases and immigrant rights activism have garnered significant media attention all over the country.[30] They are members and leaders of immigrant rights

---

[28] Caitlin Dickerson and Zolan Kanno-Youngs, *Border Patrol Will Deploy Elite Tactical Agents to Sanctuary Cities,* N.Y. TIMES, Feb. 14, 2020, https://www.nytimes.com/2020/02/14/us/Border-Patrol-ICE-Sanctuary-Cities.html.
[29] Ordoñez, *supra* note 4.
[30]*See, e.g.,* Danae King, *Julian Castro visits immigrant Edith Espinal in sanctuary*, THE COLUMBUS DISPATCH, Oct. 15, 2019, https://www.dispatch.com/news/20191015/julian-castro-visits-immigrant-edith-espinal-in-sanctuary; Haley Nelson, *Supporters hold Mother's Day concert for Edith Espinal*, ABC 6, May 10, 2019, https://abc6onyourside.com/news/local/supporters-hold-mothers-day-concert-for-edith-espinal;Joel Dyer, *Windows, Walls and Invisible Lines: Portraits of Life in Sanctuary*, BOULDER WEEKLY, July 11, 2019, https://www.boulderweekly.com/news/windows-walls-and-invisible-lines-2/; Regina Garcia Cano, The Associated Press, *Churches offer haven from deportation*, ARKANSAS DEMOCRAT GAZETTE, Aug. 3, 2019, https://www.arkansasonline.com/news/2019/aug/03/churches-offer-haven-deportation/?features-religion; Danae King, *Second Columbus woman facing deportation seeks sanctuary at church*, THE COLUMBUS DISPATCH, July 1, 2018, https://www.dispatch.com/news/20180701/second-columbus-woman-facing-deportation-seeks-sanctuary-at-church; Mary Tuma, *Amid New Immigration Policies Local Attorneys and Immigrants Navigate a Broken System*, THE AUSTIN CHRONICLE, July 26, 2019, https://www.austinchronicle.com/news/2019-07-26/amid-new-immigration-

organizations including Plaintiffs ASN, FMP, and GL. They are also all women asylum seekers who have endured extensive violence in their countries of origin and have found safety and established lives and families in the United States.

34.     The targeted sanctuary leaders are all devout members and leaders of the faith-based sanctuary movement across the United States, made up of hundreds of faith-based communities taking collective, direct action to prevent the detention and deportation of vulnerable individuals. They have been outspoken public advocates for immigrant rights and the sanctuary movement for years, often speaking at rallies, community events, and with both local and national media organizations.[31] For example, Hilda Ramirez, one of these advocates who received a fine, has for years been described as a "poster child for the [sanctuary] movement."[32] Edith Espinal, another sanctuary leader who received a fine, has met with many

---

policies-local-attorneys-and-immigrants-navigate-a-broken-system/; Courtney Tanner, *How a mother and her two girls are celebrating Christmas inside a Utah church while avoiding deportation*, THE SALT LAKE CITY TRIBUNE, Dec. 23, 2018, https://www.sltrib.com/news/2018/12/23/christmas-sanctuary-how/; Leoneda Inge, *Honduran Woman Seeks Sanctuary In Chapel Hill Church*, NORTH CAROLINA PUBLIC RADIO – WUNC, Apr. 18, 2018, https://www.wunc.org/post/honduran-woman-seeks-sanctuary-chapel-hill-church; Dave Eggers, *The Trump Administration Seeks to Deport An Abuse Victim Who Fears For Her Life*, THE NEW YORKER, Oct. 24, 2018, https://www.newyorker.com/news/daily-comment/the-trump-administration-seeks-to-deport-an-abuse-victim-who-fears-for-her-life; Ned Oliver, *ICE ordered her deportation. Instead she's spent the last year living in a Richmond church. 'I will not dare to put a foot outside'*, VIRGINIA MERCURY, July 21, 2019, https://www.virginiamercury.com/2018/09/04/24-7-vigilance-a-live-in-lawyer-and-embracing-activism-two-months-of-claiming-sanctuary-in-a-richmond-churchs-basement/; Desiree Montilla, *Guatemalan refugee reflects on one-year anniversary in sanctuary*, CBS 19 NEWS, Oct. 6, 2019, https://www.cbs19news.com/content/news/Chalk-mural-illustrates-Guatemalan-refugees-journey-to-Charlottesville-558153421.html; Abigail Clukey, *Undocumented Woman Finds Healing And Support In Sanctuary*, NATIONAL PUBLIC RADIO, Aug. 4, 2019, https://www.npr.org/2019/08/04/745609635/undocumented-woman-finds-healing-and-support-in-sanctuary.
[31]*See, e.g.,* Sara Fleming, *Eleven Months Into Sanctuary, Araceli Velasquez Speaks Out Against Immigration Policy,* WESTWORD, July 11, 2018, https://www.westword.com/news/araceli-velasquez-speaks-out-against-immigration-policy-eleven-months-into-sanctuary-10524841; Dalia Hatuqa, *A year in 'sanctuary': the Ohio mother living in a church to defy deportation,* THE GUARDIAN, Sep. 28, 2018, https://www.theguardian.com/us-news/2018/sep/28/edith-espinal-columbus-mennonite-church-ohio-immigration-sanctuary; Meredith Hoffman, *We spoke to Immigrants Who Are Hiding in US Churches to Avoid Being Deported,* VICE News, Feb. 10, 2016, https://www.vice.com/en_us/article/43mqjn/we-spoke-to-immigrants-who-are-hiding-in-us-churches-to-avoid-being-deported.
[32] Abigail Hauslohner, *The 'sanctuary city' on the front line of the fight over Trump's immigration policy,* WASH. POST, Feb. 2, 2017, https://www.washingtonpost.com/national/we-cannot-afford-to-make-our-community-less-safe-by-driving-people-into-the-shadows/2017/02/02/f14ed2d6-e5ac-11e6-ba11-63c4b4fb5a63_story.html.

community leaders and elected officials, including a presidential candidate, to discuss immigration policy from sanctuary.[33]

35.     Plaintiffs have engaged in significant organizing and legal support for these sanctuary leaders, including vigils, rallies, and Congressional visits to raise awareness of their dire circumstances and the growing threat these individuals face from current immigration policies. Many of the sanctuary leaders participate in a collective, supported by several of the Plaintiff organizations, to respond to developments in immigration policy and to advocate for humane responses. The civil fine letters have required additional resources to be marshaled in defense of these sanctuary leaders, including the coordination of legal responses and additional public advocacy.

## IV.  The Constitutional Concerns Raised by the Imposition of Fines

36.     The Supreme Court has repeatedly recognized that speech on "matters of public concern" or "public issues" occupy "the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection."[34] Speech regarding immigration policy is such "core political speech" where First Amendment protection is "at its zenith".[35] The Second Circuit has recognized that "advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents," and is thus "'at

[33] Gabe Ortiz, *Julián Castro visits Ohio mom who has been in sanctuary for two years after facing deportation,* DAILY KOS, Oct. 15, 2019, https://www.dailykos.com/stories/2019/10/15/1892581/-Juli-n-Castro-visits-Ohio-mom-who-has-been-in-sanctuary-for-two-years-after-facing-deportation.
[34] *See Connick v. Myers,* 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964) (noting that the First Amendment reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").
[35]*Buckley v. Am. Constitutional Law Found.,* 525 U.S. 182, 186-87 (1999) (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)).

the heart of… First Amendment protection'[36] and 'occupies the highest rung of the hierarchy of First Amendment values.'"[37]

37.     Immigration lawyers and even former federal immigration officials have stated that these fines are completely unprecedented. Leon Fresco, the former deputy assistant attorney general for the DOJ Office of Immigration Litigation, commented that the fines are "a vivid illustration of the lengths the Trump administration will go to use any available authority to try to enforce immigration law... I have not seen a $300,000 fine for failing to facilitate one's own removal."[38]

38.     According to statements from DHS officials, ICE began issuing fine letters only in December 2018, as "part of a rolling effort to curb sanctuary jurisdictions that have thwarted Trump's efforts to deport undocumented immigrants."[39]

39.     DHS's use of these massive civil fines against sanctuary movement leaders who are also women seeking asylum and protection in the U.S. echoes the retaliatory prosecution of sanctuary movement leaders decades ago. That these efforts are part of a campaign to specifically target and quell dissenters also raises serious First Amendment concerns. In addition, these large civil penalties also raise Eighth Amendment concerns.

40.     The vast majority of the sanctuary leaders who received fines filed answers to their respective intent-to-fine letters in August and September 2019, contesting the fines and arguing they are unconstitutional on their face and as-applied.

---

[36] *Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759, (1985) (quoting *First Nat. Bank of Boston* v. *Bellotti*, 435 U.S. 765, 776 (1978)).
[37]*Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (quoting *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983) ) (quoting *NAACP v. Claiborne Hardware Co*., 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).
[38] Ordoñez, *supra* note 4.
[39] Maria Sacchetti, *Trump administration threatens hefty fines on immigrants who elude deportation*, Wash. Post, July 2, 2019, https://www.washingtonpost.com/immigration/trump-administration-threatens-hefty-fines-on-immigrants-who-elude-deportation/2019/07/02/956e2334-9cc2-11e9-9ed4-c9089972ad5a_story.html.

41.    On October 21, 2019, at least seven fine recipients received near-identical letters from DHS stating that their fines had been withdrawn due to ICE discretion. All were signed by the same DHS officer, who had also signed all of the original 'intent-to-fine' letters. The seemingly coordinated withdrawal of these fines, like the original intent-to-fine letters, received local, national, and international media attention.[40]

42.    The recipients were offered no explanation or insight as to why they were initially targeted for the fines, nor why the fines were later dropped. In addition, the withdrawal letters indicated that ICE could reimpose the fines in the future at their discretion. ICE spokespersons have publicly stated that they will continue to pursue any and all methods of deportation, including re-imposition of the fines, and that "ICE remains committed to utilizing this [civil fines] enforcement tool."[41]

43.    In December 2019, ICE gave an exclusive to *The Washington Times*, announcing that it had fined 230 individuals and that it would be issuing new letters to the sanctuary leaders whose fines had been rescinded.[42] Subsequently, six of the sanctuary leaders with whom Plaintiffs work, who had their fines withdrawn in October, received new letters

---

[40]*See, e.g., EEUU cancela multa de casi medio millón de dólares a una immigrante Mexicana*, EL PERIODICO, Oct. 23, 2019, https://www.elperiodico.com/es/internacional/20191023/eeuu-cancela-multa-inmigrante-mexicana-7696965; Ivette Leyva, *Ice retira las multas de hasta 500,000 dólares impuestas a migrantes refugiados en iglesias*, TELEMUNDO, Oct. 23, 2019, https://www.telemundo.com/noticias/2019/10/23/ice-retira-las-multas-de-hasta-500000-dolares-impuestas-migrantes-refugiados-en-iglesias-tmna3558346; Frank Ordoñez, *Trump Administration Withdraws Huge Fines For Some Immigrants In U.S. Illegally*, NATIONAL PUBLIC RADIO, Oct. 22, 2019, https://www.npr.org/2019/10/22/772263253/trump-administration-withdraws-huge-fines-for-some-immigrants-in-u-s-illegally; Geneva Sands, *ICE rescinds half-million fine against undocumented immigrant living in Ohio church*, CNN, Oct. 22, 2019, https://www.cnn.com/2019/10/22/politics/ice-rescinds-fine-edith-espinal/index.html; Julián Aguilar, *Immigration agency decides against six-figure fines for undocumented immigrants living in sanctuaries*, THE TEXAS TRIBUNE, Oct. 23, 2019, https://www.texastribune.org/2019/10/23/trump-administration-cancels-big-fines-some-undocumented-immigrants/; Associated Press, *ICE withdraws big fines for immigrants living in churches*, TAMPA BAY TIMES, Oct. 24, 2019, https://www.tampabay.com/news/2019/10/24/ice-withdraws-big-fines-for-immigrants-living-in-churches/.
[41] *Id*.
[42] Steven Dinan, EXCLUSIVE: *ICE revives six-figure fines against illegal immigrants living in sanctuary*, WASHINGTON TIMES, Dec. 7, 2019, https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-fines-agains/.

17

from ICE—this time threatening civil fines and criminal prosecution and requiring all of the sanctuary leaders to go to the respective ICE offices in their jurisdictions to present themselves for removal, departure, or for "continued cooperation with the Department of Homeland Security".

## V.  The Necessity of Information Sought Pursuant to the Freedom of Information Act

44.     The history of the Sanctuary Movement, paired with the current administration's sweeping changes to U.S. immigration enforcement and policies, has spurred the public interest in matters relating to immigration. The imposition and withdrawal of the fines, specifically, have garnered widespread local and national media attention.[43]

45.     The information sought here is necessary to educate and inform the public of the government's policies toward the Sanctuary Movement. Several members of the U.S. Congress, alarmed by Defendants' retaliatory actions towards the Sanctuary Movement, have introduced private immigration bills in support of the sanctuary leaders, which would grant them lawful permanent residency. On June 24, 2019, Rep. Joe Neguse (CO) introduced a private bill on behalf of Ingrid Encalada Latorre, a sanctuary leader who received a fine.[44] On September 6, 2019, Rep. Joyce Beatty (OH) introduced a private bill on behalf of Edith Espinal, another sanctuary leader who received a fine. On September 26, 2019, Rep. Joaquin Castro (TX) introduced a private bill on behalf of Hilda Ramirez, another sanctuary leader who

---

[43]*See supra* notes 4 and 30.
[44] For the relief of Ingrid Encalada Latorre, H.R. 3455, 116th Cong. (2019).

received a fine.[45] And on November 12, 2019, Rep. Lloyd Doggett (TX) also introduced a private bill on behalf of Ms. Ramirez.[46]

46.     Other members of Congress have reached out to ICE directly regarding their concern. For example, Senator Cory Booker of New Jersey, submitted Questions for the Record to ICE Acting Executive Associate Director for Enforcement and Removal Operations, Timothy Robbins, on October 29, 2019. Specifically, Senator Booker inquired about ICE's criteria for selecting the fine recipients, whether all fine recipients were living in sanctuary, why ICE had rescinded eight out of nine fines, and why they had not rescinded the final fine. As of February 6, 2020, ICE had not responded to Senator Booker's Questions for the Record.

47.     FOIA requires the federal government to disclose records in its possession unless they fall into one of a limited number of exemptions in the statute. Its "central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny."[47] Access to this information is necessary so that the general public can meaningfully engage in timely and important conversations about immigration enforcement and immigrant rights.[48]

## VI. Plaintiffs' FOIA Request

46.     On September 11, 2019, Plaintiffs sent a Request pursuant to 5 U.S.C. §§ 552 *et seq.* to Defendants.

---

[45]*See* Press Release, Austin Sanctuary Network, Rep. Castro Introduces Private Bill for Austin Sanctuary Leaders (Oct. 1, 2019), https://austinsanctuarynetwork.org/2019/10/01/press-release-oct-1/.
[46] For the relief of Alirio Palacios Gamez, Hilda Veronica Ramirez Mendez, and Jayro Ivan Juarez Ramirez, H.R. 5058, 116th Cong. (2019).
[47]*U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 774 (1989) (emphasis omitted).
[48]*Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico*, 457 U.S. 853, 868 (1982) (plurality opinion) ("[A]ccess to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner[.]"); *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 862-63 (1974) (Powell, J., dissenting) ("[P]ublic debate must not only be unfettered; it must also be informed.").

47.     Plaintiffs' Request sought records related to or containing policies, procedures, guidelines, and instructions regarding fines or penalties imposed on individuals including immigrants taking "sanctuary" in places of worship or elsewhere, pursuant to the Immigration and Nationality Act ("INA") § 274D, 8 U.S.C. § 1324d.

48.     Plaintiffs' Request sought expedited processing under 5 U.S.C. § 552(a)(6)(E)(i)(I), citing a "compelling need" to inform the public of the policies and decision-making regarding the unprecedented and highly selective enforcement of large civil penalties against immigrants who have taken sanctuary, among others, so that the public can meaningfully engage in the national debate regarding immigration policy.

49.     Plaintiffs sought a fee waiver on the basis that "disclosure of the requested materials is in the public interest because it is likely to contribute significantly to the public understanding of the activities or operations of the government and is not primarily in the commercial interest" of the Plaintiffs. 5 U.S.C. § 552(a)(4)(A)(iii). Plaintiffs are nonprofit organizations with no private commercial interest in the records requested and will make all non-confidential information available to the public, including the media, at no charge.

## VII.  Defendant Agency Responses

### Defendant ICE's Response

53.     On September 17, 2019, ICE sent Plaintiffs their initial acknowledgment letter via email assigning a case number to Plaintiffs' FOIA request, and granting Plaintiffs' request for a fee waiver. ICE's response did not address Plaintiffs' request for expedited processing. ICE also invoked a ten-day extension to respond to Plaintiffs' request.

54.     On November 1, 2019, Plaintiffs sent ICE a follow-up letter via email and Federal Express noting that over 30 business days had passed since ICE's acknowledgment and

requesting a response from ICE within five days updating Plaintiffs on the status of their request.

55.     ICE did not respond. By failing to respond to Plaintiffs' request for expedited processing within the 10 days mandated by statute, ICE constructively denied Plaintiffs' expedited processing request.

56.     To date, Plaintiffs have received no further response from ICE in regard to their Request.

**Defendant Treasury's Response**

57.     On September 24, 2019, Treasury sent Plaintiffs their initial acknowledgment letter notifying plaintiffs that Treasury had assigned Plaintiffs' request to two subagencies within Treasury, the Office of Foreign Asset Control (OFAC) and the Bureau of Fiscal Service (BFS), and that each subagency would reply to Plaintiffs' request directly.

*Defendant Treasury's OFAC Response*

58.     On September 25, 2019, OFAC sent Plaintiffs an initial acknowledgment letter denying Plaintiffs' request for expedited processing and denying Plaintiffs' request for a fee waiver. OFAC erroneously stated that Plaintiffs had only 10 days to appeal the denial of expedited processing.

59.     On October 2, 2019, Plaintiffs appealed OFAC's decision to deny expedited processing.

60.     On October 16, 2019, OFAC sent a final response to Plaintiffs notifying Plaintiffs that they had not conducted a search as required under U.S.C. § 552(a)(3)(C), but had consulted subject matter experts in OFAC's Enforcement and Global Targeting Divisions, and that the experts advised OFAC that the statute referenced in Plaintiffs' request is unrelated to

anything OFAC administers or enforces. However, Defendant Treasury referred Plaintiffs'
Request to OFAC because they believed OFAC might have responsive records, indicating that
this subject matter is within their purview and they must run a search pursuant to Plaintiffs'
Request.

61.     On November 14, 2019, OFAC denied Plaintiffs' appeal of the expedited
processing denial.

62.     On December 3, 2019, Plaintiffs appealed OFAC's October 16, 2019 final
response as an improper and inadequate search.

63.     In a letter dated January 3, 2020 responding to Plaintiffs' appeal, OFAC
affirmed their October 16, 2019 response.

### Defendant Treasury's FSB Response

62.     On October 8, 2019, the BFS sent an initial acknowledgment letter to Plaintiffs
denying expedited processing and declining to address Plaintiffs' request for a fee waiver.

63.     On October 21, 2019, Cynthia Sydnor-Jones of BFS contacted Plaintiffs asking
to speak by phone.

64.     On October 22, 2019, BFS staff spoke with Plaintiffs via conference call
regarding the request and offered to send Plaintiffs a small set of documents which BFS felt
could assist in potentially narrowing the request. On the call, BFS requested Plaintiffs to
suspend statutory FOIA deadlines while reviewing the additional documents BFS proposed
sending. Plaintiffs did not agree to suspend statutory deadlines.

65.     On November 1, 2019, BFS sent via email five documents totaling 20 pages
they represented were responsive to Plaintiff's request, and asked whether Plaintiff would like
to terminate their request, amend their request, or continue with the request as-is. The records

produced by BFS had no connection to the specific fines that are the subject of Plaintiffs' Request.

66.     On November 18, 2019, Plaintiffs notified BFS via email that they did not wish to amend their request and wished to proceed with their original request.

73.     On December 17, 2019, BFS sent a response denying Plaintiffs request for a fee waiver and providing four additional nonresponsive records. BFS did not provide any reasoning or grounds for denying Plaintiffs' request for a fee waiver, writing only that the request for a fee waiver had been denied. When notifying a requester of an adverse determination, Department of the Treasury regulations call for "[a] brief statement of the reasons for the denial," 31 CFR 1.4(i)(2).

67.     On December 23, 2019, Plaintiffs appealed BFS's response as inadequate and unresponsive to their Request. Plaintiffs also appealed BFS's fee waiver denial, as BFS did not provide any reasoning or grounds for denying Plaintiffs' request for a fee waiver.

68.     Federal Express's website shows BFS received and signed for Plaintiffs' appeal on January 2, 2020.

69.     To date, Plaintiffs have received no further responses from BFS in regard to their request.

### Defendant EOIR's response

70.     On September 19, 2019, EOIR sent Plaintiffs their initial acknowledgement letter. The letter informed Plaintiffs that their request had been placed on a non-expedited "track" for processing, rather than the "expedited" track, constructively denying Plaintiffs' expedited processing request. EOIR's letter advised Plaintiffs that a separate letter would address Plaintiffs' request for a fee waiver.

71.     On October 10, 2019, EOIR sent a final response notifying Plaintiffs that they had searched for the requested records but found nothing. EOIR provided Plaintiffs with no information regarding the searches the agency undertook or custodians searched, or any other information which would enable Plaintiffs to assess or challenge the adequacy of the search. EOIR's actions violate 28 CFR 16.6(e)(2) by failing to provide "[a] brief statement of the reasons for the denial".

72.     On October 25, 2019, Plaintiffs appealed that EOIR's response as inadequate. Plaintiffs also appealed EOIR's constructive denial of expedited processing.

73.     On November 5, 2019, Plaintiffs received an email notification acknowledging EOIR had received Plaintiffs' administrative appeal.

74.     On January 3, 2019, EOIR sent a response to Plaintiffs' administrative appeal, affirming their October 10, 2019 final response.

75.     Plaintiffs have never received a response from EOIR regarding our request for a fee waiver.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of FOIA for Failure to Disclose and Release Records Responsive to Plaintiffs' Request**

76.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

77.     Defendant OFAC improperly refused to conduct a search. Defendants FSB and EOIR failed to conduct reasonable searches for responsive records. Defendant ICE improperly refused to conduct a search, or to respond to Plaintiffs' request at all.

78.     By failing to disclose and release the requested records, and by failing to conduct timely and adequate searches reasonably calculated to uncover responsive records, Defendants have violated the public's right, advanced by the Plaintiffs, to agency records under 5 U.S.C. § 552(a)(6)(A), 5 U.S.C. § 552(a)(3), and Defendants' corresponding regulations.

## SECOND CLAIM FOR RELIEF

### Defendants Improperly Denied Or Have Not Responded to Plaintiffs' Request for Expedited Processing

70.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

71.     Defendants have violated Plaintiffs' right to expedited processing under 5 U.S.C. § 552(a)(6)(E) and Defendants' own regulations. 6 C.F.R. § 5.5(e).

## THIRD CLAIM FOR RELIEF

### Defendants EOIR and Treasury Improperly Denied or Dismissed as Moot Plaintiffs' Request for a Fee Waiver

74.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if repeated and incorporated herein.

75.     Defendants EOIR and Treasury have violated Plaintiffs' right to a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii) and Defendants' own regulations, 6 C.F.R. § 5.11(k).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Order Defendants immediately to make a full, adequate, and expedited search for the requested records;

2.      Order Defendants to engage in expedited processing in this action;

3.      Enjoin Defendants from assessing fees or costs for the processing of the FOIA Request;

4.       Order Defendants, upon completion of expedited processing, to disclose the requested records in their entirety and make copies available to Plaintiffs no later than ten days after the Court's order;

5.      Award Plaintiffs their costs and reasonable attorney's fees incurred in this action as provided by 5 USC § 552(a)(4)(E); and

6.      Grant any other and further relief as this Court may deem just and proper.

Dated: February 26, 2020                      Respectfully submitted,
New York, NY

_____/s/ Ghita Schwarz_____
Ghita Schwarz (GS-9554)
Lupe Aguirre
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6445
gschwarz@ccrjustice.org

___/s/ Alina Das_____
Alina Das, Esq. (AD8805)
Daniel T. Lee, Law Student Intern
Lauren M. Wilfong, Law Student Intern
Immigrant Rights Clinic
Washington Square Legal Services
New York University School of Law
245 Sullivan Street, 5th Floor
New York, NY 10012
(212) 998-6430
alina.das@nyu.edu

Attorneys for Plaintiffs