## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AUSTIN SANCTUARY NETWORK, *et al.*,<br><br>        Plaintiff,<br><br>              v.<br><br>DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 20-cv-1686

## <u>DECLARATION OF FERNANDO PINEIRO</u>

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Acting FOIA Officer of the Freedom of Information Act Office (the "ICE FOIA Office") at U.S. Immigration and Customs Enforcement ("ICE"). The ICE FOIA Office is responsible for processing and responding to all Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. I have held this position since July 10, 2019, and I am the ICE official immediately responsible for supervising ICE responses to requests for records under the FOIA, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a (the "Privacy Act"), and other applicable records access statutes and regulations. Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013 to July 9, 2019, and prior to that I was the FOIA Officer for three years at the Office for Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS").

2.      My official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office, which is responsible for the receipt, processing, and response to all FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. In that capacity, I manage and supervise a staff of ICE FOIA Paralegal Specialists, who report to

1

me regarding the processing of FOIA and Privacy Act requests received by ICE.  Due to my experience and the nature of my official duties, I am familiar with ICE's procedures for responding to requests for information pursuant to provisions of the FOIA and the Privacy Act.

3.      I make this declaration in support of ICE's Motion for Summary Judgment in the above-captioned action.  The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

4.      This declaration describes how ICE received Plaintiffs' FOIA request, how the ICE FOIA Office processed Plaintiffs' FOIA request, how the ICE FOIA Office searched for records responsive to Plaintiffs' FOIA request, and how the ICE FOIA Office responded to Plaintiffs' FOIA request.  In addition, and in accordance with the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration explains the basis for withholding portions of the requested information pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E), 5 U.S.C. § 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  ICE's *Vaughn* Index is attached hereto as Exhibit A.

I.      **PLAINTIFFS' FOIA REQUEST AND ADMINISTRATIVE HISTORY OF THE CASE**

5.      This lawsuit stems from a FOIA request, dated September 11, 2019, submitted by Plaintiffs to U.S. Immigration and Customs Enforcement ("ICE"), the Executive Office for Immigration Review ("EOIR"), and the U.S. Department of the Treasury ("Treasury").  The FOIA request sought, generally, records pertaining to the assessment and collection of civil fines and penalties pursuant to Section 274D of the Immigration and Nationality Act, INA § 274D, 8 U.S.C. § 1324d.

**6.**     Specifically, the Plaintiffs sought from ICE:

1) Any and all records relating to current policies, procedures, guidelines, instructions, or other materials concerning when and how civil fines and penalties under INA § 274D, 8 U.S.C. § 1324d, are enforced on individuals who are alleged to have a final administrative removal order, including but not limited to immigrants taking sanctuary.

2) Any and all guidelines, schedules, instructions, or other records concerning fee calculations, fee amounts, or other monetary information ICE is allowed to impose on individuals pursuant to INA § 274D, 8 U.S.C. §1324d, including but not limited to immigrants in sanctuary.

3) Any communications between ICE officials and officials of local or federal agencies regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. §1324d for individuals, including but not limited to immigrants taking sanctuary, between January 2013 and the date of this Request.

   a. This includes any communications between ICE personnel or between ICE personnel and other federal agencies relating to the drafting, updating, and/or creation of ICE Form I-79B "Notice of Intention to Fine Under Section 274D of the Immigration and Nationality Act."

4) Any data, charts, statistics, or lists collected by ICE regarding individuals who have been sent notices of fines under INA § 274D, 8 U.S.C. §1324d, including but not limited to immigrants taking sanctuary.

5) The number of individuals who ICE has imposed fees, fines, and/or penalties pursuant to INA § 274D, 8 U.S.C. §1324d, including but [not] limited to immigrants taking sanctuary, broken down by date, country of origin, state/city of residence, and gender.

6) The number of individuals who have been sent ICE Form I-79B "Notice of Intention to Fine under Section 274D of the Immigration and Nationality Act" broken down by date, country of origin, state/city of residence, and gender.

7) Any data, charts, statistics, lists, or records collected by ICE regarding individuals taking sanctuary and/or the churches, places of worship, and other locations where individuals are taking sanctuary.

**7.**     A true and complete copy of Plaintiffs' FOIA request is attached hereto as Exhibit B.

8.    Upon initial receipt of Plaintiffs' FOIA request on September 17, 2019, the ICE FOIA Office acknowledged the request by email.  A true and complete copy of the ICE FOIA Office's acknowledgement email is attached hereto as Exhibit C.

9.    Also, on September 17, 2019, the ICE FOIA Office tasked ICE's Office of Enforcement and Removal Operations ("ERO") and ICE's Office of Policy and Planning ("ICE Policy") to conduct a search for potentially responsive records.

10.    Prior to ICE providing a final response to Plaintiffs' FOIA request, on February 26, 2020, Plaintiffs filed the present complaint naming ICE, EOIR, and Treasury as defendants.  *See* ECF No. 1.

11.    On April 3, 2020, Defendants filed their answer to Plaintiffs' complaint.  *See* ECF No. 17.

12.    ICE has reviewed a total of 13,342 pages of records for potential responsiveness, and in sixteen productions, released 1,150 pages in full, released 2,183 pages in part, and withheld 3,241 pages pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E).

13.    The remaining paragraphs in this declaration, set forth ICE's search for responsive records and ICE's withholding of information pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E).[1]

## II.    OVERVIEW OF SEARCH PROCESS

14.    When the ICE FOIA Office receives a FOIA request, the intake staff evaluates it

---

[1] Please note for the majority of records that were withheld in full, Exemptions 5, 6, 7(C), and/or 7(E) are applicable; however, the parties agreed to *Vaughn* the applicability of Exemption 5, only.  It was further agreed that ICE did not waive the applicability of any additional exemptions that are appropriate.  If the Court does not agree with the Exemption 5 withholdings, ICE may still assert Exemptions 6, 7(C), and/or 7(E), as appropriate, and will provide support for these exemptions.

to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3.  If it is a proper request, it is assigned a case tracking number.

15.     If a FOIA request does not reasonably describe the records sought, the ICE FOIA Office will seek clarification from the requestor by post, email, or telephone.  If the requested information is under the purview of a DHS component other than ICE, the ICE FOIA Office will refer the request to the appropriate DHS component for processing and a direct response to the requestor.  If the FOIA request seeks records under the purview of a government agency other than DHS, ICE FOIA informs the requestor to contact the other government agency directly and ICE administratively closes the FOIA request.

16.     FOIA requests received before October 1, 2014, were entered into the ICE FOIA Request Tracking System.  FOIA requests received on or after October 1, 2014, are entered into the FOIAXpress case tracking system.

17.     Based upon a requestor's description of the records being sought and ICE FOIA's knowledge regarding the responsibilities of the various program offices, the ICE FOIA Office identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches.

18.     ICE records are maintained by leadership offices and/or within ICE directorates, namely, Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), and/or Management and Administration (M&A).  Program offices within the leadership office and the ICE directorates are staffed with a designated point of contact (POC) who is the primary person responsible for communications between that program office and the ICE FOIA Office.  Each POC is a person with detailed knowledge concerning the operations of their particular program office.

19.     When the ICE FOIA Office receives a FOIA request, its first step is to identify, based on its experience and knowledge of ICE's program offices, which program offices within ICE, if any, are likely to possess records responsive to that request and to initiate searches within those program offices.  Once the ICE FOIA Office determines the appropriate program offices for a given request, it provides the office POCs with a copy of the FOIA request and instructs them to conduct a search for responsive records.  The POCs then review the FOIA request, along with any case-specific instructions that may have been provided by the ICE FOIA Office and based on their experience and knowledge of the program offices' practices and activities, forward the request and instructions to the individual employee(s) or component office(s) within the program office that are likely to have responsive records.

20.     Per the ICE FOIA Office's instructions, the individual(s) and component office(s) are directed to conduct searches of their file systems, including paper files and electronic files, which, in their judgment, based on their knowledge of the manner in which they routinely keep records, would likely be the files to contain responsive records.

21.     Once those searches are completed, the individuals and component offices provide any potentially responsive records to their program office's POC, who in turn provides the records to the ICE FOIA Office.  The ICE FOIA Office then reviews the collected records for responsiveness, processes the records, and applies the appropriate withholdings.

22.     ICE employees and program offices use various systems to maintain records, such as investigative files, records regarding the operation of ICE programs, and administrative records. ICE employees may store electronic records on their individual computer hard drives, their program office's shared drive (if the office uses one), DVDs, CDs, or USB storage devices. The determination of whether these electronic locations need to be searched in response to a particular

FOIA tasking, as well as how to conduct any necessary searches, is based on the manner in which the employee/office maintains the relevant files.

23.     Additionally, ICE employees use the Microsoft Outlook email system.  Each ICE employee stores his or her files in a manner which works best for that particular employee.  ICE employees use various methods to store their Microsoft Outlook email files: some archive their files monthly, without separating by subject; others archive their email by topic or by program; still others may create PST files of their emails and store them on their hard drive or shared drive. Individual employees archive their own emails according to their individual work-related needs. Individual archives of emails are searched by the individual employees based on their knowledge of where they are likely to find responsive records.

## III.     DESCRIPTION OF PROGRAM OFFICES TASKED TO SEARCH FOR RECORDS IN RESPONSE TO PLAINTIFFS' FOIA REQUEST

24.     ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States.  ERO manages all logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release.  ERO upholds U.S. immigration law at, within, and beyond the U.S. borders.  ERO operations target public safety threats, such as convicted criminal aliens and gang members, as well as individuals who have otherwise violated our nation's immigration laws, including those who illegally re-entered the country after being removed and immigration fugitives ordered removed by federal immigration judges.  ERO deportation officers assigned to INTERPOL also assist in targeting and apprehending foreign fugitive aliens who are wanted for crimes committed abroad and who are not in the U.S.  In addition, ERO removes aliens ordered removed by the U.S. to more than 170 countries around the world.

25.     The Office of the Principal Legal Advisor (OPLA), which serves as an advisor to the ICE Director and subordinate directorates, is the largest legal program in DHS.  By statute, OPLA serves as the exclusive representative of DHS in immigration removal proceedings before the Executive Office for Immigration Review (EOIR), litigating all removal cases including those against criminal aliens, terrorists, and human rights abusers.  OPLA also provides legal advice and prudential counsel to ICE personnel on their customs, criminal, and immigration law enforcement authorities, the Freedom of Information Act and Privacy Act, ethics, legal liability under the Federal Tort Claims Act, and a range of administrative law issues, such as contract, fiscal, and employment law.  OPLA represents the agency before the Merit Systems Protection Board, the Equal Employment Opportunity Commission, and the Board of Contract Appeals.  OPLA attorneys provide support to the Department of Justice in the prosecution of ICE cases and in the defense of ICE's authorities in federal court.

26.     The ICE Office of Policy and Planning (ICE Policy) leads strategic policy and regulatory development, as well as operational requirements development, to inform and empower ICE decision-makers.  ICE Policy serves as a primary policy advisor to the ICE Director and Deputy Director through its participation in interagency policy forums and engagement with DHS, DHS Components, and other Executive Branch agencies on agency-wide policy matters involving ICE operations and functions.  ICE Policy also liaises with other policy offices within ICE Directorates and program offices to develop internal ICE policy documents on topics ranging from human capital to acquisitions to law enforcement operations.  ICE Policy is responsible for identifying, developing, and effectively communicating ICE's organization priorities and policies.

## IV.   SEARCHES CONDUCTED BY ERO AND ICE POLICY IN RESPONSE TO PLAINTIFFS' FOIA REQUEST PRE-LITIGATION

27.    In the administrative stage of this FOIA request, based on its experience and knowledge, the ICE FOIA Office tasked ERO and ICE Policy with a search for potentially responsive records.

*ERO's Search*

28.    Once the search tasking was received by the ERO Information Disclosure Unit (IDU), points of contact (POCs) within ERO, IDU reviewed the substance of the FOIA request, and based on their subject matter expertise and knowledge of the program office's activities, tasked specific divisions within ERO to conduct searches for potentially responsive records.  ERO IDU tasked ERO Policy, ERO Field Operations, and ERO Enforcement.

29.    ERO Policy, a subordinate unit within the ERO Executive Information Unit, coordinates the development, review, clearance, and cancellation of policy-related documents., including directives, temporary directives, technical and procedural updates of directives, handbooks, standard operating procedures, and forms.  A management and program analyst within ERO Policy conducted a search of the ERO Policy Library, which houses policies implemented by ERO, as well as the ICE Policy Manual for potentially responsive records using the search terms "1324d," "274d," and "10088.1."  Potentially responsive records were located and returned to ICE FOIA for processing.

30.    A Unit Chief within ERO Field Operations conducted a search of the FieldOps SharePoint and the FieldOps hard drive for potentially responsive records using the search terms "sanctuary case" and "sanctuary."  Potentially responsive records were located and returned to ICE FOIA for processing.

31.     The Enforcement Program Manager within ERO Enforcement conducted a search of their desktop/laptop and outlook (email) for potentially responsive records.  For the search of the desktop/laptop, the custodian searched using the search terms "form," "directive," "instructions," "appendix," "guidance," "questionnaire," "numbers," "fines," and "sanctuary." For the search of outlook, the custodian searched using the search terms "form," "directive," "instructions," "questionnaire," "fines," and "sanctuary."   Potentially responsive records were located and returned to ICE FOIA for processing.

*ICE Policy's Search*

32.     Once the search tasking was received by the ICE Policy FOIA POC, based on their subject matter expertise and knowledge of the program office's activities, an extern conducted a search of the ICE Policy Manual and the ICE Policy Shared Drive using the search terms "274D," "I-79B," "1324d," and "sanctuary."  Potentially responsive records were located and returned to ICE FOIA for processing.

**ADDITIONAL SEARCHES OF ERO AND OPLA POST-LITIGATION**

33.     Following the filing of the instant action and after a litigation review, it was determined that additional searches for responsive records should be conducted in ERO and OPLA.

*Supplemental ERO Search*

34.     Once the supplemental search tasking was received by the ERO IDU, the ERO IDU POC reviewed the substance of the FOIA request, and, again, based on their subject matter expertise and knowledge of the program office's activities as well as communications with ICE's agency counsel, tasked the Executive Associate Director (EAD) of ERO, the Deputy Executive Associate Director (DEAD) of ERO, and the Chief of Staff of ERO.

35.     The EAD of ERO conducted a search of his outlook (email) using the search terms "civil," "fines," "INA §274(D), "8 U.S.C. § 1324d," "sanctuary," "ICE Form I-79B," and "Notice of Intention to fine."  Potentially responsive records were located and returned to ICE FOIA for processing.

36.     The DEAD of ERO conducted a search of his desktop/laptop and outlook (email) using the search terms "I-79B," "Notice of Intention," "Civil Fines," "8 USC § 1324d," "INA § 274D," and "Sanctuary."  Potentially responsive records were located and returned to ICE FOIA for processing.

37.     The Chief of Staff of ERO conducted a search of his laptop and outlook (email) using the search terms "civil fines" and "274 D."  Potentially responsive records were located and returned to ICE FOIA for processing.

*OPLA Search*

38.     Once the supplemental search tasking was received by OPLA, the OPLA FOIA POC reviewed the substance of the FOIA request, and based on their subject matter expertise, knowledge of OPLA's practices and activities, and communications with ICE's agency counsel, the Executive Deputy Principal Legal Advisor (EDPLA), the Deputy Principal Legal Advisor (DPLA) for Enforcement and Litigation, the Deputy Principal Legal Advisor (DPLA) for General and Administrative Law, the Commercial and Administrative Law Division (CALD), and the Enforcement and Removal Operations Law Division (EROLD) were tasked to search for potentially responsive records.

39.     The EDPLA and the DPLA for Enforcement and Litigation conducted a search of their outlook (email) using the search term "274D."  Potentially responsive records were located for both custodians and returned to ICE FOIA for processing.

40.     The DPLA for General and Administrative Law conducted a manual search of relevant three-ring binders and folders for potentially responsive records.  The DPLA also conducted a search of his outlook (email) using the search terms "274," "274D," "1324d," and "fine."  Potentially responsive records were located and returned to ICE FOIA for processing.

41.     The Deputy Chief of the Revenue Recovery Unit within CALD conducted a search of his desktop/laptop and outlook (email) using the search terms "civil penalties," "civil fines," and "274D."   Potentially responsive records were located and returned to ICE FOIA for processing.

42.     An Associate Legal Advisor within CALD conducted a search of his desktop and outlook (email) using the search terms "274(D)" and "1324(d)."  Potentially responsive records were located and returned to ICE FOIA for processing.

43.     An Associate Legal Advisor within CALD conducted a search of her outlook (email) using the search terms "civil penalt," "civil fines," and "274D."  Potentially responsive records were located and returned to ICE FOIA for processing.

44.     An Associate Legal Advisor within CALD conducted a search of his desktop/laptop and outlook (email) using the search terms "274D," "civil fine," and "civil penalty."  Potentially responsive records were located and returned to ICE FOIA for processing.

45.     Based on knowledge and experience with the records that were requested, EROLD deferred to ERO to provide any records that may be responsive to the request.

46.     All responsive records located by the various custodians within ERO, ICE Policy, and OPLA were processed and produced, subject to appropriate withholdings, from April 2020 through April 2021.

## ORGANIZATION OF THE *VAUGHN* INDEX

47.     Pursuant to the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), a *Vaughn* Index accompanies this declaration; the *Vaughn* Index provides a description of FOIA Exemptions 3, 5, 6, 7(C), and 7(E) redactions that Plaintiffs are challenging.

48.     The *Vaughn* index is in a table format.  The first column contains the bates number prefix and suffix (page numbers) for the records produced as well as the month in which the record was produced, i.e., April 2020 Production.  The second column contains the date of the document, where applicable.  The third column describes the document type (email correspondence, draft, etc.).  The fourth column describes the type of withholdings on the records (full or partial).  The fifth column describes the underlying records and provides justifications for the asserted exemptions.  The sixth column includes the citation for the applied FOIA Exemption.  The *Vaughn* index encompasses the challenged records identified by the Plaintiffs, which totaled more than 3,700 pages of records.  These pages were produced to the Plaintiffs from April 2020 to October 2021, subject to withholdings pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E).

## V.     DESCRIPTION OF FOIA WITHHOLDINGS APPLIED TO RECORDS PROVIDED TO PLAINTIFFS

### FOIA Exemption 5 U.S.C. § 552(b)(3)

49.     Exemption 3 of the FOIA permits an agency to withhold documents "specifically exempted from disclosure by statute . . . provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."

50.     Portions of two pages of records were withheld, in part, pursuant 8 U.S.C. § 1367 which prohibits the "use by or disclosure to anyone (other than a sworn officer or employee of the Department, or bureau or agency thereof, for legitimate Department, bureau, or agency purposes)

of any information which relates to an alien who is the beneficiary of an application for relief" through a T visa for trafficking victims, a U visa for cooperating victims of certain other crimes, or special-rule cancellation for battered spouses or children.  *See* 8 U.S.C. § 1367. ICE withheld such records to comply with the provisions of this statute.

51.     Portions of the records withheld pursuant to Exemption 3 were further withheld pursuant to FOIA Exemptions 6 and 7(C), as described below.

**FOIA Exemption 5 U.S.C. § 552(b)(5)**

52.     Exemption 5 of the FOIA allows the withholding of inter- or intra-agency records that are normally privileged in the civil discovery context.  Pursuant to Exemption 5, the three most frequently invoked privileges are the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege.

53.     In this case, ICE applied FOIA Exemption 5 to protect from disclosure information subject to the deliberative process privilege, the attorney-client privilege, and the attorney work-product privilege.

54.     ICE strives for transparency in informing the public about actions taken to achieve the various operational missions within the agency.  Notably, ICE provides announcements and news releases on its own website to notify the public of actions taken by the agency.

55.     The civil fines initiative, which is the subject of the FOIA request, stemmed from Executive Order 13768 – Enhancing the Public Safety in the Interior of the United States, which ordered the Secretary of Homeland Security to "issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties that the Secretary is authorized under the law to assess and collect from aliens unlawfully present in the United State

and from those who facilitate their presence in the United States."[2]  In order for ICE to properly implement the Executive Order's requirements, ICE's program offices (including their attorneys) and DHS personnel engaged in many open and frank discussions, recommendations, and analyses in order to determine (1) how to begin assessing and collecting fines, (2) if any legal challenges could arise, and (3) the specific process and steps ICE ERO would need to take in order to determine who would be amenable, how they would be fined, and how the fine would be collected.

56.     Final agency policies regarding this program were produced to Plaintiffs.  *See, e.g.*, ICE Directive 100881.1: Fines and Penalties for Civil Violations of Immigration Law (listing the procedures and requirements for the fine issuance process); ICE Delegation Order 01-2018 (granting field offices and local-level ICE officers authority to decide whom to fine under the guidance).

*Attorney-Client Privilege*

57.     ICE applied Exemption 5 to protect from disclosure records subject to the attorney-client privilege.

58.     The attorney-client privilege protects confidential communications between an attorney and his or her client relating to a legal matter for which the client has sought professional advice.  It applies to facts divulged by a client to his attorney, and encompasses any opinions given by an attorney to his or her client based upon, and thus reflecting, those facts, as well as communications between attorneys that reflect client-supplied information.  The attorney-client privilege is not limited to protecting documents created in anticipation of litigation.

59.     Attorney-client communications are shielded from disclosure in order to encourage a full and frank discussion between the client and its legal advisor.  The attorney-client privilege

---

[2] https://www.govinfo.gov/content/pkg/DCPD-201700072/pdf/DCPD-201700072.pdf

recognizes that sound legal advice or advocacy depends upon a lawyer being fully informed by his client.  If these communications, as covered by the attorney-client privilege, were disclosed, this could result in a chilling effect on interactions and communications between agency employees and their legal counsel.

**60.**     ICE applied withholdings to records containing confidential communications between attorneys (within ICE OPLA and to DHS Office of the General Counsel) and their client (ICE Senior Leadership, and individuals within ICE ERO, ICE Policy, and ICE Office of Public Affairs ("OPA")) relating to multiple aspects of the implementation and continuation of the civil fines initiative based on the Executive Order.  Such communications include emails containing legal advice and proposed legal strategy, as well as discussions between ICE attorneys and other personnel for the purpose of obtaining and rendering legal advice on the following topics: (i) how to assess fines on noncitizens who fail to depart the United States during the voluntary departure period; (ii) the process for identifying individuals who are candidates for the imposition of a civil fine and the application of civil fines on particular groups of noncitizens, including those taking sanctuary; (iii) having ICE's Bond Management Unit assist with reviewing noncitizen cases for potential fines; (iv) ICE's statutory authority for the assessment and collection of civil fines; (v) the statute of limitations on ICE's imposition of civil fines; (vi) complying with the Paperwork Reduction Act; (vii) letters withdrawing the imposition of civil fines and the draft Civil Fines handbook; (viii) the draft Civil Fines handbook; (ix) the accounts to be used for depositing civil penalties; (x) the filing of documents and litigation strategy in particular noncitizens' Immigration Court proceedings; and (xi) discussions concerning the review policy to be implemented pertaining to Section 274D orders.

61.     Pursuant to the attorney-client privilege, ICE also withheld legal memorandums and opinions (as well as communications concerning such documents), that were drafted in order to provide advice to their client concerning assessing and collecting civil fines against certain individuals pursuant to the INA.  Specifically, ICE withheld legal memoranda and opinions pertaining to: (i) ICE's process for collecting fines and penalties pursuant to statutory and regulatory authority; (ii) the process by which ERO would issue Notices of Intent to Fine under Sections 274D and 240B(d)(1) of the INA (iii) actions for ICE to take following the imposition of a civil fine on an individual noncitizen; (iv) a potential pilot project pertaining to the collection of civil fines by ICE ERO Field Operations; (v) how ICE could use the funds collected from civil fines in accordance with its statutory authority; and (vi) the Department of the Treasury's Bureau of Fiscal Service's Treasury Offset Program, and the collection of delinquent fines; (vii) the use of case law to provide a defense to ICE's civil fines' initiative; and (viii) the status of future cases that might be considered for fines and future collections.

*Attorney Work Product Privilege*

62.     ICE also applied Exemption 5 to protect from disclosure records subject to the attorney work-product privilege.  This privilege protects documents and other memoranda prepared by an attorney in contemplation of litigation.  Its purpose is to protect the adversarial trial process by insulating the attorney's preparation from scrutiny.

63.     As ICE developed the civil fines initiative, ICE and DHS attorneys were acutely aware of potential legal challenges to the imposition of the civil fines and its heightened potential for litigation.  Accordingly, many of the records responsive to the Request consist of records prepared by ICE attorneys in anticipation of legal challenges to the civil fines initiative generally, as well as in anticipation of challenges that would arise in individual cases.

64.     Pursuant to the work product privilege, ICE withheld information in records that was prepared by agency attorneys — specifically, questions, thoughts, strategy, and legal analysis (as well as intra-agency communications discussing the information in these records) regarding ICE's authority to impose civil penalties pursuant to Section 274D of the INA, as well as communications reflecting legal advice and litigation strategy with respect to specified immigration court proceedings.

65.     Those records were prepared by ICE and DHS attorneys in contemplation of future litigation challenging the civil fines initiative, which litigation ultimately came to fruition, *see Austin Sanctuary Network et al. v. Gaynor et al.*, No. 21 Civ. 164 (ZMF) (D.D.C. Jan. 19, 2021), and in order to assist ICE with legal filing and strategy in individuals' ongoing proceedings in immigration court.

*Deliberative Process Privilege*

66.     **Draft Documents Withheld in Full Pursuant to the Deliberative Process Privilege.**  Exemption 5 was applied to protect in full various draft documents, including (1) draft legal memorandums and legal opinions, (2) draft responses to Questions for the Record following a Congressional hearing, (3) draft versions of the ICE ERO civil fines handbook and corresponding attachments and/or appendices that were never finalized, (4) draft guidance to the ERO Field Offices regarding next steps in order to implement the civil fines initiative in each field office's area of responsibility, (5) preliminary draft forms and letters to aid ICE in the execution of the civil fines initiative, (6) draft briefing materials prepared by ICE staff to assist in the preparation of ERO Leadership for a meeting with the ICE Acting Director which predate the meeting and reflect the drafter's opinions and analysis on various topics concerning the civil fines initiative, (7) a draft Executive Summary drafted by ICE attorneys pertaining to the civil fines that can be

collected by ICE, (8) a draft Executive Summary concerning an individual's immigration history, encounter with ICE, and current location, (9) a draft PowerPoint presentation including an explanation of the statutory authority to impose penalties, considerations following immigration court proceedings, the commencement of the fines proceedings, the decision process, and the actual collection of penalties, (10) draft news releases that were subject to further review and edits, and (11) a draft template for a legal pleading prepared by ICE OPLA attorneys to potentially be used in future immigration court proceedings by the Department of Justice's Executive Office of Immigration Review.

67.    By their very nature, draft documents are pre-decisional, preliminary versions of what may later become a final document in whole or in part, or they remain drafts that never mature into final form as the material may be withdrawn or discarded during the decision-making process. In fact, the process by which a draft evolves into a final document is itself a deliberative process.

68.    Many of the draft documents withheld from the responsive document set contain significant edits, marginal suggestions and comments, and/or embedded questions regarding content.  These records were also either marked as a watermark or in the header/footer as "draft," "pre-decisional," "draft deliberative," or "pre-decisional draft," further emphasizing the importance and need to withhold them.

69.    If draft documents were released, the public could potentially become confused regarding how ICE assessed, analyzed, and proposed to collect civil fines against individuals with a final order of removal, as well as whether ICE determined if changes in the process should be made based on a review and analysis of certain phases of the initiative.  Disclosure of such material could cause harm and mislead the public as the comments and text of draft documents often differ, sometimes significantly, from final agency positions.

70.     The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions, conclusions, and recommendations included within inter-agency or intra-agency memoranda, letters, emails and drafts.  The release of these draft documents, which are by their nature non-final agency decision, would cause harm, discourage the expression of candid opinions, and inhibit the free and frank exchange of information among agency personnel.  Disclosure of draft documents would also result in a chilling effect on intra- and inter-agency communications.  ICE employees must be able to discuss proposed agency action freely.

71.     **Documents Withheld in Part Pursuant to the Deliberative Process Privilege.** As noted *supra* ¶ 55, in order for ICE to properly implement the Executive Order's requirements, ICE's program offices and DHS personnel engaged in many open and frank discussions recommendations in order to determine (1) how to begin assessing and collecting fines, (2) if any legal challenges could arise, and (3) the specific process and steps ICE ERO would need to take in order to determine who would be amenable, how they would be fined, and how the fine would be collected.  Accordingly, these discussions generated documents by ICE personnel that consist of deliberations, contemplated actions, and proposals with respect to the civil fines initiative.

72.     ICE withheld pre-decisional, deliberative internal discussions, deliberations, and recommendations between and amongst ICE Senior Leadership, ERO, OPLA, and ICE's Office of Public Affairs ("OPA") pertaining to the assessment, collection, and invocation of civil fines and penalties against individuals pursuant to specific sections of the INA.  In addition to those records for which ICE has asserted the attorney-client and attorney work product privileges, those records include emails, meeting minutes, and presentations pertaining to (1) discussions regarding comments and edits made to draft documents, (2) deliberations and recommendations pertaining

to potential candidates for the imposition of a civil penalty, (3) discussions concerning which divisions of ICE would review potential candidates for fines and the factors ICE would consider in assessing whether an individual is a proper candidate for a civil penalty, (4) discussions concerning the status and timing of ICE's implementation of the civil fines initiative, (5) discussions concerning expanding the civil fines initiative, (6) discussions about responding to potential publicity that could stem from the issuance of the Notices of Intention to Fine letters, (7) discussions concerning the proposed messaging and focus of an upcoming interview with the Washington Times, (8) discussions concerning the potential use of a particular account for the collection and depositing of civil fines, (9) discussions and proposals about the steps that ICE should take in order to issue Notices of Intention to Fine to applicable individuals, (10) recommendations about whether to proceed with issuing notices to certain individuals, (11) recommendations concerning the use of certain forms to be used during the civil fines process, and (12) discussions regarding the establishment of the ICE Victims of Immigration Crime Engagement Office ("VOICE").

73.     These records are predecisional in nature because they were prepared for purposes of assisting ICE officials in making final determinations regarding such policy issues as how, and upon whom, ICE should impose civil penalties. They are deliberative because they reflect ongoing recommendations, analyses, and discussions as to how to ICE and its various program offices should implement the civil fines program and assess whether it was working. The documents that ICE withheld pursuant to the deliberative process privilege would reveal the give-and-take through which ICE ultimately reached its final policy with respect to the issuance of civil fines.

74.     The deliberative process privilege protects the integrity of the deliberative or decision-making processes within the agency by exempting from mandatory disclosure opinions,

conclusions, and recommendations included within inter-agency or intra-agency memoranda, letters, or emails. The release of this internal information would cause harm, discourage the expression of candid opinions, and inhibit the free and frank exchange of information among agency personnel. This harm would result in a chilling effect on intra- and inter-agency communications.  ICE employees must be able to discuss proposed agency action freely.

### FOIA Exemption 5 U.S.C. § 552(b)(6)

75.    FOIA Exemption 6 allows the withholding of information found in "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(6).  Records that apply to or describe a particular individual, including investigative records, qualify as "personnel," "medical" or "similar files" under Exemption 6.  When applying this exemption to responsive records, the agency must balance the individual's personal privacy interest against the public need for the information.

### FOIA Exemption 5 U.S.C. § 552(b)(7) Threshold

76.    5 U.S.C. § 552(b)(7) establishes a threshold requirement that, to withhold information on the basis of any of its subparts, the records or information must be compiled for law enforcement purposes.

77.    The information for which FOIA Exemption 7 has been asserted in the instant matter satisfies this threshold requirement.  Pursuant to the Immigration and Nationality Act, codified under Title 8 of the U.S. Code, the Secretary of Homeland Security is charged with the administration and enforcement of laws relating to the immigration and naturalization of aliens, subject to certain exceptions.  *See* 8 U.S.C. § 1103.  ICE is the largest investigative arm of DHS and the second largest investigative agency in the federal government.  Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Customs Service and the

Immigration and Naturalization Service, ICE now has more than 20,000 employees and offices in all 50 states and 48 foreign countries, and is responsible for enforcing the nation's immigration laws, and identifying and eliminating vulnerabilities within the nation's borders.

78.    The records and information at issue in this matter pertain to ICE's obligation to enforce the immigration laws of the United States by investigating non-U.S. individuals who may be present in the United States illegally, including a potential application of a civil penalty for those individuals who have a final order of removal from an Immigration Judge.

79.    Because ICE had not previously assessed or collected civil fines from noncitizens in the manner prescribed by Executive Order 13768, the procedures and techniques that ICE developed in order to implement the civil fines initiative are not well known to the public.

### FOIA Exemption 5 U.S.C. § 552(b)(7)(C)

80.    FOIA Exemption 7(C) protects from disclosure records or information "compiled for law enforcement purposes," the release of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552 (b)(7)(C) ("Exemption 7(C)").

### Application of FOIA Exemption 5.U.S.C. § 552 (b)(6) and (b)(7)(C)

81.    When asserting Exemptions 6 and 7(C), ICE balances an individual's personal privacy interest against the public's interest in obtaining information that sheds light on ICE's performance of its statutory duties.

82.    ICE applied Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure the names, Alien number ("A-number"), health status, dates of birth, immigration case status, and other personally identifiable information relating to third parties.  This information that ICE withheld from law enforcement records would permit the identity of the named individuals to be directly or indirectly inferred.

83.     Third-party individuals have a recognized privacy interest in not being publicly associated with law enforcement investigations through the release of records compiled for law enforcement purposes.  The identities of persons named in law enforcement files (whether or not the named individual is the target of investigations or law enforcement actions) are properly withheld under Exemptions 6 and 7(C) in recognition of the stigmatizing connotation carried by the mere mention of individuals in law enforcement files.

84.     In withholding such information relating to third parties, ICE considered the privacy interests of those individuals in remaining free from embarrassment, humiliation, annoyance, harassment, intimidation, un-official questioning, retaliation, or physical harm for having been identified in these law enforcement records.

85.     Furthermore, such information, if disclosed to the public or to a third-party requester without the permission of the individual, could expose the individuals to identity theft and may reasonably lead to unwanted contact from persons that might seek to harm them.

86.     ICE also applied Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure the names, email addresses, signatures, initials, and phone numbers of federal law enforcement officers and the names, addresses, and phone numbers of other federal agency personnel.

87.     In withholding such information from law enforcement records, ICE considered the privacy interests of these federal law enforcement employees in not becoming targets of harassment - be it in the form of requests for authorized access to law enforcement information or requests for information about ongoing or closed investigations - and their interest in remaining free of interference in the performance of their duties by persons who are currently of interest to law enforcement or oppose the ICE mission.  In addition, there are privacy considerations at issue

in the interest of each of these individuals in remaining free from harassment and annoyance in conducting their official duties in the future, their interest in remaining free from harassment and annoyance in their private lives, and their interest in not being targeted by individuals in the future who may begrudge them.

88.     Further, federal law enforcement employees who take part in highly publicized or sensitive investigations or operations have an interest in keeping their involvement in such activities private in order to avoid an onslaught of media attention or stigma and undue public attention.  These federal law enforcement employees face an increased risk of harassment or attack, and, therefore, have an increased privacy interest due to the nature of their work.

89.     ICE determined that the disclosure of the information described in Paragraphs 82 and 86 above would constitute a clearly unwarranted invasion of personal privacy and thus applied Exemption 6.   In addition, ICE determined that disclosure of the information described in Paragraphs 82 and 86 above was compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of personal privacy, and thus applied Exemption 7(C).

90.     Having determined that the individuals identified in the responsive records have a cognizable privacy interest in not having their information released, ICE FOIA then balanced the interest in safeguarding the individuals' privacy from unnecessary public scrutiny against the public's interest in obtaining information that would shed light on the operations and activities of ICE in the performance of its statutory duties.  Plaintiffs have failed to articulate any public interest that could be advanced by releasing this information and in each instance where Exemptions 6 and 7(C) were applied, the redaction was limited to the name of the individual or other personally identifiable information, which if released, would not shed any further light as to the operations or

activities of ICE.  All of the information surrounding the redactions was released and the limited extent of the redaction is readily apparent from the context of the records.

## FOIA Exemption 5 U.S.C. § 552(b)(7)(E)

91.     FOIA Exemption 7(E), 5 U.S.C. §552(b)(7)(E), protects from disclosure records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions that are not well known to the public, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

## Application of FOIA Exemption 5 U.S.C. § 552(b)(7)(E)

92.     First, ICE applied a limited number of Exemption 7(E) redactions to protect from disclosure law enforcement sensitive system URLs, internal shared drive names, an internal law enforcement system name, internal tracking numbers associated with civil penalties, and internal case numbers.  The release of this information could reasonably be expected to allow a person to breach into sensitive law enforcement systems and cause foreseeable harm.  This information, used for the purpose of retrieving law enforcement sensitive information, is not commonly known, and could be used to navigate within the law enforcement system and compromise the integrity of the data either by allowing for the deletion or alteration of information.  This potential to circumvent detection and manipulate law enforcement sensitive information could place law enforcement officers and the public at risk.  In addition, release of this information could reveal techniques and/or procedures for law enforcement investigations or prosecutions and/or disclose guidelines for law enforcement investigations or prosecutions.  Disclosure of these techniques and guidelines could permit those seeking to violate or circumvent the law to take proactive steps to counter operational and investigative actions taken by ICE during enforcement operations.

93.     Additionally, ICE applied Exemption 7(E) to protect the procedural steps ICE will take in order to issue a civil fine against an individual.  The procedural aspects of this information – which includes identification of a case by the ICE ERO Field Office, review of the case, tracking number assignment, recommendation of a civil fine, and collection of the fine – are not well-known to the public.  This information is for internal use only and releasing it could reveal techniques and/or procedures for law enforcement investigations or prosecutions and/or disclose guidelines for law enforcement investigations or prosecutions.  Disclosure of these techniques and guidelines could permit those seeking to violate or circumvent the law to take proactive steps to counter operational and investigative actions taken by ICE during enforcement operations.

94.     Based on the foregoing, the disclosure of the information that was protected pursuant to FOIA Exemption 7(E) serves no public benefit and would not assist the public in understanding how the agency is executing its statutory responsibilities beyond what is already publicly known.

## VI.   SEGREGABILITY

95.     5 U.S.C. § 552(b) requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

96.     A line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied.

97.     With respect to the records that were released, all information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated and non-exempt portions were released.  ICE did not withhold any non-exempt information on the grounds that it was non-segregable.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.

Signed this 29th day of October 2021.

_____

Fernando Pineiro
Acting FOIA Officer
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009