**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AUSTIN SANCTUARY NETWORK,
FREE MIGRATION PROJECT,
GRASSROOTS LEADERSHIP, and
CENTER FOR CONSTITUTIONAL
RIGHTS,

            Plaintiffs,

    v.

UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES
DEPARTMENT OF TREASURY;
and DEPARTMENT
OF JUSTICE EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,

            Defendants.

Case No. 20-cv-1686 (LJL)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Alina Das
Vibha Kannan, Legal Intern
Rebecca Schectman, Legal Intern
Washington Square Legal Services
NYU Law Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
(347) 693-6485
alina.das@nyu.edu

*Attorneys for Plaintiffs*

Katherine Gallagher
Rafaela Uribe
Center for Constitutional
Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

*Attorneys for Plaintiffs*

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr.
Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND AND TIMELINE ...................................................................................3

   I.    Senior Officials and Undisclosed Actors Devise the Civil Fines Policy. ........................3

   II.   ICE Targets Sanctuary Leaders for Civil Fines. ..............................................................5

   III.  ICE Cancels and Then Publicly Announces the Reissuance of the Civil Fines. ..............7

   IV.  ICE Retaliates After the Instant FOIA Lawsuit is Filed. ..................................................8

   V.   Information About the Civil Fines Program Proves Essential to Advocacy Efforts. .......8

ARGUMENT ...................................................................................................................10

   I.    Standard of Review.......................................................................................................10

   II.   Defendant Failed to Conduct an Adequate Search for Relevant Records. ....................11

     a. Defendant Should Have Searched the Records of ICE Senior Leadership. ..................12

     b. Defendant Should Have Searched the Offices of Public Affairs and Partnership and
       Engagement. ................................................................................................................15

     c. Defendant's Selection of Search Terms and File Systems Varied Widely and Without
       Any Rational Basis, and the Agency Failed to Include Clearly Relevant Key Terms...15

   III.  Defendant Improperly Redacted and Withheld Information About Civil Fines Under
       Exemption 5...................................................................................................................18

     a. Defendant Has Failed to Show that the Deliberative Process Privilege Properly
       Applies to the Documents it Seeks to Withhold. ........................................................18

     b. Defendant Failed to Properly Segregate Deliberative and Pre-decisional Material from
       Purely Factual Material. ...............................................................................................29

     c. Defendant Improperly Applied the Attorney-Client Privilege to Certain Documents. 33

   IV.  Defendant's Use of Exemption 6 and 7(C) are Overbroad and Do Not Justify the
       Withholding of Names and Titles of High-Level and Policy-Making ICE Officials.....36

CONCLUSION ...............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*100Reporters LLC v. U.S. Dep't of Just.*,
248 F. Supp. 3d 115 (D.D.C. 2017).............................................................21

*Access Reps. v. Dep't of Just.*,
926 F.2d 1192 (D.C. Cir. 1991)..............................................................25

*Adamowicz v. IRS.*,
552 F. Supp. 2d 355 (S.D.N.Y. 2008) .......................................................11

*Aguirre v. Sec. & Exch. Comm'n*,
551 F. Supp. 2d 33 (D.D.C. 2008)......................................................36, 37

*Am. C.L. Union v. Dep't of Def.*,
No. 15-cv-9317, 2017 WL 4326524 (S.D.N.Y. Sept. 27, 2017) ...................18, 20, 22

*Amnesty Int'l USA v. CIA*,
No. 07-cv-5435, 2008 WL 2519908 (S.D.N.Y. June 19, 2008).........................16, 17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .....................................................................11

*Bagwell v. U.S. Dep't of Justice*,
No. 15-cv-00531, 2015 WL 9272836 (D.D.C. Dec. 18, 2015) ...............................12

*Banks v. Dep't of Just.*,
700 F. Supp. 2d 9 (D.D.C. 2010)...............................................................14

*Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*,
377 F. Supp. 3d 428 (S.D.N.Y. 2019) .......................................................15

*Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*,
No. 21-cv-2443, 2021 WL 5562558 (S.D.N.Y. Nov. 29, 2021) ........................14, 16

*Brennan Ctr. v. Dep't of Just.*,
697 F.3d 184 (2d Cir. 2012) ...................................................27, 31, 33, 34

*Campbell v. Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998)...............................................................14

*Carney v. U.S. Dep't of Justice*,
19 F.3d 807 (2d Cir. 1994) ...................................................................11

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ................................................................33

*Ctr. for Auto Safety v. Env't Prot. Agency*,
731 F.2d 16 (D.C. Cir. 1984) ..................................................................29

*DeBrew v. Atwood*,
792 F.3d 118 (D.C. Cir. 2015) ................................................................11

*Dep't of Air Force v. Rose*,
425 U.S. 352 (1976) ...............................................................................10

*Duttle v. Bandler & Kass*,
127 F.R.D. 46 (S.D.N.Y. 1989) ...............................................................33

*Env't Prot. Agency v. Mink*,
410 U.S. 73 (1973) .................................................................................29

*Fams. for Freedom v. U.S. Customs & Border Prot.*,
797 F. Supp. 2d 375 (S.D.N.Y. 2011). ...............................................38, 39

*Fox News Network, LLC v. U.S. Dep't of the Treasury*,
911 F. Supp. 2d 261 (S.D.N.Y. 2012) .....................................................35

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) .......................................................10, 21, 30

*Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*,
929 F.2d 81 (2d Cir. 1991). ....................................................................31

*Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*,
208 F. Supp. 3d 520 (S.D.N.Y. 2016) ......................................................15

*In re County of Erie*,
473 F.3d 413 (2d Cir. 2007) ...................................................................33

*In re Grand Jury Proceedings*,
102 F.3d 748 (4th Cir. 1996) ..................................................................33

*In re Grand Jury Subpoena Duces Tecum dated September 15, 1983*,
731 F.2d 1032 (2d Cir. 1984) .................................................................34

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997) ................................................................28

*Jud. Watch v. Dep't of State*,

241 F. Supp. 3d 174 (D.D.C. 2017)..........................................................................31

*Jud. Watch, Inc. v. U.S. Postal Serv.*,
  297 F. Supp. 2d 252 (D.D.C. 2004)...............................................................33, 34

*King v. Dep't of Just.*,
  830 F.2d 210 (D.C. Cir. 1987)...........................................................................32

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*,
  No. 20-cv-2761, 2021 WL 4253299 (S.D.N.Y. Sept. 17, 2021)................................20

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
  566 F.2d 242 (D.C. Cir. 1977).....................................................................29, 30

*N.Y. Times Co. v. CIA*,
  314 F. Supp. 3d 519 (S.D.N.Y. 2018). ..................................................................11

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
  19 F.4th 177 (2d Cir. 2021). .......................................................................26, 27

*Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*,
  409 F. Supp. 2d 379 (S.D.N.Y. 2006) ...................................................................30

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
  877 F. Supp. 2d 87 (S.D.N.Y. 2012) ....................................................................11

*Nat'l Council of La Raza v. U.S. Dep't of Just.*,
  411 F.3d 350 (2d Cir. 2005) ...............................................................................33

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
  486 F. Supp. 3d 669 (S.D.N.Y. 2020) .............................................................22, 24

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*,
  811 F. Supp. 2d 713 (S.D.N.Y. 2011) .......................................................20, 26, 28

*Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*,
  868 F. Supp. 2d 284 (S.D.N.Y. 2012) .............................................................20, 21

*Nat'l Whistleblower Ctr. v. Dep't of Health and Hum. Servs.*,
  903 F. Supp. 2d 59 (D.D.C. 2012)........................................................................28

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975). .............................................................................24, 31, 32

*Playboy Enters., Inc. v Dep't of Just.*,
  677 F.2d 931 (D.C. Cir. 1982)............................................................................30

*Pritchard v. Cnty. of Erie*,
   473 F.3d 413 (2d Cir. 2007) ....................................................35, 36

*Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*,
   598 F.3d 865 (D.C. Cir. 2010) ............................................................26

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
   421 U.S. 168 (1975) ...............................................................................20

*Reporters LLC v. Dep't of Just.*,
   823 F.2d 574 (D.D.C. 2017) ................................................................23

*Reporters LLC v. Dep't of Just.*,
   823 F.2d 574 (D.D.C. 2017) ................................................................27

*Roseberry-Andrews v. Dep't of Homeland Sec.*,
   299 F. Supp. 3d 9 (D.D.C. 2018) ......................................................37

*Stern v. FBI*,
   737 F.2d 84 (D.C. Cir. 1984) ........................................................37, 38

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ........................................................30

*Tax'n With Representation Fund v. IRS*,
   646 F.2d 666 (D.C. Cir. 1981) ............................................................19

*Tigue v. U.S. Dep't of Just.*,
   312 F.3d 70 (2d Cir. 2002) ...................................................................18

*U.S. Dep't of Def. v. Fed. Labor Rels. Auth.*,
   510 U.S. 487 (1994) ...............................................................................37

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989). ..............................................................................37

*U.S. Dep't of State v. Ray*,
   502 U.S. 164 (1991) ...............................................................................10

*U.S. Fish & Wildlife Serv. v. Sierra Club*,
   592 U.S. ___ (2021) ..............................................................................31

*U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*,
   852 F. Supp. 156 (E.D.N.Y. 1994) ....................................................35

*United States v. Mejia,*
 655 F.3d 126 (2d Cir. 2011) ..................................................................33

*Valencia-Lucena v. U.S. Coast Guard,*
 180 F.3d 321 (D.C. Cir. 1999) ...............................................................13

*Wachtel v. Guardian Life Ins. Co.,*
 239 F.R.D. 376 (D.N.J. 2006) .................................................................34

*Wood v. FBI,*
 432 F.3d 78 (2d Cir. 2005) ...............................................................11, 36

*Wright v. Admin. for Child. & Fams.,*
 No. 15-cv-218, 2016 WL 5922293 (D.D.C. Oct. 11, 2016)....................28

**Statutes**

5 U.S.C. § 552 (a)(4)(B)........................................................................2, 10

5 U.S.C. § 552(b)(7)(C)...........................................................................37

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................10

<u>**PRELIMINARY STATEMENT**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs the Austin Sanctuary Network ("ASN"), Center for Constitutional Rights ("CCR"), Free Migration Project ("FMP"), and Grassroots Leadership ("GL") (collectively, "Plaintiffs") hereby move this Court for an order denying the Motion for Summary Judgment submitted by the United States Department of Homeland Security Immigration and Customs Enforcement ("ICE"), the Department of Treasury ("Treasury"), and the Executive Office of Immigration Review ("EOIR") (collectively, "Defendants"), and granting Plaintiffs' Cross Motion for Summary Judgment (hereinafter the "Cross-Motion"). Plaintiffs respectfully ask the Court to find that Defendant ICE's searches were inadequate and order additional searches to uncover responsive documents. In addition, Plaintiffs request that the Court either compel Defendant ICE's disclosure of redacted and/or withheld portions of the records requested in the attached exhibits, or, in the alternative, conduct an *in camera* review of these records.[1]

In 2019, the Trump Administration made national headlines when it levied hundreds of thousands of dollars in fines against several prominent women for "failure to depart" the United States and return to countries where they feared persecution and torture. As described in greater detail below, each of these women are asylum-seekers who have taken sanctuary in houses of worship and have been outspoken leaders of the "sanctuary movement" to protect immigrant communities. The Trump Administration's choice to develop the civil fines policy and target this group of people, among the potentially millions of individuals subject to fines, raises serious legal, policy, and moral questions. In response to Plaintiffs' and the sanctuary leaders' advocacy,

---

[1] While Plaintiffs also sued the Treasury and EOIR, they are not pursuing summary judgment with respect to these two defendants. *See* ECF No. 42.

Department of Homeland Security ("DHS") Secretary Alejandro Mayorkas initiated the cancellation of the fines policy in April 2021. Yet today, more than three years after the fines were first issued, they have not been formally rescinded, and little is known about the origin and rationale behind the policy.

Plaintiffs filed a FOIA request on September 11, 2019, seeking records related to the federal government's policies and practices of imposing fines and monetary penalties on individuals, particularly leaders of the sanctuary movement. Defendant ICE did not respond, prompting Plaintiffs to file the instant lawsuit on February 26, 2020. After this Court's May 1, 2020 Order for Defendant ICE to process 1,200 pages monthly, Defendant ICE produced 6,574 pages of documents, the vast majority of which were heavily redacted or withheld in their entirety.[2] Pursuant to 5 U.S.C. § 552(a)(4)(B), ICE invoked Exemptions 5, 6, and 7(C) to conceal policies and internal communications, despite having used the media to broadcast chosen messaging around the fines, which instilled fear in immigrant communities.

Defendant ICE has failed to meet the burden for summary judgment and continues to mystify the origin and rationale behind the civil fines. First, ICE's search was inadequate. ICE used inconsistent search terms without a reasonable basis, and failed to search all systems, offices, and individuals likely to have responsive records. Second, ICE's claimed exemptions are unjustified. With respect to Exemption 5, ICE frequently invoked the deliberative process privilege to protect information which is neither predecisional nor deliberative, and failed to demonstrate that certain withheld information is protected by the attorney-client privilege. ICE's invocations of Exemptions 6 and 7(C) failed to articulate a legitimate privacy interest to justify numerous redactions of names of high-ranking agency leadership and others. This Court should compel ICE

---

[2] See Declaration of Rebecca Schectman ¶ 4 (hereinafter, "Schectman Decl.").

to disclose the withheld portions of the requested records—54 documents, or 146 pages— and search certain offices and custodians for records that shed light on this attack against women in sanctuary and the immigrant rights movement.

**BACKGROUND AND TIMELINE**

I.   **Senior Officials and Undisclosed Actors Devise the Civil Fines Policy.**

On January 25, 2017, days after taking office, former President Trump signed Executive Order No. 13768, calling on DHS to ensure the assessment and collection of civil fines from noncitizens.[3] In the year and a half that followed, Trump's closest advisors appear to have crafted the policies which resulted in women sanctuary leaders facing hundreds of thousands of dollars in fines. High-ranking government officials Stephen Miller, Gene Hamilton, and Jon Feere, all known for their anti-immigrant positions, communicated about the civil fines program during its inception.[4]

---

[3] Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017). Executive Order No. 13768 was revoked on January 20, 2021 by an Executive Order titled "Revision of Civil Immigration Enforcement Policies and Priorities." Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021).
[4] *See* Declaration of David Bennion ¶¶ 4–14 (hereinafter, "Bennion Decl."). Stephen Miller, Gene Hamilton, and Jon Feere are central architects of the Trump administration's most notable anti-immigrant policies and are affiliated with white nationalist causes and organizations. *See, e.g.*, Terry Gross, *'Hatemonger' Paints Trump Advisor Stephen Miller As A 'Case Study In Radicalization'*, NAT'L PUBL. RADIO (Aug. 24, 2020), https://www.npr.org/2020/ 08/24/905403716/hatemonger-paints-trump-advisor-stephen-miller-as-a-case-study-in-radicalization ("Miller has been seen as a link between the white nationalist agenda and the Trump White House."); *Stephen Miller's Influence on Immigration Policy — And Throughout the Administration*, AM. OVERSIGHT (Jan. 27, 2021), https://www.americanoversight.org/ investigation/stephen-millers-influence-on-immigration-policy-and-throughout-the-administration ("The fingerprints of White House Senior Adviser Stephen Miller appear on many of the Trump administration's harshest immigration policies"); *Former Trump Administration Official Gene Hamilton's Contacts with Far-Right Anti-Immigration Groups*, AM. OVERSIGHT (May 6, 2021), https://www.americanoversight.org/former-trump-administration-official-gene-hamiltons-contacts-with-far-right-anti-immigration-groups ("While he was working in the Trump administration . . . Hamilton maintained contact with many such anti-immigrant groups. He granted them a high level of access: agreeing to organize meetings, to share data, and to discuss policy."). All are deeply connected with the Center for Immigration Studies, which has been classified as an "anti-immigrant hate group" by the Southern Poverty Law Center, among other

While details remain concealed, top political leadership in Trump's inner circle were also likely involved in the beginning stages of development of the civil fines program.[5] On December 17, 2017, Feere, Senior Advisor to ICE's Director and ICE Chief of Staff, emailed DHS Assistant General Counsel Michael Davidson and ICE leadership asking for help "fast tracking" the civil fines directive.[6] On December 22, 2017, Feere reported on his progress to Miller, then White House Senior Adviser for Policy.[7] On March 25–27, 2018, Miller and Gene Hamilton, an aide to then-Attorney General Jeff Sessions, exchanged emails regarding the potential use of revenue generated by civil fines to pay for construction of a border wall, with Miller writing to Hamilton: "[s]o the fines and penalties can PAY for wall construction?" (capitalization in original).[8] Many of the limited number of documents produced from this time period are heavily redacted, including names of authors and recipients who influenced and developed the civil fines policy.

---

racist and anti-immigrant organizations. *Center for Immigration Studies*, S. POVERTY L. CTR., https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies; *see also* Bennion Decl. ¶¶ 7–10, 13.

[5] On February 6, 2017, a week after Trump's Executive Order, Chief of the ERO Law Division within OPLA (name redacted) sent an email with the subject: "Due-Outs From Meeting with ICE and DHS Leadership." Schectman Decl. Exhibit (hereinafter, "Ex.") D.1. This email distributes tasks "after a productive meeting with some of our new political leadership" on February 2, 2017. Much of the contents and many of the recipients cc'd on this email are redacted. On the same day, DHS Assistant General Counsel Michael Davidson forwarded the aforementioned email but changed the subject to: "FW: Due-Outs From Meeting with ICE and DHS Leadership HOT HOT HOT HOT." *See* Ex. D.1.

[6] *See* Ex. A.1. On December 20, 2017, a fully withheld white paper titled "White Paper.Regulatory Changes to Assess Penalties 4-21.doc" was sent in an attachment to an email from Adam Loiacono, Deputy Principal Legal Advisor for Enforcement and Litigation, to Jon Feere, Michael Davidson, and ICE leadership. *See* Ex. B.3.

[7] *See* Ex. F.5., Email from Jon Feere to Stephen Miller.

[8] *Id*; *see also In the Documents: Stephen Miller Emails with Justice Department Official About Anti-Immigration Measures*, AM. OVERSIGHT (July 23, 2020), https://www.americanoversight.org/in-the-documents-stephen-miller-emails-with-justice-department-official-about-anti-immigration-measures; *see* Plaintiff's Compl., *Am. Oversight v. DHS, DOJ, HHS, and Dep't of State*, 19-cv-00774 (D.D.C. Mar. 20, 2019), https://www.americanoversight.org/document/american-oversight-v-dhs-doj-hhs-and-state-stephen-miller-communications.

On June 19, 2018, former ICE Acting Director Thomas Homan issued ICE Delegation No. 01-2018, Delegation of Authority to Administer and Enforce Provisions Relating to Civil Penalties for Failure to Depart (hereinafter, "Delegation Order") and ICE Directive 10088.1, Fines and Penalties for Civil Violations of Immigration Law (hereinafter, "Homan Directive"), which directed ICE officials to administer and enforce fines and penalties for the violation of immigration laws.[9] ICE identifies these documents as "[f]inal agency policies" concerning the civil fines program.[10]

## II.    ICE Targets Sanctuary Leaders for Civil Fines.

Defendant ICE has released very few documents from the ten months after the Homan Directive was issued on June 19, 2018.[11] The first unredacted reference to targeting sanctuary cases appears in an April 18, 2019 email in which ICE directs field offices to target local sanctuary cases which are tracked via a spreadsheet."[12] The accompanying email was sent to a number of unknown recipients and, despite heavy redactions, appears to contain specific instructions for field offices with sanctuary cases in their area.

---

[9] *See* Ex. F.1. (Homan Delegation Order) and Ex. F.2. (Homan Directive on ICE Procedures for Implementing Civil Fines).

[10] Declaration of Fernando Pineiro in Support of ICE's Motion for Summary Judgment, ECF No. 56, ¶ 56 (hereinafter, "Pineiro Decl.").

[11] *See* Ex. E.7, A.7., an email chain showing discussion between ICE OPLA leadership and David Wetmore, Associate Deputy Attorney General in the Office of the Deputy Attorney General, who asks for an update on implementation of the civil fines and whether ICE has faced any "legal hurdles." Previously, in 2017–2018, Wetmore was an immigration advisor to the White House Domestic Policy Counsel. Wetmore worked as a Trump appointee in both positions and was later appointed by Attorney General William Barr as Chief Appellate Immigration Judge of the Board of Immigration Appeals. *See* Felipe De La Hoz, *The Shadow Court Cementing Trump's Immigration Policy*, THE NATION (June 30, 2020), https://www.thenation.com/article/society/trump-immigration-bia/.

[12] *See* D.8.

On June 26, 2019, ICE sent nine Notice of Intention to Fine (hereinafter, "NIF") letters to sanctuary leaders.[13] Email correspondence the next day announced the issuance of fines and demonstrated the agency's awareness of the fine recipients' prior advocacy and media attention surrounding their immigration cases. The email instructs recipients (all redacted) to expect media interest "because each of these cases has alreaDdy had high media interest and because 8 of the 9 appear to have lawyers," and further states that "this process is being conducted essentially in a vacuum" and contains a table tracking nine people in sanctuary.[14]

ICE's prediction of media interest was correct. The unprecedented fines made national headlines, with press coverage noting that ICE's targets were outspoken advocates who had entered sanctuary for their own protection and depended on faith-based and immigrant rights communities for food and shelter.[15] During July and August 2019, both local and national news outlets reported on the civil fines and their impact on Plaintiffs and the sanctuary leaders.[16]

---

[13] *See* Ex. F.3., Sample Notice of Intention to Fine (redacted). The NIF letters stated that ICE intended to fine each individual between $300,000 to over $500,000. These forms alleged that recipients had "willfully failed or refused to depart the United States," "willfully failed or refused to present [themselves] for removal," and "connived, conspired, or took any other action" to thwart their deportations.

[14] *Briefing Guide: ICE's Use of Civil Fines to Target Immigrant Leaders in Sanctuary*, CTR. FOR CONST. RTS. (Oct. 23, 2020), https://ccrjustice.org/briefing-guide-ices-use-civil-fines-target-immigrant-leaders-sanctuary.

[15] *See, e.g.,* Stephanie Ebbs & Anne Flaherty, *ICE Issuing Fines to Immigrants Who Have Taken Sanctuary in Churches*, ABC NEWS (July 2, 2019), https://abcnews.go.com/Politics/ice-issuing-fines-immigrants-sanctuary-churches/story?id=64094018; Franco Ordoñez, *Trump Administration Hits Some Immigrants in U.S. Illegally With Fines Up To $500,000*, NAT'L PUB. RADIO (July 2, 2019), https://www.npr.org/2019/07/02/738059913/trump-administration-sends-out-notices-of-500-000-fines-for-those-in-u-s-illegal.

[16] *See, e.g.*, Elizabeth Dias, *Ordered Deported, Then Sent a $497,777 Fine From ICE*, N.Y. TIMES (July 4, 2019), https://www.nytimes.com/2019/07/04/us/migrants-deportation-fines.html; Saja Hindi, *Colorado Immigrant Seeking Sanctuary Imposed Penalty for not Leaving the United States*, DENVER POST (July 3, 2019), https://www.denverpost.com/2019/07/03/colorado-immigrant-sanctuary-ingrid-encalada-latorre-ice/; Russ Bowen, *Immigrant Taking Sanctuary at Chapel Hill Church Among Many Nationwide Facing Hefty Fines*, CBS17 (Aug. 26, 2019), https://www.cbs17.com/news/local-news/orange-county-news/immigrant-taking-sanctuary-at-

## III. ICE Cancels and Then Publicly Announces the Reissuance of the Civil Fines.

On October 21, 2019, ICE withdrew at least seven of the NIFs without explanation.[17] On December 7, 2019, ICE announced the reissuance of fines to sanctuary leaders through an exclusive story to conservative newspaper *The Washington Times* before the sanctuary leaders ever received new notices.[18] ICE's coordination with the media to publicly announce the reissued fines, along with the sheer enormity of these civil penalties, is emblematic of the Trump Administration's use of public relations and press campaigns to instill fear in those who have publicly critiqued the U.S. immigration system.[19] Public messaging was a crucial component of the civil fines program, and ICE has heavily redacted and withheld documents about its media and public relations activities. *See* Ex. C, Media and Congressional Inquiries.

---

chapel-hill-church-among-many-facing-hefty-fines; Yonat Shimron, *Sanctuary Churches Say Fines Against Immigrants Meant to Sow Fear*, Religion News (July 3, 2019), https://religionnews.com/2019/07/03/sanctuary-churches-say-fines-against-immigrants-meant-to-sow-fear/.

[17] *See, e.g.*, *EEUU Cancela Multa de Casi Medio Millón de Dólares a una Immigrante Mexicana*, El Periodico (Oct. 23, 2019), https://www.elperiodico.com/es/internacional/ 20191023/eeuu-cancela-multa-inmigrante-mexicana-7696965; Geneva Sands, *ICE Rescinds Half-Million Fine Against Undocumented Immigrant Living in Ohio Church*, CNN (Oct. 22, 2019), https://www.cnn.com/ 2019/10/22/politics/ice-rescinds-fine-edith-espinal/index.html; Julián Aguilar, *Immigration Agency Decides Against Six-Figure Fines for Undocumented Immigrants Living in Sanctuaries,* Tex. Trib. (Oct. 23, 2019), https://www.texastribune.org/ 2019/10/23/trump-administration-cancels-big-fines-some-undocumented-immigrants/.

[18] Steven Dinan, *Exclusive: ICE Revives Six-Figure Fines Against Illegal Immigrants Living in Sanctuary*, Wash. Times (Dec. 7, 2019), https://www.washingtontimes.com/news/2019/dec/ 7/exclusive-ice-moves-revive-six-figure-fines-agains/.

[19] *See, e.g.*, J.D. Long-García, *Trump's Anti-Immigration Rhetoric is Meant to Instill Fear, Not For Enforcement, Advocates Say*, Am. Mag. (July 25, 2019), https://www.americamagazine. org/politics-society/2019/07/25/trumps-anti-immigration-rhetoric-meant-instill-fear-not-enforcement; Olivia Sanchez, *Endless Fear: Undocumented Immigrants Grapple With Anxiety, Depression Under Trump*, USA Today (Aug. 25, 2019), https://www.usatoday.com/story/news/ nation/2019/08/25/undocumented-immigrants-struggle-mental-health-surival-mode/181667 2001/; Noah Bierman, *Trump Kicks off a New Campaign Reprising His Old Themes*, L.A. Times (June 18, 2019), https://www.latimes.com/ politics/ la-na-pol-trump-reelection-kickoff-rally-arena-immigration-orlando-20190618-story.html.

## IV.    ICE Retaliates After the Instant FOIA Lawsuit is Filed.

On February 26, 2020, Plaintiffs held a press conference to announce the filing of the instant action and to denounce "the retaliatory nature of these fines."[20] Edith Espinal Moreno, an immigration activist and sanctuary leader in Ohio, stated that "I know [ICE is] trying to scare me and other people in sanctuary, but I won't give up. My faith in God and the support of the community gives me strength to do everything I can to keep my family together."[21] ICE responded two days later, signing new NIFs commanding Ms. Espinal Moreno and other sanctuary leaders affiliated with this case to appear at ICE offices for purposes of removal, departure, and similar enforcement actions and threatening further civil fines and even criminal prosecution.[22]

## V.    Information About the Civil Fines Program Proves Essential to Advocacy Efforts.

In response to this Court's orders,[23] as of February 4, 2022, Defendant ICE has made sixteen productions consisting of 6,574 total pages of responsive documents. Schectman Decl. ¶ 4. However, nearly half have been withheld in full and an additional 2,000 pages have been withheld in part, many with heavy redactions. *Id.* Even the limited information obtained through this FOIA litigation has shown that actors within and outside of the Trump Administration devised a punitive civil fines policy to target sanctuary leaders who publicly speak out about the need for changes in immigration policy.

---

[20] *Immigrant Rights Groups Sue ICE for Immediate Release of Information Concerning the Continuing Retaliation Against Immigrants in Sanctuary*, FREE MIGRATION PROJECT (Feb. 26, 2020), https://freemigrationproject.org/immigrant-rights-groups-sue-ice-for-immediate-release-of-information-concerning-the-continuing-retaliation-against-immigrants-in-sanctuary/.
[21] *Id.*
[22] The new NIFs were dated February 27, 2022, just one day after two sanctuary leaders spoke at the February 26, 2020 press conference announcing this lawsuit. *During Coronavirus Pandemic, ICE Renews Egregious Civil Fines Against Women Living in Sanctuary*, FREE MIGRATION PROJECT (Mar. 24, 2020), https://freemigrationproject.org/during-coronavirus-pandemic-ice-renews-egregious-civil-fines-against-women-living-in-sanctuary/.
[23] ECF Nos. 16, 26.

These revelations have been crucial to Plaintiffs' efforts to educate the public and change policy. Within a week of President Biden taking office, thirty Senators and House members signed a letter calling for formal protections for sanctuary leaders.[24] On April 15, 2021, *The New York Times* published an op-ed by Reverend Tom Goldsmith of Salt Lake City's First Unitarian Church, where sanctuary leader Vicky Chávez-Fino had taken refuge since 2018, criticizing the fines as "unconscionable."[25] Days later, on April 21, 2021, DHS Secretary Mayorkas announced the rescission of two Delegation Orders that had authorized ICE to administer and enforce civil penalties for failure to depart, calling the fines "unnecessar[ily] punitive."[26]

The information hidden by ICE's redactions and inadequate searches remains essential to Plaintiffs' advocacy and efforts to educate the public. The fines against the sanctuary leaders still have not been officially rescinded by ICE. Years after this policy was conceived and implemented, information about who devised it, who decided to target sanctuary leaders, and for what purpose, remains undisclosed. The public has a right to know information about an unprecedented program of large civil penalties that targeted sanctuary movement leaders who have criticized government

---

[24] *Rep. Castro, Members of Congress Join Sanctuary Leaders to Call on President Biden to Free Them from Churches Immediately*, FREE MIGRATION PROJECT (Jan. 26, 2021), https://freemigrationproject.org/rep-castro-members-of-congress-join-sanctuary-leaders-to-call-on-president-biden-to-free-them-from-churches-immediately/; Bicameral Letter in Support of Sanctuary Families (Jan. 26, 2021), available at https://castro.house.gov/imo/media/doc/1.26.20%20Castro-Markey%20Letter%20for %20 Sanctuary%20Relief%20FINAL.pdf.

[25] Tom Goldsmith, *Opinion: They Sought Refuge in Our Church. ICE Fined Them $500,000.*, N.Y. TIMES (Apr. 21, 2021), https://www.nytimes.com/2021/04/15/opinion/biden-immigrants-sanctuary.html.

[26] *See* Press Release, Dep't of Homeland Sec., DHS Announces Rescission of Civil Penalties for Failure-to-Depart (Apr. 23, 2021), https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart. Plaintiffs ASN and FMP, along with additional organizational and individual plaintiffs, have also filed an action in the District of D.C. seeking compensatory and punitive damages for the violations of Plaintiffs' First Amendment and Eighth Amendment rights as well as the violation of the Religious Freedom Restoration Act (RFRA). *Austin Sanctuary Network et al. v. Alejandro Mayorkas et al.*, No. 1:21-cv-00164-TFH (D.D.C. Jan. 21, 2021, amended March 24, 2021).

policies. Because these fines appear to have been part of a broader agenda of targeting local sanctuary policies, the fines implicate the important liberty interests of millions of people in this country who seek to remain here with their families.[27] Moreover, similar programs could be implemented in the future.[28] Information about these policies will allow the public to engage in an ongoing, critical, and pressing public dialogue about U.S. immigration policies, including the use of fines against sanctuary movement leaders.

## ARGUMENT

### I.    Standard of Review

The central purpose of FOIA is to "promote honest and open government." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999). The statute was designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Accordingly, FOIA's "strong presumption in favor of disclosure" places the burden on the defending agency to justify its searches and redactions and to show that withheld information falls within the claimed exemptions. 5 U.S.C. § 552 (a)(4)(B); *Ray*, 502 U.S. at 173.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court must draw all reasonable inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*,

---

[27] According to statements from DHS officials, ICE began issuing fine letters only in December 2018, as "part of a rolling effort to curb sanctuary jurisdictions that have thwarted Trump's efforts to deport undocumented immigrants." Maria Sacchetti, *Trump Administration Threatens Hefty Fines on Immigrants who Elude Deportation*, WASH. POST (July 2, 2019), https://www.washingtonpost.com/immigration/trump-    administration-threatens-hefty-fines-on-immigrants-who-elude-deportation/2019/07/02/956e2334-9cc2-11e9-9ed4-c9089972ad5a _story.html.
[28] *See* Bennion Decl. ¶¶ 11–15.

477 U.S. 242, 255 (1986). Summary judgment is the process generally used to resolve FOIA claims. *Adamowicz v. IRS.*, 552 F. Supp. 2d 355, 360 (S.D.N.Y. 2008). To satisfy this summary judgment burden, agencies must submit affidavits that are "detailed, nonconclusory and submitted in good faith." *Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005) (internal citation omitted).

The agency bears the burden of demonstrating that it conducted an adequate search for records responsive to the FOIA request and that any withheld material is exempt from disclosure. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). To satisfy this burden, the agency must show "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *DeBrew v. Atwood*, 792 F.3d 118, 122 (D.C. Cir. 2015) (internal citations omitted). To justify decisions to withhold responsive records, an agency must provide "reasonably detailed explanations why any withheld documents fall within an exemption." *Id.* Agency affidavits must describe with reasonable specificity the nature of the documents at issue and the justification for nondisclosure, as "conclusory assertions are insufficient." *N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519, 525 (S.D.N.Y. 2018).

## II.  Defendant Failed to Conduct an Adequate Search for Relevant Records.

Summary judgment should not be granted in favor of the agency "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 877 F. Supp. 2d 87, 96 (S.D.N.Y. 2012). Under this standard, ICE's search is woefully inadequate, missing some of the most relevant agency custodians and offices entirely, while also employing haphazard and overly narrow search terms and methods. Plaintiffs therefore request that the Court order ICE to conduct a more robust supplemental search that includes the records of key ICE senior

leadership including Jon Feere, Matthew Albence, Thomas Homan, and Thomas Blank; the Office

of Public Affairs; and the Office of Public Relations and Engagement.

### a. Defendant Should Have Searched the Records of ICE Senior Leadership.

Defendant ICE states that it searched mid-level agency offices, namely ICE Enforcement

and Removal Operations ("ERO"), ICE's Office of Policy and Planning ("ICE Policy"), and the

Office of the Principal Legal Advisor ("OPLA"). Pineiro Decl. ¶¶ 24–26. In doing so, ICE missed

the custodians most likely to have communicated with entities outside ICE—the White House, the

Department of Justice, Congressional offices, and anti-immigrant lobbyist and think tanks—

regarding the scope, rationales, and implementation of the civil fines policy. These custodians

include top ICE leadership: Jon Feere, Matthew Albence, Thomas Homan, and Thomas Blank.

There is ample basis in case law to demonstrate why ICE's failure to search these custodians

demonstrates the inadequacy of its search.

*First*, ICE failed to uncover material known to be in its possession, which "raises a

legitimate question as to thoroughness of the search." *See Bagwell v. U.S. Dep't of Justice*, No.

15-cv-00531, 2015 WL 9272836, at *2 (D.D.C. Dec. 18, 2015) (finding doubt as to the adequacy

of a search where it failed to uncover a record of communication alluded to in public). Public

records show that Plaintiffs are missing key documents regarding communications between agency

leadership about the civil fines policy. For example, documents released from a FOIA filed by the

group American Oversight show that Stephen Miller was a key architect in the formation of the

civil fines policy, and he was communicating with DHS and ICE officials. Yet Plaintiffs have not

received even one email on which he is addressed or cc'd.[29] American Oversight also uncovered

---

[29] Ex. F.5.; *In the Documents: Stephen Miller Emails with Justice Department Official About Anti-Immigration Measures*, AM. OVERSIGHT (July 23, 2020), https://www.americanoversight.org/in-

documents showing that Jon Feere, Miller's inside man at ICE, reported to Miller about "an update on the fines and penalties directive" and "where we stand on . . . 274(D)" as early as December 22, 2017—yet this email does not appear to have been produced to Plaintiffs.[30] Plaintiffs have received no emails between Feere and Miller and almost none between Feere and any other leadership outside of ICE. In fact, the only documents that ICE produced involving agency senior leadership appear to be ones in which lower-level staff were included. The failure to search ICE senior leadership has led to a striking absence of high-level communications between, for example, White House advisors like Miller and ICE senior leadership like Feere. Given Defendant's own acknowledgment that the civil fines policy was a controversial, new initiative from the start, Defendant should have searched senior leadership: its Director, Deputy Director, and the Chief of Staff. The records ICE produced cannot constitute the universe of responsive records regarding the civil fines policy.

**Second**, what ICE did produce demonstrates that senior leadership was likely to possess relevant material. For an agency's search to be adequate, it must "follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (finding a search inadequate where an agency failed to search an office identified as potentially containing responsive records and an individual with a close nexus to the record requested). This "includ[es] leads that emerge during [an agency's] inquiry." *Campbell v. Dep't*

_____

the-documents-stephen-miller-emails-with-justice-department-official-about-anti-immigration-measures.

[30] *See* Ex. F.6. (American Oversight email between Feere and Miller); Andy Kroll, *Internal Emails Reveal How Stephen Miller Leads an Extremist Network to Push Trump's Anti-Immigrant Agenda*, ROLLING STONE (Dec. 11, 2019), https://www.rollingstone.com/politics/politics-features/stephen-miller-immigration-trump-white-nationalist-emails-jon-feere-924364/ (discussing email from Feere to Miller and describing Feere as "a fixture in Miller's immigration working group where new ideas for cracking down on immigration get conceived" and "Miller's point man inside ICE").

*of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998) (holding that the district court erred in finding FBI's search adequate when FBI failed to search for potentially responsive records alluded to in other records the FBI produced). ICE failed to follow up on obvious leads obtained through its search process, which indicated that ICE senior leadership was involved in the formation of the civil fines policy. As noted above, certain key members of ICE leadership, including Jon Feere, Thomas Homan, Matthew Albence (former ICE Acting Director and Deputy Director), and Thomas Blank (former ICE Chief of Staff), were included in a selection of civil fines emails and memorandums produced to Plaintiffs. *See* Ex. A, Architects of Civil Fines. To that end, ICE had the responsibility to specifically search the emails and laptops of these prominent individuals and their associates. ICE's failure to do so demonstrates that its search was inadequate.

*Third*, ICE has not provided a reasonable explanation for why it did not search these custodians. Agencies may not unreasonably limit the offices and custodians searched without explanation. *Banks v. Dep't of Just.*, 700 F. Supp. 2d 9, 15 (D.D.C. 2010) (finding a search inadequate where the defendants failed to explain why they included some custodians and excluded others). ICE fails to provide any explanation for why the agency did not search senior leadership's files and why ICE's FOIA Office identified ERO, ICE Policy, and OPLA as the only offices likely to possess responsive records. ICE's declaration contains just one hint regarding its choice of custodians, a statement that ICE's FOIA office identified search locations based on their "knowledge regarding the responsibilities of the various program offices." Pineiro Decl. ¶ 17. But conclusory statements that an ICE officer used their "knowledge" and "expertise" to conduct a reasonable search, without further explanation, is not enough to prove the adequacy of the search. *Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*, No. 21-cv-2443, 2021 WL 5562558, at * 5 (S.D.N.Y. Nov. 29, 2021). These failures demonstrate the inadequacy

of ICE's search and underscore Plaintiffs' request, *infra*, that the Court compel Defendant to conduct supplemental searches of key offices and custodians, particularly Jon Feere.

**b. Defendant Should Have Searched the Offices of Public Affairs and Partnership and Engagement.**

For similar reasons, ICE's decision not to search the Offices of Public Affairs and Partnership and Engagement is unreasonable. A crucial purpose of the fines was the media interest that policymakers sought to generate; the imposition of hundreds of thousands of fines on women living in sanctuary with no means of self-support could not have been expected to result in the collection of funds. Indeed, ICE routinely communicated with the press about its civil fines policy and its impact on sanctuary leaders, with numerous articles published on this initiative—some of which were even referenced in produced emails with the Office of Public Affairs and the Office of Partnership and Engagement. *See* Ex. C, Media and Congressional Inquiries. Several emails also included communications with Richard Rocha, Senior Advisor for the ICE Office of Partnership and Engagement, and the Office of Public Affairs in advance of press releases or congressional inquiries. *See, e.g.*, Ex. C.4., C.9. To that end, ICE's failure to search these two offices was an obvious failure to follow up on search leads, showing that its search was inadequate.

**c. Defendant's Selection of Search Terms and File Systems Varied Widely and Without Any Rational Basis, and the Agency Failed to Include Clearly Relevant Key Terms.**

An agency's search can also be deemed inadequate when it fails to explain unreasonable differences between search terms across offices, *see Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019), or when an agency fails to explain why clearly relevant search terms were not used, *Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016). Additionally, agencies cannot fail to

use obvious terms, acronyms or spelling variations in their searches, *Amnesty Int'l USA v. CIA*, No. 07-cv-5435, 2008 WL 2519908, at *1, *15 (S.D.N.Y. June 19, 2008), or fail to explain discrepancies between the systems each office searched. *Brennan Ctr. for Just.*, 2021 WL 5562558, at *5 (holding that a search was improper where the defendant failed to explain why some ICE divisions searched shared drives while others did not).

ICE's search for responsive records was inadequate under this standard. ICE used a haphazard and inconsistent approach to its search terms and methods because it failed to give standardized instructions when delegating to internal offices, resulting in widely divergent terms and an inconsistent search of file systems across different units; used unlikely plural and compound words; and excluded obviously relevant terms that were clearly identified as central to the request. For example, within OPLA, the Executive Deputy Principal Legal Advisor and the Deputy Principal Legal Advisor for Enforcement and Litigation only searched for one term, "274D," and only two of the three associate legal advisors even included the term "civil fines" in their search. Pineiro Decl. ¶¶ 39–44. Not one of the OPLA officers included the term "sanctuary" in their search terms (or other spelling variations). *Id.* ICE cannot have conducted an adequate search when it failed to include clearly relevant search terms from the FOIA request. *See Brennan Ctr. for Just.*, 2021 WL 5562558, at *5 (finding that ICE's search was inadequate where some divisions failed to use what other divisions deemed clearly relevant search terms, including basic phrases like "training" or "guideline" when the FOIA request called for "training materials" and any materials that "guide" agents in implementing the handbooks).[31] The Pineiro declaration also fails to explain

---

[31] In response to ICE's request, Plaintiffs provided ICE with an initial list of search terms before their April 2020 production in a letter dated April 9, 2020. *See* Ex. F.7. This list included obvious search terms, such as "sanctuary" and "civil fines," but also included the names of specific sanctuary leaders. ICE failed to include even the most obvious of search terms from this list even though the agency had actively requested and received guidance from Plaintiffs.

whether certain words were searched in both their singular and plural form, if other acronyms or spellings were used, and if these terms were searched together through Boolean connectors, all of which are required to establish an adequate search. *See Amnesty Int'l USA*, 2008 WL 2519908, at *1.

Similarly, the ICE FOIA Office tasked ICE Policy to respond to Plaintiff's FOIA Request but provided no further guidance on how to carry out the task, leading to the omission of significant search terms. Pineiro Decl. ¶ 32. An extern conducted a search of the ICE Policy Manual and the ICE Policy Shared Drive using the search terms "274D," "I-79B," "1324d," and "sanctuary." *Id.* A search using only four terms, without even the inclusion of clearly relevant terms like "civil fines" and "penalties" (and their singular and plural forms) is not reasonably calculated to uncover documents relevant to Plaintiff's seven-part FOIA request. The same flaws are present in the search conducted by ERO.[32] ICE offers no explanation, let alone a reasonable one, for why it failed to search using patently obvious search terms, and why some of the terms it did use were only used in some searches and locations.

Finally, ICE haphazardly selected file systems to look for responsive records. While ERO Field Operations conducted a search of the division's SharePoint and hard drive, the program manager within ERO Enforcement searched his or her laptop and email. Pineiro Decl. ¶¶ 29–31.

---

[32] ERO's Information Disclosure Unit tasked three subdivisions with searching for responsive documents only "based on their subject matter expertise and knowledge of the program office's activities," resulting in widely divergent search terms and the omission of key words. Pineiro Decl. ¶ 28. A management and program analyst within ERO Policy searched for only three terms: "1324d," "274d," and "10088.1." A Unit Chief within ERO Field Operations only searched for two terms: "sanctuary case" and "sanctuary." And the Enforcement Program Manager within ERO conducted searches for nine terms on their laptop ("form," "directive," "instructions," "appendix," "guidance," "questionnaire," "numbers," "fines," and "sanctuary") and six search terms in their emails ("form," "directive," "instructions," "questionnaire," "fines," and "sanctuary.") *Id.* at ¶¶ 28–31. Moreover, ERO Policy also failed to search key terms included in the FOIA Request, such as "sanctuary," "notice of intent to fine," and "civil fines."

Meanwhile, ICE Policy only searched the ICE Policy Manual and ICE Policy Shared Drive without searching any individual's computer or email. *Id.* at ¶ 32. Furthermore, OPLA tasked six people with searching for responsive records without explanation, and of those individuals, only three searched their laptops. *Id.* at ¶¶ 39–44. ICE's declaration fails to justify any of these discrepancies. Such obvious gaps in search terms and system locations, unexplained in any way by the agency's affidavits, are grounds to find that Defendant's search was inadequate and that the Court should compel them to properly search certain custodians and offices.

### III. Defendant Improperly Redacted and Withheld Information About Civil Fines Under Exemption 5.

#### a. Defendant Has Failed to Show that the Deliberative Process Privilege Properly Applies to the Documents it Seeks to Withhold.

Defendant ICE has improperly withheld approximately 90 pages under Exemption 5's deliberative process privilege. Exs. A-E. In order for the government to properly assert the deliberative process privilege, it bears the burden of showing that the "inter- or intra-agency" record at issue is both (1) "predecisional," *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) "deliberative," *i.e.*, actually related to the process by which policies are formulated. *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76 (2d Cir. 2002); *see also Am. C.L. Union v. Dep't of Def.*, No. 15-cv-9317, 2017 WL 4326524, at *15–16 (S.D.N.Y. Sept. 27, 2017) (holding that to qualify for the privilege, documents must be made to assist a decisionmaker in arriving at a decision and be part of the agency "give and take" of the deliberative process).

ICE arrived at its final civil fines policy on June 19, 2018. Contrary to ICE's position, the deliberative process privilege does not apply to ICE's interpretations, implementation, and applications of the already-final civil fines guidance, including discussions of proposed changes to existing policy and/or how to apply existing policy to specific cases. Similarly, ICE misapplied

the deliberative process privilege to its discussions of how to articulate the already-final policy to the public. The Court should order the release of these materials.

### i. The June 19, 2018 ICE Directive and Delegation Order Are the Final Expression of the Civil Fines Policy.

In deciding whether a record or is pre- or post-decisional, courts first determine when a final decision has been made. To do so, courts examine (1) who the document or policy was issued by, and whether they possess the authority to make a final policy decision; and (2) if the documents are relied upon as accurate representations of agency policy. *See Tax'n With Representation Fund v. IRS*, 646 F.2d 666, 683 (D.C. Cir. 1981). Applying this analysis to the records produced by ICE, the June 19, 2018 Homan Directive and Delegation Order constitute the final civil fines policy. *See* Exs. F.1, F.2. ICE has therefore mislabeled dozens of records as pre-decisional when in fact they relate to the clarification, application, or implementation of this final policy.

First, the Directive and Delegation Order were signed by Thomas Homan, then-Acting Director of ICE, who had the authority to issue final policies. Second, ICE itself references these documents as "final agency policies" in its declaration. Pineiro Decl. ¶ 56. Third, the Vaughn Index supports the conclusion that the Directive and Delegation Order were the culmination of prior deliberations. Of the dated documents, Defendant's Vaughn Index includes over 90 partially withheld and over 10 fully withheld documents from January 2017 to June 2018 that show ICE discussed the structure of the civil fines policy in the months preceding the issuance of the Homan Directive and Homan Delegation Order in great detail.[33] The flurry of more than forty emails and documents between January 1, 2018 to June 19, 2018 suggests that the Homan Directive and Delegation Order are a culmination of over a year's worth of discussions, deliberations, and

---

[33] *See, e.g.*, Def.'s Vaughn Index, ECF No. 56-1, p. 18, 122, 123.

research on how to operationalize Trump's Executive Order 13768 on civil fines. Finally, there is clear evidence that after the Homan Directive and Delegation Order were issued, the policy was treated as final and the "give and take" of deliberative process considerably stopped. *Am. C.L. Union*, 2017 WL 4326524, at \*15–16. In fact, there is only one email sent about the civil fines program between November 2018 and April 2019—a January 2019 email where David Wetmore acknowledges that "[i]t has been some time – apparently last July – since we last discussed ICE's fine collection." Ex. E.7. ICE clearly treated the June 19, 2018 documents as an expression of final policy, with further emails and documents discussing the application and implementation of this policy in specific cases.

### ii. Defendant Improperly Withheld Agency Interpretations and Applications of Already-Final Guidance.

The most basic indicator of a record's predecisional nature is that it be "antecedent to the adoption of an agency policy." *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 811 F. Supp. 2d 713, 742 (S.D.N.Y. 2011). By contrast, a record is not predecisional if it "set[s] forth the reasons for an agency decision already made," *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975), or if it contains deliberations on the implementation of an existing policy or how to apply an existing policy to a specific case, *Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, 868 F. Supp. 2d 284, 293 (S.D.N.Y. 2012); *see also Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, No. 20-cv-2761, 2021 WL 4253299, at \*13 (S.D.N.Y. Sept. 17, 2021) (excluding from the deliberative process privilege emails discussing how to apply the agency's existing policy on employee press communications to the specific case of an employee with an upcoming media interview). A document qualifies as "deliberative" if "it formed an essential link in a specific consultative process, reflects the personal opinions of the writer rather than the policy of the agency, and if

released, would inaccurately reflect or prematurely disclose the views of the agency." *Grand Cent. P'ship*, 166 F.3d at 482.

Defendant has not met the requirements for withholding the challenged documents under the deliberative process privilege. ICE repeatedly asserts the privilege to withhold documents that post-dated the final civil fines policy issued on June 19, 2018, and were simply an application, clarification, or interpretation of an existing policy. The subsequent discussions related to civil fines enforcement against subsets of noncitizens (like individuals in sanctuary)—including the decisions to issue, withdraw, and reissue NIFs against specific people—are not new policies but rather case-specific applications of the final civil fines policy. *See, e.g.*, *Nat'l Immigr. Project*, 868 F. Supp. 2d at 293. Additionally, ICE recycles boilerplate language or restates the statutory standard in the Vaughn Index without pointing to any clear subsequent policy decisions that these documents are deliberating. *See 100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017) (rejecting agency argument that "would create a four-year umbrella effectively shielding all agency action from review without accounting for any subsidiary agency decisions" in the Vaughn Index).

The withheld documents are post-decisional and not protected by Exemption 5 because they (1) implement and apply the civil fines policy to different ICE field offices or subsets of noncitizens (including sanctuary cases); (2) legally clarify how this existing policy applies to certain individuals; (3) explain the policy to lower-ranked ICE officials; (4) consider future collections attempts and procedural changes to this existing policy or provide justifications for such policy decisions; and (5) contain other information that explains, interprets, or applies the June 2018 civil fines policy.

For example, ICE improperly redacted parts of a spreadsheet which contains information about noncitizens in sanctuary who were subject to NIFs with updates from August 12, 2019. Ex D.12. Defendant's Vaughn Index claims that the deliberative process privilege applies because ICE personnel are providing a recommendation whether to proceed with issuing NIFs to certain noncitizens in sanctuary. Def.'s Vaughn Index, ECF No. 56-1, p. 254–55. However, this description makes clear that the decision to proceed with fining sanctuary leaders contemplates how to *apply* the existing civil fines policy to a particular subset of noncitizens, not create new policy. *See Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 700 (S.D.N.Y. 2020) (holding that ICE documents contemplating how to apply the Priority Enforcement Program policy in certain cities was not protected by the deliberative process privilege because it was an application of existing policy).

The same can be said about other emails and documents discussing how to apply the civil fines policy to sanctuary leaders and other noncitizens. In a November 21, 2019 email discussing sanctuary cases, Defendant justifies withholdings in part because the document includes the discussion of "future collection efforts along with draft letters" and "draft redelegation orders." Ex. D.11.; Def.'s Vaughn Index, ECF No. 56-1, p. 249–50. However, additional changes to a policy or "[m]ore guidance . . . does not undercut the finality of the guidance already given." *Am. C.L. Union*, 2017 WL 4326524, at *8; *see also Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 669 (finding that redactions in "one section laying out two options for moving forward with the form rollout, and the recommendation by the paper author on new language for the form," related to the "implementation or [ ] application of an existing policy . . . as opposed to the formulation of a new policy").

Defendant has similarly shielded at least 25 additional pages of records dated after June 19, 2018 that also involve the application, implementation, or clarification of the civil fines policy and should not be withheld under the deliberative process privilege. *See* Exhibit D, particularly D.5., D.7., D.8., D.9.–D.11., D.14., D.15., D.17., D.18., D.20., and D.22.[34] Thus, Defendant has

---

[34] **Ex. D.5.** includes emails between ICE ERO and OPLA on July 9, 2018, to July 18, 2018, soon after the issuance of the Homan Directive and Delegation Order. In **Ex. D.7.**, Defendant improperly applied redactions to this November 8, 2018 email sent on behalf of Acting Assistant Director for Field Operations to ICE field directors giving further instructions on the Homan Directive and next steps on the implementation of the fines policy in different jurisdictions. The email also travels from the direction of a superior officer to inferior staff, which suggests that it is less likely to be deliberative and more likely to contain explanations of previously made decisions. *Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Just.*, 823 F.2d 574, 586 (D.C. Cir. 1987). **Ex. D.8.** is an email that includes "recommendations regarding which information should be included in either a questionnaire or an executive summary in order to assist ICE Headquarters in determining if an individual is amenable for a fine." Def. Vaughn Index, ECF No. 56-1, p. 84. Thus, this email seems to be an explanation of the most salient criteria that should be noted for individual cases based on the existing civil fines policy. Furthermore, the email thread is dated April 18, 2019, after the issuance of the June 2018 policy, and it goes from a higher-ranked, ICE headquarters official (ERO Domestic Operations — West Unit Chief) to lower-ranked, peripheral officials (multiple Field Officer Directors across various cities), which are generally considered deliberative. *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 586. In **Ex. D.10.**, ICE's Vaughn Index argues that this email, dated October 23, 2019, is protected because ICE ERO is discussing future collection efforts and which cases could be amenable to a fine based on certain criteria. Def. Vaughn Index, ECF No. 56-1, p. 251. However, this is simply another example of Defendant attempting to apply the civil fines policy and existing criteria to future cases they are interested in pursuing. The email seems to describe "an example" and what criteria it could possibly meet under the fines policy. In **Ex. D.11.**, the title itself of the emails in 2019 and 2020, "Civil Fines Updates," do not appear deliberative. In **Ex. D.14.**, Defendant's Vaughn Index suggests that these pages are improperly withheld because they are not deliberative of any decision and are simply summaries ("working drafts of synopses of cases pertaining to third parties who are potential candidates for civil penalties"). Def. Vaughn Index, ECF No. 56-1, p. 63. ICE argues that because these drafts contain tracked changes, it should be withheld under the Deliberative Process Privilege. However, this is an improper withholding of a document just because it is a draft document. *See Reporters LLC v. Dep't of Just.,* 823 F.2d 574, 585 (D.D.C. 2017) (a draft report is not deliberative if it was not "generated as part of a definable decision-making process"). In **Ex. D.15.**, Defendant improperly redacted Power Point slides dated on August 20, 2019. Neither the title of the presentation, "Program Overview" or the redactions in "Trial Cases - HQ Selects" appear to be deliberative. In fact, ICE's Vaughn index notes this about "which types of cases should be considered for a civil fine in the future," Def. Vaughn Index, ECF No. 56-1, p. 111–12, showing that Defendant itself seems to be acknowledging that this is a discussion of whether an existing policy could be applied to a particular set of people. The emails in **Ex. D.17.**, which take

erred in withholding documents issued after the June 19, 2018 civil fines policy that are simply discussing how to implement the policy or apply parts of the policy to specific circumstances.

### iii. Defendant Improperly Applied the Deliberative Process Privilege to Discussions that are not Deliberative and to Documents That Likely Contain Information Expressly Adopted in the Final Policy

The deliberative process privilege is less likely to protect communications moving from superior to inferior staff because they are more likely to contain explanations of previously made decisions or recommendations that become final agency policy. *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 586. Moreover, if an agency "chooses expressly to adopt or incorporate by reference" a once-predecisional recommendation, that document is no longer "predecisional," and accordingly, it loses protection under Exemption 5. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975). These records become the "working law" of an agency, as they include "the reasons which . . . suppl[ied] the basis for an agency policy actually adopted." *Id.*

First, Defendant failed to justify their broad withholdings in emails that involve the communication of ICE leadership, who were explaining previous policies. Many of these communications—even those before the issuance of the final civil fines policy on June 19, 2018— do not appear to only contain deliberative information, particularly emails coming from Jon Feere, and other members of ICE leadership. *See* Exs. A.1., A.2., A.5. (emails that include Feere and

---

place between April to May 2019, discuss "the statute of limitations and the issuance of civil fines for sanctuary cases," which concerns the application of the civil fines policy to a subset of noncitizens. Def. Vaughn Index, ECF No. 56-1, p. 106–109. For **Ex. D.18.**, Defendant justifies the redactions in this October 9, 2019 email based on the fact that these emails discuss the "status of the draft civil fine withdrawal letters and proposed language that can be used in the drafts." Def. Vaughn Index, ECF No. 56-1, p. 163. However, more guidance and proposed additions can also serve as an agency implementing an existing policy. *See Nat'l Day Laborer Org. Network*, 486 F. Supp. 3d at 669 (finding that redactions in one section that laid out two potential options for next steps in a form rollout related to the implementation of an existing policy). **Ex. D.20.** and **D.22.** include emails dated November 21, 2019, and July 27, 2019, well after the Homan Directive and Delegation Order, and even after issuance of fines to sanctuary leaders on June 26, 2019.

other ICE Senior Leadership communicating with staff before June 19, 2018). For example, in an email thread from December 17, 2017, Feere states to OPLA Attorney Mike Davidson that he is "hoping you can help me fast track the directive . . . to collect all fines and penalties from illegal aliens and those who facilitate their unlawful presence." Exs. A.1., A.2. However, ICE has withheld a large portion of Feere's comments that follow an excerpt of a final DHS enforcement memo. Defendant's Vaughn index justifies the withholding under the deliberative process privilege because the email includes "a request for legal advice made to ICE OPLA's leadership regarding proposed steps to issue civil fines." Def. Vaughn Index, ECF No. 56-1, p. 259. However, the unredacted portion of the email suggests that Feere is explaining his understanding of an existing policy, the DHS enforcement memo's directive, which should not be withheld under the deliberative process privilege.

Second, broad withholdings of Feere's emails are not justified if these recommendations were expressly adopted in the final civil fines policy. Since discussions from senior officials are more likely to "manifest decisionmaking authority" and to be "the denouement of the decisionmaking rather than part of its give-and-take," many of the discussions which include Feere and other ICE leadership likely were adopted or incorporated by reference in the final civil fines policy. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); Exs. A.1, A.2., A.5. Plaintiffs respectfully request that the Court compel Defendants' disclosure, or at minimum conduct *in camera review*, of redacted portions of all emails including Jon Feere before June 19, 2018 containing challenged exemptions pursuant to 5 U.S.C. § 552(a)(4)(B).

### iv. Defendant Erred in Withholding Documents That Merely Discuss How to Articulate the Civil Fines Policy to Outside Entities.

Agency discussions of how to respond to questions about a previously determined policy, particularly when there is already a final communications policy in place, do not relate to the

substantive formation of new policy. *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 876 (D.C. Cir. 2010). Where, as it appears here, "agency personnel are debating, both implicitly and explicitly, how frank to be with the public about what the agencies' policies are," the materials are not privileged. *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 741–42.

In *National Resource Defense Council*, the Second Circuit recently held that records reflecting agency deliberations about how to present a policy to the public are covered by the deliberative process privilege even if the underlying policy decision they are presenting is final. *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 19 F.4th 177, 187 (2d Cir. 2021). However, the court acknowledged that only documents that require a "policy-oriented judgment" in how to present an already final policy to the public are protected. *Id.* In other words, if the agency has already established a final communications policy, subsequent discussion on how to present aspects of an underlying agency decision are not protected. *Id.*

Based on this standard, Defendant should not withhold deliberations on how to present the civil fines policy to the public after July 3, 2019, when ICE Communications Director Bryan D. Cox issued an email that seemed to establish the agency's media strategy on how to present the civil fines policy to the public. Ex. F.4. As the Second Circuit explained in *NRDC*, if there is already an established communications policy, future discussions need not be withheld because these deliberations do not involve "the formulation or exercise of policy-oriented judgment." *Nat. Res. Def. Council*, 19 F.4th at 187–88. Cox's email indicates that the approved statement is a response to the Washington Post and "multiple local media outlets," suggesting that this email is an expression of how to officially present the fines policy to the public.

Further agency communications discussing ICE's public strategy are simply iterations of their already-final communications decision outlined in Cox's July 3, 2019 email and not a policy-

oriented judgement protected under the privilege. *See Nat. Res. Def. Council*, 19 F.4th at 185–86. It follows that an internal email on December 6, 2019 from an ICE Spokesperson from the Office of Public Affairs to ICE ERO's Enrique Lucero regarding his upcoming interview with the *Washington Times* is simply an application of an already-final communications decision. Ex. C.9. The same is true for ICE's improper withholding of draft news releases, which are all dated after the issuance of the civil fines policy (June 19, 2018) and after Cox's email establishing ICE's media strategy (July 3, 2019). Exs. C.3., C.6., C.5., C.7.

Defendant also failed to justify its withholdings of questions and answers responding to congressional inquiries about the civil fines policy under the deliberative process privilege. Ex. C.1., C.8. Although Defendant's Vaughn Index claims that this is a draft response with tracked changes, the attachment included in the email includes the word "final." The second set of responses to the questions for the record, dated March 11, 2020, are fully withheld. These records are not predecisional or deliberative, as they do not form "an essential link in a specific consultative process" or "prematurely disclose the views of the agency." *Brennan Ctr. v. Dep't of Just.*, 697 F.3d 184, 202 (2d Cir. 2012). These responses are dated July 25, 2019 and March 2020, well after the Homan Directive and Delegation Order was issued and after Cox's July 3, 2019 email established ICE's public media strategy. The answers outlined in response to the congressional hearings are simply a matter of how to publicly communicate an established civil fines policy, informed by ICE's internal communications strategy.[35] Thus, Defendant ICE has

---

[35] Even if the agency argues that these questions should be protected as a draft document, a draft report is not deliberative if it was not "generated as part of a definable decision-making process." *Reporters LLC v. Dep't of Just.,* 823 F.2d 574, 585 (D.D.C. 2017). As Judge Scheidlin noted in *National Day Laborer Org. Network*, these communications show what "agency personnel are debating, both implicitly and explicitly, [and] how frank to be with the public about what the agencies' policies *are*. These are not the sorts of deliberative discussions that the privilege is

erred in withholding these documents discussing how to present the civil fines policy to the public.

> v. **Defendant Should Produce Withheld Documents to Plaintiffs Because the Deliberative Process Privilege Can be Outweighed by the Possibility of Government Misconduct.**

Where there is reason to believe the documents sought may shed light on government misconduct, "the [deliberative process] privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997) (internal quotation marks and citations omitted); *see also Nat'l Whistleblower Ctr. v. Dep't of Health and Hum. Servs.*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) (finding that the government misconduct exception could be invoked in FOIA cases); *Wright v. Admin. for Child. & Fams.*, No. 15-cv-218, 2016 WL 5922293, at *11 (D.D.C. Oct. 11, 2016).

Defendant ICE should not withhold the challenged documents under the deliberative process privilege because the propriety of the government's decision-making process for the civil fines policy is in question and documents suggest government misconduct. There are clear indications within the documents that sanctuary leaders were actively targeted, with ICE noting the significant media interest that these cases had garnered.[36] In fact, Defendant's own brief notes that they were discussing the "the application of civil fines on particular groups of noncitizens, including those taking sanctuary."[37] The involvement of anti-immigration policymakers such as Jon Feere and Stephen Miller also raises concern that the administration was issuing these fines in

---

intended to protect; these are the sorts of discussions that FOIA is intended to *reveal*." *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 741.

[36] *Briefing Guide*, *supra* note 14.

[37] Def. Memo of Law in Support of Motion for Summary Judgement, ECF No. 55, p. 14–15.

retaliation against women immigrant activists.[38] Their continued influence shaping immigration policy even outside of the administration and the real possibility that these individuals could return to the administration and continue this punitive policy suggests that there is an extremely strong public interest and a clear sign of government misconduct in instituting this policy, which should weigh towards disclosure.[39]

### b. Defendant Failed to Properly Segregate Deliberative and Pre-decisional Material from Purely Factual Material.

Under 5 U.S.C. § 552(b), agencies must disclose "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt." ICE must disclose "purely factual material" that can be separated from portions of the documents that they wish to withhold. *See, e.g.*, *Env't Prot. Agency v. Mink*, 410 U.S. 73, 91 (1973) (agencies must release "severable" factual material). An agency "cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). This segregability requirement applies to all documents and all exemptions in the FOIA. *Ctr. for Auto Safety v. Env't Prot. Agency*, 731 F.2d 16, 21 (D.C. Cir. 1984).

If Defendant claims that certain non-exempt records are not segregable, they "should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead*, 566 F.2d at 261. In addition, Defendant must "provide the reasons behind their conclusions" that records are not segregable—otherwise plaintiffs will be unable to evaluate records and courts will be unable to review them. *Id.* The purpose of this requirement is consistent with the principles of the FOIA, as it "cause[s] the agency to reflect on the need for secrecy" as well as reducing the court's reliance on *in camera* review. *Id.* Before

---

[38] See Bennion Decl. ¶¶ 6–9.
[39] *Id.*

approving an agency's assertion of a FOIA exemption, "the district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

In this case, there are several white papers that have been fully withheld.[40] While Defendant asserts that each of these documents contains legal analysis, there are likely sections which are purely factual, such as sections providing background, context, or citations as well as the author(s) of each document. *See Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 409 F. Supp. 2d 379, 385 (S.D.N.Y. 2006) ("Subjective opinions with respect to an agency's policy are protected. . . . But preliminary findings as to objective facts are not shielded . . . ."); *Grand Cent. P'ship*, 166 F.3d at 482 ("[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.").

These background facts are not protected simply because Defendant found some facts responsive to their task of issuing civil fines. *See, e.g., Playboy Enters., Inc. v Dep't of Just.*, 677 F.2d 931, 935 (D.C. Cir. 1982) ("[A] report does not become a part of the deliberative process because it contains only those facts which the person making the report thinks material."); *Jud. Watch v. Dep't of State*, 241 F. Supp. 3d 174, 185 (D.D.C. 2017) ("[T]he mere selection of facts

---

[40] *See* Ex. B, White Papers and White Paper Correspondence, including Exs. B.2. and B.3., both white papers which were sent in response to Jon Feere's December 17, 2017 email asking for help to "fast track the directive in the DHS enforcement memo to collect all fines and penalties from illegal aliens and those who facilitate their unlawful presence"; Ex. B.4. (white paper attached to a January 18, 2018 email titled "COLLECTION OF DELINQUENT FINES FOR FAILURE TO DEPART THE UNITED STATES THROUGH THE TREASURY OFFSET PROGRAM (TOP)"); Ex. B.5. (white paper reflecting preliminary background and proposed steps to follow in order for ICE to collect fines pursuant to Section 274D of the INA); Ex. B.6. (white papers including preliminary background and analysis regarding how ICE will collect fines pursuant to Sections 274D, 274C, and 240B of the INA); Schectman Decl. ¶ 6.

to be incorporated in a summary is [not] enough in and of itself to satisfy the requirement that it be deliberative."). Since Defendant has not shown in its declaration or Vaughn Index how factual material is "inextricably intertwined" with privileged material, the agencies have not met their "burden of establishing the necessity of keeping its records' factual observations undisclosed." *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991).

Beyond likely containing factual material, these white papers must be examined to see if they are agency "working law," and thus fall outside of the bounds of the deliberative process privilege and Exemption 5. Documents characterized as "opinions and interpretations which embody the agency's effective law and policy" are subject to disclosure under this exception. *Sears*, 421 U.S. at 153 (internal quotation marks omitted).[41] "The reasons for a decision made by an agency, or a policy actually adopted" are agency working law and are subject to disclosure. *Brennan Ctr.*, 697 F.3d at 196. Though documents which are merely last in a series of drafts are not necessarily final, ones treated by the agency as final and given "real operative effect" are final and cannot be withheld under Exemption 5's deliberative process privilege. *U.S. Fish & Wildlife Serv. v. Sierra Club*, 592 U.S. ___ at *6 (2021) (quoting *Sears*, 421 U. S. at 160).

These white papers are referenced in subsequent emails, including a June 10, 2019 email which referenced a request for "providing a copy of the white paper on the collection of penalties and fines to OMB."[42] The fact that agencies external to ICE are asking for a copy of a white paper suggests that this is a final expression of agency policy or "working law" of the agency. *Brennan Ctr.*, 697 F.3d at 196. Shielding these already-decided policy documents from review is exactly the type of practice that the FOIA seeks to remedy in its representation of "a strong congressional

---

[41] *See* B.1., email correspondence discussing a white paper with ICE Policy staffers.
[42] *See* Ex. B.7.

aversion to secret [agency] law." *Sears*, 421 U.S. at 152 (internal quotation marks omitted). At a minimum, the court should conduct an *in camera* review of the documents in Exhibit B to determine whether they contain information that is factual, post-decisional, non-deliberative, or has been adopted as final policy.

Similarly, in Exhibit D.13., a fully withheld Bates range, Defendant's Vaughn Index does not provide an author, person or entity seeking advice, time period when authored, or purpose behind what Defendant alleges is a "[l]egal analysis of how civil fines and penalties not currently assessed can be collected by DHS." This modest description does not meet the standard to prevail on a claim of summary judgment. *See supra* I. Standard of Review; *King v. Dep't of Just.*, 830 F.2d 210, 219 (D.C. Cir. 1987) ("Specificity is the defining requirement of the Vaughn index and affidavit.").

Defendant contends in their Motion and the Pineiro declaration that their release of 2,183 pages of partially withheld documents "reinforces" their argument that they properly segregated records.[43] However, 3,241 pages of challenged records were *fully* withheld, which undermines their contention. Pineiro Decl. ¶ 12. Furthermore, many documents which are withheld in part likely contain segregable material. For example, Exhibits A and D contain emails and documents that are either withheld in full or nearly entirely redacted.[44] In Ex. D.1., for example, the entire body of an email is entirely redacted. Defendant specifies that this information is withheld pursuant to Exemptions (b)(5), but does not specify why they were unable to segregate information that does not fall under this exception. While back-and-forth in email correspondence may seem deliberative at first glance, "[i]f the documents themselves merely restate facts and do not involve

---

[43] *See* ECF No. 55, p. 6; Pineiro Decl. ¶ 12.
[44] *See*, *e.g.*, Exs. A.2., D.1., D.2., D.3., D.4., D.6., D.9., D.19., and D.21.

legal or policy matters, any comments or opinions about these same documents are not privileged." *Jud. Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 263 (D.D.C. 2004). Thus, ICE has not properly segregated these documents and the court should conduct *in camera* review to compel disclosure of these documents.

### c. Defendant Improperly Applied the Attorney-Client Privilege to Certain Documents.

The attorney-client privilege "protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." *Brennan Ctr.*, 697 F.3d at 207 (quoting *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011)). It "protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). However, the privilege "does not allow an agency to withhold a document merely because it is a communication between the agency and its lawyers." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862–63 (D.C. Cir. 1980). The privilege "may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy," as open communication would not be "inhibited" by the release of documents which have become part of agency law. *Brennan Ctr.*, 697 F.3d at 207 (quoting *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 360 (2d Cir. 2005)). Finally, agencies cannot use attorney-client privileges to cover up agency misconduct. *Cf. Duttle v. Bandler & Kass*, 127 F.R.D. 46, 53 (S.D.N.Y. 1989) (discussing crime-fraud exception to attorney-client privilege); *In re Grand Jury Proceedings*, 102 F.3d 748, 752 (4th Cir. 1996) (attorney

communications cannot be privileged if they misrepresent or conceal what their clients have done).[45]

### i. Defendant Erred in Applying Attorney-Client Privilege to Documents Where Confidentiality Has Not Been Maintained.

The attorney-client privilege cannot be invoked if communications between the lawyer and their client are not made confidentially or kept in confidence.[46] *Brennan Ctr.*, 697 F.3d at 207. Defendant ICE identifies their client as "ICE Senior Leadership, and individuals within ICE ERO, ICE Policy, and ICE Office of Public Affairs."[47] Information obtained from other litigation clearly demonstrates that powerful policy influencers outside of these specified clients were apprised of the civil fines policy's progress.[48] "[T]he agency must show that it supplied information to its lawyers with the expectation of secrecy and was not known by or disclosed to any third party." *Jud. Watch*, 297 F. Supp. 2d at 267 (internal quotations omitted). Defendants frequently fail to assert, let alone demonstrate, that the confidentiality of redacted communications has been maintained until their production to Plaintiffs.[49] Given the level of interest and involvement of external players in the civil fines program, the Court should order ICE to produce such documents which were sent to persons outside the agency, or alternatively conduct *in camera* review of such document.

---

[45] The crime-fraud exception is construed broadly in that the communication does not necessarily need to involve a crime or fit the definition of common law fraud. *In re Grand Jury Subpoena Duces Tecum dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984); *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 380 (D.N.J. 2006) (applying the exception to misleading representations).

[46] There is evidence that political influencers outside of government agencies were involved in the formulation of many Trump administration immigration policies. *See supra,* note 4; Bennion Decl. ¶¶ 7–14. If external people were recipients or cc'd in communication about the civil fines, their inclusion would also break the attorney-client privilege.

[47] Pineiro Decl. ¶ 60.

[48] *See* Exs. F.5. and F.6.

[49] *See* Exs. A.1., A.2., A.5., A.7., D.1.–D.6., D.9., D.11., D.13., D.16.–D.18., and D.20. *See* Def.'s Vaughn Index, ECF No. 56-1.

Documents relating to media congressional inquiries strongly imply that the advice was to be shared with people external to the agency and that confidentiality was not maintained. In Exhibit C.2., each of the responses to Representative David Price's Questions for the Record are fully redacted under Exemption (b)(5), despite the public nature of the hearing, which is available to the public online.[50] ICE publicly responded to Rep. Price's Questions, and therefore the idea that this document could be privileged due to the issuance of legal advice is illogical.[51]

### ii. Defendant Erred in Applying Attorney-Client Privilege to Documents Which Contain Policy Advice, not Legal Advice.

White papers in Exhibit B, mentioned *supra*, cannot be fully withheld pursuant to attorney-client privilege where the document gives policy advice, not legal advice. *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012) (the attorney-client privilege protects "only legal advice, not economic, business, or policy advice"). Even when prepared by a lawyer or submitted to a lawyer, policy advice is not protected under the attorney-client privilege. *Pritchard v. Cnty. of Erie*, 473 F.3d 413, 420–21 (2d Cir. 2007) ("When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor . . . that consultation is not privileged."); *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 160 (E.D.N.Y. 1994) ("[T]he mere fact that a communication is made directly to an attorney, or an attorney is copied on a memorandum, does not mean that the communication is necessarily privileged."). Even though a lawyer preparing policy advice may not have policymaking authority, they may still render policy advice to officials who are authorized to make policy, such as Jon

---

[50] Ex. C.2. is a September 17, 2019 email from OPLA's Chief of the Executive Communications Unit with subject: "FOR SES APPROVAL-109247 QFRs 24-27 -ICE Oversight Hearing / Fees for Sanctuary Immigration."

[51] U.S. House of Representatives Committee on Appropriations, *ICE Oversight Hearing*, July 25, 2019, https://appropriations.house.gov/events/hearings/us-immigration-and-customs-enforcement-oversight-hearing.

Feere. *Pritchard*, 473 F.3d at 421. Email communications to and from Feere are likely to contain policy advice, and should be produced to Plaintiffs.[52]

The Second Circuit defines legal advice based on the predominant purpose of a communication, which must be to receive or provide legal advice, not policy advice. *Pritchard*, 473 F.3d at 420. ICE has not shown that these white papers are predominantly memoranda where legal advice is sought or provided. For example, in Exhibit B.6., ICE writes in its Vaughn that the white papers "includ[es] legal analysis," but otherwise contains "background" and "an analysis regarding who will be identified for each fine and which forms will be used to implement the initiative." *See* Def. Vaughn Index, ECF No. 56-1, p. 19–20. The Court should order ICE to produce documents which contain finalized descriptions of policy or policy advice, and in the alternative, the court should conduct *in camera* review of documents in Exhibits A–E.

## IV. Defendant's Use of Exemption 6 and 7(C) are Overbroad and Do Not Justify the Withholding of Names and Titles of High-Level and Policy-Making ICE Officials.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The purpose of Exemption 6 is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Wood,* 432 F.3d at 86. If disclosure would compromise "substantial privacy interests," it need not be disclosed. *Aguirre v. Sec. & Exch. Comm'n,* 551 F. Supp. 2d 33, 53 (D.D.C. 2008). If no substantial privacy interest is established, however, the court must weigh the "potential harm to privacy interests" against "the public interest in disclosure of the requested information." *Id.* The "only relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of

---

[52] *See* Exs. A.1., A.2., A.5., and A.7.

FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." *U.S. Dep't of Def. v. Fed. Labor Rels. Auth.,* 510 U.S. 487, 495 (1994). Information that "merely identifies the names of government officials who authored documents and received documents" does not generally fall within Exemption 6. *Aguirre,* 551 F. Supp. 2d at 53. Moreover, while the public interest in the disclosure of low-level federal employees generally does not outweigh an individual's privacy interest, *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 30 (D.D.C. 2018), the opposite is true for high-level officials that are involved in important policy-making under Exemption 6 and Exemption 7(C). *Stern v. FBI*, 737 F.2d 84, 86 (D.C. Cir. 1984) (finding that the public interest in disclosure of the identity of an FBI employee—a high level official found to have participated knowingly in a cover-up—outweighs that employee's privacy interest).

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). While Exemption 7(C) requires balancing of privacy interests and the public interest, the privacy interest have been construed more broadly than those of Exemption 6. *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 756 (1989).

Defendant has failed to meet its required burden for the categorical withholding of the names, titles, and email domains of certain government officials, including those that are involved in high-level policymaking. The significant attention paid to this case speaks to the high level of public interest in the civil fines policy. Furthermore, disclosure of the names and email domains of certain individuals would contribute significantly to the public understanding of the operations and activities of ICE's civil fines policy. The public has a great interest in learning which high-

level officials and/or influencers outside of the agency were responsible for crafting a policy that DHS later acknowledged was overly "punitive."[53] *See Stern*, 737 F.2d at 94 ("The public has a great interest in being enlightened about that type of malfeasance by this senior FBI official—an action called 'intolerable' by the FBI—an interest that is not outweighed by his own interest in personal privacy.").

ICE claims that the names of federal law enforcement employees were withheld because those who "take part in highly publicized or sensitive investigations or operations have an interest in keeping their involvement in such activities private in order to avoid an onslaught of media attention or stigma." Pineiro Decl. ¶ 88. But there is a substantial public interest in knowing whether the information in these documents and emails articulate high-level agency policy, particularly when there is a great risk that these individuals could continue to wield great influence in future administrations.[54] *See Fams. for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 399 (S.D.N.Y. 2011). Significantly, Plaintiffs seek only the names, titles, and email domains of high-level government officials and their contacts, not phone numbers or other intrusive types of personal information.[55]

The public interest in the disclosure of high-level official names, titles, and email domains outweighs individual privacy interests within three categories of documents: emails among and including the Civil Fines Working Group, emails including Jon Feere, and other emails which suggest high-level policy making power. First, disclosure of the redacted names is warranted for emails including the Civil Fines Working Group because the employees' discussions (e.g., creating a civil fines policy and specifically being assigned to a working group for this purpose) were not

---

[53] *See* DHS Press Release, *supra*, note 26.
[54] *See* Bennion Decl. ¶¶ 11–15.
[55] *See* Ex. F.8. for an organization chart describing ICE's leadership structure.

"low level" work, and disclosure would allow the public to understand the agency's decision to issue civil fines to specific sanctuary leaders. *See* E.1., E.2., E.3., E.4., E.5, E.8.

Second, Defendant improperly withheld names in high-level policy emails that were directly addressed to ICE leadership and included Jon Feere, Senior Advisor to the Director and ICE Chief of Staff. *See* A.1., A.2., A.3., A.4., A.5., A.6., A.7., A.8. In one email, the sender even references the individuals in the email as "ICE leadership"—yet Defendant has improperly redacted certain individual names and email addresses. *See* A.6. The public interest in knowing who within ICE spearheaded the civil fines policy, and whether the issuance of civil fines was the work of certain individuals or an agency-wide policy, outweighs the individual privacy interest— particularly when Plaintiffs are simply asking for the disclosure of names, titles, and email domains, rather than other intrusive personal information. *See Fams. for Freedom*, 797 F. Supp. 2d at 375 (the public interest in determining whether policies set out in ICE documents were agency-wide or work of single agency employee outweighed privacy interests of federal employees in withholding their names as authors and recipients of documents).

Finally, Defendant ICE has improperly withheld the individual names, titles, and email domains of people within five emails where these individuals have been shown to have leadership and policy-making authority for the civil fines policy. *See* C.2., C.4., D.11., E.6., E.7. For example, one email references individuals within the email as a "reviewing" or "deciding" officer (Ex. E.6.), while another includes Richard Rocha noting that "[w]ord on the street is that you're the man I can talk to about the fines" to a redacted individual (Ex. C.4.). In these particular cases, the public interest in understanding the operational knowledge behind the civil fines policy outweighs these high-level federal employees' individual privacy interest in protecting their names and titles, which

are likely already public. This Court should compel the disclosure of the names, titles, and email domains of these high-level federal employees and any people external to the agency.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendant ICE's Motion for Summary Judgment, grant Plaintiffs' Cross-Motion, and order production of the nondisclosed records challenged by Plaintiffs at Exhibits A–E. Alternatively, Plaintiffs request this Court to conduct an *in camera* review of the documents enumerated in Exhibits A–E.

Dated: February 4, 2022
New York, NY

Respectfully submitted,

*/s/ Alina Das*
Alina Das, Esq. (AD8805)
Vibha Kannan, Legal Intern
Rebecca Schectman, Legal Intern
Immigrant Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street, 5th Floor
New York, NY 10012
(347) 693-6485
alina.das@nyu.edu

Katherine Gallagher
Rafaela Uribe
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorneys for Plaintiffs*