UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AUSTIN SANCTUARY NETWORK FREE
IMMIGRATION PROJECT, *et al.,*

                Plaintiffs,

       -v-

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT, *et al.,*

                Defendants.

20 Civ. 1686 (LJL)

**DEFENDANT UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT'S
REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS MOTION FOR
SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
Counsel for Defendants
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2633
Email: tara.schwartz@usdoj.gov

TARA SCHWARTZ
Assistant United States Attorney
— Of Counsel —

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 2

I.   ICE's Civil Fines Policy .................................................................................. 2

II.  Plaintiffs' FOIA Request ................................................................................ 5

III. ICE's Searches ................................................................................................ 6

IV. ICE Withholdings ............................................................................................ 7

ARGUMENT ......................................................................................................... 8

I.   ICE's Search for Records Was Reasonable and Adequate ............................. 8

    A.  ICE Was Not Required to Search the Records of ICE Senior Leadership ................... 9

    B.  ICE Was Not Required to Search the Offices of Public Affairs and Partnership and Engagement ..................................................................................... 13

    C.  ICE's Search Methods and Search Terms Were Reasonable and Adequate ............. 14

        1.  ICE's Search Methods Were Reasonable 16

        2.  ICE's Search Terms Were Reasonable     18

II.  ICE Properly Withheld Records Pursuant to Exemption 5 .................................. 21

    A.  ICE Properly Withheld Documents Pursuant to the Deliberative Process Privilege .. 22

        1.  ICE Properly Withheld Documents that Post-Date the Directive 22

        2.  ICE Properly Withheld Documents That Pre-Date the Directive 24

        3.  ICE Properly Withheld Documents Discussing How to Message the Civil Fines Policy to the Media 25

    B.  The Government Misconduct Exception Does Not Apply ........................................ 28

    C.  ICE Properly Withheld Documents Subject to the Attorney-Client Privilege ........... 30

III. ICE Properly Withheld the Names and Titles of Non-Public Facing Employees Pursuant to Exemptions 6 and 7(C) ...................................................................... 31

IV. ICE Has Established That It Properly Segregated All Deliberative and Pre-Decisional Material   32

CONCLUSION ....................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Access Reports v. DOJ*, 926 F.2d 1192 (D.C. Cir. 1991) ............................................................ 29

*ACLU v. DOJ*, 252 F. Supp. 3d 217 (S.D.N.Y. 2017) .................................................................. 40

*ACLU v. NSA*, 925 F.3d 576 (2d Cir. 2019) ............................................................................... 30

*ACLU v. NSA*, No. 13 Civ. 9198 (KMW) (JCF), 2017 WL 6387731 (S.D.N.Y. Aug. 17, 2017), *aff'd*, 925 F.3d 576, 601 (2d Cir. 2019) ........................................................................................ 39

*AFGE v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139 (D.D.C. 2010) ........................ 19, 20, 22

*Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479 (S.D.N.Y. 2010) .............................................. 15

*Amnesty Int'l USA v. CIA*, No. 07 Civ. 5435, 2008 WL 2519908 (S.D.N.Y. June 19, 2008) ...... 17

*Bigwood v. DOD*, 132 F.Supp.3d 124 (D.D.C. 2015) ................................................................. 24

*Carney v. DOJ*, 19 F.3d 807 (2d Cir. 1994) ................................................................................ 9

*Conti v. DHS*, No. 12 Civ. 5827, 2014 WL 1274517 (S.D.N.Y. Mar. 24, 2014) ....................... 17

*CREW v. DHS*, 514 F. Supp. 2d 36 (D.D.C. 2007) ..................................................................... 28

*CREW v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40 (D.D.C. 2006) .............................. 25

*Ctr. for Investigative Reporting v. CBP*, 2019 WL 7372663 (D.D.C. Dec. 31, 2019) ................ 40

*Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515 (S.D.N.Y. 2010). 17, 20, 23, 25

*Garcia v. DOJ*, 181 F. Supp. 2d 356 (S.D.N.Y. 2002) ................................................................ 14

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ........................................... 9, 14

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ............................................................................ 12

*Huntington v. U.S. Dep't of Com.*, No. 15 Civ. 2249 (JEB), 2018 WL 647633 (D.D.C. Jan. 31, 2018), *aff'd*, No. 18-5086, 2018 WL 4600760 (D.C. Cir. Sept. 11, 2018) ................................... 25

*ICM Registry, LLC v. U.S. Dep't of Com.*, 538 F. Supp. 2d 130 (D.D.C. 2008) ........................ 35

*Immigrant Def. Project v. ICE*, 208 F. Supp. 3d 520 (S.D.N.Y 2016) ............................. 20, 24, 25

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ...................................................................... 35

Johnson v. EOUSA, 310 F.3d 771 (D.C. Cir. 2002) ............................................................... 21, 40

*Judicial Watch, Inc. v. DHS*, 736 F. Supp. 2d 202 (D.D.C. 2010) .............................................. 28

*Judicial Watch, Inc. v. Reno*, No. 00 Civ. 723, 2001 WL 1902811 (D.D.C. Mar. 30, 2001) ....... 28

*Judicial Watch, Inc. v. U.S. Dep't of State*, 285 F. Supp.3d 249 (D.D.C. 2018) ........................ 34

*Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70 (2d Cir. 1979) .................................................... 39

*Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137 (D.D.C. 2015) ........... 17, 18, 25

*Miller v. Casey*, 730 F.2d 773 (D.C. Cir. 1984) ........................................................................ 13

*Morley v. CIA* 508 F.3d 1108 (D.C. Cir. 2007) ............................................................ 16

*Nat'l Immigration Project of the Nat. Lawyers Guild v. DHS*, No. 11 Civ. 3235 (JSR), 2012 WL 6809301 (S.D.N.Y. Dec. 27, 2012) ............................................................................ 21

*Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 903 F. Supp. 2d 59 (D.D.C. 2012) 35

*New York Times Co. v. DOJ*, 939 F.3d 479 (2d Cir. 2019) ........................................... 30

*NRDC v. EPA*, 19 F.4th 177 (2d Cir. 2021) ........................................................... 31, 33

*Petrucelli v. DOJ*, 106 F. Supp. 3d 129 (D.D.C. 2015) .............................................. 13

*Physicians for Human Rights v. DOD*, 675 F. Supp. 2d 149 (D.D.C. 2009) .............. 18

*Pub. Emps. for Env't Resp. v. U.S. Section Int'l Boundary & Water Comm'n.*, 839 F. Supp. 2d 304 (D.D.C. 2012), *aff'd in part, rev'd in part & remanded on other grounds*, 740 F.3d 195 (D.C. Cir. 2014) ........................................................................................................... 19

*Rojas-Vega v. ICE*, 302 F. Supp. 3d 300 (D.D.C. 2018) ............................................ 19

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ................................. 14

*Schoenman v. FBI*, 841 F. Supp. 2d 69 (D.D.C. 2012) ............................................. 40

*Schrecker v. DOJ*, 217 F. Supp. 2d 29 (D.D.C. 2002), *aff'd*, 349 F.3d 657 (D.C. Cir. 2003) ...... 21

*SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2022 WL 123590 (S.D.N.Y. Jan. 13, 2022) ...................................................................................................................... 31

*Sheridan v. Dep't of the Navy*, 9 F. App'x 55 (2d Cir. 2001) ................................... 11

*Sierra Club v. U.S. Dep't of Interior,* 384 F. Supp. 2d 1 (D.D.C. 2004) ................... 26

*Spadaro v. U.S. CBP*, No. 16-cv-16 (RJS), 2019 WL 1368786 (S.D.N.Y. Mar. 25, 2019) ........ 34

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ............................ 38

*Weisberg v. DOJ*, 745 F.2d 1476 (D.C. Cir. 1984) .................................................... 18

*Wiesner v. FBI*, 668 F. Supp. 2d 164 (D.D.C. 2009) ................................................ 15

*Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1 (D.D.C. 2004) ......... 28

*Wright v. Admin. for Child. & Fams.*, No. 15 Civ. 218, 2016 WL 5922293 (D.D.C. Oct. 11, 2016) ............................................................................................................... 34, 35

**Statutes**

5 U.S.C. § 551 ........................................................................................................... 12

5 U.S.C. § 552 ........................................................................................................... 13

INA § 240B ................................................................................................................... 3

INA § 274C ................................................................................................................... 3

INA § 274D ........................................................................................................... passim

**Other Authorities**

Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017) ......................................... 2

Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021) ........................................................... 6

ICE Delegation Order 01-2018 .................................................................................. passim

ICE Directive 10088.1: Fines and Penalties for Civil Violations of Immigration Law ........ passim

Memorandum from John Kelly on Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf ...................................................... 2, 14, 29

**Regulations**

8 C.F.R. Part 280 ....................................................................................................... 4

# PRELIMINARY STATEMENT

ICE's opening brief established that its expansive search—which covered three program offices and ten custodians—was reasonable and adequate in response to Plaintiffs' FOIA request. The search resulted in ICE reviewing a total of 13,342 pages for potential responsiveness, of which 6,574 pages were determined to be responsive. ICE then conducted a line-by-line review of each of those 6,574 pages of responsive documents to apply any relevant FOIA exemptions. After this review, ICE produced to Plaintiffs 1,150 pages in full and 2,183 pages in partially redacted form, and withheld 3,241 pages.

In their cross-motion, Plaintiffs challenge the adequacy of ICE's search. But their arguments rest on an unreasonably expansive interpretation of the request that they submitted to ICE, a misunderstanding of how and by whom ICE's civil fines initiative was implemented, and a misconception of an agency's duty in conducting a FOIA search. As discussed in more detail below, in response to Plaintiffs' request, three of ICE's program offices—Enforcement and Removal Operations ("ERO"), the Office of Policy and Legal Advisors ("OPLA"), and the ICE Office of Policy and Planning ("ICE Policy")—and custodians within the former two offices who were responsible for the implementation of ICE's civil fines policy, searched their respective file systems. This expansive search, which covered the files of the relevant program offices and custodians, was reasonable, adequate, and fulfilled ICE's obligation to search for documents responsive to Plaintiffs' request.

Plaintiffs also challenge withholdings that ICE made, pursuant to Exemptions 5, 6 and 7(C), on 54 documents constituting 146 pages of emails and other documents.[1] Plaintiffs argue that Exemptions 5's deliberative process privilege does not apply to: (i) documents that post-date

---

[1] Unless otherwise specified, citations to exhibits in this brief refer to Exhibits A-F (ECF Nos. 59-1-6) attached to the Declaration of Rebecca Schectman (ECF No. 59).

the final policy that ICE implemented in order to assess civil fines on individuals who willfully failed to depart the United States despite a final order of removal: (ii) documents that pre-date ICE's final civil fines policy, but contain agency working law; and (iii) documents reflecting how ICE would message the civil fines to the media and Congress. This argument is based on a misunderstanding of what the deliberative process privilege covers and misapprehension of the relevant facts. Plaintiffs' further argument that ICE's withholdings pursuant to the attorney-client privilege are improper is based on nothing more than rank speculation.

As explained in more detail below, the Court should grant ICE's motion for summary judgment and deny Plaintiffs' cross-motion for summary judgment.

## BACKGROUND

I.     **ICE's Civil Fines Policy**

As laid out in ICE's opening brief, on January 25, 2017, former-President Trump signed Executive Order 13768, which required the Secretary of the Department of Homeland Security (DHS) to issue guidance and promulgate regulations to ensure the assessment and collection of civil fines and penalties on aliens unlawfully present in the United States. *See* Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017) (the "Executive Order"). On February 20, 2017, the Secretary of DHS, John Kelly, issued a memorandum to various component offices of DHS, including ICE, on the implementation of Executive Order 13768 and guidance for the enforcement of immigration laws. *See* Memorandum from John Kelly on Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf (the "DHS Memorandum")). Section F of the memorandum stated:

> As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required

by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

(*Id.* at 5).

In response to the Executive Order and DHS Memorandum, ICE enacted policy that was finalized through ICE Directive 10088.1: Fines and Penalties for Civil Violations of Immigration Law. (*See* Declaration of Michele E. Welch ("Welch Decl.") Ex. 2 (the "Directive")).[2] The Directive, which was issued on June 19, 2018, by its terms, sets forth ICE's "policy" of "exercis[ing] discretion in enforcing applicable laws and regulations governing" the assessment and collection of fines and penalties in three scenarios: (i) failure to voluntarily depart the United States within the specified voluntary departure period, pursuant to Immigration and Nationality Act (INA) § 240B(d)(1), (ii) engaging in prohibited activities involving document fraud, pursuant to INA § 274C(d)(3), and (iii) willfully failing to depart pursuant to a final order of removal, pursuant to INA § 274D(a). (*See id.* ¶ 1).

It is this latter category, individuals who willfully failed to depart the United States pursuant to a final order of removal, that is the subject of Plaintiffs' FOIA request. (*See* ECF No. 56, Declaration of Fernando Pineiro ("Pineiro Decl.") Ex. B (the "Request")). ICE's authority to impose a fine on this category of people is found in INA § 274D, which states that:

Any alien subject to a final order of removal . . . who willfully fails or refuses to depart from the United States pursuant to the order . . . shall pay a civil penalty of not more than $500 to the Commissioner for each day the alien is in violation of this section.

8 U.S.C. § 1324d(a).[3]

---

[2]     The Directive is also included as part of Plaintiffs' submission as Exhibit F.2.
[3]     *See also* 8 C.F.R. Part 280 (regulations on the imposition and collection of fines)

Notably, the Directive delegates responsibility for implementing the civil fines policy to two individuals at ICE, the Executive Associate Director of ERO and the Principal Legal Advisor, as well as an additional individual at DHS. (*See* Directive ¶ 4.1). The Directive makes the Executive Associate Director of ERO and the Principal Legal Advisor "responsible for ensuring compliance with the provisions of th[e] Directive and issuing guidance within his or her Directorate or Program Office for implementation, as appropriate." (*Id*.). It further makes OPLA responsible for providing appropriate legal guidance. (*See id*. at ¶ 4.3).[4]

Moreover, as mentioned above, the "policy" that ICE implemented through the Directive provided that ICE would "exercise discretion in enforcing applicable laws and regulations governing the assessment and collection of fines and penalties against aliens, who have unlawfully remained in the United States [i] beyond an unauthorized period of voluntary departure or [ii] in violation of a removal order, or [iii] individuals or business entities who have engaged in prohibited activities involving document fraud." (*Id*. at ¶ 2) . Beyond identifying these three categories, the Directive does not provide further direction as to how to identify such individuals or business and does not delineate any subcategories of individuals or businesses to prioritize. (*See generally, id*.).

The same day that the Directive was issued, ICE Acting Director Thomas Homan issued ICE Delegation Order 01-2018, which explicitly delegated authority to the ERO Executive Associate Director (EAD), Deputy Executive Associate Director (DEAD), and Field Office Directors to "administer and enforce provisions relating to civil penalties for failure to depart

---

[4] The Directive also: (i) makes the Office of the Chief Financial Officer "responsible for the collection of civil fines and penalties, including creating accounts receivable for valid fines, issuing invoices, tracking the fines in ICE's financial system, and referring delinquent debts to the Department of Treasury, as required by law" (Directive ¶ 4.4) , and instructs ICE Law Enforcement Officers to "comply with the provisions of [the] Directive, as applicable, and other relevant agency, Directorate, or Program Office guidance on the process and procedures for assessing and colleting fines and penalties, including recordkeeping requirements" (*id*. ¶ 4.2).

under" INA § 274D.  (Welch Decl. Ex. 3 ("Delegation Order")).[5]  Thus, by their terms, the

Directive and Delegation Order tasked ERO leadership with authority to use their discretion,

subject only to legal advice provided by OPLA, to impose civil fines on aliens who willfully failed

or refused to depart the United States pursuant to a final order of removal.  (Welch Decl. ¶ 12).  In

other words, what ICE refers to, in its opening brief, as the government's "civil fines initiative"

constituted ICE's enforcement of § 274D, which was carried out by ERO leadership, and to a more

limited extent, OPLA.  Once the Directive and Delegation Order were issued, the ICE Director's

Office was not involved in ERO's efforts to implement the civil fines policy.  (*Id*. at ¶ 16).

Pursuant to its delegated authority, ERO made two rounds of attempts at levying civil fines

on individuals who remained in the United States despite final orders of removal pursuant to

§ 274D.  As documented in Plaintiffs' brief, and through the documents produced to Plaintiffs,

ERO utilized its discretion to, in some cases, levy civil fines on individuals living in sanctuary

who failed to depart the United States despite a final order of removal.

On January 20, 2021, President Biden revoked Executive Order 13768, *see* Exec. Order

No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021), and thus ICE's civil fines initiative was and remains

discontinued.

## II.     Plaintiffs' FOIA Request

Broadly speaking, the Request sought records concerning ICE's policies and

implementation of § 274D, including as they applied to those taking sanctuary.  (*See generally*,

Request at 2).  Specifically, part 1 of the Request sought records relating to "current policies,

procedures, guidelines, instructions, or other materials concerning when and how civil fines and

penalties . . . are enforced on individuals who are alleged to have a final administrative removal

---

[5]       The Delegation Order is also included as part of Plaintiffs' submission as Exhibit F.1.

order, including but not limited to immigrants taking sanctuary." (*Id*.). Part 2 of the Request sought "guidelines, schedules, instructions, or other records concerning fee calculations, fee amounts, or other monetary information ICE is allowed to impose on individuals . . . including but not limited to immigrants taking sanctuary." (*Id*.). Part 3 of the Request sought "communications between ICE officials and officials of local or federal agencies regarding fines, fees, and/or penalties . . . for individuals, including but not limited to immigrants taking sanctuary . . . includ[ing] any communications between ICE personnel or between ICE personnel and other federal agencies relating to the drafting, updating and/or creation of ICE Form I-79B[.]" (*Id*.). Parts 4-6 of the Request sought data and records related to specific individuals whom ICE had attempted to fine. (*See id*.). Finally, Part 7 of the Request sought ICE's records and data on individuals taking sanctuary. (*See id*.).

## III.    ICE's Searches

In response to the Request, ICE conducted numerous searches within three program offices:  ERO, OPLA, and ICE Policy.  Given the ICE Director's delegation of authority for enforcing § 274D to ERO and OPLA, ICE focused its search efforts on those two program offices. ERO searched both the files of its relevant sub-units and the files of relevant custodians.  (*See* Welch Decl. ¶¶ 4-7).  Specifically, Executive Associate Director Enrique Lucero and Deputy Executive Associate Director Tae Johnson—to whom implementation of the civil fines initiative had explicitly been delegated—and the Chief of Staff of ERO Caleb Vitello searched their respective files using numerous relevant search terms.  (*See id*. at ¶ 6; Pineiro Decl. ¶¶ 35-37). ERO also conducted searches of the units within it that were likely to have responsive information. (*See* Pineiro Decl. ¶¶ 28-31; Welch Decl. ¶ 5).  ERO Policy, the unit that houses policy-related documents, including directives, temporary directives, technical and procedural updates of directives, handbooks, standard operating procedures, and forms, searched its policy library.

(Pineiro Decl. ¶ 29).  ERO Field Operations, the unit that oversees and provides guidance to and coordination amongst ERO's 24 field offices, searched its FieldOps SharePoint and FieldOps hard drive.  (*Id*. ¶ 30).  Further, an Enforcement Program Manager within ERO Enforcement, the unit that manages enforcement initiatives and components through which ERO identifies and arrests removable noncitizens, searched his computer and email using a wide range of relevant search terms.  (*Id*. ¶ 31).

Given the Directive's instruction to OPLA to provide ERO with legal guidance on the implementation of § 274D, ICE also tasked OPLA with conducting a search for responsive records.  (*See id*. ¶ 38).  Within OPLA, the Executive Deputy Principal Legal Advisor, Deputy Principal Legal Advisor for Enforcement and Litigation, Deputy Principal Legal Advisor for General and Administrative Law, and four attorneys within the Commercial and Administrative Law Division, all conducted searches of their respective files.  (*See id*. ¶¶ 38-46).

Finally, ICE Policy, which played a much more limited role in the civil fines initiative, searched the ICE Policy Shared Drive and ICE Policy Manual.  (*Id*. ¶  32).

## IV.    ICE Withholdings

ICE's almost-300 page *Vaughn* index carefully explains why each of the withholdings and exemptions, on 330 documents, constituting approximately 3,700 pages, are applicable.  (*See generally*, Pineiro Decl. Ex. A ("*Vaughn* Index")).  In their cross-motion, Plaintiffs limit their challenges to ICE's withholdings on 54 documents, constituting 146 pages, the majority of which are redactions to partially produced documents.  (*See* ECF No. 61 ("Pls. Br.") 2-3).  Specifically, Plaintiffs challenge ICE's withholdings pursuant to Exemption 5, based upon the deliberative process and attorney-client privileges, and its withholdings of the names, titles, and email domains of high-level and policy-making ICE officials pursuant to Exemption 6 and 7(C).  (*See id*. at 18-40).  For the Court's ease of reference, ICE is including excerpts of its *Vaughn* Index,

corresponding to the 54 documents that Plaintiffs challenge, to the present submission. (*See* Declaration of Tara Schwartz Ex. 1 ("Excerpted *Vaughn* Index")).

## ARGUMENT

### I. ICE's Search for Records Was Reasonable and Adequate

An agency may satisfy its burden of demonstrating that it conducted an adequate search through "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search." *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994) (footnote omitted). Agency affidavits are "accorded a presumption of good faith," which "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999) (internal quotation marks and citations omitted). Those affidavits need only "contain *reasonable specificity* of detail rather than merely conclusory statements." *Id.* at 478 (emphasis in original). A court may award summary judgment if the affidavits provided by the agency are "adequate on their face." *Carney*, 19 F.3d at 812.

The numerous searches ICE conducted in response to the Request, as summarized above and as outlined more fully in the Pineiro and Welch Declarations, establish that ICE's response to the Request was reasonable and adequate. Given the role that OPLA played in formulating the civil fines policy and the role that ERO leadership played in enforcing the policy, it was reasonable and logical for ICE to focus its search efforts on those program offices.

Plaintiffs argue that ICE's search was inadequate because it: (1) failed to search the emails and computers of high-level ICE leadership; (2) failed to search the Office of Public Affairs and Partnership and Engagement; and (3) used inconsistent search terms and methods across program offices. But Plaintiffs arguments are premised on a misunderstanding of how ICE imposed civil fines and a rewriting of the Request they actually submitted to ICE.

**A.      ICE Was Not Required to Search the Records of ICE Senior Leadership**

Plaintiffs argue that ICE's failure to search the files of ICE senior leadership, namely, former ICE Chief of Staff Jon Feere, former ICE Acting Director and Deputy Director Matthew Albence, former ICE Acting Director Thomas Homan, and former ICE Chief of Staff Thomas Blank, renders ICE's search inadequate.  That claim is misguided because: (i) despite Plaintiff's contention otherwise, ICE has provided a reasonable explanation for why it did not search these custodians; and (ii) the types of documents Plaintiffs believe would have been maintained by the ICE Director's Office fall outside the scope of the Request they submitted to ICE.

ICE has provided a reasonable explanation for why it did not search the computers and emails of individuals within the ICE Director's Office.  As explained above, and in the Welch Declaration, the ICE Director delegated responsibility and authority to ERO leadership for enforcing § 274D by exercising their own discretion to impose civil penalties on aliens subject to a final order of removal who willfully failed or refused to depart the United States pursuant to that order.  (*See* Welch Decl. ¶¶ 7-12).  Given that delegation of authority, it was ERO leadership, and *not* the ICE Director's Office, that determined the who, what, when, where and how to assess fines pursuant to § 274D.  (*Id*. at ¶ 13).  ICE thus reasonably determined that the ICE Director's Office would not be likely to have records responsive to the Request beyond what was contained in the files of ERO that ICE searched and produced.  Accordingly, ICE has met its burden of demonstrating that it conducted an adequate search for responsive records.  *See Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015) ("[A] search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records.").

Plaintiffs claim that ICE's search "missed the custodians most likely most likely to have communicated with entities outside ICE—the White House, the Department of Justice,

Congressional offices, and anti-immigrant lobbyist and think tanks—regarding the scope, rationales, and implementation of the civil fines policy." (Pls. Br. 12). But those types of documents are beyond the scope of the Request that they actually submitted to ICE. The only part of the Request that seeks communications is part 3, which seeks "[a]ny communications between ICE officials and officials of local or federal *agencies* regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. § 1324d . . .". (Request 2 (emphasis added)). Yet, now, unsatisfied by the thousands of documents they received that were responsive to the Request, Plaintiffs seek these other categories of documents through the guise of a challenge to the adequacy of ICE's search. That is not how FOIA works. ICE was not obligated to look beyond the four corners of the Request in so responding. *Cf. Sheridan v. Dep't of the Navy*, 9 F. App'x 55, 56 (2d Cir. 2001). The additional arguments that Plaintiffs advance regarding ICE's failure to search the files of individuals within the ICE Director's Office do not show that ICE's search was inadequate.

Specifically, Plaintiffs claim that they are missing "key documents" because ICE's production did not contain communications between ICE and Stephen Miller, a senior advisor to former President Trump. As support, they point to two documents, produced by different agencies in an entirely separate litigation showing Miller communicating about civil fines.[6] But Plaintiffs fail to explain how communications between ICE and Miller were responsive to the Request or

---

[6] The documents Plaintiffs cite appear to have been produced by DOJ and DHS. Thus, to the extent Plaintiffs argue that ICE failed to follow up on leads that would have uncovered potentially responsive documents, such argument fails because the agency has an obligation only to follow up on obvious leads, *see, e.g., Halpern v. FBI*, 181 F.3d 279, 288 (2d Cir. 1999), and the "lead" plaintiffs point to is not obvious, but speculative, and originates from another "agency" within the meaning of FOIA, *see* 5 U.S.C. § 551(1) ("'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency"). ICE, DHS, and DOJ have separate FOIA personnel, and ICE cannot be required to review every document produced by DHS or DOJ in order to determine whether it *might* point to the existence of potentially responsive documents in ICE's possession. Such cross-review would be unduly burdensome.

why ICE's failure to produce those communications renders the search they did conduct inadequate. The only portion of Plaintiffs' Request that seeks communications external to ICE is limited to communications with "local or federal agencies." That does not include Miller, a White House advisor.

An exacting review of the two documents that Plaintiffs cite supporting their contention that Miller was involved in ICE's civil fines initiative, do not call into doubt the adequacy of ICE's search in response to the Request. The first is an email chain that is entirely external to ICE: it is between Miller, two other White House officials, and DOJ. (*See* Ex. F.5). It neither references communications with ICE, nor provides any indication that Miller has communicated with any relevant ICE official. (*See id*.). It would not be in ICE's possession and Plaintiffs do not explain how or why it is probative of the adequacy of ICE's search.

The second is a single email from December 22, 2017, 6-months prior to the implementation of ICE's civil fines policy, by which Jon Feere provides a 2-page update, "on a number of fronts" to Miller and three others at the White House. (Ex. F.6). At the end of the email, Feere indicates that he had spoken to ICE's legal and policy team about civil fines pursuant to § 274D. (*See id*.). Again, Plaintiffs fail to show how why this communication between Feere and Miller was responsive to the Request. ICE's internal communications, including the documents reflecting Feere's communications with ICE's legal and policy teams, were produced to Plaintiffs. (*See, e.g.*, A.1 (December 15, 2017 email from Jon Feere to Michael Davidson, Mike Davis, and Deputy Principal Legal Advisor for Enforcement and Litigation Adam Loiacono indicating that Feere had spoken with Michael Davidson about civil fines); A.2 (December 2017 emails between Feere, Davidson, Loiacono, Davis, and Debbie Seguin).

Thus, Plaintiffs' argument rests on the assumption that ICE was obligated to produce all documents and communications that touch on the civil fines' initiative writ large. That is plainly not what FOIA requires in response to the Request. *See Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (emphasizing that agency is required to read FOIA request as drafted, "not as either [an] agency official or [requester] might wish it was drafted"); *Petrucelli v. DOJ*, 106 F. Supp. 3d 129, 136 (D.D.C. 2015) ("The FBI is not obligated to search for or to release records other than those specifically requested by the plaintiff."); *see also* 5 U.S.C. § 552(a)(3) (requiring requester to "reasonably describe[ ]" the records sought)). Thus, the fact that ICE's response did not return communications with Miller sheds no light on the adequacy of the search ICE conducted.

In sum, Plaintiffs' assertion that Miller's involvement in ICE's imposition of civil fines pursuant to § 274D somehow indicates that ICE failed to produce "key documents" responsive to their Request is nothing more than rank speculation. But "[s]peculation that other documents exist, without more, does not undermine the finding that the agency conducted a reasonable search." *Garcia v. DOJ*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002); *see also Grand Cent. P'ship*, 166 F.3d at 490 (rejecting allegations amounting to "nothing more than speculation that there must be more documents which [the agency] has deliberately or negligently failed to produce"); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

Plaintiffs also claim that ICE failed to follow up on obvious leads obtained through its search process that indicated ICE senior leadership was involved in the formation of the civil fines policy. But the documents ICE produced do not in fact show that there were obvious extant documents. A close look at the documents indicates that, in response to the DHS Memorandum, Jon Feere tasked OPLA attorney Michael Davidson with fast tracking ICE's ability to issue civil fines. (*See* A.1; A.2). Davidson then forwarded Feere's request on to other attorneys at OPLA

who conferred, recommended speaking with ERO, and provided an update to Feere.  (*See id.*).

The remaining emails show only that individuals in OPLA and ICE Policy at times circulated

documents regarding civil fines on email threads that included Feere, Matthew Albence, and

Thomas Blank.[7]  (*See* A.3-A.7).  These handful of emails on which ICE senior leadership is copied

do not indicate that these additional custodians would have documents responsive to the Request

that ICE has not already produced.  Accordingly, they provide no grounds for deeming ICE's

search inadequate because it failed to follow up on "obvious" leads.  *See, e.g.*, *Amnesty Int'l USA*

*v. CIA*, 728 F. Supp. 2d 479, 498 (S.D.N.Y. 2010) ("An agency need only pursue leads that raise

red flags pointing to the probable existence of responsive agency records that arise during its

efforts to respond to a FOIA request." (quoting *Wiesner v. FBI*, 668 F. Supp. 2d 164, 170-71

(D.D.C. 2009)) (alterations omitted)); *see also Mobley*, 806 F.3d at 582 ("A lead must be both

clear and certain and so apparent that the [agency] cannot in good faith fail to pursue it."

(alterations and quotation marks omitted)).

>    **B.**      **ICE Was Not Required to Search the Offices of Public Affairs and
>             Partnership and Engagement**

Plaintiffs claim that ICE's decision not to search the Offices of Public Affairs and

Partnership and Engagement is unreasonable because a "crucial purpose of the fines was the media

interest that policymakers sought to generate."  (Pls. Br. 15).  As support, Plaintiffs point to articles

ICE published on the civil fines initiative, which were produced to Plaintiffs, and a handful of

email communications with Richard Rocha, the former Senior Advisor for the ICE Office of

Partnership and Engagement, about public messaging.  (*See id.*).  But once again, Plaintiffs' claim

that ICE should have searched these two program offices goes beyond the scope of the Request

---

[7]      The documents Plaintiffs cite do not show any emails sent from or received by Thomas
Homan.

that they submitted to ICE. The Request does not seek documents or communications concerning ICE's public outreach or media messaging. (*See generally*, Request at 2). Thus, the fact that individuals within ERO communicated with Rocha does not, as Plaintiffs' claim, render ICE's search inadequate. ICE only had an obligation to follow up on search leads that would have produced documents responsive to the Request. *See Morley v. CIA* 508 F.3d 1108, 1121 (D.C. Cir. 2007) ("Mere reference to other files does not establish the existence of documents that are relevant to appellant's FOIA request. If that were the case, an agency responding to FOIA requests might be forced to examine virtually every document in its files, following an interminable trail of cross-referenced documents like a chain letter winding its way through the mail. FOIA clearly does not impose this burden upon federal agencies." (alterations omitted)). Plaintiffs fail to provide any basis for their conclusion that searches of these program offices would have produced records called for by the Request.

### C. ICE's Search Methods and Search Terms Were Reasonable and Adequate

Plaintiffs also argue that ICE's search was inadequate because: (i) ICE's FOIA Office failed to give standardized instructions when delegating search tasking to contacts at ICE's program offices, which resulted in ICE's program offices and custodians using differing methods to search for responsive records; and (iii) ICE's program office and custodians selection of search terms varied and were insufficient. Plaintiffs' view of the law—that in response to a multi-part request for documents, the court should police the search methods and terms used by various program offices and custodians—is untethered from FOIA's reasonableness standard.

When evaluating the sufficiency of an agency's search, courts—mindful of the agency's superior knowledge of its recordkeeping system and the presumption of good faith owed to the declarations describing the request—look to whether the search appears designed to return all relevant records. *Amnesty Int'l USA v. CIA*, No. 07 Civ. 5435, 2008 WL 2519908, at *15

(S.D.N.Y. June 19, 2008); *see also Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  But an agency's search need not be "perfect" in Plaintiffs' estimation (or even the Court's), so long as the agency "has provided logical explanations for each of the decisions it made as to search terms to be used and how to conduct the searches," evincing a good faith effort to design a comprehensive search.  *Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 535 (S.D.N.Y. 2010).  Thus, FOIA does not give requesters the right to Monday-morning-quarterback the agency's search.  *See, e.g., Conti v. U.S. Dep't of Homeland Sec.*, No. 12 Civ. 5827, 2014 WL 1274517, at *15 (S.D.N.Y. Mar. 24, 2014) ("[A]n agency is not required to search for all possible variants of a particular name or term.").

The reasonableness standard applies not only to an agency's determination about the locations and methods of searching but also to its decisions about what search terms to use.  Indeed agencies "have discretion in crafting a list of search terms that they believe to be *reasonably tailored* to uncover documents responsive to the FOIA request."  *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015) (alterations and internal quotation marks omitted) (emphasis added); *accord Physicians for Human Rights v. DOD*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("Defendants properly exercised their discretion in crafting lists of search terms that they believed to be reasonably tailored to uncover documents responsive to the FOIA request.").  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was adequate."  *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original).  "Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior."  *Liberation Newspaper*, 80 F. Supp. 3d at 146-47.

### 1.    ICE's Search Methods Were Reasonable

Plaintiffs argue that ICE's search for responsive records was inadequate because ICE failed to give standardized instructions on how to conduct searches when delegating to its program offices, which resulted in differing search methods and search terms amongst program offices and custodians.  But it is entirely permissible for an agency to delegate the manner and method of searching to those offices or individuals with potentially responsive files, as each office will be the most familiar with its own record-keeping system, and which search terms would be most likely to yield responsive records.  *See Pub. Emps. for Env't Resp. v. U.S. Section Int'l Boundary & Water Comm'n*., 839 F. Supp. 2d 304, 317-18 (D.D.C. 2012) (concluding that agency's search was reasonable where its legal affairs staff assessed request and forwarded it to correct division, and employee with "significant experience" in the subject matter conducted search), *aff'd in part, rev'd in part & remanded on other grounds*, 740 F.3d 195 (D.C. Cir. 2014); *Rojas-Vega v. ICE*, 302 F. Supp. 3d 300, 307 (D.D.C. 2018) (finding ICE's search methods adequate where its FOIA Office interpreted the request as one for records relating to ERO's immigration enforcement mission and therefore referred the request to ERO for searching).

As outlined in the Pineiro Declaration, ICE's FOIA Office sent the Request to points of contact within each program office.  That person, who is someone with a "detailed knowledge concerning the operations of their particular program office" (Pineiro Decl. ¶ 18), reviewed the FOIA request and directed the relevant custodians to conduct searches of their file systems, which "in their judgment, based on their knowledge of the manner in which they routinely keep records, would likely be the files to contain responsive records" (*id*. ¶ 20).  FOIA plainly permits individuals within agencies to reasonably exercise their discretion, in this manner, in making decisions about how best to locate records within their own files.  *See AFGE v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 151 n.11 (D.D.C. 2010) ("Plaintiffs' argument that the search

was inadequate because different officials used different terms when searching their own files is also unpersuasive."). Indeed, courts regularly rely on the "representations of individuals tasked with searching their personal files" in assessing search adequacy. *Immigrant Def. Project*, 208 F. Supp. 3d 520, 528 n.4 (S.D.N.Y. 2016); *accord Fox News,* 739 F. Supp. 2d at 535; *see also AFGE*, 711 F. Supp. 2d at 151 n.11. Thus, the fact that individuals within ICE exercised discretion in searching for responsive records, as opposed to following instructions from the ICE FOIA Office or some other individual within ICE, is perfectly logical and fails to show that ICE's search was inadequate as Plaintiffs suggest.

Plaintiffs' insinuation that ICE's searches were inadequate because of "inconsistencies" between custodians or program offices search terms is similarly unavailing. FOIA does not require an agency to conduct the same search across all of its offices. *See Fox News*, 739 F. Supp. 2d at 534-35 (affirming agency's use of "decentralized method" whereby it processes requests through disclosure office which reviews request and then refers it to relevant offices within agency, resulting in differing search terms and protocols amongst offices). That different program offices and custodians searched different systems and used different methods to search for responsive files is both reasonable and logical. As explained in the Pineiro Declaration, each program office and custodian stores their records differently. (*See* Pineiro Decl. ¶ 22 ("ICE employees and program offices use various systems to maintain records . . . [and] ICE employees may store electronic records on their individual computer hard drives, [and] their program office's shared drive (*if the office uses one*) . . .".) (emphasis added)). The natural result is that, in response to a FOIA request, ICE's various program offices and custodians will use varying methods to search their own files.

Plaintiffs contention that ICE need provide further detail as to the searches it conducted is not grounded in FOIA's requirements. An agency must provide only "basic information"

sufficient to convey "what records were searched, by whom, and in what manner." *Schrecker v. DOJ*, 217 F. Supp. 2d 29, 33 (D.D.C. 2002), *aff'd*, 349 F.3d 657 (D.C. Cir. 2003). "Requiring a [further] description of how [agency personnel] searched their files so that plaintiffs can scrutinize all aspects of [the agency's] efforts would run afoul of the principle that courts confronted with FOIA requests should not 'attempt to micro manage the executive branch.'" *Nat'l Immigration Project of the Nat. Lawyers Guild v. DHS*, No. 11 Civ. 3235 (JSR), 2012 WL 6809301, at *7 (S.D.N.Y. Dec. 27, 2012) (quoting *Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002)). Plaintiffs' speculation that the systems ICE searched were inadequate is ungrounded in any factual basis and does not undermine the credibility and presumption of good faith to which the Pineiro Declaration is entitled.

## 2.    ICE's Search Terms Were Reasonable

Plaintiffs also argue that ICE's search was inadequate because the program offices and employees used varying and limited search terms. Yet again, Plaintiffs seek to hold ICE to a far higher standard than what is required to show that its search was reasonable. That ICE used different search terms from one program office or custodian to the next only shows that ICE's search was conducted reasonably, given both that: (i) different ICE program offices and employees played differing roles in ICE's enforcement of § 274D; and (ii) that each program office and employee stored their files in differing manners.

The Pineiro Declaration, Welch Declaration, Directive, and Delegation Order, and the documents produced to Plaintiffs, describe the responsibilities of the offices that were searched, and the reasons each office might reasonably have been expected to have relevant documents. (*See, e.g.,* Pineiro Decl. ¶¶ 25-27 (describing how ICE determined which offices would be tasked with searches, and enumerating those offices); *id*. ¶¶ 28-36 (describing the responsibilities of each office tasked)). As explained above, pursuant to the Directive and Delegation Order, ERO used

its discretion to enforce § 274D and OPLA provided legal advice on how to implement § 274D. Thus, it is only natural that in reviewing the Request, utilizing their own judgment about how to find responsive records, and searching for those records, custodians within each program office relied on different search terms to collect documents responsive to the Request. *See AFGE*, 711 F. Supp. 2d at 151 n.11 ("[G]iven that many of the declarants play different roles within the agency, there is no basis to doubt that [the agency] properly exercised its discretion in crafting lists of search terms that it believed to be reasonably tailored to uncover documents responsive to the FOIA request." (citations, internal brackets, and internal quotation marks omitted)); *see also Fox News*, 739 F. Supp. 2d at 534 ("There is no requirement that an agency use identical search terms in all of its offices.").

Plaintiffs argument about the inadequacy of search terms used by some of the OPLA attorneys focuses on the quantity of the terms used as opposed to the quality of the search conducted. In support of their argument that ICE's searches were limited, Plaintiffs point to the fact that searches of two of the seven OPLA attorneys who searched their emails only used the term "274D" and that one of the three associate legal advisors who searched their emails did not include the term "civil fines." However, as ICE has explained, each ICE employee stores his or her files in the manner that works best for that employee: some separate their emails by subject, topic, or program; others save documents to their hard drive or shared drive. (Pineiro Decl. ¶ 23). When ICE employees are tasked with searching for records responsive to a FOIA request, they search their own files based on their knowledge of where they are likely to find responsive records. (*Id*.). The term "274D" refers to the section of the INA pursuant to which ICE imposed civil fines on individuals who remained in the United States after a final order of removal. Unsurprisingly, it appears in six out of the seven parts of the Request. OPLA's role in the civil fines initiative, as

outlined in the Directive, was to provide ERO with legal advice as to how to implement § 274D. It is thus far from surprising that two OPLA attorneys, relying upon their own knowledge about where and how they store their own files, used this single search term.

Moreover, Plaintiffs argue that ICE's search was inadequate because the OPLA attorneys did not use the term "sanctuary" in searching. Plaintiffs fail to explain why any OPLA attorney would be likely to be in possession of records that refer to the term "sanctuary" but are otherwise not captured by search terms relating to provision of the INA upon which ICE based its authority to fine individuals. The very phrasing of the Request itself, which seeks various types of documents relating to § 274D—the broadest possible category—and then specifies "including but not limited to immigrants taking sanctuary," indicates that 274D and other terms would likely cast a far wider net than the term "sanctuary." (*See* Request at 2). Thus, the Request itself makes plain that documents on the topic of immigrants taking sanctuary constitute a subset, rather than a separate category, of documents relating to § 274D. That the OPLA attorneys used search terms based on their own understanding of the files in their possession, rather than the terms Plaintiffs prefer, provides no reason to believe ICE's search was inadequate. *See Immigrant Def. Project*, 208 F. Supp. 3d at 528 ("[T]he omission of certain search terms or keywords does not [] demonstrate that Defendants' search was inadequate."); *Conti*, 2014 WL 1274517, at *15; *Bigwood v. DOD*, 132 F.Supp.3d 124, 140 (D.D.C. 2015) ("In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request. Rather, a federal agency has discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents responsive to the FOIA request." (internal quotation, alteration, and citation omitted)).[8]

---

[8] Plaintiffs also argue that ICE's search was inadequate because the Pineiro Declaration fails to explain whether certain words were used in their singular and plural form, if other acronyms or spellings were used, and if these terms were searched together through Boolean connectors. This

ICE has provided logical explanations for the decisions it made as to how to conduct searches of its various program offices and custodians and shown that it made a good faith effort to design a comprehensive search. *See Fox News*, 739 F.Supp.2d at 535 (holding agency's search is adequate so long as it "has provided logical explanations for each of the decisions it made as to search terms to be used and how to conduct the searches," evincing a good faith effort to design a comprehensive search). That is all that FOIA requires. *See Liberation Newspaper,* 80 F. Supp. 3d at 146-47 ("Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior.").

## II.      ICE Properly Withheld Records Pursuant to Exemption 5

Plaintiffs' challenges to ICE's claimed exemptions are equally unavailing. ICE has established the documents withheld under Exemption 5 properly fall within the deliberative process privilege and the attorney-client privilege. Plaintiffs' arguments to the contrary are both factually and legally flawed.

---

is false. The Pineiro Declaration clearly lays out the disjunctive searches that each custodian performed using quotation marks to state the exact search terms each custodian ran. (*See* Pineiro Decl. ¶¶ 29-32, 35-37, 39-44). Such searches satisfy ICE's obligations under FOIA, as ICE was not required to use Boolean operators or connectors in performing its searches. *See, e.g., CREW v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 50 (D.D.C. 2006) (rejecting argument that agency had not demonstrated adequacy of search by failing to describe Boolean operators or connectors employed in search); *Immigrant Def. Project*, 208 F. Supp. 3d at 528 (holding that omission of specific search terms, keywords, or Boolean connectors does not demonstrate search was inadequate); *Huntington v. U.S. Dep't of Com.*, No. 15 Civ. 2249 (JEB), 2018 WL 647633, at *6 (D.D.C. Jan. 31, 2018) (rejecting plaintiffs' argument that agency's singular-form search terms were inadequately narrow to capture responsive documents), *aff'd*, No. 18-5086, 2018 WL 4600760 (D.C. Cir. Sept. 11, 2018).

## A. ICE Properly Withheld Documents Pursuant to the Deliberative Process Privilege

### 1. ICE Properly Withheld Documents that Post-Date the Directive

Plaintiffs' argument that certain of the documents contained in Exhibit D[9] withheld pursuant to the deliberative process privilege are not predecisional or deliberative because they "post-dated the final civil fines policy issued on June 19, 2018," (Pls. Br. 21), reflects a flawed understanding of the relevant decision-making process. Plaintiffs operate under the assumption that once the overarching civil fines policy was put into place, no further policy decisions needed to be made regarding the implementation of that policy. That is obviously untrue.

Plaintiffs claim that all documents which post-date the Directive must constitute "case-specific applications of the final civil fines policy" (Pls. Br. 20-24), relies on "too simplistic a view of [the] agency decision and policy process." *Sierra Club v. U.S. Dep't of Interior,* 384 F. Supp. 2d 1, 16 (D.D.C. 2004) ("major policy positions" may comprise "smaller policy decision," which are separately afforded deliberative process protections"). ICE's "final" civil fines policy is a four page document in which then Acting Director Homan "implemented sections 240B(d)(l), 274C(d)(3), and 274D(a) of the Immigration and Nationality Act (INA) and applicable regulations" by delegating to ICE program offices responsibility for "exercis[ing] *discretion* in enforcing applicable laws and regulations governing the assessment and collection of fines and penalties against aliens, who have unlawfully remained in the United States beyond an authorized period of voluntary departure or in violation of a removal order . . .". (Directive at ¶¶ 1, 2 (emphasis added)). Indeed, the Directive provided guidelines for the imposition of civil fines at

---

[9]     ICE has determined it no longer wishes to assert the deliberative process privilege over Exhibits D.7, D.8, D.10, D.11, D.12, D.15, and D.22. (*See* Supplemental Declaration of Fernando Pineiro ("Supp. Pineiro Decl.") ¶ 12). Accordingly, here, ICE addresses only those documents for which it maintains the deliberative process privilege withholding.

only an extremely high level of generality, leaving decisions to ICE program offices as to what categories of individuals to fine; how to determine which individuals within those categories to fine; and how much to fine such individuals. (*See generally,* Directive; *see also* Welch Decl. ¶ 13).

Decisions about how to apply broad policies in individual cases are not necessarily automatic; they can involve difficult policy judgments about how the policy should apply, what the limits of the policy are, and unexpected issues that are encountered. Thus, it is only logical that ICE engaged in extensive deliberation subsequent to the Directive as ERO and OPLA personnel figured out how to exercise such discretion. Specifically, the documents that ICE has withheld pursuant to the deliberative process privilege that post-date the Directive are: (i) communications between ERO personnel and OPLA seeking and/or providing legal advice on how to calculate civil fines, issues that arose in imposing the fines, and how to calculate and apply the relevant statute of limitations, (*see* Excerpted *Vaughn* Index at 28-31 (D.5); *id.* at 38-42 (D.17), *id.* at 44-47 (D.20); *see also id.* at 31-32 (D.6); *id.* at 32-33 (D.9); ; (ii) drafts documents reflecting ICE's consideration of potential candidates to fine (*id.* at 37-38 (D.14)); (iii) discussions amongst ERO personnel including OPLA personnel regarding how to withdraw fines (*see id.* at 42-43 (D.18)). That these discussions occurred after the Directive does not strip them of entitlement to the deliberative process privilege. *See Judicial Watch, Inc. v. DHS*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (where a situation facing the agency involved "numerous discussions" and "required multiple decisions," related records were "generated as part of a continuous process of agency decision making," and were both predecisional and deliberative); *CREW v. DHS*, 514 F. Supp. 2d 36, 46 (D.D.C. 2007) (records "regarding various problems relating to the ongoing response to [Hurricane] Katrina and suggesting solutions and approaches and draft situation reports" were properly withheld as "communications regarding the analysis of the ongoing policy

of the Government's response to Katrina" (emphases in original)); *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 13-14 (D.D.C. 2004); *Judicial Watch, Inc. v. Reno*, No. 00 Civ. 723, 2001 WL 1902811, at *3 (D.D.C. Mar. 30, 2001) (rejecting argument that "all documents dated after . . . the date on which [the government] allegedly made the decision to return Elian Gonzalez to Cuba, [were] post-decisional under FOIA," because the situation involved "multiple agency decisions," some of which occurred after the return date).

For example, in *Access Reports v. DOJ*, 926 F.2d 1192 (D.C. Cir. 1991), a DOJ attorney had "prepared [a] memo to help his superiors in the process of defending the legislative package that the Department had already offered." *Id*. at 1196. The requester argued that this made the memo post-decisional, but the D.C. Circuit disagreed, concluding that the relevant decision was not the contents of the legislative package, but DOJ's "study of how to shepherd the FOIA bill through Congress." *Id*. The D.C. Circuit held that Exemption 5 "protects such communications just as it protects ones contributing to deliberations about whether to introduce legislation in the first instance." *Id*. at 1196-97. The processes that surrounded the numerous specific policy-related decisions that ICE needed to consider regarding the implementation of the general civil fines policy are similarly protected under Exemption 5.

### 2. ICE Properly Withheld Documents That Pre-Date the Directive

Plaintiffs also argue that ICE failed to justify withholdings in three emails that involve communications of ICE leadership because such documents must have constituted final agency policy. (*See* Pls. Br. 24-25 (citing A.1, A.2, and A.5)). They contend that ICE's withholdings were improper because these documents "*do not appear* to only contain deliberative information" (*id*. at 24), and the discussions "*likely* were adopted or incorporated by reference in the final civil fines policy" (*id*. at 25). This is nothing more than rank speculation.

Plaintiffs cite the December 17, 2017 discussion between Jon Feere and OPLA attorney Michael Davidson in Exhibits A.1 and A.2. Plaintiffs surmise that, because, Feere asks for Davidson's help fast tracking the DHS Memorandum and then explains his understanding of existing policy in the unredacted portions of the document, the portion of the email that is redacted must contain unprotected "working law."

Yet as the Second Circuit has made clear, for an agency document to constitute "working law," it must "bind[] the agency and the public." *New York Times Co. v. DOJ*, 939 F.3d 479, 491 (2d Cir. 2019); *see also ACLU v. NSA*, 925 F.3d 576, 594 (2d Cir. 2019) (working law "has operative effect—i.e., binding rather than persuasive power," and "announces what an agency's law is, not what the law might be"). As ICE's *Vaughn* Index makes clear, the portions of the email that were redacted contain communications from Feere to Davidson "seeking legal advice and a recommended course of action regarding steps that should be taken in order to issue Notices of Intention to Fine letters as well as which types of cases should be identified" (Excerpted *Vaughn* Index at 2-3 (Ex. A.1)), and "seeking legal advice pertaining to (1) the issuance of fines pursuant to statutory authority, (2) recommendation on next steps in the civil fines initiative, and (3) the application of a civil fine on a particular group of noncitizens" (*id*. at 3-7 (Ex. A.2)). Plaintiffs, who do not begin to advance a theory as to how internal requests for legal advice can have binding effect on the public such as to constitute working law, have not met their burden of establishing that the withheld information constitutes working law.

### 3.    ICE Properly Withheld Documents Discussing How to Message the Civil Fines Policy to the Media

As Plaintiffs concede, in *NRDC v. EPA*, 19 F.4th 177, 187 (2d Cir. 2021), the Second Circuit held that records reflecting how agency staff should communicate agency policies to people outside the agency are protected from disclosure pursuant to the deliberative process privilege.

(*See* Pls. Br. 26). That is because "communications decision[s] implicate[] the agency's policymaking role and remain[] delicate and audience-sensitive, susceptible to distortions and vulnerable to fudging when the deliberators fear or expect public reaction." *Id.* at 186. Accordingly, [d]ocuments created as "as part of [an agency's] efforts to communicate with people outside the agency about specific policies" which "reflect[ ] discussions about what to say about the polic[ies] or how to formulate that message" are shielded by the privilege. *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2022 WL 123590, at *7 (S.D.N.Y. Jan. 13, 2022) (citing *NRDC*, 19 F.4th at 190).

To try to avoid the consequences of the Second Circuit's *NRDC* decision, Plaintiffs argue that ICE cannot withhold deliberations on how to present the civil fines policy to the public after July 3, 2019, because on that date, ICE Communications Director Bryan Cox "issued an email that *seemed* to establish the agency's media strategy on how to present the civil fines policy to the public." (Pls. Br. 26 (citing Ex. F.4) (emphasis added)). In other words, Plaintiffs argue that all communications about how to present the civil fines policy outside of the agency lose their deliberative character because ICE had established a strategy for how to do so. But that is wrong both because Cox's July 3, 2019 email did not establish a media strategy on how to present the civil fines policy to the public and because the deliberative process privilege requires an analysis beyond merely looking at dates of documents.

In support of their claim that Cox's July 3, 2019 email established a media strategy, Plaintiffs cite Exhibit F.4. Exhibit F.4 evidences that Cox noted that ICE had received inquiries from the Washington Post and North Carolina media outlets about a *particular individual* who was issued a fine. (*See* Ex. F.4). Cox responded by providing a two paragraph statement that could be shared with the media about ICE's dealings with this particular individual. (*See id.*). Cox's

approval of a statement to specified media outlets on this one individual is a far cry from "establish[ing] the agency's media strategy." (Pls. Br. 26). It is not a formal policy and provides no guidance or instructions to ICE personnel on how to present the civil fines policy to the public outside of these specified requests pertaining to a single individual whom ICE had issued a notice of intention to fine letter. (*See* Ex. F.4).

Thus, Plaintiffs assertion that further ICE communications are iterations of the media strategy from Cox's July 3, 2019 email is entirely unfounded. The other documents Plaintiffs cite as being formulated subject to Cox's purported policy: (i) contain considerations on how to message the policy through an interview and press releases; (ii) are dated months after Cox's email; (iii) do not relate to the same written statement about which Cox issued his approval; and (iv) are not limited to the one individual mentioned in Cox's email. (*See* Excerpted *Vaughn* Index at 24 (Ex. C.9 (April 16, 2020 email reflecting "recommended messaging and focus for" interview with reporter)); *id.* at 21-23 (Exs. C.3, C.5, C.6 (draft news releases pertaining generally to issuance of notices of intention to fine that ICE issued); *id.* at 23 Ex. C.7 ("[i]nternal e-mail communication … requesting a review of a draft issue paper and news release pertaining to the issuance of additional civil fines"). Thus, Plaintiffs' claim that these documents relate to a previously established media strategy is simply incorrect.

Plaintiffs further argument, that ICE failed to justify its withholdings of questions and answers responding to congressional inquiries (*see* Pls. Br. 27-28), is also misguided. In *NRDC*, the Second Circuit held that the deliberative process privilege could apply to "draft talking points prepared for senior agency staff about agency policies and internal discussions and *draft responses to inquiries from the press and from members of Congress*." 19 F.4th at 185 (emphasis added). With respect to how to communicate policies and actions to Congress, the Court reasoned that a

"poor communications decision at a congressional hearing might mean the difference between receiving the agency's requested budgetary appropriation, on the one hand, or inviting intrusive oversight hearings into agency operations, on the other." *Id*. at 185-186.  Here, Plaintiffs argue that ICE was not entitled to assert the deliberative process privilege over draft responses to Congress because they do not form an essential link in a specific consultative process or prematurely disclose the views of the agency, and were drafted after ICE's Directive and the Cox email.  That misses the point of *NRDC*, which held that determining how to message a policy to the public or Congress can itself constitute a deliberative process.  *See id.* at 186 (Decisions about how to message a policy to Congress, like decisions about how to message such policies to the media, "do[] not constitute a 'mundane,' 'standard[,]' or routine' decision "over which the agency has no significant discretion.'").  The draft responses to congressional inquiries, which contain redline and comment bubbles, are precisely the type of documents that the Second Circuit indicated are entitled to the deliberative process privilege.

## B.  The Government Misconduct Exception Does Not Apply

Plaintiffs' argument that the ICE should be denied the deliberative process privilege because of the possibility of government misconduct is also misplaced.  As an initial matter, the government misconduct exception to the deliberative process privilege should not be applied in FOIA cases.  *See, e.g.*, *Spadaro v. U.S. CBP*, No. 16-cv-16 (RJS), 2019 WL 1368786, at *6 (S.D.N.Y. Mar. 25, 2019) (expressing doubt as to existence of government misconduct exception); *Judicial Watch, Inc. v. U.S. Dep't of State*, 285 F. Supp.3d 249, 253-54 (D.D.C. 2018) (surveying caselaw, and concluding that "it is not clear in this circuit whether a government misconduct exception may properly be invoked in a FOIA case"); *Wright v. Admin. for Child. & Fams*., No. 15 Civ. 218, 2016 WL 5922293, at *11 (D.D.C. Oct. 11, 2016) (refusing to recognize exception in FOIA context).

Yet even if such an exemption were to be recognized in the FOIA context, the extremely high bar for its invocation has not been met in this case. "The relevant consideration for 'extreme government wrongdoing' sufficient to trigger the exception is the egregiousness of the contents of the discussion." *Judicial Watch*, 285 F. Supp. 3d at 254. That is, "the 'policy discussions' sought to be protected with the deliberative process privilege [must be] so out of bounds that merely discussing them was evidence of a serious breach of the responsibilities of representative government," such that "[t]he very discussion . . . was an act of government misconduct." *ICM Registry, LLC v. U.S. Dep't of Com.*, 538 F. Supp. 2d 130, 133-34 (D.D.C. 2008) (conduct at issue must be "nefarious"). Given this high standard, it is unsurprising that plaintiffs are unable to cite a single case in which any court has found that government misconduct warrants refusing an agency application of the deliberative process privilege.[10] Moreover, the exception requires the advancing party to state a "discrete factual basis for the belief" that misconduct has occurred. *National Whistleblower Ctr.*, 903 F. Supp. 2d at 67. The purported "misconduct" alleged here is the implementation of a publicly announced policy initiative, as directed under a Presidential Executive Order. While the policy itself might be controversial, this is not the type of "nefarious" conduct sufficient to trigger the government misconduct exception.

---

[10]     Plaintiffs cite three cases in support of their argument that government misconduct justifies the revocation of the deliberative process privilege. (*See* Pls. Br. 28). *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), was not a FOIA case: the court addressed the scope of the common law deliberative process privilege where the White House withheld documents in response to a grand jury subpoena. In *Nat'l Whistleblower Ctr. v. HHS.*, 903 F. Supp. 2d 59, 68-69 (D.D.C. 2012), the court found there was no evidence of the sort of "extreme government wrongdoing" that would prevent the agency from invoking the deliberative process privilege. And *Wright*, supports the Government's position, that the government misconduct exception does not apply in the FOIA context.

## C. ICE Properly Withheld Documents Subject to the Attorney-Client Privilege

ICE has properly applied the attorney-client privilege. Plaintiffs suggest that ICE has an obligation to demonstrate that the confidentiality of redacted communications has been maintained until their production to Plaintiffs. But Plaintiffs cite no law establishing a standard whereby an agency must demonstrate chain of custody over attorney-client communications to assert the attorney-client privilege. ICE has affirmed that it applied the attorney-client privilege to "confidential communications" between ICE and DHS counsel and their clients (*see* Pineiro Decl. ¶¶ 58-60), and ICE has done the work, in its *Vaughn* Index, of establishing to whom and from attorney-client communications were sent, including specifically noting that email communications were internal to ICE.

Plaintiffs have provided no evidence that ICE waived the privilege by sharing the legal advice it received with third parties. Although, Plaintiffs argue that "[d]ocuments relating to congressional inquiries strongly imply that the advice was to be shared with third parties external to the agency and that confidentiality was not maintained" (Pls. Br. 35), the documents that Plaintiffs cite are draft legal edits to responses to questions posed to ICE by Congress. (*See* Exs. C.1-C.2). That ICE ultimately shared some information with Congress about the civil fines policy does not render all prior attorney-client communications on that subject discoverable. Otherwise, every statement or document shaped by legal advice would be deemed a waiver of all prior attorney-client communications.

Plaintiffs further argue that ICE improperly invoked the attorney-client over documents that contain policy advice, rather than legal advice. Yet this argument is based on pure conjecture, which is not sufficient to overcome the presumption of good faith that should be accorded to ICE's attestations that the withheld material relates to the provision of legal advice.

### III.   ICE Properly Withheld the Names and Titles of Non-Public Facing Employees Pursuant to Exemptions 6 and 7(C)

In its opening brief, ICE explained that it withheld the names and other personally identifying information (PII) of ICE personnel pursuant to Exemptions 6 and 7(C) because disclosure would reasonably be expected to constitute an unwarranted invasion of personal privacy.   In so doing, ICE considered that the public interest in such PII is outweighed by such employees privacy interests, especially because federal law enforcement officers face an increased risk of harassment and attack due to the nature of their work.  (*See* Pineiro Decl. ¶ 88).

In their brief, Plaintiffs claim they are challenging ICE's withholdings only to the extent that they are seeking the names, titles, and email domains of high-level government officials in a limited number of documents.  (Pls. Br. 38).  Plaintiffs argue that the privacy interests of these individuals is outweighed by public's interest learning which high-level officials and/or influencers outside of the agency were responsible for crafting the civil fines policy.  ICE has thus agreed to lift redactions on the names and titles of personnel who are Senior Executive Services or otherwise considered by the agency to be high-level policy-making officials.  (*See* Supp. Pineiro Decl. ¶ 8).  ICE has also explained that all of the email domain names that were withheld pursuant to Exemptions 6 and 7(C) are "ice.dhs.gov."  (*Id*. at ¶ 11).  Thus, despite Plaintiffs' speculation, these documents do not contain communications with individuals—high-level or not—external to ICE.

Accordingly, ICE's agreement to lift the withholdings requested by Plaintiffs renders their argument on this point moot and ICE is entitled to summary judgment on its remaining Exemption 6 and 7(C) withholdings.

## IV. ICE Has Established That It Properly Segregated All Deliberative and Pre-Decisional Material

In its motion papers, ICE explained that it reasonably segregated all non-exempt portions of the records it produced. Specifically, ICE's FOIA Office conducted a line-by-line review of the produced records, segregating factual information when it was not inextricably intertwined with deliberative content, and applying discretionary waivers of exemptions where appropriate. (*See* Pineiro Decl. ¶¶ 96-97). It also explained that it released all non-exempt portions of the records and it did not withhold any non-exempt information on the ground that it was non-segregable. (*Id*.). ICE then went through the task of indexing approximately 3,700 pages of documents, including many pages that were produced in part and from which the context is apparent, providing Plaintiffs with a description of what lies below each redaction. (*See, generally, Vaughn* Index). ICE is entitled to the presumption that it complied with its obligation to disclose reasonably segregable material. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Nevertheless, Plaintiffs contend that ICE has not complied with its obligation to reasonably segregate material in several white papers that ICE withheld in full. These documents consist of draft legal opinions (*see* Excerpted *Vaughn* Index at 11-14 (Exs. B.2-B.4)), and draft white papers containing legal advice from ICE OPLA attorneys (*see id*. at 14-16 (Exs. B.5-B.6)), all of which—as evidenced by the cover emails to which they are attached—predate the Directive and Delegation Order. Plaintiffs argue that these documents must be examined because they "likely" contain sections which are purely factual and can be segregated from the remainder of the documents and may also contain "working law." (*See* Pls. Br. 30-32).

Plaintiffs argument that ICE failed to comply with its segregability obligations with respect to these white papers and in emails that were produced to Plaintiffs with redactions (*see* Pls. Br. 32-33), consists of nothing more than speculation about what ICE has withheld. But further, even

if these documents do contain factual or background information, it is entirely proper for an agency to withhold factual information that is "inextricably intertwined" with legal advice or policy making recommendations if their disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5. *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 85 (2d Cir. 1979).

Courts routinely grant agencies' summary judgment on the issue of segregability where they have affirmed they conducted a line-by-line or other segregability review and have released non-exempt portions of the documents, despite arguments made by plaintiffs that further segregation can be done. *See, e.g., ACLU v. NSA*, No. 13 Civ. 9198 (KMW) (JCF), 2017 WL 6387731, at *4 (S.D.N.Y. Aug. 17, 2017) (holding agency met its obligation to show proper segregability review where it affirmed it had conducted line by line analysis of documents), *aff'd*, 925 F.3d 576, 601 (2d Cir. 2019) (rejecting plaintiff's speculative contention that legal analysis must contain segregable material where agency affirmed that it conducted segregability review); *ACLU v. DOJ*, 252 F. Supp. 3d 217, 229 (S.D.N.Y. 2017) (granting summary judgment to DOJ where agency representatives affirmed that withheld documents contained no reasonably segregable non-exempt information); *Ctr. for Investigative Reporting v. CBP*, 2019 WL 7372663, at * 15 (D.D.C. Dec. 31, 2019) ("The D.C. Circuit has already interpreted subsection (b) of FOIA as satisfied by affidavits attesting to the agency's 'line-by-line review of each document withheld in full' and the agency's determination 'that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions." (quoting *Johnson*, 310 F.3d at 776 (affirming district court's conclusion that EOUSA met its burden on segregability where it provided "a comprehensive *Vaughn* index describing each document withheld, as well as the exemption under which it was withheld" and an affidavit from an agency witness indicating that

she conducted a "line-by-line review of each document" and determined that "no documents contained releasable information which could not be reasonably segregated from the nonreleasable portions"); *Schoenman v. FBI*, 841 F. Supp. 2d 69, 80 (D.D.C. 2012) (finding that agency's "line-by-line review of each document in an attempt to identify and release non-exempt portions of each document" satisfies requirement to reasonably segregate nonexempt information).

## CONCLUSION

For the reasons stated herein, the Court should grant ICE's motion for summary judgment and deny Plaintiffs' cross-motion for summary judgment.

Dated:  March 4, 2022
       New York, New York

<br>

                 Respectfully submitted,

                 DAMIAN WILLIAMS
                 United States Attorney
                 Southern District of New York

By:     */s/ Tara Schwartz*
                 TARA SCHWARTZ
                 Assistant United States Attorney
                 86 Chambers Street, Third Floor
                 New York, New York 10007
                 Telephone: (212) 637-2633
                 E-mail: tara.schwartz@usdoj.gov