**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AUSTIN SANCTUARY NETWORK,
FREE MIGRATION PROJECT,
GRASSROOTS LEADERSHIP; and
CENTER FOR CONSTITUTIONAL
RIGHTS,

                    Plaintiffs,


            v.


UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; UNITED STATES
DEPARTMENT OF TREASURY;
and DEPARTMENT
OF JUSTICE EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,

                    Defendants.

Case No. 20-cv-1686 (LJL)


# PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGEMENT

Alina Das
Vibha Kannan, Legal Intern
Rebecca Schectman, Legal Intern
Washington Square Legal Services
NYU Law Immigrant Rights Clinic
245 Sullivan Street, 5th Floor
New York, NY 10012
(212) 998-6467
alina.das@nyu.edu

*Attorneys for Plaintiffs*

Katherine Gallagher
Rafaela Uribe
Center for Constitutional
Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

*Attorneys for Plaintiffs*

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr.
Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    I.    Defendant's Search Was Inadequate. .............................................................................. 2

        A. Defendant's Failure to Search Senior ICE Leadership for Responsive Records is Unreasonable................................................................................................................ 3

        B. Defendant's Failure to Search the Offices of Public Affairs and Partnership and Engagement Was Unreasonable. ............................................................................. 9

        C. Defendant's Search Methods and Terms Were Not Adequate or Reasonable in Response to Plaintiffs' Request. ........................................................................... 11

    II.    Defendant's Exemption 5 Withholdings Remain Unjustified........................................ 15

        A. ICE's Withholdings Create an Impermissible Body of "Secret Law" Governing the Civil Fines Policy............................................................................................ 15

        B. Defendant Improperly Withheld Documents Pursuant to the Deliberative Process Privilege. ............................................................................................................. 18

        C. Defendant Improperly Applied the Attorney-Client Privilege. ............................ 30

    III.    Defendant Did Not Properly Segregate All Deliberative and Pre-Decisional Material. 34

    IV.    Defendant Improperly Withheld the Names and Titles of Public-Facing Employees under Exemption 6 and 7(c)...................................................................................... 35

CONCLUSION...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*100Reporters LLC v. U.S. Dep't of Just.*,
  248 F. Supp. 3d 115 (D.D.C. 2017) ......................................................................... 23

*Abtew v. U.S. Dep't of Homeland Sec.*,
  808 F.3d 895 (D.C. Cir. 2015) ........................................................................... 24, 25

*Access Reports v. Dep't of Justice*,
  926 F.2d 1192 (D.C. Cir. 1991) .................................................................. 25, 26, 28

*ACLU v. NSA*,
  925 F.3d 576 (2d Cir. 2019) ............................................................................... 34, 35

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983) ................................................................................ 16

*Am. Immigr. Laws. Assoc. v. EOIR*,
  830 F.3d 667 (D.C. Cir. 2016) ................................................................................... 7

*Am. Oversight v. HHS*,
  2019 WL 1430429 (D.D.C. Mar. 30, 2019) ............................................................... 7

*Amnesty Int'l USA v. CIA*,
  728 F. Supp. 2d 479 (S.D.N.Y. 2010) ................................................................... 6, 9

*Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*,
  370 F. Supp. 3d 116 (D.D.C. 2019) ........................................................................ 33

*Assassination Archives & Research Ctr. v. CIA*,
  781 F. App'x 11 (D.C. Cir. 2019) ............................................................................ 25

*Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*,
  377 F. Supp. 3d 428 (S.D.N.Y. 2019) ..................................................................... 13

*Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*,
  697 F.3d 184 (2d Cir. 2012) ............................................................................... 25, 28

*Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*
  21-CV-2443 (JSR), 2021 WL 5562558 (S.D.N.Y. Nov. 29, 2021) ......................... 12

*Campbell v. U.S. Dep't of Just.*,
  164 F.3d 20 (D.C. Cir. 1998), *as amended* .............................................................. 6

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ................................................................. 15, 18, 33

*Conservation Force v. Ashe*,
979 F. Supp. 2d 20 (D.D.C. 2013) ................................................................. 9

*Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*,
279 F. Supp. 3d 121 (D.D.C. 2017) ............................................................... 24

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
436 F. Supp. 3d 90 (D.D.C. 2019) ................................................................. 24

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*,
486 F. Supp. 3d 317 (D.D.C. 2020) ............................................................... 29

*Davis v. City of New York*,
2011 WL 1742748 (S.D.N.Y. May 5, 2011) ................................................... 22

*Elec. Frontier Found. v. U.S. Dep't of Just.*,
826 F. Supp. 2d 157 (D.D.C. 2011) ............................................................... 23

*Evans v. U.S. Off. Pers. Mgmt.*,
276 F. Supp. 2d 34 (D.D.C. 2003) ................................................................. 18

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) ........................................................................... 27

*ICM Registry, LLC v. Dep't of Commerce*,
538 F.Supp.2d 130 (D.D.C. 2008) ................................................................. 29

*Immigrant Def. Project v. U.S. Immigr. & Customs*,
208 F. Supp. 3d 520 (S.D.N.Y. 2016) ..................................................... 11, 12

*Inst. for Just. v. IRS*,
941 F.3d 567 (D.C. Cir. 2019) ......................................................................... 6

*Int'l Couns. Bureau v. DOD*,
657 F. Supp. 2d 33 (D.C. Cir. 2009) ............................................................... 4

*Judicial Watch of Florida, Inc. v. Dep't of Justice*,
102 F.Supp.2d 6 (D.D.C. 2000) ..................................................................... 29

*Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*,
2021 WL 4253299 (S.D.N.Y. Sept. 17, 2021) ......................................... 5, 11, 21

*Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*,
    407 F. Supp. 3d 311 (S.D.N.Y. 2019) ................................................................. 13

*Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*,
    407 F. Supp. 3d 334 (S.D.N.Y. 2019) ........................................................... 25, 28

*LaCedra v. Exec. Office for U.S. Attorneys*,
    317 F.3d 345 (D.C. Cir. 2003) ........................................................................... 7

*NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*,
    463 F. Supp. 3d 474 (S.D.N.Y. 2020) ............................................................... 13

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ............................................................................. 7

*Nat'l Council of La Raza v. U.S. Dep't of Just.*
    411 F.3d 350 (2d Cir. 2005) ................................................................. 15, 31, 32

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs*,
    486 F. Supp. 3d 669 (S.D.N.Y. 2020) ............................................................... 21

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*,
    811 F. Supp. 2d 713 (S.D.N.Y. 2011) ........................................................... 15, 18

*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*,
    903 F.Supp.2d 59 (D.D.C. 2012) .................................................................. 28, 29

*Nat. Res. Def. Council v. U.S. Env't Prot. Agency*,
    19 F.4th 177 (2d Cir. 2021) .......................................................................... 26, 27

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) ........................................................................................ 15

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ........................................................................................ 31

*Paisley v. CIA*,
    712 F.2d 686 (D.C. Cir. 1983) ......................................................................... 23

*Pritchard v. Cnty. of Erie*,
    473 F.3d 413 (2d Cir. 2007) ....................................................................... 30, 31

*Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*,
    842 F. Supp. 2d 720 (S.D.N.Y. 2012) ............................................................... 32

*Prop. of the People, Inc. v. Dep't of Just.*,
    405 F. Supp. 3d 99 (D.D.C. 2019) ................................................................. 4

*Scott v. Board of Educ. of City of East Orange*,
    219 F.R.D. 333 (D.N.J. 2004) ................................................................... 22

*Tax Reform Research Group v. IRS*,
    419 F. Supp. 415 (D.D.C. 1976) ............................................................ 29, 30

*Tigue v. DOJ*,
    312 F.3d 70 (2d Cir. 2002) ..................................................................... 27

*Trea Senior Citizens League v. U.S. Dep't of State*,
    923 F. Supp. 2d 55 (D.D.C. 2013) ............................................................ 23

*United States v. Am. Tel. & Tel. Co.*,
    86 F.R.D. 603 (D.D.C. 1979) ................................................................... 33

*United States v. Weissman*,
    94 Cr. 1995 WL 244522 (S.D.N.Y. Apr. 26, 1995) ......................................... 31

*Valencia–Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999) ................................................................. 10

*Velez v. City of New York*,
    2010 WL 2265443 (E.D.N.Y. June 2, 2010) ................................................. 22

*Vietnam Veterans of Am. Connecticut Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*,
    8 F. Supp. 3d 188 (D. Conn. 2014) ........................................................... 12

*Waller v. Fin. Corp. of Am.*,
    828 F.2d 579 (9th Cir. 1987) ................................................................... 33

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009) ..................................................................... 35

Statutes

5 U.S.C. § 552(a)(4)(B) ............................................................................. 26
5 U.S.C. § 552(f) ...................................................................................... 9
8 U.S.C. § 1324d ...................................................................................... 7

## PRELIMINARY STATEMENT

The Trump Administration's implementation of the civil fines policy implicates many of the most serious of constitutional transgressions, including burdens on First, Fifth, and Eighth Amendment rights. According to Defendant's own admissions, federal officials were "acutely aware" of the "heightened potential" for litigation and yet decided to target several outspoken, asylum-seeking women who chose to take sanctuary in houses of worship for exorbitant, unprecedented fines in a public-facing, media-focused operation. The purpose of this targeting does not appear to be about collecting the money—Defendant Immigration and Customs Enforcement ("ICE") was aware from the sanctuary leaders' asylum applications that each was indigent—but something else entirely. Plaintiffs' Freedom of Information Act ("FOIA") request ("Request") was written to uncover the truth about this policy—including who crafted this fines program, why it was created, what its purpose was, and whether and how it fit into a broader effort to target the sanctuary movement.

To date, many of these questions remain unanswered. Defendant ICE asserts that it has complied with the requirements of FOIA—searching its records adequately and redacting and withholding scores of documents appropriately. In opposing Plaintiffs' cross-motion for summary judgment, ICE argues that Plaintiffs misconstrue their own FOIA request; that ICE bears no responsibility to search ICE Senior Leadership or public- or media-facing offices for responsive records; that its haphazard search terms and methods were reasonable; and that it faithfully applied deliberative process, attorney-client, and privacy privileges across the emails, white papers, and other records it has produced to Plaintiffs.

As explained further below, Defendant's search and many of its redactions and withholdings were improper. As an initial matter, Defendant, not Plaintiffs, misread the FOIA

request, ignoring critical aspects of its comprehensive request for civil fines records and its broader request for information on the tracking and targeting of people in sanctuary. Their arguments also demonstrate an internal tension. On one hand, ICE argues that the unprecedented and complex nature of the program demands significant redactions so as to not chill deliberations or disclose attorney-client communications about this high-profile and controversial effort. On the other hand, ICE argues that senior leadership is unlikely to have responsive records about this unprecedented targeting of people in sanctuary and that this policy was delegated to directorate offices without any further oversight. ICE has not complied with the requirements of FOIA, and this Court should (1) order the search of certain offices and custodians and (2) compel the disclosure of the withheld portions of the requested records that shed light on this attack against women in sanctuary and the immigrant rights movement.

## ARGUMENT

### I. Defendant's Search Was Inadequate.

Defendant ICE argues that it did not have an obligation to search high-level ICE leadership, the Office of Public Affairs or the Office of Partnership and Engagement, and that ICE custodians used adequate search terms and methods. To justify its search, Defendant claims that Plaintiffs have misunderstood how ICE imposed the civil fines policy, as much of the implementation of the policy was delegated to directorate offices—Enforcement and Removal Operations ("ERO"), the Office of the Principal Legal Advisor ("OPLA"), ICE Policy, and other field offices—after the issuance of the June 19, 2018 Homan Directive and Delegation order; therefore, agency senior leadership in the ICE Director's Office purportedly would not have relevant records. Moreover, Defendant argues that Plaintiffs never actually asked for many of these documents in their initial request.

Through these arguments, ICE misconstrues Plaintiffs' Request and sidesteps its own responsibility to conduct an adequate and reasonable search. In interpreting Plaintiffs' Request in the narrowest possible manner, ICE purposefully failed to search offices, custodians, and documents that the request does reference, including senior leadership, the Office of Public Affairs, and the Office of Partnership and Engagement. ICE subdivisions also failed to use consistent search methods and terms and did not use the term "sanctuary" in numerous searches, suggesting an incredibly narrow reading and a clear disregard for the goals of Plaintiffs' FOIA request. Defendant's arguments regarding its failure to search senior leadership remain at odds with ICE's overarching characterization of the civil fines policy as highly complex and unprecedented. Given the novelty of the policy, ICE's argument that high-level officials discontinued their discussion after the 2018 Homan delegation order—despite significant developments and press around its implementation against sanctuary leaders—is unreasonable. These failures demonstrate the inadequacy of ICE's search and underscore Plaintiffs' request that the Court compel Defendant to conduct supplemental searches of key offices and custodians, particularly former Senior Advisor to the Director and ICE's Chief of Staff Jon Feere.

**A. Defendant's Failure to Search Senior ICE Leadership for Responsive Records is Unreasonable.**

Defendant argues that it did not need to search the computers and emails of individuals within the ICE Director's office—including former ICE Chief of Staff Jon Feere, former ICE Acting Director and Deputy Director Matthew Albence, former ICE Acting Director Thomas Homan, and former ICE Chief of Staff Thomas Blank—for two reasons. First, Defendant argues that the ICE Director "delegated responsibility and authority to ERO leadership for enforcing § 274D" so it was ERO that "determined the who, what, when, where and how to assess fines" by exercising its own discretion, not the ICE Director's office. Second, Defendant states that the

documents Plaintiffs believe would be maintained by senior leadership fall outside of the scope of the FOIA request they submitted to ICE. *See* Def. Reply Memo of Law in Support of its Motion for Summary Judgement (hereinafter "Def. Reply"), ECF No. 63 at 9.

The first argument is belied by Defendant's own declarations and briefing, which underscore the unprecedented and high-profile nature of this policy, and by independent evidence of senior leadership's interest in the program. The second argument also fails because Defendant ICE, not Plaintiffs, misread Plaintiffs' FOIA request, narrowly interpreting terms like "records" and ignoring requests asking for records tracking sanctuary leaders and communications internally and with other "federal agencies."

1. **Defendant's Characterization of the Civil Fines Policy Directly Contradicts Its Claim That It Did Not Need to Search Agency Senior Leadership.**

An agency must show that it did not unreasonably limit the offices or custodians searched. *See, e.g.*, *Int'l Couns. Bureau v. DOD*, 657 F. Supp. 2d 33, 38–39 (D.C. Cir. 2009) (granting plaintiffs summary judgment where an agency improperly limited its search to particular custodians and topics). Furthermore, its search can be deemed inadequate if the requestor offers evidence that there was a reasonable likelihood that other offices or custodians would possess responsive records that the agency failed to search. *See Prop. of the People, Inc. v. Dep't of Just.*, 405 F. Supp. 3d 99, 120 (D.D.C. 2019) (holding that plaintiffs' explanation of FBI's Counterintelligence Division's role was enough evidence to suggest that agency should have searched the office in this circumstance).

The claim that the agency's senior leadership was not involved in subsequent implementation decisions seems implausible given that Defendant was faced with complex and unprecedented policy questions that continued after the June 19, 2018 Homan Directive and

Delegation Order. *See* Def. Reply at 9. ICE's brief emphasizes the unprecedented and complex nature of this policy and its hyper-awareness of the possibility of litigation as a result of choices to fine high-profile, asylum-seeking women living in church sanctuaries. *See* Def. Memo of Law in Support of Motion for Summary Judgement, ECF No. 55 at 13, 17. However, ICE also claims that the agency's senior leadership was so uninvolved in the policy after the 2018 Homan Directive that they would only appear on the few emails with ERO and OPLA that were already produced, offices are classified in the agency's organizational chart as "directorates" rather than ICE "leadership." *See* Ex. F.8 of Declaration of Rebecca Schectman (hereinafter, "Schectman Decl."), ECF No. 59-6. ICE cannot have it both ways, and it has not shown why there is nothing in its productions that points to who made these decisions and for what purpose. ICE's own declaration states that ERO leadership "may have provided occasional updates to the ICE Director's Office on their implementation of Directive 10088.1," acknowledging that senior leadership was involved after the delegation order. *See* Declaration of Michelle E. Welch in Support of ICE's Reply Motion for Summary Judgement, ECF No. 65, ¶ 17 (hereinafter "Welch Decl.").

Defendant claims that because so few produced emails from ERO, ICE Policy, and OPLA copy individuals like Jon Feere, Matthew Albence, and Thomas Blank, separate searches of senior leadership emails are not necessary. But the opposite is true. Failure to search the individual emails and computers of senior leadership would exclude any communication that happened between these officials *without* ERO, ICE Policy, and OPLA officials copied on the emails. *See Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control & Prevention*, No. 20 CIV. 2761 (AT), 2021 WL 4253299, at *7 (S.D.N.Y. Sept. 17, 2021) ("Bonds' inclusion on the emails uncovered by a search of her email inbox does not mean that

Heldman [her subordinate] did not send or receive other responsive emails *which did not include Bonds* [her supervisor at the CDC]. Therefore, it is reasonably likely that Heldman has other, undiscovered responsive documents, and must be included in a reasonable search.") (emphasis added); *see also Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) ("[A]n agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested.").

### 2. Defendant Misread and Improperly Narrowed Plaintiffs' FOIA Request in Failing to Search ICE Senior Leadership.

Defendant's next argument, that the senior leadership documents Plaintiffs are requesting are outside of the scope of their FOIA request, is wrong for three reasons. First, ICE has misinterpreted the word "records" in Plaintiffs' Request to exclude communications. There is no justification for this exclusion. Second, ICE ignores part seven of Plaintiffs' Request, which clearly asks for "records" maintained by the agency regarding individuals in sanctuary, *separate* from the civil fines policy, which senior leadership also likely had an interest in. Third, Defendant ignores Plaintiffs' clear interest in communications with other "local and federal agencies." *See* Welch Decl., Ex. A, ECF No. 65-1, Plaintiffs' FOIA Request at 2 (hereinafter, "Plaintiffs' Request").

An agency must show that it did not adopt an overly narrow interpretation of the FOIA request. *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 498–99 (S.D.N.Y. 2010) (emphasizing that an agency must "construe FOIA requests liberally" and finding a search inadequate when the defendant was on notice of the types of documents requested but narrowly interpreted the terms in the request) (internal quotations omitted); *see also Inst. for Just. v. IRS*, 941 F.3d 567, 572 (D.C. Cir. 2019) ("We do not require technical precision in FOIA requests, and a request certainly should not fail where the agency knew or should have known what the requester was

seeking all along."). Moreover, when a FOIA requester "seek[s] all of a certain set of documents" while also "evincing a heightened interest in a specific subset thereof," such a request "is reasonably susceptible to the broader reading" of seeking the entire set of documents despite the fact that a specific subset of documents is named. *LaCedra v. Exec. Office for U.S. Attorneys,* 317 F.3d 345, 348 (D.C. Cir. 2003); *see also Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (holding that a FOIA request seeking records "'pertaining to' [Ross] Perot" and specifically "ask[ing] for records indexed under Perot's name" was "sufficient to alert the agency that appellants sought information about Perot, even if it was not indexed under his name").

In arguing that the only part of the Request that seeks "communications" is part three — which seeks "[a]ny communications between ICE officials and officials of local or federal agencies regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. § 1324d"— Defendant is purposefully ignoring the first part of the Request, which asks for "all ***records*** relating to current policies, procedures, guidelines, instructions or other materials concerning when and how civil fines and penalties under INA § 274D, 8 U.S.C. § 1324d, are enforced on individuals who are alleged to have a final administrative removal order, including but not limited to immigrants taking sanctuary." *See* Def. Reply at 10; Plaintiffs' Request at 2 (emphasis added). Case law is clear that asking for "records" in a FOIA request covers email communications and that Plaintiffs' request did not need to specifically ask for "communications" to receive emails from and to senior leadership. *See, e.g.*, *Am. Immigr. Laws. Assoc. v. EOIR*, 830 F.3d 667, 669 (D.C. Cir. 2016) (defining a "chain of emails" as a "responsive 'record'"); *Am. Oversight v. HHS*, No. 17-1448, 2019 WL 1430429 (D.D.C. Mar. 30, 2019) (holding that Defendant's practice of defining a "record" to be each individual agency

email in the chain based on whether the author was an official at an agency rather than treating "entire email chains as a 'record'" read the request too narrowly).

Defendant ICE also ignores that part seven of Plaintiffs' Request seeks "records collected by ICE regarding individuals taking sanctuary," which is reasonably likely to include communications between agency senior leadership tracking sanctuary cities and leaders *beyond* the civil fines policy. There is clear evidence that pursuing sanctuary cities was an important priority for the Trump administration and that senior officials within and outside of ICE, like former President's Senior Advisor Stephen Miller, were actively involved in this effort. *See* Declaration of David Bennion Decl., ECF No. 60, ¶ 6, 7. Because it was apparent that officials like Stephen Miller were often communicating with individuals like Jon Feere about high-priority immigration issues, *id.*, the ICE Director's office would likely have records responsive to this part of the request, which seeks information about sanctuary policy that includes but is not limited to the civil fines policy. Defendant's failure to search the communications of senior leadership is unreasonable and shows that it has ignored a core purpose of Plaintiffs' Request.

Finally, Plaintiffs' Request also expresses an interest in senior leadership emails and their communications between themselves and with external "local and federal agencies." Plaintiffs' Request at 2. Defendant's failure to search any senior leadership offices or specific individuals requested by Plaintiffs has excluded records shared between and among leadership, as well as records shared between leadership and the Executive Office of the President, other agencies, and outside entities. Contrary to ICE's arguments, this is fully within the scope of the FOIA request. Part one of the FOIA request asked for "[a]ny and all records" relating to the civil fines policy, clearly encompassing email communications between ICE senior leadership and their

communications with other offices and agencies. *Id.* And Part three of the request explicitly asks for communications between ICE officials and "local or federal agencies." *Id.*

Defendant ICE attempts to further side-step its obligation to search the records of individuals within the ICE Director's office by incorrectly arguing that emails between ICE senior leadership and Stephen Miller and other key individuals like former counsel to the Attorney General Gene Hamilton would not be included in Plaintiffs' request because Miller was part of the "White House." Def. Reply at 11. But this ignores the agency's obligation to construe FOIA requests liberally, particularly when it is on notice of the types of documents requested by Plaintiffs. *See Amnesty Int'l USA*, 728 F. Supp. 2d at 498–99. Throughout Plaintiffs' request, it was clear that they were interested in communications with external stakeholders, and part three of the Request specifically mentions Plaintiffs' interest in communications between ICE officials and "local or federal agencies." Moreover, the Executive Office of the President ("EOP") is explicitly a federal agency within the meaning of FOIA. 5 U.S.C. § 552(f). There is clear evidence that, at the minimum, ICE was communicating not only with the EOP, but also with other federal agencies such as the Department of Treasury, the Department of Homeland Security, and the Department of Justice about the civil fines policy, which are clearly included in Part three of Plaintiffs' request. *See* Def.'s *Vaughn* Index, ECF No. 56-1 at 74, 197, 249, 257. For all the reasons enumerated above, the Court should compel Defendant to search the emails and computers of agency senior leadership within the ICE Director's office.

### B. Defendant's Failure to Search the Offices of Public Affairs and Partnership and Engagement Was Unreasonable.

As discussed above, agencies have a duty to construe FOIA requests liberally. Therefore, they must "select the interpretation that would likely yield the greatest number of responsive documents." *Conservation Force v. Ashe*, 979 F. Supp. 2d 20, 102 (D.D.C. 2013). It is well-

settled that if an agency has reason to know that certain places may contain responsive documents, "it is obligated under FOIA to search barring an undue burden." *See Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 327 (D.C. Cir. 1999).

Defendant argues that Plaintiffs' FOIA request did not ask for public outreach and media messaging, so it had no obligation to search the Offices of Public Affairs and Partnership and Engagement. *See* Def. Reply at 13–14. But that claim is a clear misunderstanding of the Request and an impermissibly narrow reading in an effort to avoid searching relevant offices. The agency had a clear understanding that media communications and press were a central part of its civil fines policy. In fact, the manner in which Defendant ICE utilized media to communicate the civil policy was at issue long before this set of briefings or even initial agency productions. *See* Transcript of Status Conference on March 17, 2020. Defendant ICE first publicly communicated the civil fines policy to the press through an article in *The Washington Times* without properly notifying the public through official agency channels. *Id.* Moreover, Defendant ICE's own communications demonstrate that other offices within ICE were communicating with the Office of Public Affairs. *See* Ex. D.11 of Schectman Decl., ECF No. 59-4 (November 21, 2019 email update stating "The Office of Public Affairs has been notified of the upcoming events."). In such a circumstance where the press was used so strategically in pursuit of publicly communicating this policy, it is clear that Defendant would have known the Office of Public Affairs and the Office of Partnership and Engagement would be offices that contain important responsive records to the Request.

Moreover, Plaintiffs' Request includes multiple parts that indicate that they are interested in "[a]ny and all records relating to current policies, procedures, guidelines, instructions or other materials" and "communication between ICE officials" regarding the enforcement and

implementation of the civil fines policy, particularly the decision to target immigrants in sanctuary. Plaintiffs' Request at 2. In reading this request as only asking for the current policies and guidelines regarding the enforcement of civil fines, Defendant reads this request incredibly narrowly, failing to note that the phrases "relating to" and "other materials" also shows Plaintiffs' interest in ICE's internal and external dissemination of this policy and the way they communicated it. *See Knight First Amend. Inst.*, 2021 WL 4253299, at *4 (holding that the CDC did not adequately search for all documents regarding the dissemination and communication of the agency's policy itself because the CDC impermissibly narrowed the FOIA request and ignored the phrase "relating to," only producing actual policy and guideline document and excluded other "incidental documents"). Defendant has an obligation to liberally construe Plaintiffs' FOIA request even if it did not actively use the words "media," particularly when ICE was on notice that Plaintiffs had an interest in this material before it began its productions. *See Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520 (S.D.N.Y. 2016) (holding that ICE's failure to search its Office of Public Affairs was unreasonable because the agency was required to construe the request liberally and given that the request specifically sought "overview documents," so the office should have read the request to encompass documents related to press releases). This request, paired with the agency's clear understanding that ICE's Office of Public Affairs and Office of Partnership and Engagement played a very active role in the public narrative of the civil fines policy, suggest that Defendant should have searched these offices.

### C. Defendant's Search Methods and Terms Were Not Adequate or Reasonable in Response to Plaintiffs' Request.

Defendant also attempts to substantially narrow the universe of records that Plaintiffs requested through its inconsistent search methods and selective exclusion of certain key search

terms. ICE argues that the differences in search methods and search terms across different

agency offices were reasonable because of the agency's superior knowledge of its record keeping

systems and a presumption of good faith in crafting search terms. Defendant also notes that

FOIA does not give requesters the right to "Monday-morning quarterback" the agency's search.

*See* Def. Reply at 15. ICE argues that it can use decentralized search methods because of

superior knowledge of file keeping systems; ICE also notes that Plaintiffs overemphasize "the

quantity of the terms used as opposed to the quality of the search conducted" and that a search

term like "274D" is general enough to encompass all responsive documents. *Id.* at 19.

Defendant's claims fail to adhere to FOIA's standards of a reasonable search. First, in using such

few search terms, ICE has substantially narrowed the universe of records and excluded other

clearly relevant terms—in fact, the agency does not even provide a logical justification of why it

even failed to use the word "sanctuary" in several searches, which relate to documents that

Plaintiffs clearly requested *separate* from the civil fines policy. Second, ICE's conclusory

statements to justify its search system inconsistencies are inadequate to meet its burden.

    A search can be inadequate when an agency simply states what databases were searched

without a clear explanation of "whether there are other electronic files which were not searched,

and if there are, why they were not searched." *Vietnam Veterans of Am. Connecticut Greater

Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 221 (D. Conn. 2014).

Moreover, declarations that do not accurately describe what information different systems and

databases contain are insufficiently detailed to show beyond material doubt that the search

conducted was adequate. *Id.* at 212–213. If an agency uses inconsistent or narrow search terms

and methods, they must provide "logical explanations" for decisions it makes with respect to the

search terms and methods it does or does not use. *Immigrant Def. Project*, 208 F. Supp. 3d at

527; *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*, No. 21-CV-2443 (JSR), 2021 WL 5562558, at *5 (S.D.N.Y. Nov. 29, 2021) ("ICE contends that this amounts to the Court inappropriately 'Monday-morning quarterbacking' ICE's search terms and locations. While an agency need not use the requestor's wish list of search terms in order to conduct an adequate search under FOIA, the agency must provide logical explanations for each of the decisions it made as to search terms to be used and how to conduct the searches.")

*First,* it is not "Monday-morning quarterbacking" to request a logical explanation for its decision to reject even the most obvious of terms on the April 9, 2020 search list that Plaintiffs provided to Defendant at their own request. *See* Ex. F.7 of Schectman Decl., ECF No. 59-6. Multiple custodians within ERO searched for only two to three search terms that excluded obvious terms such as "civil fines," suggesting a clear disregard for the goals of Plaintiffs' Request. Additionally, not one of the OPLA officers included the term "sanctuary" in their search, indicating that they ignored aspects of Plaintiff's Request completely. *See* Declaration of Fernando Pineiro in Support of Def.'s Motion for Summary Judgement, ECF No. 56, ¶¶ 39–44 (hereinafter "Pineiro Decl."). While ICE assets they were focused on quality not quantity, this fails to provide a reasonable and sufficient explanation for these substantial omissions. *See NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*, 463 F. Supp. 3d 474, 485 (S.D.N.Y. 2020); *see also Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 311, 325 (S.D.N.Y. 2019), *rev'd on other grounds*, 30 F.4th 318 (2d Cir. 2022) (finding a search for two search terms "unreasonably narrow given the breadth of Plaintiff's request"); *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019) (finding agencies' respective uses of three and four search terms inadequate where they failed to employ other obvious search terms). Defendant attempts to argue

that "274D," a term used across the different custodian searches and the legal basis of the civil fines policy, would encompass more specific search terms like "civil fines" and "sanctuary," which was a subset of cases within the civil fines policy. *See* Def. Reply at 20. In claiming this, ICE has completely disregarded a full part of Plaintiffs' Request which clearly asks for records about sanctuary cases separate from the civil fines policy. As noted in Defendant's own brief, "274D" does not appear in part seven of the FOIA request which asks for "[a]ny data, charts, statistics, lists, or records collected by ICE regarding individuals taking sanctuary and/or the churches, places of worship, and other locations where individuals are taking sanctuary." Plaintiffs' Request at 2. This part of the request indicates that Plaintiffs are interested in any records indicating the tracking of sanctuary cases, including documents collected for purposes unrelated to civil fines. Defendant's own April 2019 spreadsheet produced in response to this FOIA request, which included individuals seeking sanctuary in churches, demonstrates that it is reasonably likely that this tracking was occurring separately from these fines. *See* Ex. D.22 of Schectman Decl., ECF No. 59-4.

     *Second,* ICE fails to justify why certain electronic systems were searched by certain offices and custodians, and why others were not. The agency's original Pineiro Declaration simply states that the agency uses "various systems" to maintain its records, pointing to employee emails and potential share drives. *See* Pineiro Decl. ¶ 22. ICE fails to explain other systems it references throughout the search process like the "ERO policy library" or the "FieldOps hard drive" and why only some custodians had access to these resources while others did not. *Id.* at ¶ 29–30. Instead, Defendant simply leaves Plaintiffs with the conclusory statement that it has greater expertise in its file systems, without even a basic explanation of these inconsistencies. While ERO Field Operations conducted a search of the division's SharePoint

and hard drive, the program manager within ERO Enforcement searched his or her laptop and email. Pineiro Decl. ¶¶ 29–31. Meanwhile, ICE Policy only searched the ICE Policy Manual and ICE Policy Shared Drive without searching any individual's computer or email. *Id.* at ¶ 32. None of these differences are explained in further detail, suggesting that ICE's search methods are inadequate. Therefore, in narrowing search terms and search methods, ignoring the goals of Plaintiffs' FOIA request, Defendant failed to adequately search for responsive records and substantially narrowed the universe of documents that Plaintiffs clearly sought.

## II. Defendant's Exemption 5 Withholdings Remain Unjustified.

### A. ICE's Withholdings Create an Impermissible Body of "Secret Law" Governing the Civil Fines Policy.

ICE's withholdings effectively create a secret body of law that shields review of why a group of women, all leaders in the sanctuary and immigrant rights movement, were hit with massive fines. Agency records qualify as "secret law" when they are "used by [the agency] in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). Withholding such agency positions undermines the central purpose of FOIA, which is "'to ensure an informed citizenry,' which is 'vital to the functioning of a democratic society [and] needed to check against corruption and to hold the governors accountable to the governed.'"[1]

The secret law doctrine applies both to the deliberative process privilege (*see Coastal States*, 617 F.2d at 867), as well as the attorney-client privilege. *Nat'l Day Laborer Org. Network*

---

[1] Memorandum for All Heads of Executive Departments and Agencies, from Merrick Garland, Attorney General, Re: Freedom of Information Act Guidelines (March 15, 2022), available at https://www.justice.gov/ag/page/file/1483516/download (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).

*v. U.S. Immigration & Customs Enf't Agency* ("NDLON"), 811 F. Supp. 2d 713, 755 (S.D.N.Y. 2011). In *National Council of La Raza v. Department of Justice*, the Second Circuit held that "[l]ike the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy. In such circumstances, the principal rationale behind the attorney-client privilege — to promote open communication between attorneys and their clients so that fully formed legal advice may be given . . . evaporates; for once an agency adopts or incorporates a document, frank communication will not be inhibited." 411 F.3d 350, 360 (2d Cir. 2005) (internal citations and quotations omitted).

Regarding Exemption 5 privileges, ICE plainly states that the June 2018 Homan Directive is the final expression of the civil fines policy. *See* Def. Reply at 22. But ICE then states that decisions issued after the directive, such as the choice of whom to levy fines against, are protected "policy-related" decisions. Def. Reply at 24. Under this framework, ICE shields all information showing what happened between the final decision to create a civil fines program (the Homan Directive), and the result of having this program target a particular group of people who all have a religious affiliation and are outspoken activists. *See* Ex. D.8 of Schectman Decl., ECF No. 59-4 (April 18, 2019 email to offices "identified as having a sanctuary case(s) within [their] area of responsibility" and requesting information to determine if ICE could fine the person taking sanctuary); *see also* Ex. D.12 of Schectman Decl., ECF No. 59-4 (spreadsheet from an unknown date demonstrating the targeting of sanctuary leaders).

ICE produced very few documents from the ten months after the Homan Directive was issued on June 19, 2018. *See* Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgement, ECF No. 61, at 5. Individual recommendations to go after sanctuary leaders cannot

be exempt from disclosure if adopted as basis for the final decision. *Afshar v. Dep't of State*, 702 F.2d 1125, 1142-43 (D.C. Cir. 1983) (holding that a recommendation applicable only to an individual and of no precedential value is non-exempt if adopted as the basis for a final decision). The question of why the sanctuary leaders were selected as the recipients of massive fines has remained hidden despite ICE's identification of 6,574 pages of responsive documents. Schectman Decl., ECF No. 59, ¶ 4. The possibility of constitutional violations looms large in the targeting of sanctuary leaders based on their religious affiliation and status as immigrant rights leaders. *See* Exhibit A (2020-ICLI-00028 5651, previously attached as Ex. D.10 to ECF No. 59-4 and reproduced by Defendant with certain redactions removed on March 25, 2022) (email stating "ERO is looking for a certain 'type' of population which might be more amenable to a civil fine").

There are reasons to believe that the motivations to target the sanctuary leaders as individuals was related to ICE's desire to attack "sanctuary states/cities." *See* Ex. A (stating "[t]he focus for this exercise would certainly be on sanctuary states/cities", and later stating "While other criteria is necessary (i.e. IJ warnings) —that can be obtained through the case review process."). Additionally, ICE's use of the fines to generate headlines is well-documented. After the fines were initially rescinded, ICE itself publicly announced through an exclusive story with *The Washington Times* that they were "tak[ing] the first steps to revive massive fines" against the sanctuary leaders.[2] Finally, the interest in targeting people in sanctuary was vocalized by influential people in the innermost circles of the Trump administration. *See* Exs. F.5 and F.6

---

[2] Steven Dinan, *Exclusive: ICE Revives Six-Figure Fines Against Illegal Immigrants Living in Sanctuary*, Wash. Times (Dec. 7, 2019), https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six -figure-fines-agains/.

of Schectman Decl., ECF No. 59-6 (Stephen Miller emails which signal high-level interest in the Trump administration about the civil fines).

Each of the white papers referenced in Exhibit B are fully redacted. *See* Exs. B.2.–B.6. of Schectman Decl., ECF No. 59-2. These papers are the only possible source of "law" or agency positions that explain or justify the targeting of sanctuary leaders for the massive fines. *See* Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 15 (stating that "White Papers also include an analysis regarding who will be identified for each fine."). Defendant ICE cannot hide their legal justifications for targeting this group of people. "[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 867; *NDLON*, 811 F. Supp. 2d at 762 ("Because the memo at issue describes [the agency's] legal position in terms and under circumstances strongly suggestive of finality, the agency may not claim deliberative process to shield its articulation of that position.") (citing *Evans v. U.S. Off. Pers. Mgmt.*, 276 F. Supp. 2d 34, 41 (D.D.C. 2003)). ICE has fully redacted each white paper and thus has hidden all justifications for levying the fines against the sanctuary leaders.

Because Defendant ICE has failed to provide any legal justification for the sanctuary fines program, the white papers sought herein (Exhibits B.2–B.6.), are the only source of "law" or agency positions that could explain or justify the policy decision to target sanctuary leaders. That renders them outside the protections of Exemption 5. FOIA does not permit ICE to keep secret its final legal justifications for operating a program imposing massive fines against a select group of people.

### B. Defendant Improperly Withheld Documents Pursuant to the Deliberative Process Privilege.

Defendant's reliance on the deliberative process privilege is wrong in three respects. First, ICE improperly applies the privilege to a series of records post-dating the June 19, 2018 Homan Directive and Delegation order, arguing that these documents involve complex policy deliberations. However, many of the post-directive productions involve the implementation and application of the policy to specific individuals, rather than a debate as to how to finalize policy. Moreover, by failing to identify any final policy during the two-year period ICE pursued civil fines against individuals in sanctuary, the agency is simply attempting to shield years of documents related to the fining of these women activists. Second, ICE improperly applies the privilege to records that provide the agency's "working law" on civil fines. ICE characterizes Plaintiffs' theory as "rank speculation," but do not contend with evidence from its own productions that demonstrate a reasonable likelihood that aspects of the civil fines policy— including in records that pre-date the Homan Directive—had already been articulated prior to the decision to delegate authority to ERO and OPLA. Third, ICE improperly applies the privilege to records demonstrating the agency's discussion of how to articulate an already-final policy to other entities. ICE misconstrues precedent on how and when records involving media and Congressional relations are covered by this privilege. In improperly applying this privilege, ICE is withholding important documents that likely reveal information about a punitive policy that unconstitutionally targeted women taking sanctuary in churches. The Court should order the release of these materials.

1. **Defendant Improperly Applied the Deliberative Process Privilege to Documents That Post-Date the Homan Directive.**

In attempting to characterize the June 19, 2018 Homan Directive as an evolving policy— one that did not mark a shift to implementation and application of the fines—without further

clarity on the final subsidiary decisions they are referencing, Defendant is attempting to shield several years of decision-making despite the fact that there is strong evidence that their 2018 directive established a final civil fines policy. Outside of the Homan Directive, ICE fails to establish any further final policy decisions for the subsequent two-year period in an attempt to shield hundreds of documents as deliberative. Moreover, Defendant's *Vaughn* Index indicates that some of the policy decisions it claims occurred after June 2018—such as who to fine and how much to fine them—were based on discussions and decisions that happened *before* the Homan Directive was issued, suggesting that key aspects of the civil fines policy were final and ready for implementation. Defendant ICE also claims that the produced documents indicate that these decisions were delegated to directorate ICE offices such as ERO and OPLA with very little senior leadership involvement after June 2018. Although Plaintiffs do not think senior leadership remained uninvolved after the Homan directive, as discussed above, ICE's explanation of the current universe of *produced* documents seems to indicate that many of the redactions in the productions were likely applied to case-specific implementations of final policy rather than high-level deliberations involving senior leadership.

 ***First***, Defendant mischaracterizes the Homan Directive, suggesting that it was only a "four page" document regarding the civil fines policy that delegated a great deal of discretion to various ICE program offices regarding who to fine and how much to fine them. *See* Def.'s Reply at 22–23. But in describing the Homan Directive in this manner, Defendant ICE contradicts its own evidence that the directive was a final policy that represents the product of complex legal and policy decisions. Of the dated documents, Defendant's *Vaughn* Index includes over 90 partially withheld and over 10 fully withheld documents from January 2017 to June 2018. These documents show that ICE discussed the structure of the civil fines policy in the months

preceding the issuance of the Homan Directive and Homan Delegation Order in great detail. The flurry of more than forty emails and documents between January 1, 2018 to June 19, 2018 suggests that the Homan Directive and Delegation Order are a culmination of over a year's worth of discussions and decisions on how to operationalize Trump's Executive Order 13768 on civil fines. *See, e.g.*, Def.'s *Vaughn* Index, ECF No. 56-1 at 18, 122, 123.

Additionally, decisions such as who to fine and decisions made on how much to fine them seemed to have been contemplated even before the Homan Directive, demonstrating that many of these complex policy decisions ICE points to are ones that occurred even *before* the issuance of a final policy. *See, e.g.*, Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 7–8 (January 16, 2018 email discussing the potential applicability of INA §274D fines to certain noncitizens); Def.'s *Vaughn* Index, ECF No. 56-1 at 16, 18 (withholding March 2018 memorandum that "includes background information, the process for collecting fines, steps to take if the fines are not paid, [and] consultation with other agencies" and March 2018 draft Notices of Intent to Fine specific individuals with financial penalties).

**Second**, as discussed in depth in Plaintiffs' original opposition, many of the decisions that Defendant describes simply discuss how to apply a final civil fines policy to case-specific circumstances. *See* Memorandum in Support of Plaintiffs' Cross-Motion for Summary Judgement, ECF No. 61 at 19–23. In deciding to fine certain noncitizens, ICE was simply discussing minor application of a broader established policy, which is not protected by the deliberative process privilege. *See Knight First Amend. Inst.*, 2021 WL 4253299, at *13 (holding that communications interpreting how to interpret and apply the framework of a final policy in the context of the CDC specifically was simply an application of a final policy and not protected by the deliberative process privilege); *see also Nat'l Day Laborer Org. Network v. U.S. Immigr.*

*& Customs Enf't*, 486 F. Supp. 3d 669, 700 (S.D.N.Y. 2020) (holding that ICE documents contemplating how to apply the Priority Enforcement Program policy in certain cities were not protected by the deliberative process privilege because it was an application of existing policy).

Defendant asserts that in this set of produced documents, ICE senior leadership was less involved in policy decisions after June 2018 because they delegated much of this to ERO and program field offices. Although Plaintiffs do not think that senior leadership was uninvolved in the civil fines policy after the Homan Directive, the agency's characterization of the *produced* documents indicates that these decisions after the Homan Directive were explanations and applications of an existing policy rather than wholly new and complex policy decisions. Not every question that is contemplated by an agency or its employee, and the way that question is answered, can be considered an agency policy or decision. *Davis v. City of New York*, No. 10 CIV. 0699 SAS, 2011 WL 1742748, at *6 (S.D.N.Y. May 5, 2011). "'The [p]rivilege is properly limited to communications relating to policy formulation at the higher levels of government; it does not operate indiscriminately to shield all decision-making by public officials.'" *Velez v. City of New York,* No. CV 2004–1775, 2010 WL 2265443, at *4 (E.D.N.Y. June 2, 2010) (quoting *Scott v. Board of Educ. of City of East Orange,* 219 F.R.D. 333, 337 (D.N.J. 2004)).

The lack of senior leadership involvement in this set of produced documents indicates that documents which post-date the 2018 directive were not "policy formulation at the higher levels of government," *Velez*, 2010 WL 2265443, at *4, which are characteristic of the deliberative process of a final agency decision. *See* Welch Decl. ¶¶ 9–13. This suggests that these communications and documents are applications and implementations of an already-final policy. *See Davis*, 2011 WL 1742748, at *6 (holding that even when high-ranking NYPD officers were involved in the designing of training curriculum, their involvement was not enough

to turn these documents into a policy decision, when it was really the explanation and application of an already-existing policy).

*Third*, ICE has failed to identify any point in time in which it claims to have reached a sufficiently final version of its civil fines policy despite the issuance of hundreds of thousands of fines to women activists in sanctuary. With this omission, Defendant is attempting to shield years of decision-making of a policy that was publicly implemented, without tying these discussions to any specific decisions. *See 100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017) (rejecting agency argument that "would create a four-year umbrella effectively shielding all agency action from review" without accounting for clear subsidiary agency decisions in the *Vaughn* Index). To approve exemptions of a document as predecisional, a court must be able "to pinpoint an agency decision or policy to which the document contributed." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983); *see also Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013) ("[A] broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional."); *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) ("The Court finds this description inadequate because it fails to identify a specific deliberative process to which the withheld email messages contributed.").

Defendant claims that the documents withheld after the 2018 Homan Directive should be redacted because they include (i) communications between ERO personnel and OPLA seeking and/or providing legal advice on how to calculate civil fines, issues that arose in imposing the fines, and how to calculate and apply the relevant statute of limitations; (ii) draft documents reflecting ICE's consideration of potential candidates to fine; and (iii) discussions among ERO personnel including OPLA personnel regarding how to withdraw fines. *See* Def. Reply at 23.

ICE's language about how they are simply deciding "what categories of individuals to fine" and "how much to fine such individuals" are not clear expressions of any specific subsidiary decisions, but rather an attempt by ICE to shield multiple years of documents under the civil fines policy by suggesting that it is an evolving policy decision. *See Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 102 (D.D.C. 2019) (acknowledging that, while the deliberative process privilege can apply to documents that have not yet ripened into a final agency decision, defendants fail to point to the specific subsidiary decisions that the withheld records in this case could pertain to and that simply referencing the "contracting, procurement, and construction process" of the border wall are not clear expressions of policy decisions). Descriptions included in the *Vaughn* index such as communications that seek "advice on civil fine penalty amounts" and "advice on questions pertaining to a potential civil fines' issue and collections" point to no specific decisions. In fact, Defendants even fail to include the date on several of their *Vaughn* Index entries, *see* Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 12–13, 37 (Exs. B.2, B.4, and D.14), which further suggests that the agency has not clarified the subsidiary policies that these documents are even related to. *See Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015) (holding that for a document to qualify for the deliberative process privilege, it must precede, in temporal sequence, the decision to which it relates); *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 279 F. Supp. 3d 121, 144 (D.D.C. 2017) (finding that typically, a comprehensive *Vaughn* index will at least include a document's date). The failure to point to any final policy decisions in these two years, vague language, and Defendant's exclusion of dates in certain document entries allows the agency to cloak numerous documents issued after June 19, 2018 from the public under the guise of an evolving civil fines policy, despite no clear expression of final decisions. Based on this evidence,

Defendant ICE has failed to properly apply the deliberative process and the Court should order the release of these documents.

### 2. Defendant Improperly Applied the Deliberative Process Privilege to Three Discussions that Likely Contain Working Law.

Defendant also fails to respond meaningfully to Plaintiffs' argument that three email communications between senior officials and junior officials constitute working law for the agency. As discussed in Plaintiffs' opposition, a document "moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *see also Assassination Archives & Research Ctr. v. CIA*, 781 F. App'x 11, 13 (D.C. Cir. 2019) (per curiam) ("[W]e have described a 'recommendation to a supervisor on a matter pending before the supervisor' as 'a classic example of a deliberative document.'" (quoting *Abtew*, 808 F.3d at 899)). Moreover, "working law" documents do not have to "reflect the final programmatic decisions of the program officers who request them. It is enough that they represent [the agency's] final legal position." *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 201 (2d Cir. 2012).

Here, ICE's *Vaughn* Index and the emails themselves that are parts of these communications were not simply deliberative discussions regarding the formation of a policy, but also "opinions regarding how to *interpret* policy rather than recommendations as to how to *make* policy." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 345 (S.D.N.Y. 2019). In its *Vaughn* Index, ICE describes Exhibit A.2. as including "advice pertaining to the implementation of the Executive Order and the collection of civil fines," suggesting that this email discusses the interpretation and summary of Executive Order 13768 on civil fines. *Id.* (holding that ICE's memo discussing whether Section

212(a)(3)(C) of the INA can be used to render an alien inadmissible "likely reflect[s] ICE's understanding of the State Department's authority to make immigration decisions based on the Foreign Policy Provision," which is not protected under the deliberative process privilege).

Moreover, because discussions from senior officials are more likely to "manifest decisionmaking authority" and to be "the denouement of the decisionmaking rather than part of its give-and-take," many of the discussions which include Feere and other ICE leadership were likely adopted or incorporated by reference in the final civil fines policy. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991). Defendant's insistence that senior leadership was less involved than ERO, OPLA, and ICE Policy in the decisions to impose fines provide further evidence that produced emails involving agency senior leadership were ones in which policymaking was being finalized. Finally, parts of emails such as Exhibit A.5., which redact even the smallest references to the subject and title of agency whitepapers and fully redact "recaps" of leadership meetings, suggest that parts of these emails are likely working law or simply explanations of existing material rather than the complex policy discussions that Defendant attempts to paint these as. Therefore, Plaintiffs respectfully request that the Court compel Defendants' disclosure, or at minimum conduct *in camera* review, of redacted portions of the 9 pages of email communication (Exs. A.1., A.2., A.5.), including those of Jon Feere, before June 19, 2018 containing challenged exemptions pursuant to 5 U.S.C. § 552(a)(4)(B).

### 3. Defendant Erred in Withholding Documents That Merely Discuss How to Articulate the Civil Fines Policy to Outside Entities.

Defendant ICE fails to explain how discussions on presenting the civil fines policy to the media should be protected at all points *after* the final civil fines policy was issued *and* the agency already had experience communicating with external stakeholders about the issuance of these fines. By definition, "the deliberative process privilege protects only those records that 'bear on

the formulation or exercise of policy-oriented judgment.'" *Nat. Res. Def. Council v. United States Env't Prot. Agency*, 19 F.4th 177, 185 (2d Cir. 2021) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). "[T]he record must bear on the formulation or exercise of policy-oriented judgment." *Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002). The Second Circuit's *Nat. Res. Def. Council* case has limited application here because it is not meant to protect simply *any* communications about media strategy. *Nat. Res. Def. Council*, 19 F.4th at 187–88. While some communications regarding public presentation require policymaking judgment, if there is a pre-existing communications policy, subsequent discussion on how to present aspects of an underlying agency decision are not protected. *Id.*

Defendant argues that the July 3, 2019 email from ICE Communications Director Bryan Cox is not a formulation of a final agency media policy because it was simply a response to media requests about a particular individual who was issued a fine. But this argument ignores much of the email's general background statements regarding the apprehending of individuals and the issuance of fines, and how ICE Communications leadership was articulating this policy. *See* Ex. F.4 of Schectman Decl., ECF No. 59-6. Moreover, the agency's misinterpretation of *Nat. Res. Def. Council* suggests that every discrete media inquiry ICE was responding to required a new and complex formulation of policy because there was no such final decision, shielding every discussion regarding the external communication of the civil fines policy. This would be far beyond the scope of the deliberative process privilege.

Here, the July 3, 2019 email clearly provides statements regarding the "external" and "internal background" of ICE's overarching enforcement policies. This iteration of media communication thus contemplated the broader external presentation of the fines policy, and thus expressed a final decision that was to be applied in this one case. Case law has articulated that

even "informal" agency policies can "fit comfortably within the working law framework" if they are an articulation of how the agency carries out its responsibilities. *See Knight First Amend. Inst.*, 407 F. Supp. 3d at 344. Furthermore, this email came from Bryan Cox, the ICE Communications Director and a senior person within the Office of Public Affairs. Communications that flow from a senior official to others often suggest the "denouement of the decisionmaking" process. *See Access Reps.*, 926 F.2d at 1195.

Subsequent external and media communications support Plaintiffs' argument that these documents did not contemplate complex policy decisions regarding the presentation of the civil fines policy to the public. For example, Exhibit C.9. is a communication from an ICE Spokesperson from the Office of Public Affairs to ERO's Enrique Lucero regarding his upcoming interview with *The Washington Times* to discuss the imposition of the civil fines. The *Vaughn* Index suggests that this communication was an explanation of the agency's *final* communication policy—the redactions focus on the Spokesperson's "recommended messaging and focus for the interview." Def.'s Excerpted *Vaughn* Index, ECF. 64-1 at 24. It is implausible that at this point, a day before the agency's exclusive to *The Washington Times*, ICE had not clarified an operationally final communications policy decision that was provided to Lucero. In this case, this explanation is not simply the "personal opinions of the writer" but rather the policy of the agency and should be released to Plaintiffs. *See Brennan Ctr.*, 697 F.3d at 202.

### 4. Defendant Should Produce Withheld Documents to Plaintiffs Because the Deliberative Process Privilege Can be Outweighed by the Possibility of Government Misconduct.

Government misconduct may override the deliberative process privilege in the FOIA context. *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F.Supp.2d 59, 68–69 (D.D.C. 2012). Contrary to Defendant ICE's argument, *see* Def. Reply at 28–29, this principle

applies in the FOIA context, where the party seeking the records must "provide an adequate basis for believing that [the material withheld] would shed light upon government misconduct." *Nat'l Whistleblower*, 903 F.Supp.2d at 67 (quoting *Judicial Watch of Florida, Inc. v. Dep't of Justice*, 102 F.Supp.2d 6, 15 (D.D.C. 2000)); *see also ICM Registry, LLC v. Dep't of Commerce*, 538 F.Supp.2d 130, 133 (D.D.C. 2008) (noting courts have applied this exception under FOIA in circumstances of government wrongdoing). It is the content of the communications, not the subject under discussion, that is relevant here. Even if the policy under discussion could be construed as legal, if the discussions of the conduct demonstrate a nefarious motive, the exception applies. *Id*. For example, in *Tax Reform Research Group v. IRS*, 419 F. Supp. 415 (D.D.C. 1976), Plaintiffs sought documents regarding the selective and discriminatory enforcement of IRS policies against tax-exempt organizations who voiced their opposition to the administration. Because communications regarding the targeting of such taxpayers was not part of a "legitimate governmental process," records of such communications were not protected by the deliberative process privilege. 419 F. Supp. at 426 (holding that discussions of "using a government agency to deliberately harass" is not protected by Exemption 5).

Here, Defendant improperly defines the misconduct Plaintiffs are alleging in the formation of the civil fines policy. While the civil fines policy might have been a publicly announced policy initiative propagated by a Presidential Executive Order, Plaintiffs present evidence that the implementation and communication of this policy against a selective group was "nefarious" and meets the higher burden of government misconduct. *See Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 486 F. Supp. 3d 317, 332 (D.D.C. 2020) (finding that the government misconduct exception implies "nefarious motives"). In fact, the policy can be more accurately characterized as a decision to selectively enforce excessive fines against people in church

sanctuary for speaking out about federal immigration policy. The implementation of the civil fines policy thus suggests that policy-makers set out to deliberately retaliate against women immigrant rights activists in religious sanctuary with excessive fines, in violation of the First and Fifth Amendments. ICE's choice to communicate this policy through an exclusive interview with *The Washington Times*, a conservative news outlet, rather than through direct communication with the individuals fined also suggests that ICE's motives were to chill First Amendment activity. Such discussions are not protected by Exemption 5, and thus, as in *Tax Reform Research Group*, the Court should order the release of these records.

### C. Defendant Improperly Applied the Attorney-Client Privilege.

#### 1. Defendant ICE Improperly Applied the Attorney-Client Privilege to Policy Advice.

Defendant ICE improperly applied the attorney-client privilege to documents containing policy advice, not legal advice. Policy advice is not protected by attorney-client privilege. *Pritchard v. Cnty. of Erie*, 473 F.3d 413, 420–21 (2d Cir. 2007) ("When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor . . . that consultation is not privileged."). To be protected under attorney-client privilege, the predominant purpose of a communication must be to provide legal advice, not policy advice. *Pritchard*, 473 F.3d at 420. Particularly for the white papers, ICE has not shown that their purpose was predominantly legal advice.

Defendant ICE cites no cases to support its argument that policy advice can be shielded from disclosure, instead arguing that Plaintiffs have no basis beyond "conjecture" to argue that the white papers are policy documents. This is not the case. While the white papers in Exhibit B may contain *some* legal analysis, it is likely that an important purpose of the communications was non-legal. In fact, ICE is clear that "the role that OPLA played in formulating the civil fines

*policy*" was significant enough that "it was reasonable and logical for ICE to focus its search efforts on those program offices." *See* Def. Reply at 8 (emphasis added).

Even when documents are "hybrid," meaning that they contain some legal advice, if they are predominantly for the provision of non-legal advice, the legal advice should be redacted and everything else should be produced. *Pritchard*, 473 F.3d at 423 n. 8. ("[R]edaction is available for documents which contain legal advice that is incidental to the non-legal advice that is the predominant purpose of the communication") (citing *United States v. Weissman*, No. 94 Cr. 760, 1995 WL 244522, at *4 (S.D.N.Y. Apr. 26, 1995) (recognizing the availability of redaction to protect legal advice in hybrid documents)).

### 2. ICE Adopted Documents Such as the White Papers as Agency Policy and Cannot Invoke the Attorney-Client Privilege to Withhold Them.

Documents expressly adopted or incorporated by reference into agency policy cannot be protected by the attorney-client and deliberative process privileges. *Nat'l Council of La Raza*, 411 F.3d at 356-57. "[O]nce an agency adopts or incorporates a document, frank communication will not be inhibited." *Id.* at 360. The Supreme Court has long recognized this premise, explaining in *NLRB v. Sears, Roebuck & Co.*:

> The probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice if adopted, will become public is slight. First, when adopted, the reasoning becomes that of the agency and becomes its responsibility to defend. Second, agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency. Moreover, the public interest in knowing the reasons for a policy actually adopted by an agency supports [disclosure].

421 U.S. 132, 161 (1975). Defendant ICE, through its productions, has offered no legal justification for the targeting of sanctuary leaders with massive fines, despite Plaintiffs' request for "any . . . records collected by ICE regarding individuals taking sanctuary and/or the churches, places of worship, and other locations where individuals are taking sanctuary." Plaintiffs'

Request at 2. The reason sanctuary leaders were targeted is a void that is unmet by any produced documents or ICE's public-facing statements. "While attorney-client privilege certainly protects a client's private information, FOIA prohibits agencies from treating their policies as private information. Thus, attorney-client privilege simply does not apply to statements of policy." *Nat'l Immigr. Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 730 n.10 (S.D.N.Y. 2012).

In this case, the repeated white papers references made by Feere and other high-ranking ICE leadership, and the substance of their comments are sufficient to establish that ICE incorporated these Papers into its new policy regarding the civil fines. *See, e.g.*, Exhibits A.3 and B.6. On February 23, 2018, a redacted sender sent an email stating "Good morning all, Here are some white papers from Jon Feere, Senior Advisor to Director Homan, that were forwarded to Brian and me, we can discuss further on the call. Thanks!" Ex. A.3. Attached to this email were 10 pages of documents fully withheld under the attorney-client privilege and the deliberative process privilege. Ex. B.6 of Schectman Decl., ECF No. 59-2; Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 15–16. Feere, who served as Senior Advisor to ICE's Director and as ICE's Chief of Staff, was not an OPLA attorney seeking to provide input on a proposed policy.

Feere's references to the white papers demonstrate that ICE regarded them as the justification for its new policy to target the sanctuary leaders by fining them exorbitantly. Shielding OPLA personnel's involvement in policy-making under the attorney-client privilege violates the purpose of FOIA's protections of attorney-client conversations. *Nat'l Council of La Raza*, 411 F.3d at 360-61 ("[I]t is clear that the purpose of the privilege is not to protect communications which are statements of policy and interpretations adopted by the agency.") (internal quotations omitted).

### 3. Defendant ICE Waived Attorney-Client Privilege Where OPLA Was Making Policy Decisions or Non-DHS Employees Were Copied on Emails.

In their Reply, ICE states that "Plaintiffs have provided no evidence that ICE waived the privilege by sharing the legal advice it received with third parties." *See* Def. Reply at 30. However, "[t]he burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure." *Coastal States*, 617 F.2d at 863. In Defendant's Excerpted *Vaughn*, ICE specifies that communications produced in Exhibits A.1-A.8, C.2, C.4, and E.1–E.8 "contain various emails between and among Department of Homeland Security ("DHS") employees *and non-DHS employees.*" Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 8–9, 19–20, 21–22, 49–50 (emphasis added). This is an issue for any documents attached to these emails which are withheld under attorney-client privilege and are sent to either non-governmental people or employees of other agencies which do not "have a substantial identity of legal interest." *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 615 (D.D.C. 1979) (attorneys for one agency can only be considered as jointly representing another agency if both agencies have a "substantial identity in legal interest in a particular matter" and do not have conflicting positions on the matter); *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116, 133 (D.D.C. 2019) ("When one agency shares a privileged document with another agency, the sharing of the document can destroy the privilege" unless they share a common legal interest); *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 n.7 (9th Cir. 1987).

ICE has not demonstrated who these "non-DHS employees" are, whether they are employed by a government agency, and if so, whether that agency has a substantially identical legal interest in the matter being discussed. *Id.* For example, Exhibit B.6 is a ten page document

withheld under the attorney-client privilege which is attached to Exhibit A.3, a February 23, 2018 email from Feere which the Excerpted *Vaughn* states was sent "between and among" DHS and non-DHS employees. Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 8–9. The same is true for Exhibit B.4, a one page document fully withheld pursuant to the attorney-client privilege and the deliberative process privilege titled "COLLECTION OF DELINQUENT FINES FOR FAILURE TO DEPART THE UNITED STATES THROUGH THE TREASURY OFFSET PROGRAM (TOP)" which is attached to Exhibit A.5, which ICE says is an email between and among DHS and non-DHS employees.  Def.'s Excerpted *Vaughn* Index, ECF No. 64-1 at 8–9.

Although the attorney-client privilege may extend to agencies sharing a common interest in a legal matter, ICE has not divulged the agency or agencies that the "non-DHS employees" belong to. There is no reason to think that agencies external to DHS would share a substantial identity of legal interest regarding the sanctuary fines policy.

## III. Defendant Did Not Properly Segregate All Deliberative and Pre-Decisional Material.

ICE argues that its line-by-line review, as outlined in the Pineiro Declaration at ¶¶ 96-97, is sufficient to demonstrate that ICE met its obligation to properly segregate documents. Def. Reply at 32–33. However, ICE does not account for the many white papers and policy documents that are fully withheld. *See* Exs. B.2–B.6. While some documents may be so "'intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts,'" *ACLU v. NSA*, 925 F.3d 576, 601 (2d Cir. 2019), that cannot be the case for documents such as Exhibit B.6, a ten-page, fully withheld document which Defendant states in its *Vaughn* Index contains "background."

Defendant cites *ACLU v. NSA* for the propositions that line-by-line analysis is sufficient and that any speculation on the plaintiff's part must be put to rest when an agency conducts

segregability review. No. 13 Civ. 9198 (KMW) (JCF), 2017 WL 6387731, at *4 (S.D.N.Y. Aug. 17, 2017), *aff'd*, 925 F.3d 576, 601 (2d Cir. 2019). However, that case differs in many important respects from the issues at hand here. First, in *ACLU v. NSA*, the documents in question were regarding "intelligence program documents concern[ing] highly sensitive surveillance programs" which the government alleged "would reveal core NSA foreign intelligence activities." *ACLU v. NSA*, 925 F.3d at 601. The Second Circuit looked at those documents differently: "we generally adopt a 'deferential posture in FOIA cases regarding the uniquely executive purview of national security.'" *Id.* at 601 (citing *Wilner v. NSA*, 592 F.3d 60, 76 (2d Cir. 2009)). While the Court did not see fit to "second-guess the predictive judgments made by the government's intelligence agencies[,]" we have a remarkably different set of documents here. *Id.*

Of the 6,574 pages of responsive documents produced in this case, Plaintiffs have identified a set of 146 pages which they have specifically challenged in their Cross-Motion for Summary Judgment as likely factual or otherwise not privileged. If there is any question about whether Defendants have improperly applied exemptions, Plaintiffs request that the Court review this small subset of documents *in camera*.

## IV. Defendant Improperly Withheld the Names and Titles of Public-Facing Employees under Exemption 6 and 7(c).

After reviewing Plaintiffs' Cross-Motion, which sought the names and titles of high-level government officials and their contacts, ICE agreed to lift several redactions under Exemption 6 and 7(c), but only on 29 of the 146 pages Plaintiffs challenged, and only with respect to "Senior Executive Services (SES) personnel or otherwise high-level policy-making individuals." Supplemental Pineiro Declaration ¶¶ 8–9 (explaining its decision to review Exhibits A.1–A.8, C.2, C.4, D.11, and E.1–E.8 challenged in ECF 58). ICE's reproduction resulted in the release of names like Christopher Kelly and Caleb Vitello—a known Stephen Miller associate—on some of

the 19 documents.[3] However, ICE has not adequately explained why they limited their release to solely SES personnel and high-level policy-making individuals, or why ICE chose to review only 29 pages (comprising 19 exhibits).

In these 29 pages, there are still significant b(6) and b(7)(C) redactions. For example, Exhibit B contains emails which now reveal Caleb Vitello as the person Richard Rocha, a spokesperson with the ICE Office of Partnership and Engagement, writes to stating "Word on the street is that you're the man I can talk to about fines." *See* Ex. B (2020-ICLI-00028 5702–5704, previously attached as Ex. C.4 to ECF 59-3 and reproduced by Defendant with certain redactions removed on March 25, 2022). However, ICE redacts the name of the other critical official despite their apparently even more prominent role in the civil fines policy. *See* Ex. B ("Hi Matt, Since it looks like [(b)(6)] is out, who is the best person to work with regarding fines."). The Court should order ICE to release the names of all high-level personnel government officials and their contacts throughout Plaintiffs' challenged documents.

## CONCLUSION

For the reasons stated herein, the Court should grant Plaintiffs' motion for summary judgment and deny Defendant ICE's cross-motion for summary judgment.

---

[3] Nick Miroff, *Under secret Stephen Miller plan, ICE to use data on migrant children to expand deportation efforts*, Wash. Post, Dec. 20, 2019, https://www.washingtonpost.com/immigration/under-secret-stephen-miller-plan-ice-to-use-data-on-migrant-children-to-expand-deportation-efforts/2019/12/20/36975b34-22a8-11ea-bed5-880264cc91a9_story.html (explaining how Caleb Vitello was assigned to work with Miller at the White House on the National Security Council. Additionally, Vitello was supposed to be assigned to work within Office of Refugee Resettlement (ORR) as part of Miller's plan to embed immigration enforcement agents within the agency as "part of a long-standing effort to use information from their parents and relatives to target them for deportation[.]").

Dated: April 22, 2022
New York, NY

Respectfully submitted,

*/s/ Alina Das*
Alina Das, Esq. (AD8805)
Vibha Kannan, Legal Intern
Rebecca Schectman, Legal Intern
Immigrant Rights Clinic
Washington Square Legal Services, Inc.
New York University School of Law
245 Sullivan Street, 5th Floor
New York, NY 10012
(347) 693-6485
alina.das@nyu.edu

Katherine Gallagher
Rafaela Uribe
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kgallagher@ccrjustice.org

Ghita Schwarz
LatinoJustice PRLDEF
475 Riverside Dr., Suite 1901
New York, NY 10115
212-219-3360
gschwarz@latinojustice.org

*Attorneys for Plaintiffs*