UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/19/2022

------------------------------------------------------------------X
                                   :

AUSTIN SANCTUARY NETWORK et al.,

               Plaintiffs,      :          20-cv-01686 (LJL)

           -v-           :       OPINION AND ORDER

UNITED STATES IMMIGRATION AND CUSTOMS   :
ENFORCEMENT et al.,

             Defendants.    :

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Austin Sanctuary Network, Free Migration Project, Grassroots Leadership, and Center

for Constitutional Rights (collectively, "Plaintiffs") bring an action under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, against the United States Immigration and

Customs Enforcement ("ICE"), the United States Department of Treasury ("Treasury"), and the

United States Department of Justice Executive Office for Immigration Review ("EOIR")

(collectively, "Defendants").  *See* Dkt. No. 1 ¶ 1.  Plaintiffs seek declaratory, injunctive, and

other relief to compel Defendants to produce agency records that Plaintiffs allege have been

improperly withheld from them.

      ICE filed a motion for summary judgment, and Plaintiffs filed a cross-motion for

summary judgment against ICE.[1]  Dkt. Nos. 54, 58.  For the following reasons, the motions are

granted in part and denied in part.

---

[1] While Plaintiffs also sued the Treasury and EOIR, they are not seeking summary judgment as
to those defendants.  Dkt. No. 61 at 1 n.1.

# BACKGROUND

## I.      Imposition of Civil Fines

The present FOIA action arises from the imposition of fines by the administration of then-President Donald Trump (the "Trump Administration") against several asylum-seeking women who had taken sanctuary within the United States in 2019 and the adoption of the policy that permitted those fines to be administered.  These women had been outspoken leaders of the "sanctuary movement" to protect immigrant communities and were living in sanctuary while pursuing legal remedies to remain in the United States.  Dkt. No. 1 ¶¶ 31–33.

The Trump Administration's imposition of civil fines on these individuals stemmed from an Executive Order signed by then-President Trump on January 25, 2017 titled "Enhancing Public Safety in the Interior of the United States."  Dkt. No. 56 ¶ 55; *see* Exec. Order No. 13768, 82 Fed. Reg. 8799 (Jan. 30, 2017) ("Executive Order 13768").  Executive Order 13768 required the Secretary of the Department of Homeland Security ("DHS") to issue guidance and promulgate regulations to ensure the assessment and collection of civil fines and penalties on noncitizens unlawfully present in the United States and on those who facilitate their presence. *See* Executive Order 13768 § 6.

In response to Executive Order 13768, former ICE Acting Director Thomas Homan issued ICE Directive 10088.1: Fines and Penalties for Civil Violations of Immigration Law ("ICE Directive").  Dkt. No. 59-6 at ECF pp. 6–9.  The ICE Directive was issued on June 19, 2018 and set forth ICE's "policy regarding the assessment and collection of fines and penalties for civil violations of immigration law."  *Id.* at ECF p. 6.  The ICE Directive stated that "ICE will exercise discretion in enforcing applicable laws and regulations governing" the assessment and collection of fines and penalties in three scenarios: (i) failure to voluntarily depart the United

States beyond an unauthorized voluntary departure period, (ii) engaging in prohibited activities involving document fraud, and (iii) willfully failing to depart in violation of a removal order. *Id.*

The same day that the ICE Directive was issued, Homan issued ICE Delegation Order 01-2018 ("Delegation Order"), which delegated authority to the Executive Associate Director ("EAD"), Deputy EAD, and the Field Office Directors of Enforcement and Removal Operations ("ERO") to "administer and enforce provisions relating to civil penalties for failure to depart" under the Immigration and Nationality Act ("INA") § 274D, 8 U.S.C. § 1324d.  Dkt. No. 59-6 at ECF p. 3.  ICE describes the ICE Directive and Delegation Order as "[f]inal agency policies." Dkt. No. 56 ¶ 56.

In 2019, ICE began issuing fines of up to hundreds of thousands of dollars against prominent activists living in sanctuary. *See, e.g.*, Dkt. No. 59-6 at ECF pp. 11–13.

On January 20, 2021, President Biden revoked Executive Order 13768.  *See* Exec. Order No. 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021).  Later, the Secretary of Homeland Security Alejandro Mayorkas stated about the decision to rescind the policy: "We can enforce our immigration laws without resorting to ineffective and unnecessary punitive measures."[2]

## II.     FOIA Request

Plaintiffs filed their FOIA request (the "FOIA Request" or "Request") on September 11, 2019.  Dkt. No. 56 ¶ 5.  The FOIA Request sought the following:

> 1) Any and all records relating to current policies, procedures, guidelines, instructions, or other materials concerning when and how civil fines and penalties under INA § 274D, 8 U.S.C. § 1324d, are enforced on individuals

---

[2] *DHS Announces Rescission of Civil Penalties for Failure-to-Depart*, Homeland Security (Apr. 23, 2021), https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-penalties-failure-depart.  The Court takes judicial notice of this government press release "whose accuracy 'cannot reasonably be questioned' as to the fact that the statements contained therein were made."  *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y.), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

who are alleged to have a final administrative removal order, including but not limited to immigrants taking sanctuary.

2) Any and all guidelines, schedules, instructions, or other records concerning fee calculations, fee amounts, or other monetary information ICE is allowed to impose on individuals pursuant to INA § 274D, 8 U.S.C. §1324d, including but not limited to immigrants in sanctuary.

3) Any communications between ICE officials and officials of local or federal agencies regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. §1324d for individuals, including but not limited to immigrants taking sanctuary, between January 2013 and the date of this Request.

   a. This includes any communications between ICE personnel or between ICE personnel and other federal agencies relating to the drafting, updating, and/or creation of ICE Form I-79B "Notice of Intention to Fine Under Section 274D of the Immigration and Nationality Act."

4) Any data, charts, statistics, or lists collected by ICE regarding individuals who have been sent notices of fines under INA § 274D, 8 U.S.C. §1324d, including but not limited to immigrants taking sanctuary.

5) The number of individuals who ICE has imposed fees, fines, and/or penalties pursuant to INA § 274D, 8 U.S.C. §1324d, including but [not] limited to immigrants taking sanctuary, broken down by date, country of origin, state/city of residence, and gender.

6) The number of individuals who have been sent ICE Form I-79B "Notice of Intention to Fine under Section 274D of the Immigration and Nationality Act" broken down by date, country of origin, state/city of residence, and gender.

7) Any data, charts, statistics, lists, or records collected by ICE regarding individuals taking sanctuary and/or the churches, places of worship, and other locations where individuals are taking sanctuary.

*Id.* ¶ 6.

## III.   **ICE's Search**

ICE's search for responsive documents to the FOIA Request proceeded in two stages: the administrative stage and the post-litigation stage.

In the administrative stage, the ICE FOIA office tasked the ICE Office of ERO and the ICE Office of Policy and Planning ("ICE Policy") with a search for potentially responsive records.  Dkt. No. 56 ¶ 27.  ERO was chosen because it supervises programs and works to

"identify and apprehend removable noncitizens, to detain these individuals when necessary, and to remove removable noncitizens from the United States." *Id.* ¶ 24.  ICE Policy "leads strategic policy and regulatory development, as well as operational requirements development, to inform and empower ICE decision-makers." *Id.* ¶ 26.  ICE Policy also "serves as a primary policy advisor to the ICE Director and Deputy Director through its participation in interagency policy forums and engagement with DHS, DHS Components, and other Executive Branch agencies on agency-wide policy matters involving ICE operations and functions." *Id.*

Once the request was received by ERO, the ERO Information Disclosure Unit ("IDU") tasked three specific divisions within ERO to conduct searches for potentially responsive records: ERO Policy, ERO Field Operations, and ERO Enforcement.  *Id.* ¶ 28.  ERO Policy, a subsidiary within the ERO Executive Information Unit, "coordinates the development, review, clearance, and cancellation of policy-related documents."  *Id.* ¶ 29.  A management and program analyst within ERO Policy then searched the ERO Policy Library for responsive records using the search terms "1324d," "274d," and "10088.1."  *Id.*  An ERO Field Operations Unit Chief searched the FieldOps SharePoint and the FieldOps hard drive for responsive records using the search terms "sanctuary case" and "sanctuary."  *Id.* ¶ 30.  The Enforcement Program Manager within ERO Enforcement also searched their desktop/laptop and email for responsive records. *Id.* ¶ 31.  For that desktop/laptop search, the Program Manager used the search terms "form," "directive," "instructions," "appendix," "guidance," "questionnaire," "numbers," "fines," and "sanctuary."  *Id.*  For the email search, the Program Manager used the search terms "form," "directive," "instructions," "questionnaire," "fines," and "sanctuary."  *Id.*

Once the request was received by ICE Policy, an extern at ICE Policy conducted a search of the ICE Policy Manual and the ICE Policy Shared Drive using the search terms "274D," "I-79B," "1324d," and "sanctuary." *Id.* ¶ 32.

After this litigation was commenced, ICE decided to conduct additional searches in ERO and the Office of the Principal Legal Advisor ("OPLA"). *Id.* ¶ 33. OPLA serves as an advisor to the ICE Director and subordinate directorates, is the largest legal program at DHS, and is the exclusive representative of the DHS in immigration removal proceedings before the EOIR. *Id.* ¶ 25.

Once the supplemental search request was received by ERO, the ERO IDU point of contact ("POC") tasked the EAD of ERO, the Deputy EAD, and the Chief of Staff of ERO with locating responsive records. *Id.* ¶ 34. The EAD of ERO conducted a search of his email using the search terms "civil," "fines," "INA §274(D)," "8 U.S.C. § 1324d," "sanctuary," "ICE Form I-79B," and "Notice of Intention to fine." *Id.* ¶ 35. The Deputy EAD of ERO searched his desktop/laptop and email using the search terms "I-79B," "Notice of Intention," "Civil Fines," "8 USC § 1324d," "INA § 274D," and "Sanctuary." *Id.* ¶ 36. The Chief of Staff of ERO searched his laptop and email using the search terms "civil fines" and "274 D." *Id.* ¶ 37.

Once the supplemental search task was received by OPLA, the Executive Deputy Principal Legal Advisor ("EDPLA"), the Deputy Principal Legal Advisor ("DPLA") for Enforcement and Litigation, the DPLA for General and Administrative Law, the Commercial and Administrative Law Division ("CALD"), and the Enforcement and Removal Operations Law Division were tasked with searching for responsive records. *Id.* ¶ 38. The EDPLA and the DPLA for Enforcement and Litigation searched their emails using the search term "274D." *Id.* ¶ 39. The DPLA for General and Administrative Law searched his email using the search terms

"274," "274D," "1324d," and "fine" and conducted a manual search of relevant three-ring binders and folders.  *Id.* ¶ 40.  The Deputy Chief of the Revenue Recovery Unit within CALD searched his desktop/laptop and email using the search terms "civil penalties," "civil fines," and "274D."  *Id.* ¶ 41.  Three Associate Legal Advisors also conduced searches, but each those searches differed from one another: one searched his desktop computer and email using the search terms "274(D)" and "1324(d)"; another searched her email using the search terms "274D," "civil fine," and "civil penalt"; and a third searched his desktop/laptop and email using the search terms "274D," "civil fine," and "civil penalty."  *Id.* ¶¶ 42–44.

## PROCEDURAL HISTORY

On February 26, 2020, Plaintiffs initiated the present action by filing a complaint (the "Complaint") naming ICE, EOIR, and Treasury as defendants.  Dkt. No. 1.  The Complaint alleged that Plaintiffs had made a FOIA Request to defendants on September 11, 2019, seeking records related to the federal government's policies and practices of imposing fines and monetary penalties on individuals, particularly those who have taken sanctuary to protect themselves from the threat of deportation.  *Id.* ¶ 8.  Plaintiffs had requested expedited processing and outlined the compelling need for the requested records.  *Id.*  At the time of the Complaint, Treasury had provided only twenty pages and ICE and EOIR had failed to produce any documents in response.  *Id.*  Plaintiffs therefore asserted claims for: (i) violations of FOIA for failure to disclose and release records responsive to the Request; (ii) improper denial or lack of response to the request for expedited processing; and (iii) EOIR and Treasury improperly denying or dismissing as moot Plaintiffs' request for a fee waiver.  *Id.* at 24–25.

On March 17, 2020, the Court ordered Defendants to make a first production of documents in response to the FOIA Request by April 27, 2020 and stated that a schedule for further monthly productions would be discussed at a conference then scheduled for April 29,

2020.  Dkt. No. 16.  On April 9, 2020, Plaintiffs moved by letter motion for an order expediting

the due date for the first production to April 20, 2020, noting that ICE had recently given nine

individuals who were the target of the federal government's civil penalties a deadline of April

27, 2022 to respond to their fine letters.  Dkt. No. 18.  On April 13, 2020, the Court granted the

motion to expedite and ordered Defendants to make their initial production by April 22, 2020,

including certain documents related to the nine individuals.  Dkt. No. 19.  In response to a

request from Defendants, the Court modified its April 13 Order, noting that the Treasury need

only make its initial production by April 27, 2020, although compelling ICE to make its initial

production of documents by April 22, 2020.  Dkt. No. 24.

On April 29, 2020, the parties submitted a joint letter in which each set forth its position

on a schedule for future monthly productions.  Dkt. No. 25.  The Court held a status conference

on that day.  Following the conference, the Court ordered Defendants to review and process

1,200 pages of documents and produce responsive records by the end of each month.  Dkt. No.

26.

On October 29, 2021, ICE filed its motion for summary judgment along with supporting

paperwork including a *Vaughn* index, which provides a description of the withholdings that

Plaintiffs are challenging.  Dkt. Nos. 54–56.  In a declaration accompanying its motion, ICE

stated that, in response to the FOIA Request, it had "reviewed a total of 13,342 pages of records

for potential responsiveness, and in sixteen productions, released 1,150 pages in full, released

2,183 pages in part, and withheld 3,241 pages pursuant to FOIA Exemptions 3, 5, 6, 7(C), and

7(E)."  Dkt. No. 56 ¶ 12.  Plaintiffs filed a cross-motion for summary judgment and an

opposition to ICE's motion for summary judgment on February 4, 2022.  Dkt. No. 58.  On March

4, 2022, ICE filed a reply in support of its motion for summary judgment as well as a response to

Plaintiffs' motion for summary judgment.  Dkt. No. 63.  Along with its reply, ICE filed a

declaration from the Acting FOIA Officer at ICE noting that ICE planned to remove any

redactions that it had previously made of the names and titles of ICE Senior Executive Services

("SES") personnel or otherwise high-level policy-making individuals, Dkt. No. 66 ¶¶ 7–9,

although ICE would continue to withhold the names and other personal identifying information

of mid-level management and lower-level agency employees based on their individual privacy

interests, *id.* ¶ 10.  That declaration also provided email domain information for the withheld

names and noted that ICE would no longer assert the deliberative process privilege over certain

exhibits, which would be reproduced to Plaintiffs by March 25, 2022.[3]  *Id.* ¶¶ 11–12.  On April

22, 2022, Plaintiffs filed a reply memorandum in support of its cross-motion for summary

judgment.  Dkt. No. 69.  On September 13, 2022, Plaintiff filed a letter with the Court

identifying the forty documents that contain still-disputed withholdings.[4]  Dkt. No. 76.

The Court heard oral argument on the motions on September 15, 2022.  At oral argument,

the Court ordered ICE to provide the Court copies of the white paper documents in Exhibit B for

examination *in camera*.[5]  Counsel for ICE provided those documents to the Court that day for *in

camera* review.

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate where "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[3] Namely, Exhibits D.7, D.8, D.10, D.11, D.12, D.15, and D.22.  Dkt. No. 66 ¶ 12.  These exhibit
numbers (used through this Opinion and Order) refer to the documents appended as Exhibits A
through E to the Declaration of Rebecca Schechtman.  Dkt. No. 59.
[4] Those disputed documents are: Exhibits A.1–A.8, B.1–B.7, C.1–C.9, D.1–D.6, D.9, D.13–
D.14, D.16–D.21.  Dkt. No. 76.
[5] The reasons for the *in camera* review are set forth in Section II.E.

law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under

the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of

fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009)

(quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

      In determining whether there are any genuine issues of material fact, the Court must view

all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d

130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no

genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).  If the movant meets its burden,

"the nonmoving party must come forward with admissible evidence sufficient to raise a genuine

issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536

F.3d 140, 145 (2d Cir. 2008).  The nonmoving party may not rely on "mere speculation or

conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)

(citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on

mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of

Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  Rather, to survive a

summary judgment motion, the opposing party must establish a genuine issue of fact by "citing

to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating

more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd.

v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266

(2d Cir. 2009).  If "the party opposing summary judgment propounds a reasonable conflicting

interpretation of a material disputed fact," summary judgment shall be denied.  *Schering Corp. v.

Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir. 1983).

## II.     FOIA

FOIA was enacted to promote honest and open government and to assure the existence of

an informed citizenry "to hold the governors accountable to the governed."  *Grand Cent. P'ship,*

*Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Ethyl Corp. v. E.P.A.,* 25 F.3d 1241,

1245 (4th Cir. 1994)).  Thus, "FOIA 'strongly favor[s] public disclosure of information in the

possession of federal agencies.'"  *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 587 (2d Cir.

Aug. 16, 2022) (quoting *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship &*

*Immigr. Servs. ("Knight I")*, 30 F.4th 318, 327 (2d. Cir. 2022)).

"The FOIA affords nine, exclusive exemptions from its otherwise broad disclosure

obligations.  In other words, the FOIA is 'structured [so that] virtually every document generated

by [a federal] agency is available to the public in one form or another, unless it falls within one

of the Act's nine exemptions.'"  *Id.* (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132,

136 (1975)).

In order to prevail on a motion for summary judgment in a FOIA case, the defending

agency has the burden of showing that its search was adequate and that any withheld documents

fall within an exemption to the FOIA.  *See* 5 U.S.C. § 552(a)(4)(B); *E.P.A. v. Mink,* 410 U.S. 73,

79 (1973).  A district court in a FOIA case may grant summary judgment in favor of an agency

"on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than

merely conclusory statements, and if they are not called into question by contradictory evidence

in the record or by evidence of agency bad faith." *Grand Cent. P'ship*, 166 F.3d at 478 (quoting

*Gallant v. N.L.R.B.,* 26 F.3d 168, 171 (D.C. Cir.1994) (citation omitted) (emphasis added)).  The

sworn declarations must be "factually uncontroverted and sufficiently detailed to have the

exemption appear 'logical and plausible.'" *Am. Oversight*, 45 F.4th at 587 (quoting *Knight I*, 30 F.4th at 327).

If an agency's declarations are insufficiently detailed to determine whether an exemption applies, "the district court can either review the documents *in camera* or require the FBI to provide a new declaration." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 31 (D.C. Cir. 1998), *amended* (Mar. 3, 1999). "The latter course is favored where agency affidavits are facially inadequate." *Id.* "[I]n camera review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion." *Cox v. Dep't of Just.*, 504 F. Supp. 3d 119, 151 (E.D.N.Y. 2020) (quoting *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988)). Thus, generally, a "district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions" before undertaking *in camera* review. *Am. C.L. Union v. U.S. Dep't of Just. ("A.C.L.U. I")*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016) (quoting *Spirko v. U.S. Postal Service*, 147 F.3d 992, 997 (D.C. Cir. 1998)); *see also Seife v. U.S. Dep't of State ("Seife I")*, 298 F. Supp. 3d 592, 630 (S.D.N.Y. 2018); *cf. Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 174–75 (D.D.C. 2011) ("Having found the DOJ's *Vaughn* submissions inadequate, the Court has several options regarding how to now proceed in this case. . . . [T]he Court finds that the best approach is to direct the agency to revise their *Vaughn* submissions, taking into account the deficiencies identified by the Court.").

## DISCUSSION

Plaintiffs argue that ICE failed to conduct an adequate search for relevant records, that it improperly redacted and withheld information about the civil fines program under Exemption 5,

and that its use of Exemption 6 and 7(C) are overbroad and do not justify the withholding of names and titles of certain employees.  The Court considers each point in turn.

## I.    Adequacy of ICE's Search

The agency bears the burden to demonstrate "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents."  *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012) (quoting *Morley v. Central Intel. Agency*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)); *see Int'l Couns. Bureau v. U.S. Dep't of Def.*, 657 F. Supp. 2d 33, 38 (D.D.C. 2009).  "This standard does not demand perfection, and thus failure to return all responsive documents is not necessarily inconsistent with reasonableness: an agency 'is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents.'"  *Pucci v. Requester Commc'n Branch*, 2018 WL 6804005, at *2 (S.D.N.Y. Dec. 27, 2018) (quoting *Adamowicz v. I.R.S.*, 672 F. Supp. 2d 454, 462 (S.D.N.Y. 2009)).

"Under Second Circuit law, 'to establish the adequacy of a search, agency affidavits must be . . . relatively detailed and nonconclusory.'"  *NAACP Legal Def. & Educ. Fund, Inc. v. Dep't of Just.*, 463 F. Supp. 3d 474, 483 (S.D.N.Y. 2020) (Nathan, J.) (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 488–89).  Affidavits submitted by an agency are "accorded a presumption of good faith."  *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *see also Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994).  "A 'satisfactory agency affidavit should, at a minimum, describe in reasonable detail the scope and method by which the search was conducted.'"  *NAACP*, 463 F. Supp. 3d at 483 (quoting *Amnesty Int'l USA v. C.I.A.*, 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008)).  "If a court makes a threshold determination that

an agency affidavit is sufficiently specific, it then proceeds to consider whether the underlying search was reasonable." *Id.*

To demonstrate that the underlying search was reasonable, "an agency must search all locations likely to contain responsive records; not simply where the records are 'most likely' to be found." *Id.* at 484 (quoting *Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 311, 324 (S.D.N.Y. 2019)).  In applying this standard, courts consider the search terms, the type of search performed, and where the agency searched for the records. *Id.*

Here, taken together, ICE's declarations describing the search are sufficiently specific to allow the Court to determine whether the underlying searches were reasonable.  Dkt. Nos. 56, 64–66.  Plaintiffs do not appear to contest this point.  ICE's declarations "are 'nonconclusory,' and describe 'in reasonable detail the scope and method by which the search[es were] conducted.'" *NAACP*, 463 F. Supp. 3d at 485 (first quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 489; and then quoting *Amnesty Int'l USA.*, 2008 WL 2519908, at *8).

The central question is therefore whether the underlying search performed by ICE described in those declarations was reasonable.  Plaintiffs challenge the adequacy of ICE's search for responsive records on three primary grounds: (1) ICE did not search the records of ICE senior leadership and members of the ICE Director's Office—including former ICE Chief of Staff Jon Feere, former ICE Acting Director and Deputy Director Matthew Albence, former ICE Acting Director Thomas Homan, and former ICE Chief of Staff Thomas Blank—who Plaintiffs claim are the custodians most likely to have communicated with entities outside ICE, Dkt. No. 61 at 11–14; (2) ICE failed to search the Offices of Public Affairs and Partnership and

Engagement, *id.* at 15; and (3) ICE's selection of search terms and file systems varied widely with no rational basis and did not include clearly relevant key terms, *id.* at 15–18.

A.      **Failure to Search the Records of ICE Senior Leadership**

In support of its argument that ICE's failure to search ICE's top leadership was unreasonable, Plaintiffs note that: (1) documents released through a FOIA request by another organization show that Stephen Miller, who was a White House advisor, was a key architect in the formation of the civil fines policy and communicated with DHS and ICE officials about the it, yet Plaintiffs have not received even one email on which he is addressed or copied; and (2) ICE failed to follow up on leads obtained through its search process that showed that key members of ICE leadership—including Feere, Homan, Albence, and Blank—would likely have responsive records.  *Id.* at 12–14.

ICE responds that it was reasonable not to search the computers and emails of individuals within the ICE Director's Office.  Dkt. No. 63 at 9.  According to ICE, the ICE Director delegated responsibility and authority to ERO leadership to enforce INA § 274D and "to impose civil penalties on noncitizens subject to a final order of removal who willfully failed or refused to depart the United States," and, "[g]iven that delegation of authority, it was ERO leadership, and not the ICE's Director's Office, that determined the who, what, when, where and how to assess fines pursuant to § 274D."  *Id.*  ICE also contends that the records that Plaintiffs claim that senior leadership would likely possess fall outside the scope of the FOIA request.  *Id.*  Specifically, ICE argues that the FOIA Request only requests communications between ICE officials and other *agencies*, not those ICE communications with the White House, Department of Justice, Congressional offices, and anti-immigrant lobbyist groups and think tanks.  *Id.* at 9–10.  ICE claims that the only part of the Request that seeks communications is the third request, which seeks "[a]ny communications between ICE officials and officials of local or federal agencies

regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. § 1324d." *Id.* at 10. ICE further argues that the records identified by Plaintiffs do not show that the members of ICE senior leadership would have responsive records that would not be founds in the files of the persons whose records were searched. *Id.* at 11–13.

Before delving into the particular arguments that each side makes, the Court first considers the appropriate reading of the FOIA Request. To start, a FOIA request is not to be approached as a private litigant might approach a document request served by an adversary—*i.e.*, to produce the fewest possible documents consistent with the litigant's private objective and to avoid sanctions. It is to be read in a capacious manner befitting an agency of the United States government charged with the statutory responsibility to produce for public consumption the greatest number of records that fall within the FOIA request and that do not fall within one of the specific, enumerated exemptions set forth in the Act. *See Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Immigr. & Customs Enf't*, 571 F. Supp. 3d 237, 247 (S.D.N.Y. 2021) ("FOIA 'strongly favors a policy of disclosure and requires the government to disclose its records unless [they] fall within one of the specific, enumerated exemptions set forth in the Act.'" (quoting *Nat'l Council of La Raza v. U.S. Dep't of Justice*, 411 F.3d 350, 355 (2d Cir. 2005))). "Although an agency need not expand a search beyond the four corners of the language of the request, . . . it must 'adher[e] to the full scope or the precise language of the plaintiff's request.'" *Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention ("Knight II")*, 560 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) (quoting *Charles v. Office of Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 216 (D.D.C. 2010)). "[M]ost importantly, an agency must 'construe [FOIA requests] liberally.'" *Id.* (quoting *Immigrant Def. Project v. U.S. Immigr. & Customs Enf't*, 208 F. Supp. 3d 520, 526 (S.D.N.Y. 2016)); *see also Nation*

*Mag., Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) ("Although a requester must 'reasonably describe[ ]' the records sought, 5 U.S.C. § 552(a)(3), an agency also has a duty to construe a FOIA request liberally."); *Brennan Ctr.*, 571 F. Supp. 3d at 247 ("Courts should construe FOIA exemptions narrowly and resolve doubts in favor of disclosure.").

Plaintiffs' first FOIA request ("Request 1") calls for "*[a]ny and all records relating to* current policies, procedures, guidelines, instructions, or other materials *concerning* when and how civil fines and penalties under INA § 274D, 8 U.S.C. § 1324d, are enforced on individuals who are alleged to have a final administrative removal order, including but not limited to immigrants taking sanctuary."  Dkt. No. 56-2 (emphasis added).  That language is broad.  It captures "all" records.  By requesting all records "relating to," for example, "current policies, procedures, guidelines, instructions, or other materials," the request is not limited to the policies, procedures, and other materials themselves; instead, it captures all documents that concern those policies and materials even if they do not constitute policies and materials themselves.  *See Knight II*, 560 F. Supp. 3d at 822 (holding that language "relating to" in FOIA request captured more than the policies and procedures themselves).  Moreover, Request 1 does not call just for records concerning when and how civil fines are enforced on particular individuals.  Such an interpretation would read the words "policies, procedures, guidelines, [and] instructions" out of the request.  *See id.* (explaining that FOIA requests must be interpreted to avoid surplusage).  A policy is rarely drafted with just its application to one person in mind, and this policy is no exception.  The request for all records relating to policies and the like therefore clearly includes materials concerning when and how civil fines and penalties are enforced on "individuals" (as opposed to corporations) generally.  Finally, and importantly, Request 1 also is not limited to "records relating to" current policies, procedures, guidelines, and instructions but also captures

17

"other materials," reflecting the requestor's intent that the agency produce not only records that relate to formal policies but all materials in its possession concerning when and how civil fines and penalties are enforced on individuals.

That Request 1 should not be read narrowly is reinforced by the language of the second request, which calls for "[a]ny and all guidelines, schedules, instructions, or other records concerning fee calculations, fee amounts, or other monetary information ICE is allowed to impose on individuals, . . . including but not limited to immigrants in sanctuary" and by the fourth through seventh requests, none of which use the language of "relating to."  Dkt. No. 56-2. "The comparison . . . clarifies that [Request 1] seeks records beyond the policies or procedures" or other materials concerning the enforcement of civil penalties and fines.  *Knight II*, 560 F. Supp. 3d at 822.

Moreover, it is clear beyond peradventure that one of the particular focuses of the FOIA Request was to obtain materials concerning when and how civil fines and penalties are imposed on "immigrants taking sanctuary" or "immigrants in sanctuary."  Except for the sixth request ("Request 6"), that language is included in each and every one of the seven requests, which call for the records produced by the agency to include records concerning "immigrants in sanctuary" or "immigrants taking sanctuary."  Dkt. No. 56-2.  And Request 6 is not inconsistent with that general approach.  It asks for "[t]he number of individuals who have been sent ICE Form I-79B 'Notice of Intention to Fine under Section 274D of the Immigration and Nationality Act' broken down by date, country of origin, state/city of residence, and gender."  *Id.*

With the FOIA request so understood, it is clear that ICE's failure to search ICE senior leadership was unreasonable in several respects.

18

First, ICE's claim that communications of ICE personnel with entities outside of ICE, such as the White House and Department of Justice, are beyond the scope of the FOIA Request relies on a fundamental misreading of that Request.  Dkt. No. 63 at 9–10.  ICE argues that by asking in the third request ("Request 3") for "[a]ny communications between ICE officials and officials of local or federal agencies regarding fines, fees, and/or penalties pursuant to INA § 274D, 8 U.S.C. § 1324d," Plaintiffs implicitly excluded from Request 1 communications between ICE officials and any third parties outside of "other local or federal agencies."  *Id.*  That interpretation is flawed.  "[C]ourts have rejected the idea that including a specific request invalidates an overlapping broader request."  *Knight II*, 560 F. Supp. 3d at 822 (citing cases).  Although the term is undefined in FOIA, "record" is a capacious word and has been found in other contexts to include "any item, collection, or grouping of information" that pertains to the subject of a specific request.  *Defining a 'Record' Under the FOIA*, U.S. Dep't of Justice (July 23, 2021), https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia (noting that agencies should be guided by the definition of a record found in the Privacy Act); *see DiVaio v. Kelley*, 571 F.2d 538, 542 (10th Cir. 1978) (applying the "dictionary meaning of the word 'record' [ ] as that which is written or transcribed to perpetuate knowledge or events," since FOIA failed to define the term (citation omitted)); *see also Record*, Miriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/record ("to set down in writing : furnish written evidence of").  Records frequently take the form of communications; they rarely find their home in unconveyed views of an agency employee.  Request 1, which calls for "[a]ny and all records," therefore clearly includes communications both between ICE officials and employees and communications such officials and employees had with others outside of the agency, including

those in the White House, in other government agencies, and in the private sector.  ICE thus

acted unreasonably in refusing to search for such communications.

Second, ICE acted unreasonably in failing to search the records of ICE senior leadership.

In a declaration, the Acting Unit Chief of the IDU for ERO, who has held that position only since

January 30, 2022, states that she does not "believe that it was likely that the ICE Director's

Office would have records responsive to the [FOIA] Request beyond what was contained in the

files of ERO leadership and the specific ERO divisions that searched their files" because "the

ICE Director's Office was not involved in ERO's efforts to implement the civil fines policy"

once the ICE Directive and Delegation Orders were implemented.  Dkt. No. 65 ¶¶ 16–18.  She

notes that the ICE Directive delegated responsibility for implementing the civil fines program to

the EAD of ERO and the Principal Legal Advisor, as well as an additional individual at DHS,

and that the Delegation Order delegated authority to ERO leadership for administering and

enforcing the provisions relating to civil penalties for failure to depart.  Dkt. No. 65 ¶ 9, 11; Dkt.

No. 65-2.  Accordingly, she asserts "it was ERO leadership that determined the who, what,

when, where, and how to assess fines pursuant to 274D," and "it was determined that ERO

leadership would be likely to have records responsive to the Request."  Dkt. No. 65 ¶¶ 12–14.

She thus concludes that "ERO leadership implemented Directive 10088.1, pursuant to

Delegation Order 01-2018, largely without oversight."  *Id.* ¶ 17.

The FOIA Request, however, is not addressed alone to the "who, what, when, where, and

how" to impose particular fines on particular individuals.  It also calls for all records "relating

to" current policies and other materials concerning when and how civil fines will be enforced on

individuals.  Dkt. No. 56-2.  It thus is not sufficient for ICE to search only for records regarding

how the final policy was implemented with respect to specific individuals after the policy was

adopted.  ICE also had to search for records that went to the adoption of the policy in the first

place.  Likewise, ICE's statement that ERO and OPLA had formal authority based on the

Delegation Order does not alone suffice to establish that a search limited to those offices would

be reasonable even after the Delegation Order.  The Delegation Order gave those units "authority

to administer and enforce provisions relating to civil penalties for failure to depart."  Dkt. No.

65-3.  It did not preclude those in ICE leadership from communicating about or generating

records with respect to the policy for imposing fines on individuals.

Thus, while it may be that ERO would have all of the records regarding how the policies

were actually implemented and that the ICE Director's Office did not intervene in particular

enforcement efforts, the assertions in the affidavit do not address whether there would be records

in the ICE Director's Office discussing, for example, the development, implementation, and

communication of the policy more generally, even after those policies went into effect.[6]

Plaintiffs have also demonstrated that certain ICE senior leadership likely have additional

responsive documents to the FOIA Request.  ICE senior leadership was included on numerous

communications both prior to and after the ICE Directive and Delegation Order went into effect

---

[6] The declaration of the Acting FOIA Officer does not explain how ICE made decisions about what groups within ICE to search.  He makes only the conclusory statement that, as a matter of process, "the ICE FOIA Office identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches."  Dkt. No. 56 ¶ 17.  He does not state that ICE did that in this case much less how—based on the description of the records sought—ICE chose the components to search.  *See Brennan Ctr.*, 571 F. Supp. 3d 246 ("[T]o the extent the declarations rely on simply stating in conclusory fashion that an officer used his or her 'judgment' to conduct a reasonable search, such a statement is of no use to the Court.").  There is information in his declaration to explain why ERO, OPLA, and ICE Policy would have been chosen to search for records:  ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, OPLA is the exclusive representative of DHS in immigration removal proceedings, and ICE Policy leads strategic policy and regulatory development.  Dkt. No. 56 ¶¶ 24–26.  Although the ICE FOIA Office admits that "ICE records are maintained by leadership offices," *id.* ¶ 18, the Acting FOIA Officer does not explain why such offices were not searched.

about the civil fines program.  As Plaintiffs detail, Feere, Homan, Albence, and Blank were included on certain emails and memoranda related to the civil fines program.  *See, e.g.*, Dkt. No. 59-1 at 4, 7 (emails from Feere regarding civil fines program); *id.* at 12 (discussing white paper from Feere to Homan regarding civil fines program); *id.* at 14 (email to Albence, Feere, and Blank regarding civil fines program).  For example, as early as December 15, 2017, Feere wrote to an ICE employee for help to "fast track the directive in the DHS enforcement memo to collect all fines and penalties from illegal aliens and those who facilitate their unlawful presence."  Dkt. No. 76-2 at ECF p. 4.  On December 20, 2017, he received an "update" on where things stand. *Id.* at ECF p. 8.  In February 2018, ICE employees circulated "some white papers from Jon Feere, Senior Advisor to Director Homan."  *Id.* at ECF p. 12.  In January 2018, a meeting was scheduled for Feere, Albence, and a limited group of others to discuss failure-to-depart fines.  *Id.* at ECF p. 17.  In June 2018, Feere, Blank, and Albence were among a limited group of recipients of a one-pager on fines and penalties and of a memorandum on "Fines and Penalties for Civil Violations of Immigration Law."  *Id.* at ECF pp. 14, 19.  Even after the June 19, 2018 ICE Directive and Delegation Order, there is evidence that suggests Feere was following up on the civil fines policy and its implementation.  On April 17, 2019, Feere, Albence, and Blank (among a few others) received an email with several attachments, including one spreadsheet documenting specific enforcement actions against "sanctuary cases," with a cover note "[p]lease do not forward, copy or add additional participants."  *Id.* at ECF p. 24.  In a "civil fines update" sent on January 2, 2022 between ICE employees, one ICE employee whose name is redacted states: "In the event questions arise about [redacted]—a sanctuary case that was not included in our initial service on sanctuary cases [. . .] (John Feere inquired about her last week)."  *Id.* at ECF p. 35.  Powerful inferences can be drawn from all of these documents that (1) senior

leadership had communications and generated records regarding the policies for the imposition

and administration of civil fines; and (2) that those records would not be included in the files that

ICE searched but would be located only in the files of senior leadership.  In addition, from

documents Plaintiffs otherwise have been able to obtain, Plaintiffs have demonstrated that Feere

sent at least one email to White House Advisor Stephen Miller and others in the Executive Office

of the President with a progress update.  Dkt. No. 59-6 at ECF p. 23.  There is therefore reason to

believe that Feere would have been on communications with the Office of the White House and

other external parties and that such records would not be encompassed within the search

conducted by ICE.  ICE's failure to search for and produce these documents may also account

for Plaintiffs' claim that they have received very few documents from the ten months after the

ICE Directive was issued on June 19, 2018.  Dkt. No. 61 at 5.

     **B.**     **Failure to Search the Offices of Public Affairs and Partnership and Engagement**

     ICE was also unreasonable in failing to search the Offices of Public Affairs and

Partnership and Engagement.  Dkt. No. 61 at 15.  ICE's use of the media appears to have been an

important independent component of the civil fines program.  *See Nat. Res. Def. Council v. U.S.*

*Env't Prot. Agency*, 19 F.4th 177, 185 (2d Cir. 2021) ("An agency's decision regarding how to

communicate its policies and actions to Congress, the public, and other stakeholders can have

substantial consequences.").  Notably, Plaintiff allege that it was through ICE's statements to the

media that noncitizens, including sanctuary leaders, were first notified of civil fines reissued

against them in late-2019.  Dkt. No. 61 at 7.  On December 7, 2019, the Washington Times

reported that ICE, in an exclusive interview, stated that it had issued fines to approximately 230

noncitizens and noted that "[t]he agency said it also has taken the first steps to revive massive

fines—some as large as a half-million dollars—against a group of high-profile illegal immigrants

who have taken sanctuary in churches across the country to resist their deportations."  Stephen

Dinan, *EXCLUSIVE: ICE Moves To Revive Six-Figure Fines Against Illegal Immigrants Living*

*in Sanctuary*, Washington Times (Dec. 7, 2019),

https://www.washingtontimes.com/news/2019/dec/7/exclusive-ice-moves-revive-six-figure-

fines-agains/.[7]  This story—according to Plaintiffs—was published before the sanctuary leaders

received notices that the civil fines against them had been reissued.  Dkt. No. 61 at 7.  Moreover,

according to Plaintiff, a crucial purpose of the fines initiative was the media interest that the

policymakers sought to generate, and, accordingly, ICE routinely communicated with the press

about its civil fines policy.  *Id.* at 15.  Certain records that were produced to Plaintiffs include

communications involving Richard Rocha, the Senior Advisor for the ICE Office of Partnership

and Engagement and the Office of Public Affairs.  *Id.*  Specifically, Plaintiffs point to an email

chain from October 31, 2019 in which Rocha asks, "who is the best person to work with

regarding fines" and then later emails an unidentified person to say "[w]ord on the street is that

you're the man I can talk to about fines" and notes that he is "on the hook to draft a release for

these new fines."  Dkt. No. 59-3 at ECF pp. 12–13.  Plaintiffs also point to an email from Rocha

in December 2019 in which he appears to discuss a call with a reporter regarding the civil fines

program.  *See id.* at ECF p. 28.

        ICE does not dispute that the Offices of Public Affairs and Partnership and Engagement

would have records concerning the civil fines policy but argues that it need not have searched the

Offices of Public Affairs and Partnership and Engagement because the FOIA Request did not

seek documents or communications concerning ICE's public outreach or media messaging.  Dkt.

---

[7] The Court takes judicial notice of the fact that this article was published, although it does not
take judicial notice of the truth of the facts in the article.  *See Karol v. City of New York*, 396 F.
Supp. 3d 309, 318 (S.D.N.Y. 2019).

No. 63 at 14.  But, for the reasons discussed above, that reads Request 1 too narrowly.  Request 1 encompasses "[a]ny and all records" that "relat[e]" to ICE's policies regarding civil fine and penalties.  Dkt. No. 56 ¶ 6.  Records related to the public communication of those policies and how they are enforced would clearly qualify.  *See Immigrant Def. Project*, 208 F. Supp. 3d at 531 ("OPA's stated reason that it need not search for responsive documents underestimates the Office's obligation under FOIA.  An agency must 'construe [FOIA requests] liberally.'" (citation omitted)).  The Offices of Public Affairs and Partnership and Engagement therefore should have been searched.

### C.      Search Terms

Finally, on the record before the Court, ICE's search for emails and records, where it did search, appears to have been haphazard, inconsistent, incomplete, and inadequate.  When evaluating the sufficiency of an agency's search, courts look to whether the search appears designed to return all relevant records.  The agency must "'provid[e] logical explanations for each of the decisions it made as to search terms to be used and how to conduct the searches,' evincing a good faith effort to design a comprehensive search."  *Id.* at 527–28 (quoting *Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 535 (S.D.N.Y. 2010)); *see NAACP*, 463 F. Supp. 3d at 484.

Plaintiffs argue that ICE's search plainly does not meet this standard, as ICE, among other things, used an inconsistent approach to its search terms and methods by failing "to give standardized instructions when delegating to internal offices," "used unlikely plural and compound words," and excluded clearly relevant terms that were identified as central to the request.  Dkt. No. 61 at 16.

ICE responds that there is nothing per se unreasonable about delegating to each office within an agency the manner and method of searching for responsive records and that

inconsistences between custodians or program offices alone is insufficient to show that a search is unreasonable.  Dkt. No. 63 at 16–17.  It argues that courts rely on the representations of individuals tasked with searching their personal files in assessing search adequacy and that the fact that individuals within ICE exercised discretion in searching for responsive records therefore fails to show that the search was inadequate.  *Id.* at 17.  It states: "[E]ach ICE employee stores his or her files in the manner that works best for that employee: some separate their emails by subject, topic, or program; others save documents to their hard drive or shared drive.  When ICE employees are tasked with searching for records responsive to a FOIA request, they search their own files based on their knowledge of where they are likely to find responsive records."  *Id.* at 19.

ICE's explanations fail to satisfy the standards required before a court will accept a search as being reasonable.  Although the "agency is not expected to take extraordinary measures to find the requested records," the agency still must provide  "reasonably detailed explanations" for its search.  *Garcia v. U.S. Dep't of Just., Off. of Info. & Priv.*, 181 F. Supp. 2d 356, 366, 368 (S.D.N.Y. 2002).  Deference is not tantamount to judicial abdication.  The court must still determine whether the agency offered a "reasonable justification" for how its search was "reasonably likely to yield responsive records."  *Knight II*, 560 F. Supp. 3d at 823 (citation omitted).  ICE's argument requires the Court to take it on faith that each of the few ICE employees charged with searching for responsive records was fully committed to identifying the records that would fall within the FOIA Request and was fully competent to determine the search terms to use (and the locations to search) to locate not only the records that they authored but also the records that they received and whose language they did not choose.

ICE's explanation for its search did not meet the requisite standard in at least two respects.  First, ICE provided no explanation for the search terms that were used for particular custodians and, in particular, why certain search terms were not used.  *See Knight II*, 560 F. Supp. 3d at 823 ("[F]ailure to use certain search terms, including those emphasized by Plaintiff, is not automatically unreasonable, so long as the agency provided an explanation as to why the search term was not used." (internal quotation marks and citation omitted)); *cf. Immigrant Def. Project*, 208 F. Supp. 3d at 528–29 (noting that agency described why some search terms were not used).  For example, the EDPLA and the DPLA for Enforcement and Litigation used only one search term—"274D"—in their search for responsive records.  Dkt. No. 56 ¶ 39.  But the FOIA request was not limited to documents that used the phrase "§ 274D" or that specifically discussed that statutory language.  It called for "any and all records" relating to when and how civil fines and penalties are enforced on individuals subject to a final administrative removal order when such civil fines and penalties are imposed under INA § 274D, 8 U.S.C. § 1324d. Dkt. No. 56 ¶ 6.  The FOIA Request thus would pull within its scope a record that discussed whether to impose fines or penalties on individuals subject to a final administrative removal order, including individuals in sanctuary, even if that record did not mention the statutory authority for imposing such a fine or penalty.  *See Brennan Ctr.*, 571 F. Supp. 3d at 246 ("[A] single-term search for only the name of a handbook is an inadequate search, without, at minimum searching for a relevant acronym, short title, or keyword phrase.").  In addition, not one of the OPLA officers included the term "sanctuary" in their email searches, even though the FOIA Request repeatedly makes clear that it seeks records related to immigrants in sanctuary. Dkt. No. 56 ¶ 6.  And the searches conducted by ICE Policy did not include clearly relevant terms such as "civil fines" and "penalties," which are the words used by the FOIA Request itself

to describe the records it seeks.  *Id.*; *see also Knight II*, 560 F. Supp. 3d at 823–24 (explaining that search was unreasonable where it did not use certain relevant key terms).  ICE also failed to explain whether its searches would have uncovered records including slight variations of its search terms—such as singular and plural forms of the search terms, as well as alternative spelling or acronyms.  *See Amnesty Int'l USA*, 2008 WL 2519908, at *15 ("Simply stated, a search that is designed to return documents containing the phrase 'CIA detainees' but not 'CIA detainee' or 'detainee of the CIA' is not 'reasonably calculated to uncover all relevant documents.'" (citation omitted)).

Second, ICE has provided no explanation whatsoever for the disparities in searches amongst custodians, including why some employees looked in share drives for records and others did not and why some employees used a relatively large number of search terms while others—sometimes within the same office and holding the same position—used just one search term.[8]  The Acting FOIA Officer for ICE states that "[e]ach ICE employee stores his or her files in a manner which works best for that particular employee," such that some persons store emails in their Microsoft Outlook email files while others store them on hard drives or shared drives, and then "[i]ndividual archives of emails are searched by the individual employees based on their knowledge of where they are likely to find responsive records."  Dkt. No. 56 ¶ 23.  The Acting Unit Chief of the IDU for ERO simply states that she "advised several senior ERO leaders to conduct additional searches of their own files for responsive records."  Dkt. No. 65 ¶ 6.  She does not, however, provide any rationale for the disparate searches each conducted.

---

[8]  For example, the individuals within OPLA searched different locations and used different search terms: for example, the EDPLA and the DPLA for Enforcement and Litigation used only one search term "274D" and only two of the three associate legal advisors included the term "civil fines" in their search.  Dkt. No. 56 ¶ 38–44.  And, while three of the individuals within OPLA searched their laptops, four did not.  *Id.*

ICE's statement that the disparities are a function of the judgment of individual ICE employees as to what places to search and what terms were reasonably likely to retrieve responsive records "is of no use to the Court." *Brennan Ctr.*, 571 F. Supp. 3d at 246. ICE must "provide sufficiently detailed descriptions of the underlying facts," *id.* at 246–47, and "'logical explanations for each of the decisions it made as to search terms to be used and how to conduct the searches,' evincing a good faith effort to design a comprehensive search," *Knight II*, 560 F. Supp. 3d at 823 (quoting *Immigrant Def. Project*, 208 F. Supp. 3d at 527–28). Here, "[t]here may well be a good explanation for these inconsistent search methodologies, but Defendant does not provide it. As a result, these inconsistencies provide another reason that the Court cannot conclude that Defendant's search—or at least its description of that search—is sufficient to warrant summary judgment." *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 25 (D.D.C. 2018) (citing *Tushnet v. U.S. Immigr. & Customs Enf't*, 246 F. Supp. 3d 422, 435 (D.D.C. 2017) (denying summary judgment where ICE declarations "fall short of explaining why such disparate searches were reasonable for particular offices") and *James Madison Project v. Dep't of State*, 235 F. Supp. 3d 161, 169 (D.D.C. 2017) ("But the agency misses the point: the problem with the declaration in this case is that it is conclusory, and the searches are deficient because the agency—for no discernable reason—searched different data sets using different search terms . . . even within the same bureau or office. So the agency must do more to explain its methodology, and it must explain its reasoning more clearly.")). The agency affidavits do not provide any explanation for why some persons and offices searched shared drives and others did not—a "patently obvious ga[p]." *Brennan Ctr.*, 571 F. Supp. 3d at 246. Moreover, "the disparity between the search terms used by various sections [and individuals] also indicates that

the search was inadequate where some divisions [and individuals] failed to use what other divisions [and individuals] deemed clearly relevant search terms." *Id.*

It may be that, as counsel stated at oral argument, the disparities in search terms and in search locations can be explained.  It is not necessarily the case that every employee in an agency must look for documents in the same location or use the same search terms.  It also is not necessarily the case that every employee in the same unit must necessarily use the same search terms.  *See Am. Fed'n of Gov't Emps., Loc. 812 v. Broad. Bd. of Governors*, 711 F. Supp. 2d 139, 151 n.11 (D.D.C. 2010) ("Plaintiffs' argument that the search was inadequate because different officials used different terms when searching their own files is also unpersuasive.").  Counsel postulated at argument that certain employees in OPLA only used variations of 274D as a search term and not the word "sanctuary" because they were lawyers asked for advice on 274D and would not have documents referencing sanctuary that did not refer to 274D.  That might be a reasonable argument—if it were supported by the affidavits.  But it is not.  If the agency is going to delegate to each individual employee to customize her own search to yield responsive documents, it is incumbent on the agency at least to talk to that employee and obtain from her a reasonable and logical rationale for the locations she chose to look and the search terms she chose to use, and for why she did not search in other locations or use other search terms.

### D.    A New Search Is Required

Drawing all reasonable inferences in favor of ICE, as the Court must on Plaintiffs' motion for summary judgment, the Court finds that no reasonable trier of fact could find that ICE's search was adequate in light of a proper reading of the Request, ICE's failure to search custodians who were likely to have responsive records, and ICE's inconsistent search terms and methods.  *See Brennan Ctr.*, 571 F. Supp. 3d at 247.  Accordingly, ICE is ordered to conduct a new search based on the reading of the Request that comports with the principles of FOIA, as

outlined above.  As part that search, FOIA is ordered to search the records of ICE senior leadership who are likely to have records responsive to the Request (as clarified above), including Feere, Albence, Homan, and Blank, as well as the Offices of Public Affairs and Partnership and Engagement.  ICE is also directed to search for and produce, subject to any exemptions, records related to any responsive communications with third parties, including the White House.

The Court also concludes that ICE is not entitled to summary judgment with respect to the search terms and procedures it used with respect to the custodians whose records were searched.  As a result, ICE must either conduct a new search that is reasonable and logical based on a fulsome understanding of the FOIA Request or, if it believes that the search it conducted is sufficient to yield the records that are responsive based on the correct reading of the FOIA Request, to provide detailed and reasonable justifications for how each custodian chose to search where she chose to search and with what search terms.  To the extent ICE chooses not to attempt to justify its prior search terms and procedures, ICE is directed to meet and confer with Plaintiffs regarding new search terms, recognizing that, in the end, it is the agency (and, in the absence of the agency discharging its duty, the Court), and not the requestor, that gets to choose the search terms.

## II.     FOIA Exemption 5[9]

FOIA Exemption 5 shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "The Supreme Court has instructed that '[t]he test under

---

[9] Plaintiff does not argue that ICE failed to comply with the 2016 FOIA Improvement Act.  *See Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (discussing the 2016 FOIA Improvement Act).

Exemption 5' is not whether such documents might *ever* be disclosed in civil litigation, but 'whether the documents would be "routinely" or "normally" disclosed upon a showing of relevance.'" *Am. Oversight*, 45 F.4th at 588 (quoting *FTC v. Grolier Inc.*, 462 U.S. 19, 26 (1983)). "Exemption 5 incorporates three judicially-developed (*i.e.*, common law) privileges: the attorney-client privilege, the deliberative process privilege, and the attorney work product privilege." *New York Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 488 (2d Cir. 2019).

The deliberative process privilege protects documents that are: (1) "predecisional, that is, prepared in order to assist an agency decisionmaker in arriving at his decision"; and (2) "deliberative, that is, actually related to the process by which policies are formulated." *Knight I*, 30 F.4th at 333–34 (quoting *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991)). "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021) (citation omitted). The privilege "encourage[s] candor, which improves agency decisionmaking," by "blunt[ing] the chilling effect that accompanies the prospect of disclosure." *Id.* at 785. Consistent with the rationale underlying the deliberative process privilege, it applies only to "predecisional, deliberative documents." *Id.* Generally, "[d]ocuments are 'predecisional' if they were generated before the agency's final decision on [a] matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id.* at 786.

A.      **Post-June 19, 2018 Documents**

Plaintiffs argue that ICE improperly withheld numerous documents under Exemption 5 that postdated the June 19, 2018 ICE Directive and Delegation Order. According to Plaintiffs, the ICE Directive and Delegation Order constituted ICE's final policies and, as a result, documents that postdate the ICE Directive and Delegation Order cannot be predecisional as they

were applications, clarifications, or interpretations of existing policy.  Dkt. No. 61 at 19–24.  ICE

responds that the ICE Directive granted ICE program offices "discretion in enforcing applicable

laws and regulations" and provided only high-level guidelines and thus that decisions about how

to apply the policies in individual cases were protected because they involved difficult policy

judgments.  Dkt. No. 63 at 22–23.

 The Second Circuit's decision in *Natural Resources Defense Council*, 19 F.4th 177, is

instructive on this issue.  In that case, the Second Circuit was asked to address whether agency

deliberations over how to communicate and promote existing policies to people outside the

agency were entitled to the deliberative process privilege.  *Id.*  The court concluded that they

were and held that the availability of the deliberative process privilege does not turn on "whether

the agency has definitively determined the relevant policy" but on whether the records at issue

"bear on the formulation or exercise of policy-oriented judgment."  *Nat. Res. Def. Council*, 19

F.4th at 185, 186 (quoting *Grand Cent. P'ship*, 166 F.3d at 482).  The court held that "[a]n

agency exercises policy-oriented judgment [on a matter] 'even when [the] underlying decision or

policy has already been established by the agency.'"  *Id.* (quoting *Seife I*, 298 F. Supp. 3d at

616).  Accordingly, the agency need not demonstrate that the document relates to a specific

decision; "a record is predecisional if it relates to a specific decision *or a specific decisionmaking

process* and was generated before the conclusion of that decision or process."  *Id.* at 192

(emphasis in original); *see S.E.C. v. Ripple Labs, Inc.*, 2022 WL 123590, at *2 (S.D.N.Y. Jan.

13, 2022).

 *Natural Resources Defense Council* forecloses Plaintiffs' argument that any record

postdating the ICE Directive and Delegation Order cannot be deliberative.  As the Second

Circuit held, a document may still be deliberative even if it postdates a final agency policy, as

long as it "bear[s] on the formulation or exercise of policy-oriented judgment" and "relates to a specific decision *or a specific decisionmaking process* and was generated before the conclusion of that decision or process."  F.4th at 184–85, 192 (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).

The question is thus what categories of post-June 19, 2018 documents would meet this standard.  To start, any post-June 19, 2018 ICE records containing "policy-oriented" deliberations over how to communicate the civil fine policy to the public would plainly meet this standard.  These were precisely the types of documents addressed in *Natural Resources Defense Council*.  In addition, policy-oriented deliberations about how to exercise discretion under the ICE Directive would also likely be entitled to protection under the deliberative process privilege. The ICE Directive (which is only a four-page document) explicitly vested discretion regarding the imposition of civils fine with individual ICE field offices.[10]  Dkt. No. 59-6 at ECF pp. 6–9. While the ICE Directive provided some high-level guidance as to the issuance of fines (*e.g.*, "ICE LEOs will calculate fine amounts . . . and consider mitigating and aggravating factors, when applicable"), the ICE Directive left open a significant degree of "policy-oriented judgment" to the individual program offices about how generally to determine which individuals within the detailed categories to fine and how to address the imposition of fines, including what mitigating and aggravating factors are relevant.  Such policy-oriented discussions about how to apply that discretion—assuming they were had prior to the conclusion of that decision or

---

[10] The ICE Directive provides: "ICE will exercise *discretion* in enforcing applicable laws and regulations governing the assessment and collection of fines and penalties against [noncitizens], who have unlawfully remained in the United States beyond an unauthorized period of voluntary departure or in violation of a removal order" and later notes "ICE has discretion to determine when to impose a fine."  Dkt. No. 59-6 at ECF pp. 6–9 (emphasis added).

decision-making process—would fall within the deliberative process privilege under *Natural Resources Defense Council*.

While certain records may qualify as protected on this basis, it is similarly clear that many other types of records that ICE likely generated after the issuance of the ICE Directive and Delegation Order, and which related to the implementation of those policies, would not meet this standard. For example, purely interagency "descriptive discussions" about the already-existing ICE Directive or Delegation Order would not be entitled to the deliberative process privilege. *See Nat. Res. Def. Council*, 19 F.4th at 189 ("[R]ecords reflecting the attempt of agency employees merely to describe the agency's current practices to a superior official do not qualify for the deliberative process privilege."). In addition, routine "computations" of fines or discussions about the applicable statute of limitations would not be entitled to protection under Exemption 5. As the Second Circuit noted in *Natural Resources Defense Council*, "materials relating to standard or routine computations or measurements over which the agency has no significant discretion" would not be entitled to protection under Exemption 5. *Id.* at 185 (quoting *Petrol. Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1436 (D.C. Cir. 1992)). And, perhaps most important here, "determinations of how ICE applies" these general policies in "specific cases" would not fall "within the protection of the deliberative-process privilege." *Nat'l Immigr. Project of Nat'l Laws. Guild v. U.S. Dep't of Homeland Sec.*, 868 F. Supp. 2d 284, 293 (S.D.N.Y. 2012). The "salient characteristic" of information eligible for protection under deliberative process privilege is its "association with a significant policy decision." *Petrol. Info. Corp.*, 976 F.2d at 1437. Thus, while "opinions about the applicability of existing policy to a certain state of facts' provide important insights into how those tasked with interpreting a policy, such as the directives identified by ICE, understand its often ambiguous terms," courts have

nonetheless compelled their disclosure.  *Nat'l Immigr. Project of Nat'l Laws. Guild*, 868 F. Supp. 2d at 294 (cleaned up).  As the D.C. Circuit has noted about such records: "No 'decision' is being made or 'policy' being considered; rather the documents discuss established policies . . . in the light of a specific . . . fact pattern."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).

Because there are a multitude of nondeliberative discussions or records that ICE could generate related to the implementation of the ICE Directive and Delegation Order (even despite its broad grant of discretion), the Court rejects ICE's position that it may merely assert that the deliberative process privilege applies to a particular record postdating June 19, 2018 on the basis that the record relates in some way to the implementation of these final policies.  This would not be sufficient "to have the exemption appear 'logical and plausible,'" *Am. Oversight*, 45 F.4th at 587 (quoting *Knight I*, 30 F.4th at 327), as that record could just as easily relate to the mundane computation of a fine or the statute of limitations under the policy as it would a policy-oriented judgment on how to exercise discretion generally.  For documents generated after the already-final civil fines guidance, ICE must therefore provide sufficient detail from which the deliberative nature of the records can be gleaned.

That this is true is evident from the Circuit's decision in *Natural Resources Defense Council*, 19 F.4th 177.  There, the court found that while certain communications records postdating a final agency policy may be entitled to the deliberative process privilege, "the EPA's *Vaughn* Index entries for" certain of the communication records did "not provide sufficient details from which we can ascertain the records' deliberative character."  *Id.* at 190.  As one example, the court noted that one of the entries "reveals only that the record 'discuss[es] a request from an Associated Press reporter for an interview about asbestos' and 'reflect[s] pre-

decisional deliberations . . . about responding to [that] request." *Id.* at 191 n.14.  The court noted that such a description was insufficient because, while deliberations about how the "EPA would present its position on some asbestos-related policy in that interview" would plainly qualify, the EPA's effort to respond to a reporter could "involve a host of technical considerations, such as scheduling conflicts, and a record that relates to those issues would likely fall outside the scope of the deliberative process privilege." *Id.*

In addition, to agree with ICE—*i.e.*, to hold that all documents generated under a discretionary policy are entitled to the deliberative process privilege—would incentivize all agencies to fashion broad, discretionary final policies similar to the one here.  Merely by leaving some discretion in the precise details of the policy, agencies could protect a host of documents generated pursuant to that policy, which are precisely the type of post-decisional documents that FOIA requires to be disclosed.  *See Sears, Roebuck & Co.*, 421 U.S. at 152 ("[C]ommunications made after the decision and designed to explain it" are not privileged under FOIA, which is supported "by the increased public interest in knowing the basis for agency policy already adopted").  It would also undermine the general rule that "FOIA 'strongly favor[s] public disclosure of information in the possession of federal agencies.'"  *Am. Oversight*, 45 F.4th at 587 (quoting *Knight I*, 30 F.4th at 327).

With this in mind, the Court turns to the specific documents that Plaintiffs challenge on this basis and over which ICE continues to assert the deliberative process privilege:  Exhibits D.5, D.9, D.14, D.17, D.18, D.20.[11]

---

[11] In its motion for summary judgment, Plaintiffs challenged the deliberative process privilege as applied to the following exhibits:  Exhibits D.5, D.7, D.8, D.9–D.12, D.14, D.15, D.17, D.18, D.20, and D.22.  Dkt. No. 61 at 20–24.  ICE later determined that it no longer wished to assert the deliberative process privilege over Exhibits D.7, D.8, D.10, D.11, D.12, D.15, and D.22 and would produce those documents to Plaintiffs by March 25, 2022.  Dkt. No. 66 ¶¶ 11–12.

Starting with Exhibit D.5, ICE's description of the bases for its withholdings in this document are not sufficiently detailed to determine if the deliberative process privilege applies. The *Vaughn* index states that portions of the document are withheld on the basis of the deliberative process privilege as these portions relate to "legal analysis of a civil fines' issue" and "legal advice on civil fine penalty amounts."  Dkt. No. 64-1 at 29–31.  However, while it is possible that legal advice related to a civil fines issue or civil penalty amounts may require policy-oriented deliberations, they just as easily may not.  One could imagine, for example, the civil fines issue involving a routine calculation, or the advice may relate to the application of the agency's general policy to particular individuals.  To justify its withholding of this document under this exemption, ICE must provide more detail of its deliberative nature.

This same is true for Exhibits D.9, D.18, and D.20.  The *Vaughn* index states that portions of D.9 were withheld as they involve a request for legal advice "in response to a potential issue of imposing civil fines against a certain category of noncitizens."  Dkt. No. 64-1 at 32.  And, the *Vaughn* index states that portions of D.18 and D.20 were withheld, as they pertained to "drafting withdrawal letters for civil fines" and a "potential issue with the imposition of civil fines," respectively.  *Id.* at 44–47.  Again, potential issues of imposing fines against certain categories of noncitizens and the drafting of withdrawal letters may relate to a policy-oriented deliberative process; but they are just as likely not to do so.  One could easily imagine those problems being purely administrative.  The Court therefore orders ICE to submit an updated *Vaughn* index justifying its withholdings of these exhibits under the deliberative process privilege or, if such a withholding can no longer be justified, to produce these documents to Plaintiffs (unless lawfully withheld under another FOIA exemption).  *See Seife I*, 298 F. Supp. 3d at 630; *A.C.L.U. I*, 210 F. Supp. 3d at 485 (stating that the "district court should first offer the

agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the

withheld information is clearly exempt and contains no segregable, nonexempt portions" before

undertaking *in camera* review (citation omitted)).

The remaining documents should not have been withheld at all based on the deliberative

process privilege.  Exhibit D.14 was withheld in its entirety and is described as "[w]orking drafts

of synopses of cases pertaining to third parties who are potential candidates for a civil

fine/penalty."  Dkt. No. 64-1 at 37.  Similarly, the *Vaughn* index notes that portions of Exhibit

D.17 were withheld as they relate to "the interpretation of the statute of limitations to assist with

the civil fines' initiative" and to the case against a specific noncitizen.  Dkt. No. 64-1 at 39–40.

As noted, neither "descriptive discussions" nor applications of general policies to specific facts

qualifies for the deliberative process privilege.  *Nat. Res. Def. Council*, 19 F.4th at 189; *see Nat'l

Immigr. Project of Nat'l Laws. Guild*, 868 F. Supp. 2d at 294.  ICE must therefore produce

Exhibit D.14 to Plaintiffs (subject to any necessary redactions under Exemption 7(C)) as well as

produce any portions of Exhibit D.17 withheld solely on the basis of the deliberative process

privilege to Plaintiffs.

### B.    Working Law

Plaintiffs contend that ICE improperly applied the deliberative process privilege to

discussions that were actually working law of the agency.  Dkt. No. 61 at 24.  The Second

Circuit "and the Supreme Court have long recognized that . . . an agency ought not be permitted

to 'promulgate[ ] a body of secret law which it is actually applying in its dealings with the public

but which it is attempting to protect behind a label.'"  *New York Times Co.*, 939 F.3d at 493

(quoting *Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184,

200 (2d Cir. 2012)).  The "working law" doctrine excludes from Exemption 5 two categories of

documents that can be understood to "embody the agency's effective law and policy," which are

not protected from disclosure, as opposed to documents reflecting "the agency's group thinking in the process of working out its law and determining what its law shall be," which are protected from disclosure. *Sears, Roebuck & Co.*, 421 U.S. at 153.  First, an intra-agency document that purports to offer recommendations or advice may be regarded by the agency as "in practice . . . embodying the agency's 'working law' on an issue that binds the public."  *New York Times Co.*, 939 F.3d at 490.  Second, "even when a document is, in fact, pre-decisional and non-binding at the time of its creation, it may over time come to constitute the agency's 'working law' if the agency 'expressly adopts' the document's reasoning as the agency's official position, or if the agency 'incorporates by reference' the document into a final decision."  *Id.* (quoting *Am. C.L. Union v. Nat'l Sec. Agency ("A.C.L.U. II")*, 925 F.3d 576, 593 (2d Cir. 2019)).  To fall into the latter category, it is not sufficient that some part of the document be adopted as part of the final policy; many records, as part of the natural regulatory give-and-take, contain language or recommendations that might find their way into the final policy.  Rather, "the previously-privileged intra-agency document [itself must] ha[ve] become 'working law."  *Id.* at 492.  The record must also be viewed by the agency "as *binding*, both on the agency and on the public."  *Id.* at 491 (emphasis in original).  "[A] decisionmaker's mere statements expressing his or her reliance on the reasoning of a separate memorandum do not amount to 'incorporation' of that memorandum."  *A.C.L.U. III*, 925 F.3d at 598.  "[A] document embodies an agency's 'working law' when the document binds agency officials or members of the public.  In other words, working law announces what an agency's law *is*, not what the law *might* be."  *Id.* at 594.

The Second Circuit has outlined "guiding principles" to aid in determining whether a record "is functionally binding and hence, 'working law.'"  *Id.* at 595.  They are: "whether agency officials feel free to disregard the document's instructions; whether an agency superior

distributes the document to subordinates (rather than vice versa); whether agency superiors direct

their subordinates to follow the document's instructions; whether the document is applied in the

agency's dealings with the public; and whether failure to follow a document's instructions

provides cause for professional sanction." *Id.* "[T]he FOIA requester must present 'evidence

that an agency has *actually* adopted or incorporated by reference the document at issue; mere

speculation will not suffice.'" *Am. C.L. Union v. Dep't of Def. ("A.C.L.U. III")*, 435 F. Supp. 3d

539, 559 (S.D.N.Y. 2020) (quoting *Nat'l Council of La Raza*, 411 F.3d at 359).

There are three emails that ICE withheld under Exemption 5 that Plaintiffs claim are

actually "working law": Exhibits A.1, A.2, and A.5. Exhibit A.1 is a December 15, 2017 email

from Feere to Michael J. Davidson and others that recites the language of a final DHS

enforcement memo and contains a request from Feere to Davidson for help to "fast track the

directive in the DHS enforcement memo to collect all fines and penalties from illegal aliens and

those who facilitate their unlawful presence." Dkt. No. 59-1. Exhibit A.2 is a later version of

the same email chain that contains a suggestion from the DPLA for Enforcement and Litigation

to Feere and Davidson that "we all get together, including ICE Policy and ERO after the holidays

to consider the path forward." *Id.* at 9. Certain portions of these email chains are redacted on the

basis of the attorney-client privilege and the deliberative process privilege as they relate to the

provision of legal advice on "(1) the issuance of fines pursuant to statutory authority, (2)

recommendation on next steps in the civil fines initiative, and (3) the application of a civil fine

on a particular group of noncitizens." Dkt. No. 64-1 at 2–7. Exhibit A.5 is an email chain

originating with a meeting invitation dated January 8, 2018; the purpose of the meeting is

described in the invitation as "[t]o discuss ICE's progress in implementing Section 6 of EO

13768 and assessing fines." Dkt. No. 59-1 at 17. Later in the chain, a white paper is shared

among ICE employees.  *Id.*  The *Vaughn* index notes that portions of the chain were redacted on the basis of the attorney-client privilege and deliberative process privilege as the chain contains discussions "regarding potential applicability of civil fines and an outstanding question that requires legal review by ICE OPLA."  Dkt. No. 64-1 at 7–8.

Plaintiffs argue that all three documents are working law as many of the discussions, particularly those including Feere and other ICE leadership, were likely adopted or incorporated by reference in the final civil fines policy.  *Id.* at 25.  This claim, however, is nothing more than "speculation," upon which Plaintiffs may not rely to meet their burden to show that "an agency has *actually* adopted or incorporated by reference the document at issue."  *A.C.L.U. III*, 435 F. Supp. 3d at 559 ("[T]he FOIA requester must present 'evidence that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice.'" (quoting *Nat'l Council of La Raza*, 411 F.3d at 359)).  While discussions involving senior leaders may be more likely to be the denouement of decision-making authority than those involving junior or midlevel employees, it is not the case that discussions in which senior leaders are involved necessarily or even are likely to involve such authority.  Moreover, even assuming that some of these discussions contained in the emails did end up informing the agency's final civil fines policy, that is not sufficient to make them "working law."  Plaintiffs must present evidence that "the previously-privileged intra-agency document" *itself* was viewed "as *binding*, both on the agency and on the public" and therefore became working law.  *New York Times Co.*, 939 F.3d at 491 (emphasis in original).

Plaintiffs also claim that Exhibits A.1 and A.2 are not deliberative because they involve ICE leadership explaining previous policies (there, the DHS enforcement memo).  This claim fails as well.  Dkt. No. 61 at 24–25.  In these emails, Feere does not appear to explain the DHS

enforcement memo, he instead asks for help in "fast track[ing] the directive in the DHS

enforcement memo."  And it appears that "fast tracking" that directive would involve the same

type of policy-oriented judgments that were made by the agency in response to the directive in

Executive Order 13768.  The portion of the DHS enforcement memo that is quoted in Exhibits

A.1 and A.2 is almost identical to the language in Executive Order 13768: the memo directs the

issuance of guidance and the promulgation of regulations to ensure the assessment and collection

of civil fines and penalties on noncitizens.  Dkt. No. 59-1 at ECF p. 4. The key difference

between the language in the DHS enforcement memo and the Executive Order is that the DHS

enforcement memo directs the "Directive of ICE, the Commissioner of CBP, and the Director of

users," instead of the Secretary of DHS, to issues such guidance and regulations.  *Id.*  Therefore,

contrary to Plaintiffs' argument, it is not plain from the unredacted portions of the document that

the redacted portions are not deliberative or merely involve the explanation of previous policies.

The Court therefore declines to grant summary judgment to Plaintiffs on this basis.

　　　　The Court also rejects Plaintiffs' argument that the white papers related to the civil fine

program must be examined to see if they are agency "working law" and thus fall outside of the

bounds of the deliberative process privilege.  In support of this argument, Plaintiffs point to three

email messages.  In the first dated March 30, 2017, there is a brief reference to the white paper

among staffers.  Dkt. No. 59-2.  In the second, the Associate Legal Advisor of ICE emails

another ICE employee on June 10, 2019 stating: "You also asked about providing a copy of the

white paper on the collection of penalties and fines to OMB.  After discussion, [Redacted]."

Dkt. No. 59-2 at 41.  Plaintiffs contend that: "The fact that agencies external to ICE are asking

for a copy of a white paper suggests that this is a final expression of agency policy or 'working

law' of the agency."  Dkt. No. 61 at 31.  In the third email, dated February 23, 2018, a redacted

sender writes: "Good morning all, Here are some white papers from Jon Feere, Senior Advisor to Director Homan, that were forwarded to Brian and me, we can discuss further on the call. Thanks!"  Dkt. No. 59-1 at 12.

None of these emails, however, supports Plaintiffs' argument that the working papers were working law.  While the first email indicates that the working paper was shared internally, this does not in any way indicate that the working paper functioned as a binding authority on agency decision-makers.  To the contrary, the email—which was sent over a year prior to the ICE Directive and Delegation Order—is chock full of language indicating the preliminary nature of white paper and its content, stating "I think all of us fully understand the merits of your recommendation," and "I am eager to hear the opinions of others on this matter."  Dkt. No. 59-2 at 6.  The second email is similarly unrevealing: contrary to Plaintiffs' contention, the email shows that someone within ICE had discussed possibly providing a copy of the white paper to the Office of Management and Budget ("OMB").  In other words, it does not show that agencies external to ICE had asked for a copy of the white paper.  Dkt. No. 59-2 at 41; Dkt. No. 64-1 at 16 (describing it as an "internal e-mail communication"); *see A.C.L.U. III*, 925 F.3d at 598.  And the mere consideration of whether to share this document with the OMB—while it may suggest that the document is helpful in understanding the reasoning behind a policy—does not indicate that it was binding law on not only agency personnel but also the public.  The third email was sent months prior to the implementation of the ICE Directive or Delegation Order, and therefore, if anything, supports that the white papers were used to help formulate ICE's policy with respect to civil fines.  Finally, as discussed in Section II.E, this Court conducted an *in camera* review of the white paper documents challenged (*i.e.*, the "B" Exhibits), which further supported that these documents did not function as working law of the agency.

### C.    Post-July 3, 2019 Draft Communication Documents

Plaintiffs also argue that records (Exhibits C.1, C.3, C.5, C.6, C.7, C.8, C.9) concerning how to present the civil fines policy to the public after July 3, 2019 when ICE Communications Director Bryan D. Cox issued an email on the agency's media strategy cannot be withheld on deliberative process grounds.  Dkt. No. 61 at 25–28.  According to Plaintiffs, the documents cannot reflect a policy-oriented judgment because the final policy already was generated, and the records are simply iterations of an already-final communications decision.  *Id.*  Plaintiffs argue that the same is also true with respect to the withholdings of questions and answers responding to congressional inquiries about the civil fines policy.  *Id.* at 27.

The July 3, 2019 email from Cox—which Plaintiffs describe as the agency's "final communications decisions"—contains a statement to be provided to the Washington Post and North Carolina media outlets about a notice of intention to fine letter issued to a particular noncitizen who had been ordered to be removed from the United States and who was in sanctuary.  Dkt. No. 59-6 at ECF p. 15; Dkt. No. 61 at 26.  The email also contains a statement of "EXTERNAL BACKGROUND," which includes information such as "ICE continues to focus its limited resources first and foremost on those who pose the greatest threat to public safety." Dkt. No. 59-6 at ECF p. 15.

The "C" Exhibits challenged by Plaintiff—occurring after the July 3, 2019 email from Cox—are withheld in their entirety except for Exhibits C.1 and C.9.  Exhibits C.1 and C.8 both are described in the *Vaughn* index as draft responses to Congressional inquiries on the financial penalty program and ICE's budget request for fiscal year 2021, respectively.  Dkt. No. 64-1 at 20, 23.  Exhibit C.3, dated October 31, 2019, is described on the *Vaughn* index as a "[w]orking draft of an ICE news release pertaining to the most recent round, at that time, of the Notices of Intent to Fine being issued."  *Id.* at 20.  Exhibit C.5 is an October 31, 2019 draft press release,

and Exhibit C.6 is a November 4, 2019 draft press release.  *Id.* at 22.  Exhibit C.7 is described as an internal email communication dated November 4, 2019, from an ICE Office of Public Affairs spokesperson to other ICE Office of Public Affairs personnel requesting a review of a draft issue paper and news release pertaining to the issuance of additional civil fines.  *Id.* at 23.  Exhibit C.9 is described as an internal email from an ICE Spokesperson from the Office of Public Affairs to ERO's Enrique Lucero regarding his upcoming interview with the Washington Times to discuss the imposition of the civil fines.  *Id.* at 24.

Plaintiffs' objection to the withholding of these records is squarely addressed and foreclosed by the Second Circuit's decision in *Natural Resources Defense Council*, 19 F.4th 177. As noted above, the court held that "an agency's communications decisions necessarily implicate the agency's policies and must be informed by those policies" and that such "decisions involve 'the formulation or exercise of policy-oriented judgment.'"  *Id.* at 186 (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 482).  The court reasoned, "[a]n agency's decision regarding how to communicate its policies and actions to Congress, the public, and other stakeholders can have substantial consequences.  A poor communications decision at a congressional hearing might mean the difference between receiving the agency's requested budgetary appropriation, on the one hand, or inviting intrusive oversight hearings into agency operations, on the other."  *Id.* at 185–86.  Thus, "an agency exercises 'policy-oriented judgment' when communicating its policies to people outside the agency" and thus "records reflecting deliberations—as opposed to merely descriptive discussions—regarding those decisions are protected by the deliberative process privilege."  *Id.* at 189 (quoting *Grand Cen. P'ship*, 166 F.3d at 482); *see also Ripple Labs*, 2022 WL 123590 at *7 (sustaining claim of deliberative process for draft talking points and questions and answer for SEC officials' use in communicating with the public).

ICE has sustained its burden to show that the withheld portions of Exhibits C.1, C.3, C.5, C.6, C.7, C.8, and C.9 are protected by the deliberative process privilege.  The withholdings all concern how to communicate with the public and/or Congress on a sensitive matter of ICE policy.  They do not reflect a final decision; each of them is either in draft form[12] or raises a question of how a communication should be framed.  Thus, regardless of whether these communications came after the ICE Directive and Delegation Order or were not tied to "a specific contemplated decisions," they relate to a "specific decisionmaking process" and are therefore protected by the deliberative process privilege.  *Nat. Res. Def. Council*, 19 F.4th at 194.

That the agency formulated a view on how to respond in July 2019 to media requests about a particular individual does not affect this analysis.  Contrary to Plaintiffs' contention, the July 2019 email from Cox does not indicate that it was the agency's final media strategy with respect to all inquiries related to the civil fines program.  Instead, the email indicates the exact opposite: as noted, it addressed ICE's media strategy with respect to a *particular* noncitizen.  In addition, policy-making is not a static enterprise; an agency may be in a continual state of evaluating and updating its prior policies.  *See Nat. Res. Def. Council*, 19 F.4th at 192 (noting that "an agency may undertake a critical review of its regulations" and that such a review would be entitled to the deliberative process privilege); *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) ("[B]ecause these documents are generated as part of a continuous process of agency decision making, viz., how to respond to on-going inquiries, they are pre-decisional and, given their deliberative nature . . . were properly withheld under

---

[12]  Plaintiffs contend that Exhibit C.1 is not a draft response because the attachment "included in the email includes the word 'final.'"  Dkt. No. 61 at 27.  However, the redacted version of the document contains track changes and comment bubbles and therefore, regardless of how it was named, does not appear to be a final document.  Dkt. No. 59-3 at ECF pp. 2–4.

Exemption 5.").  Thus, the fact that ICE developed a message in response to an inquiry in the

summer of 2019 regarding one individual does not foreclose that the agency would and did

engage in further policy-oriented deliberations as to communications strategy months later in

response to new inquiries.

### D.    Government Misconduct

Plaintiffs argue that the deliberative process in this case is outweighed by the possibility

of government misconduct.  Dkt. No. 61 at 28–29.  They argue that "the government's decision-

making process for the civil fines policy in in question and documents suggest government

misconduct," with sanctuary leaders being actively targeted.  *Id.*  They thus rely on the so-called

"governmental misconduct" exception to the deliberative process privilege.

The United States Court of Appeals for the D.C. Circuit, to which courts in this District

frequently refer due to its expertise on FOIA issues, *see Whitaker v. Dep't of Com.*, 970 F.3d

200, 206 (2d Cir. 2020) (looking to "standard applied by the D.C. Circuit, which has particular

FOIA expertise"); *Brennan Ctr. for Just. at New York Univ. Sch. of L.*, 697 F.3d at 200 n.3

(noting that D.C. Circuit has become "something of a specialist" in issues of FOIA due to "the

nature of much of its caseload"), has not definitively concluded that a claim of governmental

misconduct can overcome the deliberative process privilege in the FOIA context, *see Project

Democracy Projects, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 888–90 & n.3 (D.C. Cir. 2021).

Courts within that Circuit are divided on the applicability of the governmental misconduct

exception to FOIA cases.  *See Reps. Comm. for Freedom of the Press v. U.S. Customs & Border

Prot.*, 567 F. Supp. 3d 97, 113 (D.D.C. 2021) ("[C]ourts in this circuit have not definitively

answered whether the government-misconduct exception applies in the FOIA context."); *Ctr.

For Pub. Integrity v. U.S. Dep't of Defense*, 486 F. Supp. 3d 317, 331 (D.D.C. 2020) ("[I]t is not

clear in this circuit whether a government misconduct exception may properly be invoked in a

FOIA case"). *Compare Stonehill v. U.S. Dep't of Justice, Tax. Div.*, 2022 WL 407145, at \*19 (D.D.C. Feb. 10, 2022) ("[T]he government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit." (citation omitted)), *and Neighborhood Assistance Corp. of Am., v. U.S. Dep't of Hous. & Urb. Dev.*, 19 F. Supp. 3d 1, 14 (D.D.C. 2013) (holding that the exception applies in FOIA cases), *and Nat'l Whistleblower Ctr. v. HHS*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) ("[T]he Court here finds that the government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit."), *with Wright v. Admin. for Child. & Fams.*, 2016 WL 5922293, at \*11 (D.D.C. Oct. 11, 2016) ("This Court is not persuaded that the so-called 'government misconduct' exception suggested in *In re Sealed Case* applies in the FOIA context."), *and Jud. Watch, Inc. v. U.S. Dep't of State*, 241 F. Supp. 3d 174, 182 (D.D.C.), *amended on reconsideration*, 282 F. Supp. 3d 338 (D.D.C. 2017) ("[T]he Court is not persuaded that the misconduct exception is available in a FOIA case.").

The only case that either party cites from within this District does not reach a conclusion on the issue. *See Spadaro v. U.S. Customs & Border Prot.*, 2019 WL 1368786, at \*6 (S.D.N.Y. Mar. 25, 2019) (Sullivan, J.) (noting skepticism that even if there is a misconduct exception, the requestor had offered "the kind of extreme or nefarious activity that would trigger that exception").

The courts appear to be uniform, however, in holding that, to the extent the exception does exist, it must be applied narrowly and a requestor seeking to avail itself of the government misconduct exception must clear a high bar. *See, e.g.*, *Ctr. for Pub. Integrity*, 486 F. Supp. 3d at 332; *Jud. Watch, Inc. v. U.S. Dep't of Commerce*, 2017 WL 3822733, at \*2 (D.D.C. Aug. 21, 2017). "Since the very purpose of FOIA is to help uncover government misconduct, if any allegation of misconduct sufficed to pierce the deliberative process privilege, the exception

would soon swallow the privilege whole." *Jud. Watch, Inc.*, 2017 WL 3822733, at *2.

Consequently, the relevant consideration "to trigger the exception is the egregiousness of the

contents of the discussion, not the egregiousness of the underlying conduct that the discussion

concerns." *Ctr. for Pub. Integrity*, 486 F. Supp. 3d at 332. "In the rare cases that have actually

applied the exception, the policy discussions sought to be protected with the deliberative process

privilege were so out of bounds that merely discussing them was evidence of a serious breach of

the responsibilities of representative government, *i.e.*, the very discussion . . . was an act of

government misconduct." *Id.* (cleaned up). Moreover, "the claimed governmental misconduct

must be severe enough to qualify as nefarious or extreme government wrongdoing."

*Neighborhood Assistance Corp.*, 19 F. Supp. 3d at 14; *see Wisdom v. U.S. Tr. Program*, 266 F.

Supp. 3d 93, 106 (D.D.C. 2017) ("Courts in this circuit that have recognized the government-

misconduct exception have done so in a narrowly defined set of circumstances where the claimed

governmental misconduct [is] severe enough to qualify as nefarious or extreme government

wrongdoing." (internal citations and quotations omitted)); *Nat'l Whistleblower*, 903 F. Supp. 2d

at 68–69.

Plaintiffs here claim that this exception applies as the Government has used this policy to

retaliate against women immigrant activists through selective enforcement against them. Dkt.

No. at 28. At oral argument, the Government explained, without disagreement from Plaintiffs,

that the policy is the subject of ongoing litigation where it is challenged as having been illegal.

But that the Government has adopted a policy that a court determines is illegal, even if

"egregious" as Plaintiffs put it, does not alone deprive the Government of the benefit of the

deliberative process privilege. Public servants of good meaning can debate and deliberate (in

good faith) even an egregious public policy; their deliberation may even mitigate the harshest of

government policies.  The relevant consideration "to trigger the exception is the egregiousness of the contents of the discussion, not the egregiousness of the underlying conduct that the discussion concerns."  *Ctr. For Pub. Integrity*, 486 F. Supp. 3d at 332; *see ICM Registry, LLC v. U.S. Dep't of Com.*, 538 F. Supp. 2d 130, 133 (D.D.C. 2008).  Many policies that are the subject of FOIA requests are controversial and subject to legal challenge.  If these facts alone triggered the exception, "the exception would soon swallow the privilege whole."  *Jud. Watch, Inc.*, 2017 WL 3822733, at *2.  Here, Plaintiffs point to no evidence that any of the particular documents ICE withheld under the deliberative process privilege were themselves egregious.  The government misconduct exception does not apply.[13]

### E.    Segregability

Plaintiffs also argue that ICE failed to adequately segregate deliberative and predecisional material from purely factual material.  Dkt. No. 61 at 29.  Under 5 U.S.C. § 552(b), agencies must disclose "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt."  "This provision requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes." *Am. C.L. Union v. Nat'l Sec. Agency ("A.C.L.U. IV")*, 2017 WL 6387731, at *4 (S.D.N.Y. Aug.

---

[13] *Tax Reform Research Group v. Internal Revenue Service*, 419 F. Supp. 415 (D.D.C. 1976), upon which Plaintiffs rely, is distinguishable.  That "unusual" case involved a FOIA request for documents regarding the Nixon administration's "enemies" list—the list sent by the White House to the Internal Revenue Service ("IRS") with names of persons perceived either to be enemies to or friends of the White House with the directive that the IRS take action based upon whether the person was a friend or an enemy.  *Id.* at 417.  There, the court recognized that the case arose in "a unique factual setting" and involved activities that were "not part of the normal and proper operations of the agency."  *Id.* at 418.  In that setting, the court found that the internal documents requested—which were determined in a separate lawsuit to relate directly to the misconduct at issue—were "no more part of the legitimate governmental process intended to be protected by Exemption 5 than would be memoranda discussing the possibility of using a government agency to deliberately harass an opposition political party."  *Id.* at 426.  Plaintiffs have not made a similar showing here.

17, 2017), *aff'd*, 925 F.3d 576 (2d Cir. 2019) (quoting *A.C.L.U. I*, 210 F. Supp. 3d at 485).  Non–
exempt information is not reasonably segregable when it is "inextricably intertwined" with the
exempt information in a document "such that disclosure would compromise the confidentiality of
[exempt] information that is entitled to protection under Exemption 5."  *Hopkins*, 929 F.2d at 86
(citation and internal quotation marks omitted).  "Moreover, courts have held that disclosure is
not required when, after segregation, all that is left is 'a few nuggets of non-intertwined'
information."  *Am. C.L. Union v. U.S. Dep't of Just. ("A.C.L.U. V")*, 252 F. Supp. 3d 217, 227
(S.D.N.Y. 2017) (quoting *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 88 (2d Cir. 1979)).

   To meet this standard, "the agency must provide a 'detailed justification' for its non-
segregability" but need not "provide so much detail that the exempt material would be
effectively disclosed."  *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir.
2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C.
Cir. 1977)).  Affidavits attesting to the agency's "line-by-line review of each document withheld
in full" and the agency's determination "that no documents contained releasable information
which could be reasonably segregated from the nonreleasable portions," in conjunction with a
*Vaughn* index describing each record withheld in a form that is consistent with its claim that the
contents are not segregable, suffice.  *Id.* (internal quotation marks omitted); *see also Loving v.
Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set
forth in the *Vaughn* index and the agency's declaration that it released all segregable material"
are "sufficient for [the segregability] determination"); *A.C.L.U. IV*, 2017 WL 6387731, at *4 ("In
its supplemental submissions, the Government has adequately confirmed that the documents
have been reviewed for segregable disclosable content and that no such content exists.").
"Agencies are entitled to a presumption that they complied with the obligation to disclose

reasonably segregable material." *Seife v. U.S. Food & Drug Admin. ("Seife II")*, 553 F. Supp. 3d 148, 170 (S.D.N.Y. 2021) (quoting *Spadaro*, 2019 WL 1368786, at *7).

ICE produced a *Vaughn* index describing each record withheld, *see* Dkt. No. 56-1, and confirmed that it conducted a line-by-line review of each document for segregable content and that no such additional content exists.  The Acting FOIA Officer of ICE attested in a declaration that "[a] line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied" and that "ICE did not withhold any non-exempt information on the grounds that it was non-segregable."  Dkt. No. 56 ¶¶ 96–97. "This is the type of affirmation that is entitled to the presumption of reliability and upon which courts often rely" to find that the government has complied with its obligation to disclose reasonably segregable material.  *See e.g.*, *Seife II*, 553 F. Supp. 3d at 170–71 (finding agency met its burden based on declaration proffering "that personnel within the DFOI undertook a line-by-line review of the documents at issue and ensured that any non-exempt information that was reasonably segregable was disclosed"); *Spadaro*, 2019 WL 1368786, at *7 ("Courts often rely on affirmances like these—which are entitled to a presumption of good faith absent a showing to the contrary—in FOIA litigation.").  The presumption is corroborated by the Court's *in camera* review of the challenged documents; from that review, and with the exception stated below, there is no good reason to believe that the agency did not properly apply the rules with respect to segregability.

The single exception that justified *in camera* review related to the white papers, contained in the "B" exhibits.  Dkt. No. 61 at 30–31.  These documents raised questions as to whether the white papers—which ICE withheld in full—included segregable factual

information.[14]  *See Grand Cent. P'ship, Inc*, 166 F.3d at 482 ("The [deliberative process]

privilege does not, however, as a general matter, cover 'purely factual' material." (citation

omitted)).  Some of the descriptions of the white papers in the *Vaughn* index note that they

contain "background" information.  *See, e.g.*, Dkt. No. 64-1 at 14–15.  A description of a

different white paper in the *Vaughn* index notes that it contains a discussion of the "Department

of the Treasury's, Bureau of Fiscal Service's Treasury Offset Program," and a description of

another notes that it pertains to "regulations."  *Id.* at 12–13.  A white paper is defined as a

"government report on any subject" or a "detailed or authoritative report."  *White Paper*,

Merriam-Webster, https://www.merriam-webster.com/dictionary/white%20paper.  On its face,

the term appears to be backward-looking and not forward-looking.  Accordingly, the Court, as

mentioned above, ordered an *in camera* examination of the white paper documents (the Exhibit

B documents) on September 15, 2022 after oral argument.[15]  *See Seife I*, 298 F. Supp. 3d at 630

("If the agency fails to provide a sufficiently detailed explanation to enable the district court to

---

[14]  While it is true that factual information need not be segregated where it is too intertwined with
exempt material, *see Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 82 (2d Cir. 2002); *Am. C.L. Union
v. Dep't of Def.*, 2017 WL 4326524, at *7 (S.D.N.Y. Sept. 27, 2017), the *Vaughn* index does not
clearly state why that is true for these documents.  A white paper is not necessarily a primarily
deliberative document on a discretionary policy that likely only contains factual information that
"would reveal the deliberative process of summarization itself by demonstrating which facts in
the massive rule-making record were considered significant by the decisionmaker and those
assisting her."  *See Lead Indus. Ass'n, Inc*, 610 F.2d at 85.  A white paper instead may be a
document that is largely informative or factual.  In the latter case, factual information may be
segregable from any deliberative discussions contained therein.  Plaintiffs thus raised a serious
question as to the segregability of this document.
[15] In reaching this decision, the Court did not rely on Plaintiffs' argument that ICE's withholding
of citations and other pieces of potentially nonexempt information indicates that ICE did not
properly segregate the documents.  "[C]ase citations and quotations standing in a vacuum would
be meaningless."  *Am. C.L. Union v. U.S. Dep't of Just.*, 229 F. Supp. 3d 259, 267 (S.D.N.Y.
2017).  As a result, "FOIA does not require redactions and disclosure to this extent."  *Id.*; *see
also A.C.L.U. III*, 435 F. Supp. 3d at 556; *A.C.L.U. IV*, 2017 WL 6387731, at *4; *see A.C.L.U. V*,
252 F. Supp. 3d at 227 ("Moreover, courts have held that disclosure is not required when, after
segregation, all that is left is 'a few nuggets of non-intertwined' information.").

make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents in camera, requesting further affidavits, or allowing the plaintiff discovery." (citation omitted)).

Having reviewed the documents *in camera*, the Court can conclude that all withholdings in Exhibits B.1, B.3–B.7 were properly withheld on the basis of the deliberative process privilege.  The withheld portions of these documents only contain deliberative policy discussions or factual information that "would reveal the deliberative process of summarization itself by demonstrating which facts in the massive rule-making record were considered significant by the decisionmaker and those assisting her." *Lead Indus. Ass'n, Inc.*, 610 F.2d at 85.  The white papers contained in these exhibits were compiled for the primary purpose of assisting in a policy-oriented judgment.  Exhibit B.3 recommends regulatory changes related to the collection of fines, Exhibit B.4 considers the collection of fines under the Treasury Offset Program, Exhibit B.5 includes thoughts and concerns on the fines and penalties initiatives, and Exhibit B.6 includes a policy discussion of certain questions about the civil fines program including how to revise the forms and internal policies as well how to implement it, including with help from other agencies.  None of these documents, including Exhibit B.2, discuss individuals living in sanctuary.  While each of these white papers includes factual information, the factual information included in those white papers reflects selection by the agency as to what facts were deemed important to assist ICE in formulating its policy-oriented judgment in those white papers.  That factual information therefore reflects the agency's deliberative process.  Accordingly, the Court denies Plaintiffs' motion for summary judgment as to these documents.  *See Waldheim Repor Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993).

The Court concludes that portions of Exhibit B.2 are not entitled to the deliberative process privilege and are segregable on that basis.  This document, in large part, outlines applicable regulations and their history and does not reflect the agency's judgment as to what facts it considered particularly significant.  *Lead Indus. Ass'n, Inc.*, 610 F.2d at 85 ("[T]he judgmental element arises through the necessity to select and emphasize certain facts at the expense of others." (citation omitted)).  Exhibit B.2 may nonetheless be withheld under the attorney-client privilege.  The *Vaughn* index notes that this document is a "working draft[] of a memorandum of a legal opinion prepared by ICE OPLA attorneys pertaining to ICE's proposed steps ERO will take to issue notices of intent to fine" and is therefore subject to the attorney-client privilege.  Dkt. No. 64-1.  The document also is marked draft and is titled "privileged: attorney work product."  While the parties have not provided the Court with correspondence surrounding the drafting of the white paper, the primary purpose of the document appears to be to provide legal advice on what regulations currently apply to the issuance of a notice of intention to fine, appeal rights, and collection of fines, as well as to provide guidance as to what steps need to be taken in light of those regulations.  *See In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007) (stating that operative question is whether the communication "was made for the purpose of obtaining or providing legal advice"); *United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 390 (S.D.N.Y. 2016) ("The party invoking the attorney-client privilege [] need only show that the provision of legal advice was a 'primary purpose' . . . of the communications as to which the privilege is claimed." (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 530 (S.D.N.Y. 2015)).  Accordingly, this document may be properly withheld in full on that basis, assuming ICE is able to confirm that this document was kept in confidence, as discussed in Section II.F directly below.

### F.      Attorney Client Privilege

Plaintiffs assert that ICE improperly withheld records on grounds of attorney-client

privilege.  It asserts that ICE applied attorney-client privilege to documents where confidentiality

may not have been maintained and where the predominant purpose of the communication was

not to convey legal advice but to provide policy input.  Dkt. No. 61 at 33–36.  ICE responds that

it is not its burden to demonstrate chain of custody over attorney-client communications to assert

the attorney-client privilege and that the assumption that the withheld documents contain policy

rather than legal advice is pure conjecture.  Dkt. No. 63 at 30.

"[T]he attorney-client privilege is not an all-purpose FOIA evasion mechanism."  *Pub.*

*Emps. for Env't Resp. v. U.S. Env't Prot. Agency*, 211 F. Supp. 3d 227, 231 (D.D.C. 2016).  "In

order to prevail on a motion for summary judgment in this area, the Government must

substantiate five essential elements in its supporting documentation:

> (1) [T]he holder of the privilege is, or sought to be, a client; (2) the person to whom
> the communication is made is a member of the bar or his subordinate and, in
> connection with the communication at issue, is acting in his or her capacity as a
> lawyer; (3) the communication relates to a fact of which the attorney was informed
> by his client, outside the presence of strangers, for the purpose of securing legal
> advice; and (4) the privilege has been claimed by the client. Additionally, [(5)] a
> "fundamental prerequisite to the assertion of the privilege" is "confidentiality both
> at the time of the communication and maintained since."

*Reinhard v. Dep't of Homeland Sec.*, 2019 WL 3037827, at *11–12 (D.D.C. July 11, 2019)

(quoting *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 153–54 (D.D.C.

2012)).  The burden rests with the Government to prove, through "detailed and specific

information," that the withheld information falls within the domain of the privilege.  *Id.*; *see also*

*Pub. Emps. For Env't Resp.*, 211 F. Supp. 3d at 231.  The Government must establish that the

communication was made in confidence and that the confidence has been kept.  *Brennan Ctr. for*

*Just. at New York Univ. Sch. of L.*, 697 F.3d at 207 ("As with respect to the lawyer-client

privilege in other contexts, it is vital to [such] a claim . . . that the communications between client and attorney were made in confidence and have been maintained in confidence." (internal quotation marks and citation omitted)); *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 811 F. Supp. 2d 713, 736 (S.D.N.Y. 2011) ("The agency bears the burden of showing that the information exchanged was confidential.  That is, the agency must show that it supplied information to its lawyers with the expectation of secrecy and was not known by or disclosed to any third party." (internal quotation marks and citation omitted)).  "[T]he test is whether the information was 'circulated no further than among those members 'of the organization who are authorized to speak or act for the organization in relation to the subject matter of the communication.'"  *Cause of Action Inst. v. U.S. Dep't of Just.*, 330 F. Supp. 3d 336, 351 (D.D.C. 2018) (quoting *Coastal States*, 617 F.2d at 863).  "Put another way, the privilege remains intact so long as dissemination does not extend beyond those on a 'need to know' basis." *Id.*  The privilege also does not apply to "a government attorney's 'advice on political, strategic, or policy issues.'"  *Id.* (quoting *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998)).

Here, ICE has withheld numerous documents on the basis of attorney-client privilege; while counsel asserted it at argument, ICE fails to establish through supporting documentation that these documents were confidential "both at the time of the communication and maintained since."  *See Reinhard*, 2019 WL 3037827, at *11–12.  Specifically, while ICE has made representations about the confidential nature of the communications at the time they were made, they make no representations that such confidentiality was maintained.[16]  For example, in a

---

[16] To the extent Plaintiffs' argument that the privileged status of certain documents does not appear to be maintained is based on the fact that the *Vaughn* index entries describe certain pages of the documents as containing communications between DHS and non-DHS employees, the Court rejects that argument.  As reflected in the *Vaughn* index and confirmed by ICE's counsel

declaration, the Acting FOIA Officer of ICE states that "ICE applied withholdings to records containing confidential communications between attorneys (within ICE OPLA and to DHS Office of the General Counsel) and their client (ICE senior leadership, and individuals within ICE ERO, ICE Policy, and ICE Office of Public Affairs ("OPA"))."  Dkt. No. 56 at 16.  The declaration then details the topics of those communications.  *Id.*  But that declaration does not indicate in any way whether the confidentiality of the communications was maintained or whether the communications were ever disclosed to third parties.  And the descriptions of the documents in the *Vaughn* index fare no better.  None of the individual document descriptions contain any indication the materials were kept in confidence.

Moreover, Plaintiffs present some evidence that ICE kept third parties outside of the agency apprised of the development of the civil fine policy, indicating that not all of the privileged information was necessarily kept in confidence (although their ability to do is obviously hampered by the fact that ICE unreasonably did not produce communications with third parties).  *See* Section I.A; *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 744 (Plaintiffs "have alleged, with convincing evidence, that defendants have shared with individuals outside of the agencies at least some of the information found in the documents that they now withhold as privileged communications.").  For example, in Plaintiffs' declaration from David Bennion, the executive director of the Free Migration Project, Bennion asserts that certain of the key individuals in the Trump Administration who worked on the civil fines policy "maintained contact with many anti-immigrant groups, organizing meetings and discussing high-level policy within the administration."  Dkt. No. 60 at 3, 7.

---

at oral argument, the portions of the documents reflecting such communications have not been withheld on the basis of the attorney-client privilege.  Dkt. No. 64-1.

ICE nonetheless attempts to argue that it is Plaintiffs' burden to provide evidence that ICE waived the privilege by sharing the legal advice it received with third parties. Dkt. No. 63 at 35. But this argument gets the standard backward. "The burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications and that it was reasonably careful to keep this confidential information protected from general disclosure." *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 519 (S.D.N.Y. 2010) (quoting *Coastal States*, 617 F.2d at 863). As discussed, the agency has not done so. Accordingly, ICE is instructed to demonstrate, through affidavits and/or declarations, that the confidentiality of the documents was maintained or to produce these documents to Plaintiffs. *See Seife I*, 298 F. Supp. 3d at 630 (noting that, before undertaking *in camera* review, "[t]he district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions").

The Court, however, rejects Plaintiffs' argument that ICE improperly invoked the attorney-client privilege over documents that contain policy advice, rather than legal advice. Dkt. No. 61 at 35–36. In declarations, which are entitled to a presumption of good faith, ICE attested that it had only applied withholdings on this basis to communications "containing legal advice and proposed legal strategy" as well as to discussions "for the purpose of obtaining and rendering legal advice." Dkt. No. 56 at 16; *see also McLean on Behalf of J.N.M. v. Soc. Sec. Admin.*, 2019 WL 1074273, at *3 (S.D.N.Y. Mar. 6, 2019) ("Agency affidavits are 'accorded a presumption of good faith.'" (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 489)). As previously discussed, the Acting FOIA Officer of ICE attested that ICE conducted a "a line-by-line review. . . to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." *Id.* at 27.

Plaintiffs' "purely speculative claims" that certain documents may contain policy advice do not undermine these assertions. *McLean on Behalf of J.N.M.*, 2019 WL 1074273, at *3 (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 489). While Plaintiffs point out that certain of the white papers are described as including material beyond pure discussion of the law (such as "preliminary background and analysis"), this does not necessary imply that this material is not privileged. The operative question in determining whether the attorney-client privilege applies is whether the "*predominant* purpose of the communication is legal advice," and not whether each and every part of the communication constitutes legal advice. *In re Cnty. of Erie,* 473 F.3d at 420 (emphasis added); *see also Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 743 ("Attorneys may provide advice on a broad range of matters, but '[s]o long as the predominant purpose of the communication is legal advice,' the communication is privileged." (citation omitted)). And it is not unusual for a lawyer providing legal advice to state the background facts upon which the lawyer bases that advice; the fact that she does so does not deprive the discussion of the benefit of the attorney-client privilege. *In re Cnty. of Erie*, 473 F.3d at 419 (stating that operative question is whether the communication "was made for the purpose of obtaining or providing legal advice"). Plaintiffs' remaining claim fares no better: while Plaintiffs cursorily state that email communications to and from Feere are likely to contain policy advice, Plaintiffs offer no explanation or support for this statement. Even assuming that such communications did contain policy advice, their predominant purpose may still have been for the purpose of "legal advice." *Id.* at 420.

Finally, Plaintiffs argue that Exhibit D.13 should not have been withheld on the basis of the attorney-client privilege as the ICE's *Vaughn* index does not provide an author, person, or entity seeking advice, or the time period when authored. The *Vaughn* index merely notes that

D.13 (an undated document) consists of a "[l]egal analysis of how civil fines and penalties not currently assessed can be collected by DHS" and "was withheld in full pursuant to Exemption 5, the attorney-client privilege." Dkt. No. 64-1 at 36. This explanation is insufficient "to have the exemption appear 'logical and plausible.'" *Am. Oversight*, 45 F.4th at 587 (quoting *Knight I*, 30 F.4th at 327). The attorney-client privilege may only be invoked if an attorney provides "legal advice," if that legal advice is made to a client and in confidence; however, ICE's description of the documents includes none of those characteristics. *See Seife I*, 298 F. Supp. 3d at 607 ("Vaughn submissions are insufficient, however, where 'the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.'" (citation omitted)).

In light of the above, ICE is directed to update its *Vaughn* index to confirm that the contested documents over which it asserts the attorney-client privilege were maintained in confidence or else produce those documents, unless subject to other exemptions. ICE is also directed to update its *Vaughn* index to justify its withholding of Exhibit D.13 on the basis of the attorney-client privilege. *A.C.L.U. I*, 210 F. Supp. 3d at 485; *Seife I*, 298 F. Supp. 3d at 630.

## III.   Exemptions 6 and 7(C)

Plaintiffs also challenge the withholding, under Exemptions 6 and 7(C), of certain names and email addresses of federal officials. In their productions, ICE applied Exemptions 6 and 7(C) to protect the personal identifying information of federal law enforcement officers and other federal agency personnel on the purported grounds that "federal law enforcement officer face an increased risk of harassment and attack due to the nature of their work, especially with respect to the civil fines initiative, which was itself controversial." Dkt. No. 55 at 33. In their motion for summary judgment, Plaintiffs opposed the withholding in nineteen exhibits of the names, titles, and email domains of individuals who are involved in high-level policymaking or of high-level officials or of people external to the agency. Plaintiffs argued that there is a public interest in the

identity of high-level officials that are involved in important policymaking and that the
disclosure of the names and email domains of certain individuals would contribute to the public
understanding of the operations and activities of ICE's civil fines policy.  Dkt. No. 61 at 37.

In response to Plaintiffs' motion for summary judgment, ICE provided email domain
information and agreed to release the names and titles of ICE SES personnel or otherwise high-
level policy-making individuals in Exhibits A.1–A.8, C.2, C.4, D.11, and E.1–E.8.[17]  Dkt. No. 63
at 31; Dkt. No. 66 ¶¶ 7–9, 11.  Plaintiffs nonetheless respond that certain of the names that
remain redacted appear to be high-level policy-making individuals and therefore must be
produced.[18]  Dkt. No. 69 at 36.  At oral argument, Plaintiffs clarified that they are not seeking the
names of mid-level and low-level government employees or the names of people who have been
impacted by the policy.

Exemption 6 protects "personnel and medical files and similar files the disclosure of
which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552
(b)(6).  The applicability of Exemption 6 is a two-pronged process.  First, the court must
determine whether the information to be redacted is found in a "personnel," "medical," or
"similar" file.  *Cook v. Nat'l Archives & Records Admin.*, 785 F.3d 168, 174 (2d Cir. 2014).
Second, if the source file is of such a type, the court must balance the public's interest in
obtaining the requested information against the individual's privacy interest to assess whether

---

[17] Although Plaintiffs, in their reply brief, appeared to argue that ICE's review should not have
been limited to only those nineteen exhibits that they identified in their opening brief, Dkt. No.
69 at 36, Plaintiffs conceded at oral argument that their challenge was limited to these nineteen
documents.
[18] ICE also stated that the domain names of the emails addresses that it continued to withhold—
as not belonging to high-level policy-making individuals or SES personnel—in the challenged
exhibits were "ice.dhs.gov," indicating that the remaining redacted names were internal ICE
employees and not external parties.

disclosure would constitute a "clearly unwarranted invasion" as envisioned by the statute. *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009).

Exemption 7(C) permits the withholding of information compiled for purposes of law enforcement that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "'Exemptions 6 and 7(C) overlap,' and 'Exemption 7(C) is broader and requires a lesser showing of the likelihood of intrusion into personal privacy.'" *Am. C.L. Union v. Dep't of Just. ("A.C.L.U. VI")*, 563 F. Supp. 3d 183, 197–98 (S.D.N.Y. 2021) (quoting *Gelb v. U.S. Dep't of Homeland Security*, 2017 WL 4129636, at *5 (S.D.N.Y. Sept. 15, 2017)); *see also Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) ("Exemption 7(C), [which requires] the government to prove only that disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy, is somewhat broader than Exemption 6, which requires proof of a clearly unwarranted invasion of personal privacy." (internal quotation marks and citation omitted)). "To show that particular documents qualify as 'records or information compiled for law enforcement purposes,'" courts in this District require "an agency [to] establish a rational nexus between the agency's activity in compiling the documents and 'its law enforcement duties.'" *A.C.L.U. VI*, 563 F. Supp. 3d at 196 (compiling cases). If the documents were compiled for law enforcement purposes, the next question "is whether there is any privacy interest in the information sought." *Id.* at 198 (quoting *Associated Press*, 554 F.3d at 284). "That interest need only be more than *de minimis* to trigger the application of the balancing test to determine whether disclosure is permitted under FOIA." *Associated Press*, 554 F.3d at 284. Once such a de minimis privacy interest is identified, "disclosure is unwarranted under Exemption 7(C) unless the requester can show a 'sufficient reason for the disclosure.'" *Id.* at 288 (citation omitted).

In their briefing, Plaintiffs do not appear to dispute that the documents here are the type of records that could be withheld under Exemption 6 or Exemption 7.  In other words, they do not contest that such records are information compiled for purposes of law enforcement or that they are files "similar" to personnel or medical files.  Instead, they only argue that the public interest in disclosure of such information outweighs any individual privacy interests.  Dkt. No. 61 at 36–40.  Accordingly, Plaintiffs have waived any argument with respect to whether these records are of the type that are subject to Exemption 6 and Exemption 7.  *See Triodetic Inc. v. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order) ("[P]laintiff never raised these arguments in its opposition to defendants' motion for summary judgment. Accordingly, these arguments were waived."); *Webb v. Zimmer, Inc.*, 2019 WL 438361, at *18 (E.D.N.Y. Feb. 4, 2019) ("In the Second Circuit, a party that fails to raise an argument in its opposition papers in a motion for summary judgment has waived that argument.").

The remaining questions are whether the withholdings involve more than a de minimis privacy interest and, if so, whether the public interest outweighs that privacy interest.[19] Although the Supreme Court first recognized in considering Exemption 7(C) that "disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind," *Reps. Comm. For Freedom of Press*, 489 U.S. 749, 765 (1989), the courts have come to recognize that even public servants retain some privacy interest in their names upon entering

---

[19] There are some differences in the balancing tests under these exemptions, although these differences are not important for the Court's decision.  "[W]hile Exemption 6 is limited to records 'the disclosure of which would constitute a clearly unwarranted invasion of personal privacy,' '[t]he adverb "clearly". . . is not used in Exemption 7(C),'" *Bernegger v. Exec. Off. for United States Att'ys*, 334 F. Supp. 3d 74, 89 (D.D.C. 2018) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165 (2004)).  "Moreover, while 'Exemption 6 refers to disclosures that "would constitute" an invasion of privacy, Exemption 7(C) encompasses any disclosure that "could reasonably be expected to constitute" such an invasion.'"  *Id.* (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989)).

public service.  Thus, for example, the names of government employees have been protected from disclosure under either Exemption 6 or Exemption 7(C) where those employees are the subject of internal government investigations, *see BuzzFeed, Inc. v. U.S. Dep't of Just.,* 2019 WL 1114864, at *5 (S.D.N.Y. Mar. 11, 2019) ("I conclude that there is at least a de minimis privacy interest in the nondisclosure of the Officials' identities," which were included in a report on a former U.S. Attorney's inappropriate relationship with a subordinate), or are involved in on-the-ground investigatory and law enforcement duties, *see Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012); *Wood v. F.B.I.*, 432 F.3d 78, 88 (2d Cir. 2005) (finding that disclosure of investigators' identities could subject them to harassment or embarrassment); *Halpern v. F.B.I.*, 181 F.3d 279, 296 (2d Cir. 1999) (holding that FBI agents had a privacy interest in the nondisclosure of their names); *Nix v. United States*, 572 F.2d 998, 1006 (4th Cir. 1978) (holding that nondisclosure of names of FBI agents and assistant U.S. Attorney was proper), or worked on the regulatory approval of a controversial drug when websites encouraged readers to kill or kidnap employees involved in the manufacturing of it, *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 153 (D.C. Cir. 2006).  However, government employee names are not categorically protected from disclosure.  *See Seife I*, 298 F. Supp. 3d 592 (withholding the names of lower-level officials but not the names of high-level officials); *cf. Long*, 692 F.3d at 191 ("Names and other identifying information do not always present a significant threat to an individual's privacy interest.").  Instead, the inquiry is context dependent.  "[W]hether disclosure of a list of names is a significant or a de minimis threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue."  *Long*, 692 F.3d at 192.

　　At the same time, as the Government appears to have recognized, there is a public interest in the names of at least some persons involved in crafting and administering an important

government policy.  *See, e.g.*, *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 748 (holding

that there was a public interest in disclosure of the names of agency heads or high-level

subordinates); *Fams. for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 393

(S.D.N.Y. 2011) (ordering disclosure of the names of agency heads or high-level subordinates as

the "public . . . has an interest in knowing whether the Reports reflect the views of the agency,

rather than of particular agency employees").  Among other things, names—particularly those of

key decisionmakers—can show whether an agency's policy reflects the views of high-level

agency officials (as opposed to lower-level officials) and provide important background on the

thinking and agendas that likely went into a policy and the developments and further actions that

may come out of that policy.  *See Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 748

("There is a substantial public interest in knowing whether the documents at issue reflect high-

level agency policy, helping to inform the public as to 'what their government is up to.'").  They

also can indicate whether the decision at issue was generated or promoted by political appointees

charged with carrying out a President's agenda or by career civil servants who will continue on

from administration to administration.  They can indicate whether an individual employee acted

beyond his or her remit.  *Cf. Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d

667, 675–76 (D.C. Cir. 2016) (concluding that there is a public interest in disclosure of the name

of an immigration judge because "knowledge of her identity would enable the public to examine

her official actions (including decisions), both past and future, and to assess any possible

implications of those complaints for the conduct of her official responsibilities").  There thus is a

difference, from a FOIA perspective, in the disclosure of a ream of documents with all of the

names redacted and the disclosure of documents with names of the authors, recipients, and

persons copied on it identified.  The latter permits one to know who was involved in certain discussions and thus how a particular policy was developed and what went into its development.

ICE has recognized that proposition by disclosing the names of what it characterizes as SES personnel or otherwise high-level policy-making individuals in the contested exhibits in response to Plaintiffs' motion for summary judgment.  Those disclosures indisputably serve an interest FOIA was intended to further.  *See Wood*, 432 F.3d at 88 (noting that public interest in disclosure is stronger where employee is a high ranking official).  The problem is that two of ICE's withholdings are improper on their face and, with respect to the remainder, ICE has not justified the names it has withheld in a manner that permits the Court to conduct the balancing that Exemptions 6 and 7(C) require.  The first category of withholdings—those as to which the Court concludes that certain withheld names should be disclosed—is comprised of Exhibit C.4 and Exhibit A.8.

Exhibit C.4 is an email in which Rocha, the spokesperson for ICE asks about the ICE Directive and Delegation Order: "Since it looks like [(b)(6)] is out, who is the best person to work with regarding fines."  Dkt. No. 76-4 at ECF p. 12.  He is given the name of Caleb Vitello. Neither Rocha's name nor Vitello's name is redacted.  They are high-level personnel involved in an important element of the policy—its public dissemination.  Neither appears to have on-the-ground investigatory or enforcement responsibilities.  In the Government's words at argument, they are people sitting in an office "churning paper."  From the face of the document (and with no evidence to the contrary), the person whose name is redacted appears to be as or more senior than Vitello.  Since, from the face of the document, the redacted name also appears to have had a key role in the communications strategy for the policy, there is a public interest in his name.  It must be disclosed.

Exhibit A.8 is an email to the "ICE.Scheduler" regarding a "274D Fine Briefing."  Dkt. No. 76-2 at ECF p. 24.  It attaches a number of documents that on their face are high level and directly responsive to the FOIA Request, including a "Directors Civil Fines Brief" and a list of "Sanctuary Cases."  Certain names of high-level ICE employees, including Blank, Albence, and Feere, are on the email and are disclosed.  The body of the email states in bold lettering: "Please do not forward, copy or add additional participants.  Should additional participants need to be requested, please email [redacted]."  *Id*.  It is plainly a distribution sent on a confidential need-to-know basis.  But the names of several individuals who were sent this document have been redacted under Exemptions 6 and 7(C).  Those names, of persons who by virtue of their inclusion in the group must be deemed to be sufficiently high-level and who appear to be involved policymaking and not in the administration of the policy, also must be disclosed.

With respect to the remainder, ICE has not stated how it defined SES or high-level personnel and thus has not stated what types of names were disclosed and what names were not. Nor has ICE stated, except in the most conclusory fashion, how, if at all, the disclosure of the names of even mid-level employees, without on-the-ground law enforcement duties, would lead to harassment or attack.  The declaration it submits in support of summary judgment states:

> [F]ederal law enforcement employees who take part in highly publicized or sensitive investigations or operations have an interest in keeping their involvement in such activities private in order to avoid an onslaught of media attention or stigma and undue public attention.  These federal law enforcement employees face an increased risk of harassment or attack, and, therefore, have an increased privacy interest due to the nature of their work.

Dkt. No. 56 ¶ 88.  The same could be said of just about every government policy that is the subject of a FOIA request.  It is the job of government to mediate between competing interests; someone's ox is always going to be gored.  A determination of whether names are exempt from disclosure depends on "several factors, including the employee's rank and whether the

information sought sheds light on government activity," *Wood*, 432 F.3d at 88, as well as on whether the "occupation alone could subject the employee to harassment or attack," based on facts and not just conclusions, *Long*, 692 F.3d at 192.  ICE has not provided the Court sufficient information to rule in its favor as to the redactions in the remaining disputed withholdings. Without that information, ICE is essentially asking the Court to buy a pig in the poke.  The redactions may be justified, but the Court cannot come to that conclusion on the present record. Therefore the motion for summary judgment based on the Exemption 6 and 7(C) withholdings must be denied.  *See Lawyers' Comm. for C.R. Under L. v. U.S. Dep't of Just.*, 2020 WL 7319365, at *33 (D.D.C. Oct. 16, 2020), *report and recommendation adopted*, 2021 WL 1197730 (D.D.C. Mar. 30, 2021) ("[T]o justify the redactions of the names of employees because of feared harassment, there must be some competent evidence that disclosure of that information could lead to harassment."); *Adelante Alabama Worker Ctr. v. U.S. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 367 (S.D.N.Y. 2019) ("There mere possibility that the release of information could potentially lead to harassment is not evidence of a 'real' threat of harassment.").

## CONCLUSION

For the reasons discussed above, ICE's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The denial of ICE's motion is without prejudice to a renewed motion concerning the adequacy of ICE's search, the withholding of Exhibits D.5, D.9, D.18, and D.20 on the basis of the deliberative process privilege, the withholding of documents on the basis of the attorney-client privilege, and ICE's continued withholding of certain names under Exemptions 6 and 7(C).

As detailed in Section I.D, ICE is ordered to conduct a new search for additional records responsive to Plaintiffs' FOIA Request.  The parties are directed to meet and confer regarding the date by which ICE will complete that search as well as a briefing schedule for the parties' renewed motions for summary judgment.  After the parties have met and conferred, they are directed to notify the Court by October 4, 2022 of the dates that they decide upon and/or any remaining disagreements as the appropriate dates.

The Clerk of Court is respectfully directed to close Dkt. Nos. 54, 58.

SO ORDERED.

Dated: September 19, 2022
      New York, New York
                                         LEWIS J. LIMAN
                              United States District Judge